# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re MERRILL LYNCH AUCTION RATE SECURITIES LITIGATION <br><br> This Document Pertains To All Actions | **Master Case File No. 08-cv-3037 (LAP)** <br><br> **FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |



RECEIVED
MAY 22 2009
U.S.D.C. S.D.N.Y.
CASHIERS

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

JURISDICTION AND VENUE .............................................................................2

PARTIES ...............................................................................................................3

    A. Plaintiffs.....................................................................................................3

    B. Defendants .................................................................................................4

CLASS ACTION ALLEGATIONS ......................................................................4

FACTUAL ALLEGATIONS .................................................................................7

    A. Background.................................................................................................7

        i.   Auction Rate Securities ........................................................................7

        ii.  The Auction Process .............................................................................8

    B. Defendants Engaged In A Scheme To Defraud Purchasers Of ML ARS .....................9

        i.   Merrill Maintained A Policy Of Intervening In Every Auction For Which It Was The Sole Or Lead Auction Dealer To Create The Appearance Of Stability And Liquidity And to Prevent Auction Failures ......................................10

        ii.  Merrill Made False And Misleading Statements And Incomplete Disclosures About Auction Rate Securities During The Class Period.......................................12

        iii. Merrill Routinely Intervened In Auctions To Set The Rates Of Interest Paid On ML ARS.................................................................................13

        iv. Merrill Co-Opted Its Purportedly Independent Research Group To Prop Up The Auction Rate Securities Market And Sell ML ARS In Violation Of Its Internal Policies ............................................................................14

        v.  Merrill Pressured Its Financial Advisors And Distributing Firms To Sell ML ARS To Unsuspecting Class Members ...............................................18

        vi. Merrill Provided Extraordinary Incentives To Its Financial Advisors And Research Analysts For Promoting Sales Of ML ARS............................................20

        vii. Merrill Withdraws From The Auction Rate Securities Market.............................22

C. Defendants Acted With Scienter ................................................................23

   i.  ML ARS Were Lucrative For Defendants..............................................23

   ii.  Defendants Took Advantage Of The Opportunity To Manipulate The Market For ML ARS.........................................................................................24

   iii. Merrill Knew That ML ARS Lacked Sufficient Maximum Rates To Ensure Liquidity In The Event Of A Failed Auction ........................................25

   iv. Merrill's Manipulation Of The Market Was Designed To Limit Its Own Exposure To ML ARS.....................................................................26

   v.  Merrill Knew That The Market For ML ARS Was Unsustainable ........27

   vi. Merrill's Internal Discussions Concerning The Possibility Of A "Run On The Market" Demonstrate Its Intent To Manipulate Or Deceive ...........30

D. Plaintiffs And Class Members Relied On An Assumption That ML ARS Traded In An Efficient Market Free Of Manipulation...............................................31

E. Plaintiffs And Class Members Suffered Damage..........................................33

F. Regulators Settle Some Claims Against Merrill For Fraud In The Auction Rate Securities Market.............................................................................34

NO SAFE HARBOR ...............................................................................38

LOSS CAUSATION/ECONOMIC LOSS ......................................................38

COUNT I: Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(a) and (c) Promulgated Thereto Against Merrill By Plaintiffs And The Class............................41

COUNT II: Violation Of Section 20(a) Of The Exchange Act Against Merrill Lynch By Plaintiffs And The Class........................................................................44

PRAYER FOR RELIEF ...........................................................................45

JURY TRIAL DEMANDED.......................................................................46

1.     Plaintiffs, by their undersigned counsel, allege the following based upon personal knowledge as to their own acts and upon the investigation by their counsel, which included, among other things, a review of:   (a) public statements, sales presentations and marketing materials by Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill") and Merrill Lynch & Co., Inc. ("Merrill Lynch") (collectively, "Defendants"), and their affiliates, agents and employees; (b) Securities and Exchange Commission ("SEC") filings made by Defendants and other brokerages, financial services firms, and investment companies; (c) public filings and statements in court proceedings and civil government and regulatory investigations involving Defendants and other brokerages, financial services firms, and investment companies; (d) documents believed to be authentic copies of internal emails and other business records obtained from public record sources;  (e) securities analysts' reports, press releases, and media reports; (f) interviews with purchasers of auction rate securities and other knowledgeable individuals; and (g) discussions with consultants.

## INTRODUCTION

2.     This is a class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") on behalf of all persons or entities that, between March 25, 2003 and February 13, 2008, inclusive ("Class Period"), purchased auction rate securities for which Merrill served as sole auction dealer, lead auction dealer, co-lead auction dealer, or joint lead auction dealer ("ML ARS"), and were damaged thereby.

3.     Auction rate securities were bonds or preferred stocks that paid interest or dividends at rates set at periodic auctions.  Auction rate securities allowed issuers to obtain long-term financing at short-term interest rates, because investors reasonably expected to be able to access their principal at each periodic auction.

4.     During the Class Period, and unbeknownst to investors, Merrill engaged in a scheme, practice or course of conduct to manipulate the market for ML ARS in order to create the

appearance that the securities traded at arm's-length auctions, when in fact the available supply well-exceeded the demand for those securities.

5.    As part of its scheme to manipulate the market for ML ARS, Merrill maintained a policy of placing or causing the placement of support bids in every auction for which it served as the sole auction dealer, lead auction dealer, co-lead auction dealer, or joint lead auction dealer, to create the appearance of stability and liquidity in the auction market, prevent auction failures, and set the rates of interest or dividends paid on those securities.  Merrill enlisted its purportedly independent research analysts to prop up the market for ML ARS in violation of Merrill's own internal policies.  In addition, Merrill falsely described ML ARS as highly liquid investments that were appropriate for short-term investing, when the market for ML ARS would not have existed absent Merrill's own manipulative conduct.

6.    The goal of the scheme was to allow Merrill to underwrite billions of dollars of ML ARS and to sell those securities, including Merrill's own inventory, at par value when they were worth significantly less.  The scheme allowed Defendants to reap hundreds of millions of dollars in underwriting and auction dealer fees at the expense of investors who purchased ML ARS at overvalued prices.

7.    Defendants' scheme came to light on February 13, 2008, when the auction rate securities market collapsed after Merrill and the other major auction dealers abruptly ended their policy of propping up the market.  Since that date, the purported auctions previously managed by Merrill have ceased operating, and Merrill has admitted there is no prospect of the purported auctions resuming operations, as there is no demand for Merrill ARS.  Merrill's withdrawal of "support" for the auction market left Plaintiffs and Class members holding billions of dollars in illiquid ML ARS.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).  The claims asserted

herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. 240.10b-5).

9.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §§ 1391(b) and 1337. Defendants maintain their principal places of business within this District, and many of the acts giving rise to the violations complained of herein took place in this District.

10.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### A.    Plaintiffs

11.    Plaintiff Colin Wilson, as set forth in his certification attached hereto and incorporated by reference herein, purchased ML ARS from E*Trade during the Class Period and was damaged thereby. Plaintiff Wilson continues to hold illiquid ML ARS.

12.    Plaintiff Ronald Levy, as trustee of the Levy Family Trust U/A dated 12/08/1993, as set forth in his certification attached hereto and incorporated by reference herein, purchased ML ARS from Wells Fargo Investments, LLC during the Class Period and was damaged thereby. Plaintiff Levy continues to hold illiquid ML ARS.

13.    Plaintiff Michael Bonde, as set forth in his certification attached hereto and incorporated by reference herein, purchased ML ARS from Wells Fargo during the Class Period and was damaged thereby. Plaintiff Bonde continues to hold illiquid ML ARS.

14.    Unless specifically noted, "Plaintiffs" refers collectively to plaintiffs Wilson, Levy, and Bonde.

**B.      Defendants**

15.      Defendant Merrill Lynch & Co., Inc. is incorporated in Delaware and maintains its principal executive offices in New York, New York.  During the Class Period, Merrill Lynch was one of the world's leading financial firms.  Through its subsidiaries, Merrill Lynch offered capital markets services, investment banking and advisory services, wealth management, investment management, insurance, banking, and related products and services.  Merrill Lynch is a member of the Securities Industry and Financial Markets Association.  In January 2009, Merrill Lynch became a wholly owned subsidiary of Bank of America Corporation ("Bank of America").  In connection with the merger, Merrill Lynch transferred $15.3 billion in losses for the fourth quarter of 2008 to Bank of America, prompting Bank of America to seek $20 billion in emergency capital and a guarantee for $118 billion of assets from the federal government.

16.      Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. is incorporated in Delaware and maintains its principal executive offices in New York, New York.  During the Class Period, Merrill, a wholly owned subsidiary of Merrill Lynch, was registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and was a member of the New York Stock Exchange and the Financial Industry Regulatory Authority.  During the Class Period, Merrill underwrote and served as an auction dealer for ML ARS through its Global Markets and Investment Banking business; offered investment advisory and brokerage services and sold ML ARS to investors through businesses including its Global Private Client ("GPC") segment; and provided research on ML ARS and the auction rate securities market through its Global Research segment.

17.      Unless specifically noted, "Defendants" refers collectively to defendants Merrill Lynch and Merrill.

## CLASS ACTION ALLEGATIONS

18.      Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a class consisting of all persons and entities that, between March 25,

2003 and February 13, 2008, inclusive, purchased auction rate securities for which Merrill served as sole auction dealer, lead auction dealer, co-lead auction dealer, or joint lead auction dealer, and were damaged thereby (the "Class").

19.    Excluded from the Class are Defendants; the subsidiaries and affiliates of any Defendant; any person or entity who is a partner, officer, director, employee, or controlling person of any Defendant; members of Defendants' immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any Defendant has or had a controlling interest.

20.    The members of the Class are so numerous that joinder of all members is impracticable.

21.    Prior to the collapse of the auction rate securities market, Merrill was the one of the largest auction dealers. At the end of the Class Period, Merrill served as the auction dealer for more than $24.6 billion of auction rate preferred securities. Merrill also served as the auction dealer for billions of dollars of municipal auction rate securities, student loan-backed auction rate securities, and collateralized debt obligation auction rate securities.

22.    While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands of members of the proposed Class who hold billions in outstanding ML ARS.

23.    Record owners and other members of the Class may be identified from records maintained by Defendants and other brokerage firms and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

24.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      (a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether Defendants joined, directed, participated in, or otherwise engaged in a scheme to defraud purchasers of ML ARS during the Class Period;

(c)    Whether Defendants manipulated the market for ML ARS during the Class Period; and

(d)    Whether Class members have sustained damages and the proper measure of damages.

25.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class have been similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

26.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

27.    A class action is superior to all other available methods for the fair and efficient adjudication of Plaintiffs' claims. The damages suffered by individual Class members are relatively small given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class to individually redress the wrongs done to them.

28.    Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, is in fact manageable, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. The benefits of adjudicating this controversy as a class action far outweigh any difficulties in managing the Class.

29.    In the alternative, the Class may be certified under the provisions of Fed. R. Civ. P. 23(b)(1), 23(b)(2), and/or 23(c)(4) because:

(a)    the prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendants;

(b)    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter,

be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests;

(c)    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole; and

(d)    The claims of Class members are comprised of common issues that are appropriate for certification under Rule 23(c)(4).

## FACTUAL ALLEGATIONS

### A.    Background

#### i.    Auction Rate Securities

30.    Auction rate securities were long-term or perpetual variable-rate equity or debt instruments that paid interest or dividends at rates set at periodic "auctions."

31.    Auction rate securities were issued by closed-end preferred funds; states, state agencies, municipalities, or other governmental authorities; public or private student loan originators and lenders; and other corporations and entities ("CDO auction rate securities").

32.    The market for auction rate securities experienced dramatic growth since the securities were first introduced in 1984. At the end of 2005, approximately $263 billion of auction rate securities were outstanding. In the subsequent 26 months, the auction rate securities market grew by nearly 25 percent. By February 2008, the market for auction rate securities exceeded $330 billion.

33.    When auction rate securities were first introduced in the mid-1980s, they were available only to highly sophisticated institutional investors with required minimum purchases of $250,000 or more. Prior to the beginning of the Class Period, issuers and underwriters lowered the minimum investment to $25,000. The reduced minimum investment enabled sellers to market auction rate securities to retail investors including individuals, charities, and small businesses.

### ii.     The Auction Process

34.     Prior to February 2008, auction rate securities typically traded at par value through periodic "Dutch" auctions generally held every 7, 28, 35 or 49 days. The auctions determined which investors would own the securities as well as the "clearing rate," the rate of interest or dividends paid on those securities until the next periodic auction. Auction procedures typically allowed participants to submit orders to buy, sell, or hold auction rate securities.

35.     Auction rate securities allowed issuers to obtain long-term financing at less expensive, short-term rates. Auction rate securities purchasers were willing to accept short-term rates because they believed they reasonably believed that auction rate securities could readily be disposed of at par through the periodic auctions.

36.     Issuers of auction rate securities selected and paid firms, including Merrill, to act as a dealer through which investors submitted orders at auctions for the issuers' securities. A firm so selected was called an "auction dealer," "broker-dealer," or "auction manager," and was said to "participate" in auctions.[1] Investors also could place orders at auctions through other designated brokerages, often referred to as "remarketing agents" or "distributing firms," which then would transmit those orders to the auction dealer. A firm that underwrote an issuance of auction rate securities generally served as auction dealer for those securities.

37.     In a successful auction, the number of shares bid for purchase at a particular rate was equal to or greater than the number of shares offered for sale at those rates. All shares for sale were purchased, and the clearing rate, i.e., the lowest interest or dividend rate at which all sale orders could be fulfilled, applied to all securities sold until the next auction. An auction failed if the number of shares offered for sale exceeded the number of shares bid for purchase.

38.     If the auction failed, then none of the current holders could sell their shares, as auction rate securities have no "put" feature guaranteeing that an investor could either sell the securities back to the auction dealer on demand at par value or force the issuer to redeem the

---

[1]     The term "auction dealer," as used in the Complaint, is intended to be synonymous with the terms "broker-dealer" and/or "auction manager."

securities if the auctions failed. If an auction failed, however, the holder of an auction rate security was entitled to collect dividends or interest at a predetermined rate until the next auction. The predetermined rate of interest that was paid in the event of a failed auction was typically referred to as the "maximum rate."

39.    The maximum rate was intended to ensure that the auction rate security remained liquid if the auction failed, by attracting new buyers or prompting the issuer to refinance. If the maximum rate was insufficient to attract liquidity in the event of an auction failure, however, the risk characteristics of an auction rate security were fundamentally altered. An auction rate security that carried a low maximum rate was entirely dependent on the auction dealer's intervention and "support" for the periodic auctions to ensure liquidity, and in the absence of the auction dealer's support, any auction failure would render the security illiquid, as the maximum rate could not be counted on to attract new buyers or prompt the issuer to refinance.

**B.    Defendants Engaged In A Scheme To Defraud Purchasers Of ML ARS**

40.    Merrill was actively involved in the auction rate securities market throughout the Class Period. Merrill served as an underwriter for auction rate securities, as the sole auction dealer in "sole-managed" auctions (where only one auction dealer was signed up to participate), and as a lead auction dealer, co-auction dealer, or joint lead auction dealer in "multi-dealer" auctions (where multiple auction dealers were signed up to participate).

41.    During the Class Period, Merrill underwrote billions of dollars of auction rate securities, placing additional supply in an already saturated market. To accommodate the demands of issuers and obtain high credit ratings even as underwriting standards deteriorated over the course of the Class Period, ML ARS were issued with maximum rates that were capped at insufficient levels to attract liquidity in the event of an auction failure. Therefore, Merrill needed to suppress auction failures to prevent these low maximum rates from becoming widely known to auction rate securities investors.

42.    Throughout the Class Period, Merrill engaged in deceptive and manipulative tactics directed at auction rate securities investors to create the appearance of a functioning auction

market in which auction rate securities traded in accordance with actual supply and demand. Merrill's manipulative conduct included: (1) maintaining a policy of intervening in every auction for which Merrill served as the sole or lead auction dealer, to create the appearance of stability in the auction rate securities market, mask the inherent illiquidity of ML ARS, and prevent auction failures; (2) making false and misleading statements and incomplete disclosures about the liquidity of ML ARS and Merrill's role in propping up the auction rate securities market; (3) routinely intervening in auctions to set the rates of interest or dividends paid on those securities and deprive investors of the information necessary to assess the risk and volatility of ML ARS; (4) causing its purportedly independent research analysts to publish research reports extolling the benefits of investing in ML ARS, in violation of Merrill's own internal policies; (5) pressuring its financial advisors and distributing firms to sell ML ARS; and (6) providing extraordinary financial incentives to financial advisors and research analysts to promote the sale of ML ARS.

43.    The scheme began to unravel when Merrill and other auction dealers allowed a discrete segment of the auction rate securities market to fail, as credit markets weakened in the summer and fall of 2007. When these auctions failed, many institutional investors began liquidating their positions in auction rate securities, and the overall deterioration credit markets led to further selling pressure from corporate and retail holders of auction rate securities. In response, Merrill expanded the range and extent of its manipulative practices in an attempt to simultaneously prop up the remainder of the auction rate securities market, conceal the liquidity characteristics of ML ARS, and protect itself from the consequences of its policy of intervening in the auctions.

      **i.  Merrill Maintained A Policy Of Intervening In Every Auction For Which It Was The Sole Or Lead Auction Dealer To Create The Appearance Of Stability And Liquidity And to Prevent Auction Failures**

44.    Throughout the Class Period, Merrill used its own capital to routinely place "support bids" in every auction in which it served as the sole auction dealer or as the lead auction dealer in multi-dealer auctions. The placement of such support bids was done pursuant to a tacit

understanding among Merrill and the issuers of ML ARS that the auction dealer would act to prevent auction failures.

45.    Through the placement of these support bids, Merrill acquired ML ARS for its own account when the auctions otherwise would have failed due to lack of sufficient demand.

46.    Until August 2007, Merrill followed a uniform policy of placing support bids if needed to prevent auction failures in every auction for which it was sole or lead auction dealer.

47.    Between January 3, 2006 and May 27, 2008, Merrill placed support bids to prevent more than 5,800 auctions for which Merrill was the sole or lead auction dealer from failing.

48.    Merrill was able to place support bids and prevent auctions from failing because it was aware of the other bids in the auctions and could place its own bids after the bidding deadline for other investors.

49.    Merrill failed to disclose to investors that it invariably placed support bids in every auction for which it was the sole or lead auction dealer during the Class Period to prevent auction failures, that it did so pursuant to a tacit agreement with the issuer that it would  suppress auction failures, and that the impact of its extensive and sustained interventions created the outward appearance that ML ARS were readily liquid investments and that the auction market functioned by the natural interplay of supply and demand.

50.    By intervening to prevent auction failures and set interest rates, Merrill masked the liquidity risks inherent in ML ARS.  Due to the lack of transparency in the auction market, Class members had no way of knowing the extent to which Merrill's interventions were needed to sustain the auction rate market and ensure that auctions continued to clear.

51.    Had Merrill not supported these auctions, or had Merrill disclosed the extent of its interventions, widespread auction failures would have alerted the public to the true risk characteristics of the auction rate securities for which Merrill served as an auction dealer. Instead, Merrill's actions created a "façade of liquidity," leading purchasers of auction rate securities to believe their investments could be readily liquidated through arm's-length sales at periodic auctions.

### ii. Merrill Made False And Misleading Statements And Incomplete Disclosures About Auction Rate Securities During The Class Period

52.    Throughout the Class Period, Merrill falsely described ML ARS and the auction rate securities market to investors, and failed to provide sufficient information to allow the investing public to understand the risks of those securities.

53.    Merrill described ML ARS as highly liquid, safe investments similar to money market funds.  Merrill classified ML ARS as "Other Cash" on its investor clients' account statements, reinforcing the perception that auction rate securities were readily liquid alternatives to cash investments.

54.    Since March 2005, however, the SEC, the Financial Accounting Standards Board ("FASB"), and the "Big Four" accounting firms have adopted the position that auction rate securities do not qualify as "cash equivalents."  According to the SEC, "because the auction rate securities have long-term maturity dates and there is no guarantee the holder will be able to liquidate its holdings, these securities do not meet the definition of cash equivalents in paragraphs 8 and 9 of FASB Statement No. 95, *Statement of Cash Flows.*"

55.    Merrill recognized as much, stating in a presentation entitled, "FAS 140:  QSPE Status of Certain Securitizations," prepared in November 2005 for a broker-dealer conference, that auction rate securities "do not qualify as cash equivalents."  Nevertheless, Merrill continued to list ML ARS holdings as "Other Cash" on the account statements it sent its investor clients, and to describe auction rate securities as readily liquid and suitable for short-term investing.

56.    Merrill maintained a practice of not delivering a prospectus to its investor clients who purchased auction rate securities at periodic auctions, as it treated such purchases as "secondary market sales" exempt from the prospectus delivery requirement.  Merrill did not provide prospectuses to investors, including Plaintiffs, who purchased ML ARS from distributing firms, or require the disclosure of any other material information to such purchasers by the distributing firm.

12

57.    Merrill acknowledged in certain written disclosures that it might intervene in auctions, but suggested that it did so only sporadically. Merrill did not disclose the extent of its interventions, the purpose of its interventions, or the impact of its interventions on the market for ML ARS, and the attendant risks of acquiring ML ARS securities. Merrill failed to provide disclosures of any kind to investors, including Plaintiffs, who purchased ML ARS from distributing firms, even though it knew that the distributing firms would not be disclosing the facts surrounding Merrill's interventions in the periodic auctions for ML ARS.

58.    Thus, during the Class Period, Merrill never disclosed that it maintained a policy of placing support bids as needed to suppress auction failures in every auction for which it served as sole or lead auction dealer, that these support bids masked the lack of liquidity in the market, and that the auctions would fail without these support bids.

### iii.   Merrill Routinely Intervened In Auctions To Set The Rates Of Interest Paid On ML ARS

59.    Merrill's Auction Rate Securities Trading Desk ("ARS Trading Desk") set the clearing rate for the auctions that would have failed but for Merrill's support bids throughout the Class Period. For each auction, the ARS Trading Desk knew all the bids that had been placed by both holders and prospective buyers of the securities. Armed with this information, the ARS Trading Desk placed buy bids at specified rates and in sufficient amounts that ensured the auction would clear at those rates.

60.    Throughout the Class Period, Merrill set interest rates in such a manner as to promote continued sales of auction rate securities to the public, but without letting clearing rates become or remain so high as to alienate the issuer clients on whom Merrill depended for continuing business and attendant underwriting commissions and auction dealer fees. Among Merrill's major issuer clients was BlackRock, Inc., one of the world's largest publicly traded investment management firms and in which Merrill Lynch was the largest shareholder, owning nearly 50 percent of BlackRock's common stock.

61.    By intervening in the auctions, Merrill set the clearing rate but also added ML ARS to its own inventory.  Merrill and its distributing firms then reduced the excess inventory between auction periods by selling ML ARS at the clearing rate that Merrill had established at the previous auction.

62.    For instance, in late November 2007, Merrill chose to set higher clearing rates in an effort to sell more ML ARS and reduce its own inventory of those securities.   Merrill contemplated increasing the clearing rates to levels near the maximum rates "to clear more product."  While concluding that increasing clearing rates to a level approaching maximum rates "would be too scary," (in other words, send a disturbing signal to the market for ML ARS) the head of the ARS Trading Desk acknowledged Merrill's manipulation of interest rates, stating that "[w]e are working it higher....The gloves are off and we are not concerned with issuer perception of our abilities and the competition.  Gotta move these microwave ovens!!"

63.    Because purchasers of income securities such as bonds and preferred stocks consider higher interest rates to be an indicator of risk, Merrill's interventions to manage interest rates and suppress auction failures deprived investors of objective information that they needed to evaluate the true risk characteristics of ML ARS.

64.    Thus, Merrill's conduct in rigging the clearing rates sent a false signal about the fair price and liquidity of ML ARS.

### iv.  Merrill Co-Opted Its Purportedly Independent Research Group To Prop Up The Auction Rate Securities Market And Sell ML ARS In Violation Of Its Internal Policies

65.    During the Class Period, Merrill's Policy & Procedures Manual ostensibly established a "Chinese Wall" that was designed to "restrict and monitor the flow of [material non-public] information between the various areas of [Merrill] such as Global Research, Sales [and] Trading," in order to "avoid the misuse of such information and the appearance of impropriety as well as to manage potential conflicts of interest."

66.    As explained in Merrill's Policy & Procedures Manual, this Chinese Wall supposedly precluded Merrill's ARS Trading Desk from sharing with the Research Department information

that a reasonable investor would consider to be "important in describing whether to purchase, hold, or sell a security or other financial instrument," including information about "liquidity problems, defaults or other credit related-problems or events"; "increases or decreases in orders for the company's securities"; "unpublished research, opinions, and recommendations"; "non-public information about Merrill Lynch's securities, trading positions and securities products"; and "Merrill Lynch's intentions regarding its proprietary accounts, investment, trading, lending activities or financial strategies or decisions."

67.    In violation of these internal policies, personnel from Merrill's investment bank and ARS Trading Desk shared material non-public information about Merrill's inventory of ML ARS with Merrill's purportedly independent research analysts, and Merrill used those research analysts to make positive statements about ML ARS while downplaying the associated risks. Merrill's research analysts participated in conference calls with Merrill's financial advisors to exhort them to sell ML ARS, and touted the benefits of ML ARS in several research reports written at the behest of and/or with input of the ARS Trading Desk. These research reports were designed to sustain the façade of liquidity in the market for ML ARS and to perpetuate the illusion that ML ARS traded at par through arm's-length sales.

68.    After Merrill allowed a limited number of ML ARS auctions to fail in August 2007, the ARS Trading Desk asked the Research Department to publish favorable research on ML ARS. In response to this request, analyst Martin Mauro wrote a research report, published by Merrill on August 21, 2007, entitled, "The Fixed Income Digest:  Liquidity features of short-term municipal securities," which "point[ed] out some differences between the degree of liquidity and principal protection behind major types of short-term municipal market securities." The research report explained that Variable Rate Demand Obligations ("VRDOs") and Putable Floating-Rate Option Tax-Exempt Receipts ("P-FLOATS") have a "hard put" obliging the issuer to redeem the note at the demand of the investor, but that auction rate securities have "no hard put."

69.    When Frances Constable, the Managing Director in charge of Merrill's ARS Trading Desk, read the August 21, 2007 research report, she demanded that the Research Department retract the report.  When Mauro refused, Constable turned to analyst Kevin Conery and John Price, Constable's supervisor and the Head of Americas Sales Credit and Trading at Merrill, to ensure that the report would be retracted.

70.    Constable emphasized her concerns about the research report in an August 22, 2007 email to members of Merrill's Financial Products Group:  "I HAD NOT SEEN THIS PIECE UNTIL JUST NOW AND IT MAY SINGLE HANDEDLY UNDERMINE THE AUCTION MARKET.  IF YOU ARE GETTING ANY CALLS, PLEASE LET ME KNOW.  I HAVE ASKED FOR AN IMMEDIATE CLARIFICATION TO BE PUBLISHED AND A RETRACTION OF THIS." (Upper-case lettering as in original.)

71.    The Research Department agreed to retract the report the following day.

72.    On August 23, 2007, Merrill published a replacement report, also written by Mauro, entitled "The Fixed Income Digest:  Liquidity features of money market fund alternatives," that downplayed the risks of auction rate securities, while describing "the recent rise in yields on these instruments as being a buying opportunity for investors who are looking for short-term securities."

73.    The retraction worked.  After the close of business on August 23, 2007, Constable described the favorable impact of Mauro's revised research report on the market for ML ARS:

> Better tone to our market today on the heels of superb sales efforts from some of our IAD stalwarts and investors, in general, feeling confidant enough to dip their toes back into our market.  Incessant conference calls with GPC office complexes, sales teams and their accounts are beginning to pay off.  Revised research from Marty Mauro promoting short term alternatives to money market funds and the liquidity features of auction and other municipal products, in conjunction with Kevin Conery's research of last week have been essential tools in our sales aresenal [sic].

74.    The ARS Trading Desk continued to pressure Merrill's Research Department to publish positive research reports on ML ARS in the fall of 2007 and early 2008.

75. In response to a request from Constable for another positive research report on ML ARS, on December 6, 2007, Merrill published a research report written by Conery and Mauro entitled, "Fixed Income Digest Special Edition: Enduring value in auction securities." The report explained that "the auction preferred market offers excellent value for investors looking for short-term instruments or money market alternatives"; that "individual investors are largely shielded" from problems facing the financial markets; that closed end fund preferred auction rate securities were "a conservative's conservative auction security"; that "[c]redit fears" were "largely misplaced in [the] auction market"; that "the worries of a failed auction are misplaced: failed auctions are extremely rare, and investors may have an exaggerated view of their consequences"; that "[i]n the unlikely event of a failed auction . . . [t]he investor who is willing to wait for a subsequent auction to clear may be able to eventually receive par value back"; that the "main risk" for investors in ML ARS was "lower rates"; and that "auction securities still make sense for investors who need ready access to their funds." Conery and Mauro knew that each of the foregoing statements concerning auction rate securities was literally false and misleading at the time.

76. In promoting ML ARS, Conery and other Merrill research analysts obtained improper access to material non-public information about Merrill's inventory and sales techniques for ML ARS in contravention of the "Chinese Wall" Merrill had purportedly erected between its Research Department and sales and trading groups.

77. Conery's own work notebooks confirm that he communicated frequently with Price and Constable between at least July 2007 and the February 2008 collapse of the auction rate securities market.

78. In violation of the "Chinese Wall," Price and Constable informed Conery about the extent of Merrill's inventory of ML ARS, Merrill's specific plans to reduce its inventory, Merrill's need to increase interest rates to counteract the lack of liquidity, and the financial incentives that Merrill provided to its financial advisors for selling ML ARS.

79.    Conery had access to Merrill's "axe sheets" or daily sales listings, which contained material non-public information about Merrill's inventory of ML ARS and its incentives for selling those securities. Conery also had frequent and unsupervised contact with personnel at Merrill's ARS Trading Desk.

80.    Conery and others at Merrill's Research Department used this material non-public information to make false and misleading statements about ML ARS in their research reports, while downplaying or avoiding frank discussions of the risks associated with those securities. Merrill executives knew that Merrill's financial advisors and distributing firms would use the information in those research reports and conference calls to sell ML ARS.

### v.  Merrill Pressured Its Financial Advisors And Distributing Firms To Sell ML ARS To Unsuspecting Class Members

81.    When Merrill intervened to support an otherwise failing auction, it increased the amount of ML ARS in its proprietary account, pressing against the ceiling for ML ARS holdings set internally by Merrill's risk management policies. Those policies allowed Merrill to hold not more than a specified amount of ML ARS at any given time. As a result, Merrill was under consistent pressure to reduce its inventory of ML ARS.

82.    Merrill engaged in concerted efforts to limit its increased exposure to ML ARS on its own balance sheet, which Constable referred to as "inventory creep," by pressuring its financial advisors and distributing firms to "encourage greater retail participation and the attraction of new buyers in [the ML ARS] market," through conference calls and other means.

83.    As Constable explained in an email dated August 15, 2007, the conference calls succeeded in prompting Merrill's financial advisors to sell ML ARS: "Noteworthy:  Didn't hear any failed auctions today.  WHEW!!  Retail salesforce comforted with my brief call on GPC National sales call at noon and in depth discussion and Q&A conference call on the auction markets. . . ."

84.    During a conference call on August 15, 2007, Conery encouraged Merrill's financial advisors to view auction rate securities as a selling opportunity. Constable directly influenced

analyst Conery's statements during the August 15, 2007 conference call. When one financial advisor asked Conery a question that Constable did not like, she sent Conery a real-time electronic message ordering him to "Shut this guy down. Suggest he call outside this call. He is focusing attention away from your positive message."

85.   Merrill used additional means to pressure its financial advisors. In a November 30, 2007 email entitled "Money Market Opportunities," Thomas Murray, Merrill's Director of Municipal Marketing, directed several analysts and other managers to "keep Muni Money Market and Auction products front and center in your conversations with all [financial advisors]."

86.   Murray also proposed that Municipal Marketing, the ARS Trading Desk, and the Research Department collectively host a national sales conference call to encourage Merrill's financial advisors to sell more ML ARS. Constable responded:

> I just dislocated my shoulder raising my arm to volunteer!!! . . . We had such a national call back in August with Marty [Mauro] and Mona [Payton] at the onset of the "crisis" and it was backed up with fresh research and was well received. We saw almost instantaneous improvement in our trading levels and a commensurate reduction in inventory. It is critical for the sales force to know that management is behind these products as they represent the best products for bringing new cash into the firm.

87.   On December 12, 2007, Constable, Murray, and analysts Conery and Mauro, among others, participated in a national sales conference call with Merrill's financial advisors to convince them to sell ML ARS. During the call Murray said, "[T]here are some opportunities that grow out of what have been some severe dislocations really since August and magnified by year end pressures." Murray continued, "[T]here's a real opportunity here [to sell ML ARS]. Nothing is being suggested with the idea of a fire-sale-type approach. The idea is because it's good for the customer."

88.   In describing "a couple of specific opportunities in the auction area," Constable said the following during the December 12, 2007 conference call: "I just want to . . . reassure everyone that we are working in concert with research to provide the best ideas and to give

assurance as to the solidity and ongoing endurance of some terrific markets." Constable explained that a slide presentation about ML ARS provided to all participants on the conference call should "give you some background and should help you present to your sales force in the offices there of why these should be considered a great cash management gathering tool." Constable further said, "We have research supporting our recommendations and the value of this marketplace, so you should feel very confident that this is a great place to put your investors at this time."

89.    During the December 12, 2007 conference call, analyst Conery told Merrill's financial advisors that pressure on the auction rate securities market since August 2007 had "made things that were already attractive even more attractive." Conery reiterated that Merrill's Research Group endorsed auction rate securities issued by closed-end preferred funds as "the conservative's conservative investment in the auction market."

90.    None of the speakers in the December 12, 2007 conference call explained that auctions for ML ARS would fail *en masse* if Merrill ceased supporting the market for ML ARS, that investors' ML ARS holdings would become illiquid as a result of auction failures, that Merrill was under continued pressure to reduce its inventory of ML ARS, that Merrill was contemplating withdrawing from the auction rate securities market altogether to limit its exposure to ML ARS, and that Merrill believed that anticipated failures by other auction managers could cause a "run" on the market for ML ARS and result in the collapse of that market.

### vi.    Merrill Provided Extraordinary Incentives To Its Financial Advisors And Research Analysts For Promoting Sales Of ML ARS

91.    Merrill provided extraordinary financial incentives for its personnel to promote sales of ML ARS. Merrill paid its financial advisors as much as 12.5 basis points on an annualized basis for the aggregate amount of ML ARS they sold to investors.

92.    By comparison, the financial advisors would not have earned any commissions, or would have earned much smaller commissions, had they sold money market funds to their

clients. The revenue sharing paid by Merrill to its financial advisors provided a disproportionate incentive for those financial advisors to sell ML ARS in relation to other cash management products available to them.

93.     As the auction rate securities market tightened in the second half of 2007, Merrill offered further incentives to its financial advisors to sell ML ARS by providing "enhanced production credits" of up to 100 basis points for the aggregate amount of ML ARS the financial advisors first sold at auction to their investor clients.

94.     Merrill adjusted the amount that it paid in enhanced production credits based on the size of its ML ARS inventory and the urgency of its need to remove those securities from its balance sheet. For instance, a November 21, 2007 email from Constable confirmed that Merrill would offer 25 basis points in enhanced production credits to financial advisors for selling ML ARS to counteract Merrill's "significant growth in inventory today."

95.     Merrill executives recognized the enhanced production credits were improper and debated in the fall of 2007 whether to continue providing such enhanced production credits to financial advisors for the sale of ML ARS. Constable wrote in a September 27, 2007 email that she believed discontinuing or limiting enhanced production credits would be the "death knell" for Merrill's auction rate securities business.

96.     Merrill continued to provide enhanced production credits – which, according to Constable, were "adjusted as we saw fit" – to reward financial advisors for selling ML ARS until the end of the Class Period.

97.     In addition, Merrill improperly compensated its research analysts, including Conery, for promoting the sale of ML ARS in research reports and conference calls at the behest of the ARS Trading Desk.

98.     Conery's endorsement of auction rate securities was so critical to Merrill's ML ARS business that Merrill awarded him a six-figure bonus for his job performance in 2007.

### vii. Merrill Withdraws From The Auction Rate Securities Market

99.    As noted above, when the credit market deteriorated in the summer of 2007, Merrill and several other major auction dealers, including UBS, Lehman Brothers, and Deutsche Bank, chose not to intervene to prevent failures of auctions for CDO auction rate securities and certain auction rate preferred securities.

100.    Many of the CDO auction rate securities consisted of collateralized residential mortgage-backed securities that were secured by income streams from sub-prime mortgages. By the summer of 2007, Defendants recognized that the sub-prime mortgage market was collapsing. Merrill Lynch's exposure to that market was substantial. On October 5, 2007, Merrill Lynch announced that, for the third quarter of 2007, it would take a write-down of $5.5 billion, approximately $4.5 billion of which related to its exposure to sub-prime mortgages.

101.    Under pressure from Merrill Lynch to limit its exposure to sub-prime mortgages, Merrill elected not to support the auctions for certain CDO auction rate securities beginning in August and September 2007. Merrill declined to place support bids in auctions for at least 34 ML ARS issues, allowing those auctions to fail. Merrill also refused to place support bids in subsequent auctions for those ML ARS, causing more than $2.6 billion of those securities to remain illiquid.

102.    Institutional investors began to sell down their auction rate securities holdings beginning with the initial wave of auction failures in August 2007. As a result, Merrill intensified its efforts to prop up the remainder of the auction rate securities market.

103.    Merrill continued to monitor the industry for auction failures by other auction dealers throughout the fall of 2007 and into early 2008. Merrill and other auction dealers continued to support the market until they collectively abandoned the auction rate securities market in February 2008.

104.    According to Constable's testimony before the Commonwealth of Massachusetts, once Merrill learned that two other large auction dealers allowed their auctions to fail on February 12, 2008, it was a "fait accompli" that the entire auction rate securities market would

collapse. As a result, on February 12, 2008, Merrill executives decided that Merrill would no longer support the auctions for ML ARS.

105.    On February 13, 2008, Merrill and all other major auction dealers of auction rate securities withdrew their support for auction rate securities market. As a result, 87% of all auctions of auction rate securities failed.

106.    At no time before February 13, 2008 did Merrill notify Class members or publicly announce that it intended to withdraw its support for the ML ARS market.

107.    As a result of the withdrawal of support by Merrill for ML ARS market, the ML ARS market has permanently collapsed, rendering all outstanding ML ARS illiquid.

**C.    Defendants Acted With Scienter**

**i.    ML ARS Were Lucrative For Defendants**

108.    As one of the largest underwriters and auction dealers of auction rate securities during the Class Period, Merrill earned substantial fees for its services from the issuers of those securities.

109.    To compensate Merrill for its underwriting services, issuers typically paid Merrill one percent (1%) of the face value of the securities underwritten.

110.    According to an investigation by the Commonwealth of Massachusetts, between 2001 and 2008, Merrill underwrote approximately $13 billion of auction rate preferred securities and earned approximately $130 million in underwriting fees on those securities alone.

111.    Pursuant to agreements with the issuers, Merrill generally served as an auction dealer for the auction rate securities it had underwritten and was paid an annualized auction dealer fee for managing auctions.

112.    Issuers typically paid Merrill auction dealer fees of 25 basis points per year on the amount of auction rate securities for which Merrill acted as an auction dealer.

113.    Merrill acted as an auction dealer for approximately $24.63 billion in auction rate preferred securities. Merrill's annual auction dealer fees are estimated to exceed $61 million for those securities alone.

114.    In addition, as the owner of nearly 50 percent of the common stock of investment management firm BlackRock, Merrill Lynch was motivated to perpetuate the auction rate securities market to profit from BlackRock's issuance and management of numerous auction rate securities. Merrill served as an auction dealer for and/or sold over 180 BlackRock issuances to ML ARS investors, making BlackRock one of Merrill's largest issuer clients.

### ii. Defendants Took Advantage Of The Opportunity To Manipulate The Market For ML ARS

115.    Unlike fixed-rate bonds, commercial paper, or money market funds, auction rate securities are designed with the understanding that the holder will actively "trade" the securities by monitoring the rates of return paid on auction rate securities in relation to other short-term investment options available to the holder, and "roll at rate" (an instruction to sell unless the rate paid on the security is equal to or greater than a specified rate of interest) or sell the security outright if the rate the holder anticipates receiving on the auction rate security is inferior to other alternatives.

116.    Because purchasers of ML ARS were not the institutional buyers who were originally intended to serve as the target buyers of auction rate securities, in the absence of active trading by holders, ML ARS became increasingly vulnerable to intervention by Merrill, in its capacity as an auction dealer, to influence interest and dividend rates and create the appearance of liquidity.

117.    Before an auction took place, Merrill surveyed investor interest and provided guidance, known as "price talk," to potential investors about the range of rates within which the Merrill expected the auction would clear. Merrill controlled the "price talk" for ML ARS auctions. If investors placed bids well above the price talk, however, Merrill was able to and did place sufficient bids to clear the auctions at lower interest rates.

118.    As a result of insufficient investor participation in the auctions, Merrill was able to and did assert control over the clearing rates and the success or failure of the auctions.

119.    As an auction dealer, Merrill exercised near complete control over information associated with auctions. Merrill knew the number of bidders at an auction, the individual and

aggregate dollar amount of bids, the range of bid prices, whether there were sufficient bids by investors for the auction to succeed, and the clearing rates in successful auctions before those rates were disclosed to the issuer and investors. Merrill also knew whether it submitted bids at an auction and whether those bids were necessary for the auction's success.

120.    As an auction dealer, Merrill knew that the number of buyers for ML ARS was becoming increasingly saturated and that adverse trends in the credit markets or unfavorable news about ML ARS would result in an increase in the imbalance between sellers and buyers of ML ARS. Because of this imbalance, Merrill knew that its auctions would have failed without Merrill's intervention and other manipulative acts.

121.    Merrill took advantage of the opportunity to manipulate the auctions for ML ARS and ensured that investors lacked sufficient information to determine that those auctions cleared only because of Merrill's interventions.

### iii.    Merrill Knew That ML ARS Lacked Sufficient Maximum Rates To Ensure Liquidity In The Event Of A Failed Auction

122.    Merrill knew that retail investors would purchase ML ARS only if those securities were highly rated by credit rating agencies such as Fitch Ratings, Moody's Investor Service, and Standard & Poor's.

123.    As an underwriter, Merrill understood that it could obtain AAA ratings for the auction rate securities it underwrote only if those securities carried low maximum rates, as the higher the rate, the riskier the securities would be deemed to be by the rating agencies. In general, Merrill served as an auction dealer for the auction rate securities that it underwrote.

124.    During the Class Period, Merrill underwrote billions of dollars in auction rate securities with maximum rates that were insufficient to ensure the liquidity of those securities in the event of a failed auction.

125.    Approximately 92 percent of the auction rate securities that Merrill underwrote received AAA ratings. Merrill touted AAA ratings as a selling point.

126.    Constable acknowledged the importance of AAA ratings to Merrill's perpetuation of the market for ML ARS, stating in an email dated August 17, 2007 that Merrill was, "Drumming up [the] rating agency report machine in support of the industry."

127.    In testimony before the Commonwealth of Massachusetts, a witness Merrill designated to testify as to its underwriting practices could not identify a single instance in which Merrill refused to underwrite auction rate preferred securities based on an insufficient maximum rate.

128.    Although Merrill obtained AAA ratings to provide the appearance of quality and safety of principal, Merrill knew that those ratings actually reflected the limited liquidity of ML ARS in the form of low maximum rates.

### iv.    Merrill's Manipulation Of The Market Was Designed To Limit Its Own Exposure To ML ARS

129.    Internal documents show that Merrill engaged in manipulative conduct to sell ML ARS in order to reduce its own inventory of those securities.

130.    Recognizing the risk of having to hold ML ARS until maturity (or, in some cases, perpetuity), Defendants imposed a ceiling on the amount of ML ARS that Merrill could hold in its own inventory.  As Merrill's inventory increased after institutional investors began selling down their holdings in the fall of 2007, Merrill came under increasing pressure to reduce its ML ARS holdings.

131.    In an email dated September 27, 2007, Constable explained that "[w]e are shoveling as fast as we can" to reduce Merrill's inventory of ML ARS, which was rapidly approaching the internally set $1 billion ceiling.

132.    With Merrill's inventory of ML ARS exceeding $2.3 billion on November 19, 2007, Price directed Constable "to get smaller unfortunately – using any means possible," including discounts and increased commissions to financial advisors who sold ML ARS.  Price concluded, "Keep up the outstanding efforts."

133.    On December 19, 2007, Price described the increased inventory of ML ARS in an email to executive management at Merrill's Fixed Income Currency and Commodities Group and Merrill's Market Risk Management Group, as follows: "Please be aware that the contagion that has engulfed all has been especially harsh on the AMPS [auction market preferred stock] product.    Previously it was a business that used very little Balance Sheet with a high ROA....Inventory higher today.    Fighting hard to get it down, Munis $1.3 bln[,] AMPS $1.8 bln."

134.    Defendants came under additional pressure to reduce inventory in the fall of 2007, as lenders that had provided financing for Merrill's inventory of ML ARS stopped accepting those securities as loan collateral.    Lenders recognized that Merrill had amassed an excess inventory of ML ARS by supporting auctions for which no other buyers existed, and those securities could not be sold at par if Merrill needed to liquidate its portfolio.    As a result, the liquidity of ML ARS purchased by investors became even more dependent on Defendants' own financial condition and willingness to continue propping up the ML ARS market.

### v.    Merrill Knew That The Market For ML ARS Was Unsustainable

135.    Notwithstanding Merrill's efforts to manipulate and sustain the auction rate securities market, by the fall of 2007, Merrill executives knew that the market was unsustainable.

136.    Constable recognized that there was insufficient demand for the ML ARS already on the market and opposed taking on the role of auction dealer for further auction rate securities, stating in an email dated November 6, 2007, that "[n]onchalantly waiving in additional supply seems cavalier at best."

137.    Her supervisor, John Price, was more emphatic about the condition of the auction rate securities market when he wrote in an email dated November 19, 2007: "Market is collapsing. No more $2k dinners at CRU!!  The Financials are being invicerated! [sic]  More firings over at Citi . . . Inventory flooding the street.  Going to be a great '08 Trading environment.  All we have to do is live!!"

138.    Merrill discussed the possibility of withdrawing support for all future auctions in a confidential document dated January 8, 2008, prepared by Ming Lee and John Lambert of Merrill's Global Risk Management Group and entitled, "Auction market Preferred Stock (AMPS) – Business Risk Review." The document identified certain "Options to Reduce the Risk" as follows:

- **Option #3:** Fail future auctions
  - ✓ Pros: ML balance sheet will be capped at levels today.
  - ✓ Cons: ML cannot fail our own paper and may be forced to take that back.

- **Option #4:** Sell wherever market allows in conjunction with Option 3
  - ✓ Pros: ML can sell the securities to market at discounted prices.
  - ✓ Cons: Unless we are prepared to fail, inventory may come back at next re-auction without continued discounts.

139.    Around the same time, Merrill anticipated that firms that insured certain ML ARS would be downgraded, which would prompt investors to sell those securities. In an email dated January 9, 2008, Jim Brewer, a senior trader at the ARS Trading Desk, explained that the auction rate securities market would collapse following these downgrades: "We anticipate that if that happens there will be a wave of selling in these issues that we will be unable to support causing the auctions to fail. If any of these issues fail one can make the assumption that it will spread to the other sectors of our market regardless of the insurer or ratings."

140.    In an email dated January 23, 2008, Brewer explained to one of his colleagues, "in my opinion, we have to let [one of Merrill's issuer clients] . . . know that we feel the auction market is going to get worse not better and they would be best served [by] exiting the market."

141.    Merrill did not disclose its internal discussions over its withdrawal of support for ML ARS or the weakening and possible collapse of the auction rate securities market. Instead, Merrill continued to encourage its financial advisors and distributing firms to sell ML ARS through the first half of February 2008.

142.    As Constable explained to several trading colleagues in an email dated January 18, 2008, "[W]e are about to get shellacked from terrified investors and we HAVE TO SELL INVENTORY." (Emphasis original.)

143.    Beginning in January 2008, auction dealers Lehman Brothers, Piper Jaffray, Stifel Nicolaus, and Goldman Sachs allowed their auctions to fail. Merrill knew that the auction failures were cause for alarm. In an email dated January 23, 2008, Conery called the auction failures a "new crisis" and wrote, "We've had 3 parties confirm that Lehman is dropping out of the auction business. Nothing like adding further illiquidity to an already illiquid market."

144.    Constable recognized that failures by other auction dealers would make Merrill's efforts to unload its own inventory of ML ARS even more difficult. On January 29, 2008, she sent a copy of a negative story about a recent auction failure to Price with the following note: **"It[']s like the Sorcerer's Apprentice...can[']t someone make these people stop bucketing us with water...."** (Emphasis added.)

145.    Despite these auction failures, Merrill told its financial advisors, distributing firms, and investor clients, directly and through several published reports between January 28, 2008 and February 8, 2008, that: Merrill had no intention of allowing its auctions to fail; Merrill did "not believe this failed auction is cause for alarm"; auction rate securities continued to be "the best value" for "funds that investors need to keep liquid"; Merrill considered ML ARS to be "the conservative's conservative security"; failed auctions were "an aberration" for which Merrill did not expect to see multiple recurrences"; "there has been no official confirmation" of auction dealers exiting the auction rate securities market; and that rumors of auction dealers exiting the market were not "a sign of something more ominous to come."

146.    Similarly, in a February 7, 2008 conference call with Merrill's financial advisors, Conery disputed the possibility that all closed-end funds auctions were likely to fail, saying:

> I will tell you Merrill Lynch, certainly by all indications, is committed to this product. I would have to let the [auction] desk people speak for themselves, but given the fact that through all this turmoil they continue to plod away, I think that shows that the firm is committed to it.

\*    \*    \*

[I]s it an area we think represents a good, conservative, reasonable investment? Yes, it is. We are quite comfortable with buying Aaa one week closed-end paper. We are quite comfortable buying Aaa one month closed-end fund paper, whether it is taxable or tax exempt we feel pretty good about it.

\*    \*    \*

I don't think this [recent closed-end fund auction failure] is any sort of contagion market-wide disaster scenario.

147.    These statements by Merrill's research analysts, made at the same time that Merrill knew the ARS market was on the verge of collapse, demonstrate Merrill's intent to manipulate the market by continuing to convince its financial advisors and its distributing firms, as Merrill had done throughout the Class Period, of the safety and liquidity of ML ARS.

### vi.    Merrill's Internal Discussions Concerning The Possibility Of A "Run On The Market" Demonstrate Its Intent To Manipulate Or Deceive

148.    Merrill knew that the continued viability of the ML ARS market depended upon its own conduct as well as that of the other auction dealers. Merrill and other auction dealers knew that if one auction dealer permitted widespread auction failures, a "run on the bank" would ensue, with panic selling by investors, and the auction dealers being forced to choose between (a) attempting to sustain the auction rate securities market by buying all securities offered at auction and (b) allowing the auctions to fail *en masse*.

149.    As a result, Merrill and other auction dealers had a common interest in suppressing auction failures. In furtherance of their common interests, and with a tacit or express understanding that other auction dealers would similarly act to suppress auction failures, Merrill continued to intervene to prevent auction failures even after the ultimate demise of the auction rate securities market was widely anticipated by decision-makers at Merrill; Merrill monitored the actions of its competitors to determine if other auction dealers appeared likely to withdraw their support for the auctions; and Merrill communicated directly with competitors in an attempt to determine the time and circumstances under which Merrill's competitors were likely to withdraw their support for the market.

150.   Internal communications reveal that Merrill executives feared that exposure of the true condition of the auction rate securities market would cause its collapse. As a result, Merrill took steps to conceal this information from investors.

151.   As described above, Merrill published a research report on August 21, 2007, that discussed the possibility of auction failures and the lack of a "hard put" feature to the securities. Believing that the report could single-handedly undermine the auction market, Constable pressured the Research Department to retract the report.

152.   Subsequently, the chastened Research Department took pains not to publish research reports that "would give the auction a [sic] unnecessary problem: a run." As analyst Conery emphasized in an email dated January 28, 2008, "I want to make sure that research cannot be accused of causing a run on the auction desk, like was the case in August."

## D.   Plaintiffs And Class Members Relied On An Assumption That ML ARS Traded In An Efficient Market Free Of Manipulation

153.   Plaintiffs and Class members reasonably assumed that ML ARS traded in an efficient market free of manipulation by Merrill.

154.   Throughout the Class Period, ML ARS were widely held among numerous classes of investors including individuals, small businesses, charities, and large corporate and institutional holders.

155.   The very designation of ML ARS as "auction rate" securities implied that the securities were traded on an arm's-length basis, with the auctions matching buyers with sellers and establishing a clearing rate for periodic interest or dividend payments.

156.   Auction rate securities and the auction market had existed since 1984, and had developed rapidly since that time.

157.   In research reports issued late in the Class Period, Merrill touted the longevity and durability of auction rate securities, noting that the market for auction rate securities backed by student loans had existed "at least since the first half of the 1990s," and that auction rate preferred stock and municipal auction rate securities "have been around since the late 1980s."

31

158.   According to a Merrill research report published on February 4, 2008, "Closed-end auction market preferreds have been around for 20 years.  They have been through the S&L and banking crises of the late 1980s and early 1990s, the Asian contagion, and the 2002 accounting scandals."

159.   Merrill publicly dismissed the possibility of an auction failure, stating in a December 6, 2007 research report that "worries of a failed auction are misplaced:  failed auctions are extremely rare, and investors may have an exaggerated view of their consequences."

160.   Merrill reiterated the point in a February 1, 2008 research report, published less than two weeks before Merrill withdrew its support for the auctions:

> **How often do closed-end fund auctions fail?**
> Hardly ever.  There was one failed auction on January 22, 2008.  But that was an isolated event that involved only a small number of shares, and the next auction from that same closed-end fund was successful.  Prior to the recent episode, the last failure that involved closed end fun securities held by individual investors was in 1990.
>
> The auction failures in 1990 stemmed from the descent to insolvency of Drexel, Burnham, Lambert, who was the sole broker-dealer involved in the auctions.  The fails lasted for several months until a new broker-dealer began supporting the auctions.  Investors who held on did not lose money, as they received par value back when the auctions resumed with the new broker dealer.

161.   Through these and similar statements made until the collapse of the auction rate securities market, Merrill encouraged investors to believe that sufficient market demand existed to purchase the outstanding supply of ML ARS without intervention from Merrill itself, that the market for ML ARS was free of manipulation, and that any disclosures made by Merrill concerning its support for ML ARS provided no basis for questioning the integrity or the fairness of the market for ML ARS.

162.   Material news concerning ML ARS had a prompt and immediate effect on the market price of those securities, as evidenced by, among other things, the impending "run on the auction market" following Merrill's publication of a research report on August 21, 2007 emphasizing the lack of a "hard put" feature to ML ARS; the stabilization of the auction market following Merrill's publication of a replacement research report on August 23, 2007 promoting the

liquidity features of ML ARS and describing those securities as short-term alternatives to money market funds; and the immediate and permanent decline in the market price of ML ARS following the collapse of the auction market in February 2008.

### E.    Plaintiffs And Class Members Suffered Damage

163.    Plaintiffs, Class members, and each of them purchased ML ARS during the Class Period. The ML ARS purchased by Plaintiffs during the Class Period are identified on their certification attached hereto. As to each such ML ARS purchased by Plaintiffs and Class members, Merrill served as the sole auction dealer, lead auction dealer, co-lead auction dealer, or joint lead auction dealer. In such capacity and with respect to each such ML ARS purchased by Plaintiffs and Class members, Defendants engaged in the manipulative or deceptive devices, contrivances, schemes and artifices to defraud alleged herein, including, but not limited to, Defendants' interventions in auctions for the ML ARS purchased by Plaintiffs and Class members for the purpose and with the effect of masking the true value of such ML ARS, preventing auction failures, setting the rates of interest or dividends paid on ML ARS, and depriving Plaintiffs and Class members of the information necessary to assess the risk characteristics of ML ARS. By their actions, Defendants directly and proximately caused Plaintiffs' and Class members' injuries.

164.    Subsequent to the collapse of the ML ARS market, Plaintiffs and Class members have been unable to sell at par the ML ARS they purchased during the Class Period.

165.    Although federal and state securities regulators have forced Defendants to repurchase at par value ML ARS that Merrill sold to its retail investor clients and others, Plaintiffs and Class members continue to hold illiquid ML ARS. The ML ARS purchased by Plaintiffs and Class members are not worth the price paid for them.

166.    In its annual report for the fiscal year ended December 26, 2008, filed with the SEC on Form 10-K on February 24, 2009, Merrill Lynch admitted that the auction failures have left auction rate securities, including ML ARS, with no observable valuation methodology.

167.    In the same annual report, Merrill Lynch announced that, for the fiscal year ended December 26, 2008, it had taken a charge of $375 million (exclusive of an additional $125 million fine) in connection with Defendants' offer to repurchase ML ARS from certain investor clients made pursuant to Defendants' agreement with federal and state securities regulators. At the time Merrill Lynch recorded this charge, Defendants had repurchased ML ARS with a face value of over $3 billion. The charge recorded by Merrill Lynch constitutes an acknowledgement that ML ARS acquired by Plaintiffs and Class members are worth less than par value.

168.    Secondary market sales of ML ARS have occurred at steep discounts to par value. Investors who sold their ML ARS on this secondary market have realized substantial losses.

169.    In addition, as a result of Merrill's manipulation of auctions and clearing rates for ML ARS, Plaintiffs and Class members have not received the interest or dividends they were entitled to receive.

## F.    Regulators Settle Some Claims Against Merrill For Fraud In The Auction Rate Securities Market

170.    Merrill has been subject of various investigations and proceedings by state and federal securities regulators and law enforcement officials for its involvement in the auction rate securities market.

171.    The SEC first investigated Merrill's manipulation of the auction rate securities market in 2004. On May 31, 2006, the SEC filed an Order Instituting Administrative And Cease-And-Desist Proceedings, Making Findings, And Imposing Remedial Sanctions And A Cease-And-Desist Order Pursuant To Section 8A Of The Securities Act Of 1933 And Section 15(b) Of The Securities Exchange Act Of 1934, against Merrill and several other major auction rate securities auction dealers (*In The Matter Of Bear Stearns, et al.*, Securities Act of 1933 Release No. 8684, Securities Exchange Act Of 1934 Release No. 53888, Administrative Proceeding File No. 3-12310.)

172.    The SEC found that, between January 1, 2003 and June 30, 2004, Merrill and other auction dealers willfully violated Section 17(a)(2) of the Securities Act of 1933 by: intervening

in auctions by bidding for their proprietary accounts or asking customers to make or change orders to prevent failed auctions, set a "market" rate, or prevent all-hold auctions; submitting or revising auction bids after the submission deadline; allocating securities among bidders in a manner other than that which was disclosed in the prospectus; providing higher rates of return than the clearing rate to certain investors based on express or tacit understandings with those investors; and providing different price talk to certain investors, placing those investors at an advantage in the auctions. The SEC found that Merrill's unlawful conduct affected the clearing rate, and required Merrill to cease and desist and/or to make sufficient disclosures of these manipulative practices.

173.     In response to the SEC's May 31, 2006 Cease-And-Desist Order, Merrill placed on its website a document entitled, "Description of Merrill Lynch's Auction Rate Securities Practices and Procedures," that described some, but not all, of the risks associated with ML ARS.

174.     Merrill also included a vague reference to the website on the trade confirmations it sent to its investor clients after they purchased ML ARS. As a result, Merrill's clients would view an (incomplete) description of its auction rate securities practices and procedures only if they visited Merrill's website after purchasing ML ARS and saw and clicked on the appropriate link. Merrill failed to disclose its auction rate securities practices and procedures at all to investors who purchased ML ARS from distributing firms.

175.     Merrill's website disclosure was incomplete and misleading in that it failed to disclose, among other things, that the degree of intervention Merrill needed to prevent the ML ARS resale market from collapsing was far greater than the sporadic interventions hinted at in the disclosure; that Merrill followed a uniform policy of placing support bids in all auctions in which it was the sole or lead auction dealer until August 2007, when Merrill withdrew support for CDO auction rate securities, causing those auctions to fail; that the market for ML ARS was under increasing stress brought on by the deteriorating credit environment; that the level of support Merrill needed to provide in order to prevent auction failures was increasing as its balance sheet was weakening (thereby increasing the likelihood that Merrill would withdraw

their support for the auctions and the securities would become illiquid); that Merrill anticipated further liquidity problems and held an increasingly negative assessment of the continued viability of the auction rate securities market; that the suppression of material facts relating to Merrill's intervention in auctions resulted in the rates of interest paid on ML ARS being inadequate to compensate investors for the risk of illiquidity or to attract liquidity in the event of failed auctions; that Merrill's ARS Trading Desk pressured and co-opted its purportedly independent Research Department to endorse ML ARS, while recognizing that publication of frank assessments of the auction rate securities market by the Research Department would result in its collapse; and that Merrill allowed the Research Department substantial access to material non-public information about its inventory of ML ARS, plans to reduce that inventory, and incentives it provided to financial advisors to sell ML ARS, in violation of the prohibitions detailed in its own Auction Rate Securities Practices And Procedures.

176.    Following the collapse of the auction rate securities market in February 2008, and after the filing of this and similar lawsuits against Defendants and other financial firms, state and federal regulators commenced new investigations into securities fraud and related claims by Merrill and other auction dealers.

177.    As described in a press release issued on August 22, 2008 by the SEC, entitled, "SEC Enforcement Division Announces Preliminary Settlement With Merrill Lynch to Help Auction Rate Securities Investors," the SEC's investigation involved alleged misrepresentations by Merrill to its clients that ML ARS "were safe, highly liquid investments equivalent to money market instruments and cash." According to the press release, the SEC contended that Merrill "did not make adequate disclosures that the liquidity of these securities was based on Merrill Lynch supporting the auctions it managed when there was not enough demand....Merrill Lynch continued to tout the purported liquidity of ARS to customers despite its awareness of the escalating liquidity risks in the weeks and months preceding the collapse of the ARS market."

178.    On September 18, 2008, Linda Chatman Thomsen, the SEC's Director of the Division of Enforcement, testified before Congress that Merrill and other "broker-dealer firms

that underwrote, marketed and sold auction rate securities (ARS) misled their customers." Thomsen continued:

> Through their sales forces, marketing materials, and account statements, firms misrepresented to their customers that ARS were safe, highly liquid investments that were equivalent to cash or money market funds. As a result, numerous customers invested in ARS their savings and other funds they needed to have available on a short-term basis. These firms failed to disclose the increasing risks associated with ARS, including their reduced ability to support the auctions. By engaging in this conduct, *those firms violated the Federal securities laws, including the broker-dealer antifraud provisions*. [Emphasis added.]

179.    Implicit in the SEC's determination is that Merrill's previous disclosures to its investor clients concerning its auction rate securities practices and procedures, including those published on Merrill's website beginning in August 2006, were inadequate and do not insulate Merrill from liability.

180.    On August 21, 2008, Defendants announced that they had agreed to a settlement in principle with federal and state regulators that permanently enjoins Merrill "from violating the provisions of Section 15(c) of the Securities Exchange Act of 1934, and Rule 15c1-2 thereunder, which prohibit the use of manipulative or deceptive devices by broker-dealers."

181.    The proposed regulatory settlement involves the repurchase of ML ARS only from retail investors who bought the securities directly from Merrill. The proposed regulatory settlement fails to provide relief to other investors who were harmed by Merrill's manipulation of the auction rate securities market, including investors who purchased ML ARS from distributing firms, and institutional and large business investors who purchased ML ARS from Merrill. These Class members either continue to hold illiquid ML ARS, or have sold those securities at a loss.

182.    In addition, the proposed regulatory settlement fails to compensate Class members for damages caused by the undisclosed risk of illiquidity they incurred in purchasing ML ARS and by Merrill's manipulation of interest and dividend rates for ML ARS. The proposed regulatory

settlement also fails to account for damages caused to Class members who held ML ARS at interest rates well below market rates, following the collapse of the market.

## NO SAFE HARBOR

183.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this complaint.

184.  The statements pleaded herein were not identified as "forward-looking statements" when made.

185.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

186.  Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by a director or an executive officer of the Defendants who knew that those statements were false when made.

## LOSS CAUSATION/ECONOMIC LOSS

187.  As alleged above, during the Class Period, Defendants engaged in a comprehensive scheme and course of conduct to create, prop up, perpetuate, and manipulate for their own benefit an artificial market for ML ARS, to inflate the perceived value of ML ARS, and to generate underwriting and auction dealer fees, to the detriment of Class members.

188.  This comprehensive scheme and course of conduct operated as a fraud or deceit on Class members by, among other things, sending a false pricing signal to the market for ML ARS, and creating a false impression of the supply and demand for ML ARS for the purpose of inflating the price of, and manipulating the interest rates for, those securities.

189.    The materialization of the risks concealed by Defendants was foreseeable to Defendants throughout the Class Period.

190.    Those risks materialized when Merrill and other auction dealers refused to continue serving as buyers of last resort for auction rate securities, including ML ARS, and the auction rate securities market collapsed.

191.    Materialization of those risks and subsequent disclosures of those risks directly and/or proximately caused the damages sustained by Plaintiffs and Class members.

192.    Only through the persistent conduct of Merrill and other auction dealers in artificially supporting, maintaining, and intervening in the auctions, acting as buyers of last resort, and setting the clearing rates was the market for ML ARS able to exist during the Class Period.

193.    The auction rate securities market depended on the voluntary, pervasive, and ongoing participation of Merrill and other auction dealers in the auctions, their manipulation of interest and dividend rates, and their acquisition of auction rate securities to keep the auctions from failing. The conduct of Merrill and other auction dealers created an illusory market that, unbeknownst to Plaintiffs and Class members, had a high risk of failing and leaving investors with illiquid ML ARS.

194.    During the Class Period, Defendants' senior management recognized that Merrill's ongoing manipulation of the auction process for ML ARS, through the submission of purchase bids designed to prevent failed auctions or set clearing rates, created excessive risk to Merrill in the form of an ever-increasing inventory of ML ARS. As a result, Merrill systematically sold down its own inventory of ML ARS through an aggressive marketing campaign targeted at unsuspecting Class members.

195.    Defendants failed to disclose the purpose, nature, and effect of their manipulative conduct to Plaintiffs and Class members and the investing public generally.

196.    It was materially deceptive for Defendants to signal to investors that ML ARS traded and were priced based on the natural interplay of supply and demand.

197.    When the auctions failed, the concealed risks that ML ARS would not trade or be priced based on the natural interplay of supply and demand materialized.

198.    Because of Defendants' manipulation of the auction rate securities market, Plaintiffs and Class members were damaged when Merrill and other auction dealers withdrew their support for the auction market.

199.    If not for Defendants' manipulation of the market for ML ARS, Plaintiffs and Class members would not have purchased ML ARS or would not have purchased them at the prices and/or the interest rates at which they did.

200.    As a result of the materialization of the concealed risk that Defendants were manipulating the market for ML ARS, the true value and liquidity characteristics of ML ARS have been revealed.  ML ARS remain illiquid and cannot be sold at par value on the open market.  A recently developed secondary market values illiquid ML ARS at steep discounts to par value.  Investors who have sold their ML ARS on this secondary market have realized substantial losses.

201.    In addition, Defendants' comprehensive, manipulative, and deceptive conduct caused the interest and dividend rates on ML ARS both before and after the collapse of the auction market to be considerably lower than the rates that the market would have placed on them had the investing public been aware of the true characteristics and risks of ML ARS and the auction market.

202.    Accordingly, Defendants' wrongdoing directly or proximately caused economic losses to Class members by limiting the interest and dividends that they would have received in the absence of Defendants' manipulation.  Class members who continue to hold their ML ARS continue to receive interest and/or dividends on their ML ARS at below-market rates that are insufficient to compensate for the lack of liquidity safeguards inherent in the securities.

<u>COUNT I</u>

**Violation Of Section 10(b) Of The Exchange Act
And Rule 10b-5(a) and (c) Promulgated Thereto
Against Merrill By Plaintiffs And The Class**

203.    Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if fully set forth herein.  Plaintiffs bring this cause of action on behalf of themselves and the Class against Merrill under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. 240.10b-5(a), (c).

204.    During the Class Period, Merrill knew or recklessly disregarded that:  sellers and supply of ML ARS outstripped buyers and demand for ML ARS; that this imbalance in supply and demand for ML ARS would lead to auction failures; and that to avoid auction failures, Merrill needed to intervene to create and perpetuate the illusion of a balanced and functioning market for ML ARS.

205.    During the Class Period, Merrill employed manipulative or deceptive devices or contrivances, in contravention of Rule 10b-5(a) and (c) promulgated by the SEC, which were intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and Class members; (ii) enable Merrill to underwrite and serve as an auction dealer for billions of dollars of ML ARS, and on which Merrill made substantial underwriting and auction dealer fees; (iii) enable Merrill to sustain an artificial market for ML ARS, conceal failures of auctions for ML ARS, and conceal imbalances in the market for ML ARS; (iv) enable Merrill to manipulate the interest rates for ML ARS; and (v) cause Plaintiffs and Class members to purchase overvalued ML ARS.

206.    Merrill employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of ML ARS, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).

207.    Merrill, directly and indirectly, engaged and participated in a comprehensive scheme and continuous course of conduct to manipulate the market for ML ARS and to defraud purchasers of those securities, as specified herein.

41

208. Merrill employed manipulative or deceptive devices or contrivances, schemes and artifices to defraud, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to deceive Plaintiffs and Class members as to the value of ML ARS by, among other things, misleading Plaintiffs and Class members to believe that the prices at which they purchased ML ARS were determined by the natural interplay of supply and demand, and were not set by Merrill.

209. Merrill's manipulative conduct was furthered by the use, means, or instrumentalities of interstate commerce and/or the mails, including but not limited to use of the wires, by Merrill personnel to plan and transmit instructions for the manipulation of auctions for ML ARS; to send to its investor clients brokerage statements that listed ML ARS as "Other Cash," thus creating the misleading impression that a non-manipulated market existed during the Class Period through which the securities could be readily liquidated at par value; and to transmit to its financial advisors, distributing firms, and investor clients the research reports concerning ML ARS described herein.

210. Merrill had actual knowledge of the devices, schemes, and artifices to defraud and acts, practices, and course of business which operated as a fraud and deceit upon the purchasers of ML ARS, as set forth herein, or acted with deliberate disregard of the fraudulent or deceitful nature of said conduct.

211. Merrill employed the devices, schemes, and artifices to defraud and engaged in the acts, practices, and course of business described herein, knowingly or deliberately and for the purpose and effect of (a) manipulating the market for ML ARS, (b) concealing the truth about the value, liquidity, and risks of ML ARS from Plaintiffs, Class members, and the investing public, and (c) supporting the inflated prices and market for ML ARS.

212. If Merrill did not have actual knowledge of the devices, schemes, and artifices to defraud and acts, practices, and course of business which operated as a fraud and deceit on the purchasers of ML ARS, it was deliberately reckless in failing to obtain such knowledge by

refraining from taking those steps necessary to discover the manipulative purpose, nature, and effect of their conduct.

213.   As a result of Merrill's devices, schemes, and artifices to defraud and acts, practices, and course of business, the market prices of ML ARS failed to reflect a fair or just price of those securities and were artificially inflated during the Class Period.

214.   In ignorance of the fact that the market prices of ML ARS were artificially inflated, and relying directly or indirectly on an assumption of an efficient market for ML ARS free of manipulation by Merrill, Plaintiffs and Class members acquired overvalued ML ARS that were manipulated by Merrill during the Class Period, and were damaged thereby.

215.   At the time Merrill employed the devices, schemes, and artifices to defraud and engaged in the acts, practices, and course of business described herein, Plaintiffs and Class members were ignorant of Merrill's conduct, and believed ML ARS traded in an efficient market free of manipulation, at prices and with yields set by free-market influences.

216.   Had Plaintiffs, Class members, and the marketplace known the truth regarding the value, liquidity, and risks of ML ARS, including the extent to which the market for ML ARS was sustained by Merrill and not determined by the natural interplay of supply and demand, Plaintiffs and Class members would not have purchased ML ARS at all or would not have done so at the prices they paid.

217.   By virtue of the foregoing, Merrill has violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c) promulgated thereunder.

218.   As a direct and proximate result of Merrill's wrongful conduct, Plaintiffs and Class members suffered damages in connection with their purchases of ML ARS during the Class Period.

## COUNT II

### Violation Of Section 20(a) Of The Exchange Act
### Against Merrill Lynch By Plaintiffs And The Class

219.    Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if fully set forth herein.  Plaintiffs bring this cause of action on behalf of themselves and the Class against Merrill Lynch under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

220.    Merrill Lynch acted as a controlling person of Merrill within the meaning of Section 20(a) of the Exchange Act for the reasons alleged in this Complaint.

221.    By virtue of its operational and management control of Merrill's business and systematic involvement in the fraudulent scheme alleged in this Complaint, Merrill Lynch had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of Merrill, including the devices, schemes, and artifices to defraud and the acts, practices, and course of business, described herein, which Plaintiffs contend manipulated the market for ML ARS.

222.    Merrill Lynch had the ability to prevent the employment of the devices, schemes, and artifices to defraud and the engagement in the acts, practices, and course of business described in this Complaint.

223.    Merrill Lynch had direct and supervisory involvement in the operations of Merrill, and therefore is presumed to have had and exercised the power to control or influence the particular conduct giving rise to the securities violations alleged in this Complaint.

224.    As set forth above, Merrill violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder by its acts and omissions as alleged in this Complaint.

225.    By virtue of its position as a controlling person, Merrill Lynch is liable pursuant to Section 20(a) of the Exchange Act.

226.    As a direct and proximate result of Merrill Lynch's wrongful conduct, Plaintiffs and Class members suffered damages in connection with their purchase of ML ARS during the Class Period.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Plaintiffs as representatives of the Class under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' Lead Counsel as counsel for the Class;

B.    Awarding damages, including but not limited to rescission, other compensatory damages, consequential damages, restitution, and disgorgement of ill-gotten gains in favor of Plaintiffs and Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, litigation costs, and expert fees;

D.    Awarding Plaintiffs and the Class pre-judgment and post-judgment interest;

E.    Awarding extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

F.    Granting such other and further relief as the Court may deem just and proper.

//
//
//
//
//
//
//
//
//
//

45

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: May 22, 2009

Respectfully submitted,

**GIRARD GIBBS LLP**

By: *Aaron M. Sheanin*

Daniel C. Girard (admitted *pro hac vice*)
Aaron M. Sheanin (admitted *pro hac vice*)
Christina H. C. Sharp (admitted *pro hac vice*)
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Jonathan K. Levine (JL-8390)
**GIRARD GIBBS LLP**
711 Third Avenue, 20th Floor
New York, NY 10017
Telephone: (212) 867-1721
Facsimile: (212) 867-1767

**Plaintiffs' Lead Counsel**

**Additional Counsel:**

Norman E. Siegel
Matthew L. Dameron
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO, 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101

Christopher A. Seeger (CS-4880)
Stephen A. Weiss (SW-3520)
David R. Buchanan (DB-6368)
**SEEGER WEISS LLP**
One William Street
New York, NY 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Colin Wilson, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.    I have reviewed the amended complaint against Merrill Lynch & Co. and Merrill Lynch, Pierce, Fenner & Smith Inc. (collectively "Merrill Lynch") prepared by Girard Gibbs LLP ("Counsel"), whom I designate as my counsel in this action for all purposes.

2.    I did not acquire any auction rate securities managed by Merrill Lynch at the direction of Counsel or in order to participate in any private action under the federal securities laws.

3.    I am willing to serve as a lead plaintiff either individually or as part of a group. I understand that a lead plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.    I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.    I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.    I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

1

7.     My purchases and sales of auction rate securities managed by Merrill Lynch are attached as follows:

| Trade Date | Auction Rate Security | Number of Shares | Price Per Share/Unit | Buy or Sell |
|---|---|---|---|---|
| 7/17/2007 | BlackRock Muniholdings Fund, Inc. Auction Market Preferred Stock Series A | 5 | $25,000 | Bought |
| 6/25/2008 | BlackRock Muniholdings Fund, Inc. Auction Market Preferred Stock Series A | 1 | $25,000 | Redeemed by issuer |

8.     I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___ day of May, 2009

_____
Colin Wilson

2

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Ronald Levy, as Trustee of the Levy Family Trust U/A DTD 12/08/1993, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.    I have reviewed the amended complaint against Merrill Lynch & Co. and Merrill Lynch, Pierce, Fenner & Smith Inc. (collectively "Merrill Lynch") prepared by Girard Gibbs LLP ("Counsel"), whom I designate as my counsel in this action for all purposes.

2.    I did not acquire any auction rate securities managed by Merrill Lynch at the direction of Counsel or in order to participate in any private action under the federal securities laws.

3.    I am willing to serve as a lead plaintiff either individually or as part of a group. I understand that a lead plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.    I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.    I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

1

6.   I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

7.   My purchases and sales of auction rate securities managed by Merrill Lynch are attached as follows:

| Trade Date | Auction Rate Security | Number of Shares | Price Per Share/Unit | Buy or Sell |
|---|---|---|---|---|
| 3/16/2006 | BlackRock Muniholdings Fund, Inc. Auction Market Preferred Stock Series C | 36 | $900,000 | Bought |
| 6/27/2008 | BlackRock Muniholdings Fund, Inc. Auction Market Preferred Stock Series C | 10 | $250,000 | Redeemed by issuer |

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of May, 2009

Ronald Levy, Trustee

2

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Michael Bonde, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the amended complaint against Merrill Lynch & Co. and Merrill Lynch, Pierce, Fenner & Smith Inc. (collectively "Merrill Lynch") prepared by Girard Gibbs LLP ("Counsel"), whom I designate as my counsel in this action for all purposes.

2.      I did not acquire any auction rate securities managed by Merrill Lynch at the direction of Counsel or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a lead plaintiff either individually or as part of a group.  I understand that a lead plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.      I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6.      I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

May 08 2009 9:11      HP LASERJET FAX              7012828411              P.3
05/04/2009 MON 14:34  FAX 4159814846  Girard Gibbs - Mail&Fax                    ☑003/003

7.    My purchases and sales of auction rate securities managed by Merrill

Lynch are attached as **Attachment A** to this document.

8.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of May, 2009

Michael Bonde

2

## ATTACHMENT A

## ML ARS PURCHASED BY MICHAEL BONDE
## DURING THE CLASS PERIOD

| Trade Date | Auction Rate Security | Number of Shares | Price Per Share/Unit | Buy or Sell |
|---|---|---|---|---|
| 12/24/2007 | Nuveen Premium Income Municipal Fund, Series M | 8 | $25,000 | Bought |
| 7/18/2008 | Nuveen Premium Income Municipal Fund, Series M | 2 | $25,000 | Redeemed by issuer |

1

## CERTIFICATE OF SERVICE

Diana Wright, being duly sworn, hereby deposes and says:

I am over the age of eighteen years and not a party to the within action and am employed by the firm Seeger Weiss LLP, counsel for the plaintiff.

On May 22, 2009 I cause a true and correct copy of the foregoing

**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE**

**FEDERAL SECURITIES LAWS**, to be served via U.S. Mail, with proper postage prepaid on all

counsel of record at the following addresses:

Jay B. Kasner, Esq.
Scott D. Musoff, Esq.
**Skadden, Arps, Slate, Meagher & Flom**
**LLP (NYC)**
Four Times Square
New York , NY 10036
212 735 3000
Fax: 212 735 2000

*Representing Defendants Merrill Lynch &*
*Co., Inc. & Merrill Lynch, Pierce, Fenner*
*& Smith Incorporated*


Diana Wright