# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re MERRILL LYNCH AUCTION RATE SECURITIES LITIGATION | **Master Case File No. 09-md-2030 (LAP)** |
| This Document Relates To<br><br>No. 08-CV-3037 (LAP) | |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS LEAD PLAINTIFFS' FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Daniel C. Girard (admitted *pro hac vice*)
Aaron M. Sheanin (admitted *pro hac vice*)
Christina H. C. Sharp (admitted *pro hac vice*)
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

Jonathan K. Levine (JL-8390)
**GIRARD GIBBS LLP**
711 Third Avenue, 20th Floor
New York, NY  10017
Telephone:  (212) 867-1721
Facsimile:  (212) 867-1767

Plaintiffs' Lead Counsel

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ............................................................................................... 2

I.   Auction Rate Securities ............................................................................................. 2

II.  The Implications Of A Failed Auction ..................................................................... 3

III. Merrill Manipulated ML ARS Return Rates ........................................................... 5

IV.  The Scheme Begins To Unravel ............................................................................... 6

V.   Merrill Knowingly Manipulated The Market For ML ARS ..................................... 6

VI.  In Violation Of The SEC's May 2006 Order, Merrill Never Adequately Disclosed Its
     Manipulative Activity ............................................................................................... 8

PROCEDURAL HISTORY ............................................................................................. 9

ARGUMENT .................................................................................................................. 10

I.   LEGAL STANDARDS ON A MOTION TO DISMISS ........................................ 10

II.  PLAINTIFFS ALLEGE MANIPULATIVE CONDUCT ..................................... 11

     A. The Exchange Act Was Designed To Prohibit Manipulative Trading Practices ............ 11

     B. Plaintiffs Allege Merrill's Manipulative Conduct With Particularity ............................ 13

     C. Misrepresentations And Omissions Are Not The Sole Basis For Plaintiffs' Claim Of
        Market Manipulation .................................................................................................... 15

III. Defendants' Truth-On-The-Market Defense Fails ................................................. 17

     A. Defendants' Fact-Intensive Argument Is Inappropriate At This Stage .......................... 17

     B. Defendants' Argument Founders On The Merits, As Merrill Failed To Disclose The
        True Investment Risks .................................................................................................. 18

     C. Merrill's Other Disclosure-Related Arguments Also Lack Merit .................................. 22

IV.  PLAINTIFFS ADEQUATELY PLEAD SCIENTER ........................................... 25

A. Standards For Pleading Scienter............................................................................ 25

B. Merrill Knowingly Manipulated The ML ARS Market................................................ 26

C. Merrill's Internal Communications Demonstrate Strong Circumstantial Evidence Of Conscious Misbehavior Or Recklessness......................................................... 27

D. Merrill Had Motive And Opportunity To Commit Fraud .............................................. 28

E. Defendants' Suggested Inferences of Non-Fraudulent Intent Are Implausible And Should Be Rejected ........................................................................................ 30

V.    PLAINTIFFS PLEAD THAT THEY RELIED ON A PRESUMPTION OF AN EFFICIENT MARKET FREE OF MANIPULATION ........................................................ 33

VI.   THE COMPLAINT ALLEGES WRONGFUL CONDUCT WITH PARTICULARITY AS TO EACH DEFENDANT ............................................................................ 36

VII.  DEFENDANTS' ATTEMPT TO MISCAST THE COMPLAINT AS ALLEGING A "PURE" MISREPRESENTATION AND OMISSIONS CLAIMS IS BASELESS ........... 36

VIII. PLAINTIFFS STATE A CLAIM AGAINST MERRILL LYNCH FOR CONTROL PERSON LIABILITY ................................................................................... 37

IX.   PLAINTIFFS' CLAIMS ARE TIMELY ............................................................... 39

X.    PLAINTIFFS DO NOT ASSERT CLAIMS ON BEHALF OF INVESTORS WHO HAVE BEEN MADE WHOLE.......................................................................... 45

A. The Proposed Class Excludes Investors Whose Securities Have Been Repurchased At Par.................................................................................................... 45

B. Plaintiffs Have Standing To Represent All Class Members .......................................... 46

CONCLUSION.................................................................................................. 47

# TABLE OF AUTHORITIES

**Cases**

*ACA Financial Guaranty Corp. v. Advest, Inc.*
  512 F.3d 46 (1st Cir. 2008) ................................................................................ 26

*Affiliated Ute Citizens v. United States*
  406 U.S. 128 (1972) .......................................................................................... 22

*Aimis Art Corp. v. Northern Trust Secs., Inc.*
  2009 U.S. Dist. LEXIS 68712 (S.D.N.Y. Aug. 6, 2009) ........................................ 46

*Akerman v. Arotech Corp.*
  608 F. Supp. 2d 372 (E.D.N.Y. 2009) ................................................................. 26

*Alexander v. Evans,*
  1993 U.S. Dist. LEXIS 14560 (S.D.N.Y. Oct. 15, 1993) ....................................... 22

*ATSI Communs., Inc. v. The Shaar Fund, Ltd.*
  493 F.3d 87 (2d Cir. 2007) ......................................................................... passim

*Bank of Am. Corp. v. Braga Lemgruber*
  385 F. Supp. 2d 200 (S.D.N.Y. 2005) ................................................................. 24

*Basic v. Levinson*
  485 U.S. 224 (1988) .......................................................................................... 21

*Bell Atl. Corp. v. Twombly*
  550 U.S. 544 (2007) .......................................................................................... 10

*Brown v. E.F. Hutton Group, Inc.*
  991 F.2d 1020 (2d Cir. 1993) ............................................................................. 23

*California Public Employees' Retirement System v. Chubb Corp.*
  2002 U.S. Dist. LEXIS 27189 (D.N.J. June 25, 2002) .......................................... 33

*Catton v. Defense Tech. Sys., Inc.*
  2006 U.S. Dist. LEXIS 205 (S.D.N.Y. Jan. 3, 2006) ............................................ 17

*Comm. Workers of Am. Plan v. Csk Auto Corp.*
  525 F. Supp. 2d 1116 (D. Ariz. 2007) ................................................................. 26

*Compudyne Corp. v. Shane*
    453 F. Supp. 2d 807 (S.D.N.Y. 2006) ............................................................. 28, 37

*Crane Co. v. Westinghouse Air Brake Co.*
    419 F.2d 7874 (2d Cir. 1969) ...................................................................... 12

*Dodds v. Cigna Sec.*
    12 F.3d 346 (2d Cir. 1994) ........................................................................ 39

*Doehla v. Wathne Ltd., Inc.*
    1999 U.S. Dist. LEXIS 11787 (S.D.N.Y. Aug. 3, 1999) ........................... 23

*Dolphin & Bradbury, Inc. v. SEC*
    512 F.3d 634 (D.C. Cir. 2008) .................................................................... 21

*ECA v. JP Morgan Chase Co.*
    553 F.3d 187 (2d Cir. 2009) ................................................................. 25, 32

*Ernst & Ernst v. Hochfelder*
    425 U.S. 185 (1976) ................................................................. 10, 11, 13, 25

*Fadem v. Ford Motor Co.*
    352 F. Supp. 2d 501 (S.D.N.Y 2005.) ....................................................... 32

*Flag Telecom Holdings, Ltd. Sec. Litig.*
    618 F. Supp. 2d 311 (S.D.N.Y. 2009) ....................................................... 19

*Ganino, v. Citizens Utils. Co.*
    228 F.3d 154 (2d Cir. 2000) ........................................................ 17, 18, 21, 34

*Goldman v. Belden*
    754 F.2d 1059 (2d Cir. 1985) .................................................................... 10

*Goplen v. 51job, Inc.*
    453 F. Supp. 2d 759 (S.D.N.Y. 2006) ...................................................... 33

*Gurary v. Winehouse*
    190 F.3d 37 (2d Cir. 1999) ........................................................................ 13

*GVA Market Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.*
    580 F. Supp. 2d 321 (S.D.N.Y. 2008) ....................................................... 45

*Hall v. The Children's Place Retail Stores, Inc.*
    580 F. Supp. 2d 212 (S.D.N.Y. 2008) ....................................................... 18

*Harvey v. 320 Owners Corp.*
  2009 U.S. Dist. LEXIS 61007 (S.D.N.Y. Apr. 21, 2009).................................................. 10

*Hoffman v. UBS-AG*
  591 F. Supp. 2d 522 (S.D.N.Y. 2008)............................................................................... 47

*Hunt v. Alliance North Am. Gov't Income Trust, Inc.*
  159 F.3d 723 (2d Cir. 1998)....................................................................................... 23, 35

*In Merrill Lynch & Co. Research Reports Sec. Litig.*
  272 F. Supp. 2d 243 (S.D.N.Y. 2003)............................................................................... 32

*In re Alstom SA Sec. Litig.*
  406 F. Supp. 2d 433 (S.D.N.Y. 2005)............................................................... 17, 20, 28, 37

*In re Amaranth Natural Gas Commodities Litig.*
  587 F. Supp. 2d 513 (S.D.N.Y. 2008)............................................................................... 26

*In re Blech Sec. Litig.*
  961 F. Supp. 569 (S.D.N.Y 1997).............................................................................. 28, 29

*In re Credit Suisse First Boston*
  2001 U.S. Dist. LEXIS 3332 (S.D.N.Y Mar. 28, 2001) ................................................... 21

*In re Dell Inc., Securities Litig.*
  591 F. Supp. 2d 877 (W.D. Tex. 2008)............................................................................. 29

*In re Doral Fin. Corp. Sec. Litig.*
  563 F. Supp. 2d 461 (S.D.N.Y. 2008)............................................................................... 29

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*
  2000 U.S. Dist. LEXIS 13469, (S.D.N.Y. Sep. 20, 2000)................................................. 46

*In re Dynex Capital, Inc. Securities Litigation*
  2006 U.S. Dist. LEXIS 4988 (S.D.N.Y. Feb. 10, 2006)................................................... 43

*In re Fleming Cos. Secs. & Derivative Litig.*
  2004 U.S. Dist. LEXIS 26488 (E.D. Tex. June 10, 2004)................................................ 30

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*
  618 F. Supp. 2d 311 (S.D.N.Y. 2009)……………..……………………………………….19

*In re Global Crossing, Ltd. Sec. Litig.*
  322 F. Supp. 2d 319 (S.D.N.Y. 2004)............................................................................... 29

*In re Guilford Mills, Inc. Sec. Litig.*
   1999 U.S. Dist. LEXIS 21690 (S.D.N.Y. 1999) ...................................................... 31

*In re Initial Pub. Offering Sec. Litig.*
   241 F. Supp. 2d 281 (S.D.N.Y. 2003) ................................................................ 26, 38

*In re Initial Pub. Offering Secs. Litig.*
   544 F. Supp. 2d 277 (S.D.N.Y. 2008) ..................................................................... 33

*In re JP Morgan Chase Sec. Litig.*
   363 F. Supp. 2d 595 (S.D.N.Y. 2005) ..................................................................... 29

*In re Loral Space & Commc'ns Ltd. Sec. Litig.*
   2004 U.S. Dist. LEXIS 3059 (S.D.N.Y Feb. 23, 2004) ........................................... 31

*In Merrill Lynch & Co. Research Reports Sec. Litig*
   272 F. Supp. 2d 243 (S.D.N.Y. 2003)……………………………...…………………………32

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*
   289 F. Supp. 2d 416 (S.D.N.Y. 2003) ..................................................................... 29

*In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*
   434 F. Supp. 2d 233 (S.D.N.Y. 2006) ..................................................................... 47

*In re Moody's Corp. Sec. Litig.*
   599 F. Supp. 2d 493 (S.D.N.Y. 2009) ..................................................................... 37

*In re Parmalat Sec. Litig.*
   375 F. Supp. 2d 278 (S.D.N.Y. 2005) ..................................................................... 35

*In re Parmalat Sec. Litig.*
   383 F. Supp. 2d 616 (S.D.N.Y. 2005) ..................................................................... 37

*In re Philip Servs. Corp. Sec. Litig.*
   383 F. Supp. 2d 463 (S.D.N.Y. 2004) ..................................................................... 25

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*
   930 F. Supp. 68 (S.D.N.Y. 1996) ........................................................................... 21

*In re Qwest Communs. Int'l, Inc. Secs. Litig.*
   396 F. Supp. 2d 1178 (D. Colo. 2004) .................................................................... 30

*In re Refco Sec. Litig.*
   503 F. Supp. 2d 611 (S.D.N.Y. 2007) ..................................................................... 31

*In re Salomon Smith Barney Mut. Fund Fees Litig.*
    441 F. Supp. 2d 579 (S.D.N.Y. 2006).................................................................. 47

*In re Sterling Foster & Co., Inc., Sec. Litig.*
    222 F. Supp. 2d 312 (S.D.N.Y. 2002).................................................................. 40

*In re UBS Auction Rate Secs. Litig*
    2009 U.S. Dist. LEXIS 26385 (S.D.N.Y. Mar. 30, 2009) ................................. 10, 46

*In re Ultrafem Inc. Securities Litigation*
    91 F. Supp. 2d 678 (S.D.N.Y. 2000)................................................................... 45

*In the Matter of F.N. Wolf & Co., Inc.*
    1996 SEC LEXIS 8 (S.E.C. Jan. 3, 1996)........................................................ 13, 14

*Iqbal v. Ashcroft*
    129 S. Ct. 1937 (2009) ....................................................................................... 10

*JP Morgan Chase Bank v. Winnick*
    350 F. Supp. 2d 393 (S.D.N.Y. 2004)................................................................. 24

*Kassner v. 2nd Ave. Delicatessen, Inc.*
    496 F.3d 229 (2d Cir. 2007)................................................................................ 10

*Katz v. Image Innovations Holdings, Inc.*
    542 F. Supp. 2d 269 (S.D.N.Y. 2008)................................................................. 29

*Lapin v. Goldman Sachs Group, Inc.*
    506 F. Supp. 2d 221 (S.D.N.Y. 2006)................................................................. 18

*Last Atlantis Capital LLC v. Chi. Bd. Options Exch., Inc.*
    455 F. Supp. 2d 788 (N.D. Ill. 2006) ................................................................. 35

*Lentell v. Merrill Lynch & Co., Inc.*
    396 F.3d 161 (2d Cir. 2007)........................................................................... 15, 16

*Levitt v. Bear Stearns & Co.*
    340 F.3d 94 (2d Cir. 2003)................................................................................. 40

*Lormand v. US Unwired, Inc.*
    565 F.3d 228 (5th Cir. 2009) ............................................................................. 26

*Louros v. Kreicas*
    367 F. Supp. 2d 572 (S.D.N.Y. 2005)..................................................................... 23

*Mallis v. Bankers Trust Co.*
    615 F.2d 68 (2d Cir. 1980)................................................................................. 24

*Markowski v. SEC*
    274 F.3d 525 (D.C. Cir. 2001) ........................................................................... 32

*Maywalt v. Parker & Parsley Petroleum Co.*
    147 F.R.D. 51 (S.D.N.Y. 1993) .......................................................................... 46

*McMahan & Co. v. Wherehouse Entertainment, Inc.*
    900 F.2d 576 (2d Cir. 1990)............................................................................... 19

*Mishkin v. Ageloff*
    1998 U.S. Dist. LEXIS 14890 (S.D.N.Y. Sept. 23, 1998)................................. 37, 38

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*
    2002 U.S. Dist. LEXIS 24049 (S.D.N.Y. Oct. 10, 2002) ................................... 32

*Newman v. Warnaco Group, Inc.*
    335 F.3d 187 (2d Cir. 2003) ............................................................................... 39

*Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*
    840 F. Supp. 243 (S.D.N.Y. 1993)..................................................................... 40

*Novak v. Kasaks*
    216 F.3d 300 (2d Cir. 2000)........................................................................... 25, 26

*Open Hous. Ctr. v. Samson Mgmt. Corp.*
    152 F.R.D. 472 (S.D.N.Y. 1993) ....................................................................... 46

*Pagel, Inc. v. SEC*
    803 F.2d 942 (8th Cir. 1986) ......................................................................... 16, 37

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*
    244 F. Supp. 2d 289 (S.D.N.Y. 2003).................................................................. 46

*Provenz v. Miller*
    102 F.3d 1478 (9th Cir. 1996) ....................................................................... 17, 34

*Puttick v. Am. Online, Inc.*
    2007 U.S. Dist. LEXIS 38483 (S.D.N.Y. May 23, 2007) ................................... 45

*Rand v Starter Corp.*
    1995 U.S. Dist. LEXIS 7267 (S.D.N.Y. May 25, 1995) ........................................ 31

*Ruotolo v. City of New York*
    514 F.3d 184 (2d Cir. 2008)................................................................................ 10

*Ruskin v. TIG Holdings, Inc.*
    2000 U.S. Dist. LEXIS 11517 (S.D.N.Y. Aug. 14, 2000) ...................................... 20

*Sailor v. Northern States Power Co.*
    4 F.3d 610 (8th Cir. 1993) .................................................................................. 35

*Santa Fe Indus., Inc. v. Green*
    430 U.S. 462 (1977)....................................................................................... 13, 16

*Schick v. Ernst & Young*
    141 F.R.D. 23 (S.D.N.Y. 1992) .......................................................................... 31

*Schlick v. Penn-Dixie Cement Corp.*
    507 F.2d 374 (2d Cir. 1974)................................................................................ 16

*Schnell v. Conseco, Inc.*
    43 F. Supp. 2d 438 (S.D.N.Y. 1999)................................................................... 17

*SEC v. Badian*
    2008 U.S. Dist. LEXIS 64661 (S.D.N.Y. Aug. 22, 2008) ...................................... 16

*SEC v. Martino*
    255 F. Supp. 2d 268 (S.D.N.Y. 2003)................................................................. 15

*SEC v. Resch-Cassin & Co., Inc.*
    362 F. Supp. 964 (S.D.N.Y. 1973)................................................................. 13, 15

*SEC v. U.S. Environmental, Inc.*
    155 F.3d 107 (2d Cir. 1998)................................................................................ 26

*Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*
    2005 U.S. Dist. LEXIS 16382 (S.D.N.Y. Aug. 9, 2005) ........................................ 29

*Shah v. Meeker*
    435 F.3d 244 (2d Cir. 2006)................................................................................ 40

*Siebert v. Nives*
    871 F. Supp. 110 (D. Conn. 1994) ..................................................................... 42

*Simon v. Castello*
    172 F.R.D. 103 (S.D.N.Y. 1996) ........................................................... 36

*Sonesta Int'l Hotels Corp. v. Wellington Assoc.*
    483 F.2d 247 (2d Cir. 1973).................................................................... 18

*South Cherry Street, LLC v. Hennessee Group LLC*
    2009 U.S. App. LEXIS 15467 (2d Cir. July 14, 2009)..................... 28, 30

*Staehr v. Hartford Financial Services Group, Inc.*
    547 F.3d 406 (2d Cir. 2008)................................................................... 41

*Starr v. Georgeson Shareholder*
    412 F.3d 103 (2d Cir. 2005)............................................................. 21, 35

*Steed Fin. LDC v. Nomura Sec. Int'l Inc.*
    2001 U.S. Dist. LEXIS 14761 (S.D.N.Y. Sep. 20, 2001)..................... 23

*TCS Capital Management, LLC v. Apax Partners, L.P.*
    2008 U.S. Dist. LEXIS 19854 (S.D.N.Y. Mar. 7, 1008) ...................... 17

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*
    531 F.3d 190 (2d Cir. 2008)................................................................... 43

*Tedesco v. Mishkin*
    689 F. Supp. 1327 (S.D.N.Y. 1988)....................................................... 46

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
    551 U.S. 308 (2007)......................................................................... 25, 26

*The Interpublic Group Of Cos., Inc. v. Fratarcangelo*
    2002 U.S. Dist. LEXIS 22989 (S.D.N.Y. Nov. 26, 2002)..................... 22

*United States v. Royer*
    549 F.3d 886 (2d Cir. 2008)................................................................... 16

*Wyser-Pratte Management Co. v. Telxon Corp.*
    413 F.3d 533 (6th Cir. 2005) ................................................................. 45

**Statutes**

15 U.S.C. § 78b(3) ........................................................................................... 11

15 U.S.C. § 78b(4) ........................................................................................... 12

15 U.S.C. § 78i(a)(2)........................................................................................ 12

15 U.S.C. § 78j(b) ................................................................................................ 13

15 U.S.C. § 78u-4(b)(2) ........................................................................................ 25

**Rules**

Fed. R. Civ. P. 12(b) ............................................................................................. 10

Fed. R. Civ. P. 8(a) ............................................................................................... 38

Fed. R. Civ. P. 9(b) ............................................................................... 11, 15, 36, 38

**Administrative Authorities**

*Review of Antimanipulation Regulation of Securities Offerings*
    1994 SEC LEXIS 1302 (Apr. 19, 1994) ............................................................. 13

**Other Authorities**

Daniel R. Fischel & David J. Ross, *Should the Law Prohibit "Manipulation" in Financial Markets?*
    105 Harv. L. Rev. 503 (Dec. 1991) .................................................................... 12

L. Loss, *Fundamentals of Securities Regulation* 992 (1983) ...................................... 12

Norman S. Poser, *Stock Market Manipulation and Corporate Control Transactions*
    40 U. Miami L. Rev. 671, 694-95 (Mar. 1986)……………………………………...12, 13

Steve Thel, *Regulation of Manipulation under Section 10(b):  Securities Prices and the Text of the Securities Exchange Act of 1934*, *Securities Prices and the Text of the Securities Exchange Act of 1934*
    1988 Colum. Bus. L. Rev. 359, 410 (1988) ........................................................ 12

## INTRODUCTION

Plaintiffs purchased auction rate securities from brokers who "remarketed" those securities for Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill").  Plaintiffs have been unable to sell these securities at par following the collapse of the auction rate securities market in February 2008.  They sue Merrill for market manipulation under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and its parent, Merrill Lynch & Co. ("Merrill Lynch") as a controlling person of Merrill under Section 20(a).  Plaintiffs claim Merrill, in its capacity as "manager" of the periodic auctions at which these securities were traded, manipulated the market for these securities by *systematically* placing "support bids" to keep the auctions from failing. Plaintiffs allege Merrill's support bids and other actions created the artificial appearance of demand for the securities, masked the actual value of the securities they purchased, and caused them to realize losses on their investments when Merrill stopped placing support bids and allowed the auction rate securities market to collapse.

In their motion to dismiss, Defendants argue that Plaintiffs' claims are barred because Merrill fully disclosed all relevant facts and the Securities and Exchange Commission ("SEC") condoned its practices.  Defendants' full disclosure argument depends in the first instance on imputing to Plaintiffs, who purchased their Merrill-managed auction rate securities from third-party brokerages, knowledge of fine print in prospectuses that were never delivered and website disclosures directed only to Merrill's investor clients.  Even if one assumes for the sake of argument that Plaintiffs are charged with knowledge of these soporific and ambiguous statements, however, they provide no defense to Plaintiffs' claims.  Full disclosure would have required Merrill to advise investors that its support bids were not placed "routinely," but pursuant to an understanding with the issuer that Merrill would bid to ensure there were no auction failures, that institutional buyers were increasingly unwilling to purchase auction rate securities, that Merrill anticipated the demise of the market, and that Merrill was aggressively marketing auction rate securities to retail buyers in a last-ditch effort to limit its own exposure. Plaintiffs' allegations do not solely rest, as Defendants contend, on false statements and non-

disclosures, but on Merrill's actions to prop up the auction rate securities market while attempting to unload its own inventory before it decided, in concert with other auction managers, to allow the market to fail. Defendants also fail to explain why—if the SEC "condoned" Merrill's auction rate securities practices—it required Merrill to repurchase billions in auction rate securities and stated publicly that "*Merrill Lynch did not make adequate disclosure that the liquidity of these securities was based on Merrill Lynch supporting the auctions it managed when there was not enough demand.*"

Because Merrill did not fully or fairly disclose the facts relevant to Plaintiffs' investments, the Court should reject Defendants' challenges to Plaintiffs' allegations of market manipulation, reliance, and scienter, as they all depend on the sufficiency of Merrill's disclosures. The Court should also reject Defendants' contentions that Plaintiffs have not distinguished between the roles of Merrill and its corporate parent, Merrill Lynch, or alleged sufficient facts to show that Merrill Lynch acted as a controlling person. Plaintiffs have clearly delineated the respective roles of each and alleged sufficient facts to plead control person liability. Finally, Defendants' nonsensical suggestion that Plaintiffs' claims are barred because the statute of limitations began to run years before they purchased their securities must also be rejected.

The Court should deny Defendants' motion to dismiss in its entirety.

## STATEMENT OF FACTS

### I.    Auction Rate Securities

Auction rate securities were first offered to institutional investors in the 1980s. (¶¶ 32-33.) Initially auction rate securities carried high investment minimums of $250,000 or more. By 2005, investment minimums had been reduced to $25,000 and the securities were being offered as "money market alternatives" to individuals, charities, and small businesses. The total amount of auction rate securities outstanding grew by 26 percent from approximately $263 billion at the end of 2005 to $330 billion by the end of 2008.

The mechanics of auction rate securities are described in generally accurate terms in

Defendants' memorandum at pages 9-10.  Auction rate securities typically traded at par value. The rates of interest or dividends paid on the securities were set at periodic "auctions" held every 7, 28, or 35 days.  (¶¶ 30-34.)[1]  For each security, the issuer selected and paid firms to act as dealers through which investors would submit orders to buy, sell, or hold shares at the auction. These firms were called "auction dealers," "broker-dealers," or "auction managers," and were said to "participate" in the auctions.[2]   Merrill underwrote billions of dollars of auction rate securities and, during the Class Period, served as sole auction dealer, lead auction dealer, co-lead auction dealer, or joint lead auction dealer for those securities ("ML ARS").  (¶¶ 34-37, 40-41, 111.)[3]

## II.    The Implications Of A Failed Auction

In a successful auction, all shares offered were sold, and the "clearing rate"—*i.e.*, the lowest interest or dividend rate at which all sale orders could be fulfilled—applied to all shares

---

[1] Citations to "¶ __" refer to specific paragraphs of the First Amended Consolidated Class Action Complaint For Violation Of The Federal Securities Laws ("Complaint").  "Def. Mem." refers to the Memorandum Of Law In Support Of Defendants' Motion To Dismiss Lead Plaintiffs' "First Amended Consolidated Class Action Complaint."  "Kasner Decl." refers to Declaration of Jay B. Kasner Dated July 24, 2009.  "Dkt. No." refers to the docket for Case No. 08-cv-3037 (LAP).

[2] In an apparent oversight, Defendants erroneously state that Merrill typically served as the auction *agent* responsible for managing the auctions.  (Def. Mem. at 9.)  Merrill's description of its own auction rate securities practices states that Merrill "[did] not serve as auction agent" (Kasner Decl. Ex. A at 6), but as auction *manager*, a very different function (*id.* at 5-6, 9-11, 20). Plaintiffs have described Merrill's role in the Complaint as that of "auction dealer," as that the term is often used in the prospectuses for offerings of Merrill-sponsored auction rate securities. The terms auction manager and auction dealer are intended to refer to the same function, and for the sake of clarity, Plaintiffs have generally adopted Merrill's use of the term auction manager in this opposition memorandum.

[3] Defendants incorrectly claim in footnote 1 of their memorandum that the Complaint does not differentiate between the conduct of the two companies—Merrill Lynch, Pierce, Fenner & Smith, Inc. and Merrill Lynch & Co.—and instead refers to them together as "Merrill." Actually, the first paragraph of the Complaint says that "Merrill" refers to Merrill Lynch, Pierce, Fenner & Smith, and "Merrill Lynch" refers to Merrill Lynch & Co.  "Defendants" refers to both companies.  (The same conventions are followed in this brief.)  Merrill is being sued for conduct that violated Section 10(b) of the Securities Exchange Act of 1934.  Merrill Lynch is being sued only as a control person under Section 20(a).  (¶¶ 203-26.)

until the next auction. An auction failed if the number of shares offered for sale exceeded the number of shares bid for purchase. If the auction failed, current holders would have no choice but to hold their securities until the next auction.

Auction rate securities have no "put" feature requiring the issuer or auction manager to buy back shares at par on demand. Instead, in case of a failed auction, auction rate securities pay interest at a predetermined interest rate typically called the "maximum rate" or "penalty rate." The maximum rate was, in theory, supposed to ensure liquidity by attracting more buyers to the next auction or inducing the issuer to buy back the securities and refinance the principal. (¶¶ 37-39.) If, however, the maximum rate was insufficiently high to attract liquidity, the risk characteristics of the security were fundamentally altered. Unless the maximum rate was high enough to attract new buyers or prompt the issuer to refinance, any person left holding auction rate securities when an auction failed would be left with permanently illiquid securities. One bond market professional likened this dynamic to the "Old Maid" card game.[4]

Thus, as long as auction managers remained willing to buy all shares necessary to prevent an auction failure, the securities were by all appearances perfectly liquid. The moment the managers stopped buying up excess demand, however, the inability of the securities to attract new buyers through their maximum rates would become apparent and the market would fail *en masse*, with no hope of recovery. (¶¶ 39, 41, 51, 90, 148.) Thus, Defendants' observation that a failed auction is not the same as a default is beside the point. (Def. Mem. at 10.) Plaintiffs' complaint is not that their securities are in default, but that they were never worth the price they paid for them. (¶¶ 38, 163-64, 167-68, 199-200.)

Moreover, Plaintiffs take issue with Defendants' claim that "[f]ollowing an auction failure, a holder of ARS receives a return at a *typically much higher* maximum rate set for that security. (*Id.* ¶ 38)." (Def. Mem. at 10.) Paragraph 38 of the Complaint does *not* say the "maximum rate" was "typically much higher" than the rate set at auctions. Rather, "maximum

---

[4]  *See* Michael McDonald, "Gross Says Auction Bonds an 'Old Maid' for Investors, February 26, 2008. (http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a3DVOtlADdQI.)

rate" is simply the term used to describe the rate investors received in case of auction failure. Some auction rate securities—typically those issued by municipalities and other public entities—carried sufficiently high penalty rates to attract liquidity. When the auction rate securities market collapsed, those securities reset to rates as high as 17 percent and attracted new buyers or were refinanced by the issuer. None of those securities are implicated here. This litigation seeks compensation for losses suffered by investors who were left holding the "Old Maid" when Merrill discontinued its practice of preventing auction failures by placing support bids. Plaintiffs and the members of the proposed class purchased ML ARS which reset to maximum rates that were too low to attract liquidity when the market failed.

Through August 2007, pursuant to a tacit understanding with the issuers, Merrill placed support bids to ensure the success of every auction for which it served as sole or lead auction manager. Between January 2006 and May 2008, Merrill placed support bids to prevent over 5,800 such auctions from failing. (¶¶ 44-48.) Merrill's interventions created the appearance that ML ARS were readily liquid and traded in a market that seemed to function according to the natural interplay of supply and demand. Absent Merrill's interventions, the market for ML ARS would have failed years before Plaintiffs purchased their securities. (¶¶ 48-51.)

## III.    Merrill Manipulated ML ARS Return Rates

Merrill used its interventions as an opportunity to manipulate interest rates. When Merrill placed support bids, it did so at particular interest rates and in sufficient share amounts to ensure the rates at which the auctions would clear. (¶ 59.) Merrill set rates high enough to induce investors to buy ML ARS, but without letting clearing rates become or stay so high as to alienate its issuer clients who were on the hook for the interest payments. Merrill's rigging of clearing rates sent a false signal about the risk of ML ARS, as higher interest rates are generally an indicator of higher risk. Therefore, by intervening in the auctions, Merrill deprived investors of critical information bearing on the risk, volatility, and fair price of ML ARS. (¶¶ 63-64.)

## IV.    The Scheme Begins To Unravel

Merrill's house of cards began to collapse in the summer of 2007.  As the deterioration of the credit markets accelerated, Merrill's inventory of ML ARS began to rise.    (¶ 61.)  Concurrently, Merrill and other managers elected not to support a series of auctions for securities backed by subprime mortgages.  Word of these auction failures accelerated the pace at which institutional investors began selling off their ML ARS holdings.  Merrill responded by intensifying its efforts to prop up the ML ARS market, seeking to buy time while it implemented a desperate campaign to sell down its own inventory before the market collapsed.  (¶¶ 99-102.)

Merrill and the other major auction managers shared an interest in keeping the market afloat and suppressing any negative information that might hasten the market's demise.  The managers recognized that their continued support for the market through the placement of support bids meant they risked finding themselves with an unsaleable inventory of auction rate securities if the market collapsed.  Managers watched their counterparts closely for any signs that the "game was up," while they continued to intervene to prevent failures with the tacit or express understanding that other auction managers would continue to do the same.  (¶¶ 148-49.)

Merrill carefully monitored the industry for auction failures throughout the fall of 2007 and into early 2008.  When two other large auction managers allowed their auctions to fail on February 12, 2008, Merrill concluded that collapse of the entire market was inevitable and threw in the towel.  (¶¶ 102-04.)  The following day, Merrill and all other major auction managers withdrew their support for the auctions.  As a result, 87 percent of all auctions failed, and billions in auction rate securities became illiquid.  (¶¶ 105-07.)  There is no indication the market will ever resume operations, and the securities Plaintiffs purchased are worth a fraction of the price paid for them.  (¶¶ 7, 168, 200.)

## V.    Merrill Knowingly Manipulated The Market For ML ARS

Merrill's attempts to sell down its inventory while the market deteriorated in the fall and winter of 2007-08 meant harrowing times for Frances Constable, the beleaguered Managing Director responsible for Merrill's Auction Rate Trading Desk, as Merrill resorted to every means

at its disposal to sustain the market and unload inventory. After the initial round of auction failures in August 2007, Constable and other Merrill executives organized a series of meetings and conference calls with financial advisors and sales managers to exhort them to promote ML ARS to prospective buyers. (¶¶ 82-88.) In an email dated September 27, 2007, Ms. Constable, referring to her sales efforts, wrote that "[w]e are shoveling as fast as we can."

The ARS Trading Desk also used Merrill's "independent" research analysts to make positive statements about ML ARS in conference calls and publish research reports while downplaying risks. (¶¶ 86-89.) One report was notable in that it originally disclosed in frank terms that ML ARS lacked a "put" feature, and then, upon Constable's demand, was immediately withdrawn and replaced with a more favorable report that did not raise red flags about the risk of illiquidity. (¶¶ 68-73.) Subsequent reports were replete with positive statements about auction rate securities, even as the market collapse appeared increasingly inevitable. (¶ 75.)

With Merrill's ML ARS inventory exceeding $2.3 billion by November 19, 2007, John Price, Constable's supervisor, directed her "to get smaller unfortunately—using any means possible," including discounts and increased commissions to brokers who sold ML ARS. (¶¶ 130-32.) Merrill manipulated interest rates upward to induce ML ARS sales, as Constable explained, "We are working it higher. . . . The gloves are off and we are not concerned with issuer perception of our abilities and the competition. Gotta move these microwave ovens!!" (¶¶ 61-62.)

By November 2007, John Price, Constable's supervisor, acknowledged the unsustainable nature of the auction rate securities market: "Market is collapsing. No more $2k dinners at CRU!! The Financials are being invicerated! [sic] More firings over at Citi . . . Inventory flooding the street. Going to be a great '08 Trading environment. All we have to do is live!!" (¶ 137.) By January 2008, Merrill was internally contemplating withdrawing support for all future auctions. Merrill was also expecting that the insurers for certain ML ARS would be

downgraded, prompting a "wave of selling" by investors that would make those auctions impossible to support and trigger widespread sell-offs and auction failures. (¶¶ 138-39.)

Far from warning its customers and prospective buyers about these adverse developments, however, Merrill continued to encourage its financial advisors to sell ML ARS. Despite failures of auctions conducted by other auction managers during the last week of January 2008 and the first week of February 2008, Merrill told its financial advisors and investors directly and through published research reports that Merrill had no intention of allowing its auctions to fail. (¶¶ 143-45.) Privately, Merrill took a much more pessimistic view of the auction failures. In a January 23, 2008 email, analyst Kevin Conery called the auction failures a "new crisis" and wrote, "We've had 3 parties confirm that Lehman is dropping out of the auction business. Nothing like adding further illiquidity to an already illiquid market." (¶ 143.) Within weeks, Merrill executives decided to pull the plug on further auction support. (¶¶ 104-07.)

## VI.    In Violation Of The SEC's May 2006 Order, Merrill Never Adequately Disclosed Its Manipulative Activity

Defendants claim that they complied with a cease-and-desist order obtained by the SEC in May 2006 and are thus immune from liability. Setting aside Defendants' improper attempt to argue facts outside the record on a motion to dismiss, there are more fundamental problems with Defendants' argument. Merrill never fully or fairly disclosed the extent of its manipulative activity or the impact of that activity on the market. Thus, the SEC order does not shield Defendants from liability.

In May 2006, the SEC found that Merrill and other auction managers had willfully violated Section 17(a)(2) of the Securities Act of 1933 by, among other things, bidding for their proprietary accounts to prevent failed auctions, set a "market" rate, or prevent all-hold auctions. The SEC found that Merrill's unlawful conduct affected the clearing rate, and required Merrill to cease and desist and/or to make sufficient disclosures of these manipulative practices. (¶ 172.)

In response to the SEC's May 2006 order, Merrill placed on its website a document entitled, "Description of Merrill Lynch's Auction Rate Securities Practices and Procedures."

Merrill also included a reference to the website on trade confirmations it sent to its investor clients after they purchased ML ARS. As a result, Merrill's clients would view a description of its purported ML ARS practices only if they bought ML ARS, saw the reference to the website on the trade confirmation, visited the website, and saw and clicked on the appropriate link. (¶¶ 173-74.)

Merrill's website disclosure failed to disclose, among other things, that Merrill had invariably placed support bids whenever needed to prevent auction failures and that Merrill's suppression of auction failures had masked the impact of the low maximum rates carried by ML ARS on the liquidity of those securities in the event of an auction failure. (¶ 175.) In August 2008, the SEC stated that Merrill's disclosures had been insufficient to apprise investors that "the liquidity of those securities was based on Merrill Lynch supporting the auctions it managed when there was not enough demand." (¶¶ 177-79.)

As inadequate as Merrill's disclosures were to its own clients, they were even worse with respect to Plaintiffs and others who bought through Merrill's "remarketers." Merrill's clients received trade confirmations directing them to a website containing what purported to be Merrill's practices, but Plaintiffs' trade confirmations carried no such reference. And Merrill had no reason to think its distributing firms would provide such a reference, since Merrill did not require one. (¶ 57.) Given the SEC's conclusion that Merrill failed in its disclosure obligations to its own clients, the Court should reject Defendants' pleading stage argument that Merrill provided full disclosure to Plaintiffs, to whom Merrill made no disclosure at all.

## PROCEDURAL HISTORY

The original complaint in this action was filed on March 25, 2008, about one month after the collapse of the auction rate securities market. (Dkt. No. 1.) On October 31, 2008, the Court appointed as lead plaintiffs two investors who purchased ML ARS from Merrill. (Dkt. No. 32.) They filed a consolidated amended complaint on December 10, 2008. (Dkt. No. 34.) After Judge McKenna issued an order dismissing similar claims against auction manager UBS by investors who had been made whole in connection with the SEC's auction rate securities

settlement, *see In re UBS Auction Rate Secs. Litig.,* No. 08 CV 2967 (LMM), 2009 U.S. Dist. LEXIS 26385, at *16, 19 (S.D.N.Y. Mar. 30, 2009), on June 19, 2009, this Court allowed Colin Wilson, Ronald Levy and Michael Bonde (collectively, "Plaintiffs") to substitute as lead plaintiffs and continue to pursue this litigation.  (Dkt. No. 48.)  Plaintiffs purchased ML ARS from remarketing firms and, like all other Class members, have not been made whole.  (¶¶ 11-13, 18, 25.)  Plaintiffs filed the operative Complaint on May 22, 2009.

## ARGUMENT

## I.    LEGAL STANDARDS ON A MOTION TO DISMISS

When considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must "accept as true all facts alleged in the complaint" and "draw all reasonable inferences in favor of the plaintiff." *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  A complaint will withstand a motion to dismiss if it alleges "enough facts to state a claim to relief that is plausible on its face." *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal v. Ashcroft*, 129 S. Ct. 1937, 1949 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  "The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).  *See also Harvey v. 320 Owners Corp.*, 07 Civ. 6763 (LAP), 2009 U.S. Dist. LEXIS 61007, at *10 (S.D.N.Y. Apr. 21, 2009).

Plaintiffs allege that Merrill manipulated the market for ML ARS in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).  Manipulation refers to any "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976).  "Market manipulation requires a plaintiff to allege (1) manipulative acts; (2) damage[;] (3) caused by

10

reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI Communs., Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007). Defendants concede that Plaintiffs adequately allege the second, fifth and sixth elements of a market manipulation claim, as well as loss causation. Their challenges to the remaining elements of manipulation, reliance and scienter lack merit.

Market manipulation must be pled with particularity under Rule 9(b). *Id.* "A claim of manipulation, however, can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *Id.* at 102. "Accordingly, a manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *Id.* "This test will be satisfied if the complaint sets forth, to the extent possible, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Id.* (internal quotations omitted). The Complaint satisfies these requirements and states a claim for violation of Section 10(b).

## II. PLAINTIFFS ALLEGE MANIPULATIVE CONDUCT

### A. The Exchange Act Was Designed To Prohibit Manipulative Trading Practices

Following the stock market crash of 1929 and in the midst of the Great Depression, Congress passed the Exchange Act to protect investors against securities manipulation. *See Ernst & Ernst*, 425 U.S. at 195. Congress determined that securities prices "are susceptible to manipulation and control" that may "hinder the proper appraisal of [their] value." 15 U.S.C. § 78b(3). In a direct reference to the nation's economic turmoil, Congress concluded that "[n]ational emergencies, which produce widespread unemployment and the dislocation of trade, transportation, and industry, and which burden interstate commerce and adversely affect the general welfare, are precipitated, intensified, and prolonged by manipulation and sudden and

unreasonable fluctuations of security prices and by excessive speculation on such exchanges and markets. . . ."  15 U.S.C. § 78b(4).  These same concerns are still relevant today.

Congress was particularly concerned with "the notorious market pools" in which groups of issuers, underwriters, and speculators manipulated securities prices through their trading activities and induced outside investors to purchase securities at manipulated prices.  *See* L. Loss, *Securities Regulation* 1529 (3d ed. 1988); Daniel R. Fischel & David J. Ross, *Should the Law Prohibit "Manipulation" in Financial Markets?*, 105 Harv. L. Rev. 503, 503 (Dec. 1991).  "It is this inducement of trading that is sometimes said to be the essence of manipulation."  Steve Thel, *Regulation of Manipulation under Section 10(b):  Securities Prices and the Text of the Securities Exchange Act of 1934*, 1988 Colum. Bus. L. Rev. 359, 410 (1988).  The pools manipulated securities prices through risk-free trades such as "wash sales" or "matched orders"[5] that created the false appearance of trading activity or price changes, as well as actual transactions that generated market activity, moved share prices and induced other investors to buy securities.  *See* Norman S. Poser, *Stock Market Manipulation and Corporate Control Transactions*, 40 U. Miami L. Rev. 671, 694-95 (Mar. 1986); Thel, *supra*, at 411-12.

The Exchange Act was not merely designed to prohibit risk-free trades, as Defendants suggest.  (Def. Mem. at 25-26.)  Section 9(a)(2) condemns *actual* securities transactions involving a change in beneficial ownership that "creat[e] actual or apparent active trading in such security, or rais[e] or depress[] the price of such security, for the purpose of inducing the purchase or sale of such security by others."  15 U.S.C. § 78i(a)(2).  This provision "has been called 'the very heart of the act.'"  Poser, *supra*, at 703 (quoting L. Loss, *Fundamentals of Securities Regulation* 992 (1983)); *see also Crane Co. v. Westinghouse Air Brake Co*., 419 F.2d 787, 794 (2d Cir. 1969), *cert. denied*, 400 U.S. 822 (1970); Review of Antimanipulation

---

[5] In a "wash sale," one manipulator influences share prices by placing identical buy and sell orders for the same security through two different brokers.  In a "matched order," two manipulators agree to bid up share prices by trading shares back and forth between each other. *See* Poser, *infra*, at 695.

Regulation of Securities Offerings, 59 Fed. Reg. 21681, 1994 SEC LEXIS 1302, at *82 (Apr. 19, 1994).

Section 10(b) also prohibits the use or employment of "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of a security in contravention of SEC rules and regulations.  15 U.S.C. § 78j(b).  "Section 10(b) was intended as a 'catch-all' provision to enable the SEC 'to deal with new manipulative devices' that did not exist or were not known in 1934."  Poser, *supra*, at 705-06 (quoting *Ernst & Ernst*, 425 U.S. at 203).  Section 10(b)'s prohibition "is not confined to any particular kind of manipulation, but as more specifically defined in Rule 10b-5 is necessarily designed to outlaw every device used to persuade the public that activity in a security is the reflection of a genuine demand instead of a mirage."  *SEC v. Resch-Cassin & Co., Inc.*, 362 F. Supp. 964, 975 (S.D.N.Y. 1973) (internal quotation omitted).  *See also In the Matter of F.N. Wolf & Co., Inc.*, No. 3-8533, 1996 SEC LEXIS 8, at *44 (S.E.C. Jan. 3, 1996) ("[A]n infinite variety of manipulative devices are encompassed within Section 10(b) and Rule 10-5. . . . A finding of manipulation is not dependent upon the presence of any particular device usually associated with a manipulative scheme.").  "No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices."  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977).

**B.    Plaintiffs Allege Merrill's Manipulative Conduct With Particularity**

Section 10(b) "prohibits not only material misstatements but also manipulative acts." *ATSI Communs.*, 493 F.3d at 99.  Manipulative conduct misleads investors "to believe 'that the prices at which they purchase and sell securities are determined by the natural interplay of supply and demand not rigged by manipulators.'"  *Id.* at 100 (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)).  "In identifying activity that is outside the 'natural interplay of supply and demand,' courts generally ask whether a transaction sends a false pricing signal to the market." *Id.*  "Market manipulation is forbidden regardless of whether there is a fiduciary relationship between the transaction participants."  *Id.* at 101.  "A market manipulation claim, however,

cannot be based solely upon misrepresentations or omissions. . . . There must be some market activity. . . ." *Id.*

There is no real dispute that the Complaint alleges Merrill's manipulative market activity with particularity. According to the Complaint, from at least March 2003 until August 2007, Merrill maintained a uniform policy of placing "support bids" in every auction for which it was the sole or lead auction dealer to prevent thousands of auctions from failing and to set the rates of interest paid on ML ARS. (¶¶ 44-48, 50, 59-64, 118.) The Complaint alleges that Merrill's purchases of ML ARS through the placement of support bids masked the risks of illiquidity inherent in the securities and created the false appearance of actual trading based on the natural interplay of supply and demand. (¶¶ 45, 49-51.)

Merrill underwrote and sold new ML ARS, signaling the existence of demand for those securities. The saturated market was sustained only through Merrill's own systematic interventions, however. (¶¶ 41, 44-47, 124.) To obtain the AAA ratings necessary for ML ARS to be sold to retail investors, Merrill caused the maximum interest rates to be capped at artificially low levels that limited the appearance of risk but were insufficient to ensure liquidity in the event of a failed auction. (¶¶ 41, 122-28.) Merrill's conduct sent a false pricing signal to the market. It deprived investors of objective pricing information—a clearing rate set by actual market forces—necessary to evaluate the true risk characteristics of ML ARS. (¶¶ 63-64.) The conduct alleged was manipulative as it was intended to induce other investors to buy ML ARS on the belief that they were liquid instruments. (¶¶ 63-64, 129-33, 192-94.) *See In the Matter of F.N. Wolf*, 1996 SEC LEXIS 8, at *43 (The Exchange Act prohibits manipulation effected through: "(1) a series of security transactions, alone or with one or more persons; (2) which create actual or apparent active trading in such security or which raise or depress the price of such security; (3) for the purpose of inducing others to buy or sell the security.").

Moreover, Merrill's conduct evidenced all of the hallmarks of market manipulation. For instance, Merrill exhibited price leadership by placing support bids that affected the price of ML ARS. (¶¶ 44-46.) Merrill dominated and controlled the market for ML ARS, knowing the

number of bidders, the amounts of the bids, the ranges of bid prices, whether there were sufficient bids to allow the auction to succeed, the clearing rates in successful auctions, and whether its bids were necessary to prevent failures. (¶ 119.) Merrill's purchases increased its own inventory, thereby reducing the floating supply of ML ARS. (¶ 81.) Finally, the market for ML ARS collapsed when Merrill stopped intervening (as Merrill knew it would). (¶¶ 104-05, 107.) *See Resch-Cassin*, 362 F. Supp. at 976 (Factors characterizing market manipulation include: "(a) price leadership by the manipulator; (b) dominion and control of the market for the security; (c) reduction in the floating supply of the security; and (d) the collapse of the market for the security when the manipulator ceases his activity."); *SEC v. Martino*, 255 F. Supp. 2d 268, 286-87 (S.D.N.Y. 2003) (same).

These allegations satisfy Rule 9(b). They identify the manipulative acts that Merrill performed, when Merrill performed them, and the effect that Merrill's scheme had on the market for ML ARS. No more is required at this stage. *See ATSI Communs.*, 493 F.3d at 102.

## C. Misrepresentations And Omissions Are Not The Sole Basis For Plaintiffs' Claim Of Market Manipulation

It is true that misrepresentations and omissions cannot be the "sole basis" for a market manipulation claim. (Def. Mem. at 19-20 (citing *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177-78 (2d Cir. 2007), and *ATSI Communs.*, 493 F.3d at 101).) Defendants, however, argue that the Complaint fails to allege any manipulative market activity. As detailed above, Plaintiffs allege that Merrill engaged in manipulative acts by underwriting and selling ML ARS in the absence of sufficient investor demand, placing support bids, systematically preventing auction failures, and setting clearing rates.

Merrill's false and misleading statements and its withholding of material information about ML ARS furthered the scheme. For example, Plaintiffs allege that Merrill pushed its financial advisors and distributing firms to falsely describe ML ARS as highly liquid, cash-like investments, and reinforced that perception by listing those securities as "Other Cash" on its investor clients' account statements. (¶¶ 52-55.) Plaintiffs allege that Merrill failed to disclose

that it maintained a policy of invariably suppressing auction failures and that the market would collapse if it halted that policy. (¶¶ 57-58.) Plaintiffs also allege that Merrill co-opted its research analysts to issue misleading, positive research reports on ML ARS. (¶ 67.)

That the Complaint includes these allegations should come as no surprise. Defendants concede that "nondisclosure is usually essential to the success of a manipulative scheme." *Santa Fe Indus.*, 430 U.S. at 477. (*See also* Def. Mem. at 25.) "When individuals occupying a dominant market position engage in a scheme to distort the price of a security for their own benefit, they violate the securities laws by perpetrating a fraud on all public investors. In addition, their failure to disclose that market prices are being manipulated not only constitutes an element of a scheme to defraud, but is also a material omission of fact in the offer and sale of securities." *Pagel, Inc. v. SEC*, 803 F.2d 942, 946 (8th Cir. 1986). Fraudulent schemes often include allegations of both market manipulation and misrepresentations or omissions. *See, e.g., United States v. Royer*, 549 F.3d 886, 899-900 (2d Cir. 2008) (affirming conviction for violation of Section 10(b) under market manipulation theory where defendants made false and misleading statements and coordinated their securities trades for purpose of impacting share prices); *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 381 (2d Cir. 1974) (upholding Section 10(b) claim for "scheme to defraud which includes market manipulation and a merger on preferential terms, of which the proxy omissions and misrepresentations are only one aspect"); *SEC v. Badian*, 06 Civ. 2621 (LTS)(DFE), 2008 U.S. Dist. LEXIS 64661, at *1-2 (S.D.N.Y. Aug. 22, 2008) (denying motion to dismiss market manipulation claim involving aggressive short sales, wash sales and matched orders, as well as false descriptions of stock sales to conceal the short sales). Plaintiffs' allegations of misrepresentations and omissions bolster their theory that Merrill engaged in manipulative trading activities.

Because Merrill's misrepresentations and omissions were intertwined with the actions it took to manipulate the market, the cases Defendants cite in which courts declined to treat "pure" misrepresentations and omissions as supporting a market manipulation theory are too different to be relevant. *See Lentell*, 396 F.3d at 164 (rejecting market manipulation theory where "plaintiffs

allege that Merrill . . . issued false and misleading reports recommending that investors purchase shares of [two companies]"); *Schnell v. Conseco, Inc.*, 43 F. Supp. 2d 438, 448 (S.D.N.Y. 1999) (refusing to characterize allegations as market manipulation claims where alleged scheme consisted largely of misrepresentations and omissions including issuance of misleading research reports); *Catton v. Defense Tech. Sys., Inc.*, No. 05 Civ. 6954 (SAS), 2006 U.S. Dist. LEXIS 205, at *28 (S.D.N.Y. Jan. 3, 2006) (declining to treat alleged "pump and dump" scheme as market manipulation where "[m]ost of the allegedly fraudulent conduct was perpetrated directly, in the form of misstatements made to plaintiffs, rather than indirectly on the public and on the market"); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 476 (S.D.N.Y. 2005) ("The Complaint fails to allege that there was a scheme to defraud that went beyond the misrepresentations themselves."); *TCS Capital Management, LLC v. Apax Partners, L.P.*, No. 06 Civ. 13447 (CM), 2008 U.S. Dist. LEXIS 19854, at *62-66 (S.D.N.Y. Mar. 7, 1008) ("The Telecom Italia deal was not a wash sale or a matched order.  Rather, the 'deception' lies in the alleged failure to disclose the 'real terms' of the deal. . . . According to plaintiff, these *misleading disclosures and omissions* enabled the defendant to hold the vote that would inevitably result in approval of the cash-out merger. . . .") (emphasis original).

## III.    Defendants' Truth-On-The-Market Defense Fails

As an affirmative defense to Plaintiffs' allegations, Defendants contend that full disclosure of Merrill's conduct immunizes them from liability for manipulating the ML ARS market.  (Def. Mem. at 11-15, 22-23, 26-30.)  This defense is premature and meritless.

### A.    Defendants' Fact-Intensive Argument Is Inappropriate At This Stage

As an initial matter, such a "truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint. . . ."  *Ganino*, v. *Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).  *See also Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996) (noting that summary judgment may not be granted based on the "truth on the market" defense unless defendants show that "no rational jury could find that the market was misled.")

(internal quotation omitted). To successfully argue that investors had full and fair disclosure of all material facts, Defendants must show that "the corrective information [was] conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by" their misconduct. *Ganino*, 228 F.3d at 167. A motion to dismiss based on purported full disclosure cannot be granted where, as here, the facts alleged show that the disclosures "did not fully reveal" the extent of the wrongful conduct. *See, e.g., Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 229 (S.D.N.Y. 2008) ("While some facts regarding the maintenance of the Disney Stores were known, many were not. . . . Whether the Disney problems were adequately disclosed to the market is a fact-intensive query that cannot be disposed of on a motion to dismiss."); *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (rejecting truth-on-the-market defense where purported full disclosures of alleged conflicts of interest were "a far cry from raising awareness of anything akin to the widespread fraud and improper influence alleged in connection with Goldman's analyst reports").

> **B.    Defendants' Argument Founders On The Merits, As Merrill Failed To Disclose The True Investment Risks**

The disclosures Defendants rely upon were neither full nor fair and therefore were inadequate to apprise investors of the risks of investing in ML ARS. *See Sonesta Int'l Hotels Corp. v. Wellington Assoc.*, 483 F.2d 247, 249 (2d Cir. 1973) ("[F]ull and fair disclosure of all material facts must be made to investors so that they may have the benefit of the facts in making their investment decisions.").

Defendants' best-case scenario is a hypothetical investor who read the prospectuses for ML ARS, visited Merrill's website and read its disclosure, and read each of Merrill's research reports. (*See* Kasner Decl. Exs A, D-I.) At most, those sources would have allowed the investor to cobble together the following information. First, Merrill "routinely" placed bids at auction to buy ML ARS for its inventory, to prevent an auction failure, or to prevent an auction from clearing at a rate that did not reflect the market for ML ARS. (Def. Mem. at 11; Kasner Decl.

Ex. F at 6, 10.)  Second, while Merrill's bids were "likely to affect the clearing rate," Merrill could only "bid at a rate or within a range of rates which, in Merrill Lynch's good faith judgment, reflect[ed] a fair and reasonable rate for the security" and was prohibited "from taking into consideration the interest of the issuer of the security in paying a low rate or the interest of customers in receiving a high rate."  (Def. Mem. at 27-28; Kasner Decl. Ex. A at 14.)  Third, Merrill was not obligated to continue to bid at auction.  (Def. Mem. at 11, 15; Kasner Decl. Ex. A at 18, Ex I at 11.)  Finally, auctions may fail, and if they do, investors may not be able to sell their ML ARS at par.  (Def. Mem. at 28; Kasner Decl. Ex. A at 11, 18, Ex. D at 2, Ex. I at 11.)

These inadequate disclosures were half-truths at best.  As the Second Circuit has stated, "[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.  For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."  *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).  To "accurately inform rather than mislead" the hypothetical investor who read each of Merrill's claimed disclosures, the documents would have had to include at least the following additional facts:

•  Merrill did not just "routinely" submit support bids.  It did so *systematically* under a tacit or express understanding with the issuers of ML ARS that Merrill would *never* permit auction failures.  (¶¶ 49, 57-58.)  Because of this policy, the lack of auction failures was not indicative of the health of the ML ARS market.  (¶¶ 50-51, 120-21, 135-44.)  Disclosure of these facts was necessary to make Merrill's description of its bidding practices not misleading.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 322 (S.D.N.Y. 2009) ("The requirement that the cautionary language match the specific risk is particularly important, considering that most, if not all security offerings contain cautionary language.").

•  Merrill bid on ML ARS not because it desired to increase its own inventory— which would have been a positive message to investors—or because it wanted the clearing rate to accurately "reflect the market for the securities," but *solely to distort* the market for the

securities by creating a false impression of demand. (¶¶ 115-21.) Merrill increased interest rates to attract buyers, in a desperate attempt to keep the market afloat for as long as possible, having decided that "[t]he gloves are off and we are not concerned with issuer perception of our abilities and the competition." (¶ 62.) In light of these undisclosed facts, Merrill's disclosure that its bids might affect the clearing rates, but would nonetheless reflect a "fair and reasonable rate," was false and misleading. *See Ruskin v. TIG Holdings, Inc.*, No. 98 Civ. 1068 (LLS), 2000 U.S. Dist. LEXIS 11517, at *18-19 (S.D.N.Y. Aug. 14, 2000) ("However, cautionary language does not protect material misrepresentations or omissions when defendants knew they were false when made.") (quotation omitted).

- As a result of Merrill's continued and lucrative underwriting business, the market for ML ARS was saturated, and as institutional investors divested themselves of the securities, Merrill had no choice but to buy more ML ARS into its own inventory, placing an ever-increasing and untenable strain on its balance sheet. (¶¶ 41, 43, 61, 81-82, 102, 130-33.) The concealment of these facts prevented investors from understanding that the liquidity of ML ARS depended upon the health of Merrill's own balance sheet. *See In re Alstom*, 406 F. Supp. 2d at 453 ("affirmative statements regarding [defendant's] robust [] sales . . . indicated strong demand . . . without disclosing that this demand was in fact bolstered by [defendant's] own financing . . . [and this] omission . . . created an impression of a state of affairs that differed in a material way from the one that actually existed") (internal quotation marks and citation omitted).

- Merrill exhorted its sales force and distributing firms, through financial inducements, national conference calls, and ginned-up research reports, to sell the securities to unsuspecting retail investors, even as it feared that disclosure of the true liquidity risks would "SINGLE HANDEDLY UNDERMINE THE AUCTION MARKET." (¶¶ 65-98.) Merrill also knew that the ML ARS market was "collapsing," that "inventory [was] flooding the street," that its issuer clients "would be best served [by] exiting the market," and that, when other investment banks stopped supporting their auctions, inevitably causing a "run," Merrill too would let its auctions fail *en masse* and leave investors holding illiquid securities that could not be sold at par

for an indefinite time period.  (¶¶ 135-48.)  Merrill's disclosures were therefore misleading because they concealed information necessary for investors to understand the likelihood that the ML ARS market would collapse.  *See In re Credit Suisse First Boston*, No. 99 Civ. 12046 (WHP), 2001 U.S. Dist. LEXIS 3332, at *23 (S.D.N.Y. Mar. 28, 2001) ("warnings of specific risks like those in the ARM Prospectus do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described").

Each of the omitted facts discussed above was material, as there can be no doubt that disclosure "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Starr v. Georgeson Shareholder*, 412 F.3d 103, 110 (2d Cir. 2005) (quoting *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988)).  As a result of these material omissions, the disclosures that Defendants cite failed to provide a full and fair description of ML ARS and the auction rate securities market to enable a reasonable investor to understand the nature and extent of Merrill's manipulative conduct and the risk of investing in the securities.  *See, e.g., Credit Suisse First Boston*, 2001 U.S. Dist. LEXIS 3332, at *24 ("[D]isclosures of risk provide 'no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'") (quoting *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996); *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008 (same).

Merrill's purported "full disclosures," viewed in their totality and even in a light most favorable to Defendants, do not justify dismissal.  On a motion to dismiss, however, the Court is not called upon to apply Defendants' best-case scenario.  The Court instead must draw all reasonable inferences in Plaintiffs' favor based on the facts alleged in the Complaint.  *See Ganino*, 228 F.3d at 161.  Evaluating Plaintiffs' allegations under the appropriate standard, the Court must deny Defendants' motion to dismiss.

### C.    Merrill's Other Disclosure-Related Arguments Also Lack Merit

Defendants argue that the SEC "expressly condoned" Merrill's conduct, because the 2006 SEC order "does not prohibit broker-dealers from bidding for their proprietary accounts when properly disclosed," and Merrill claims to have disclosed its bidding practices in compliance with the order.  (Def. Mem. at 26; Kasner Decl., Ex. B at 6 n.6.)  This argument lacks merit. After the collapse of the ML ARS market, the SEC found Merrill's disclosures had been insufficient.  In August 2008, the SEC concluded that "Merrill Lynch [Pierce, Fenner & Smith] did not make adequate disclosures that the liquidity of these [auction rate] securities was based on Merrill Lynch supporting the auctions it managed when there was not enough demand."  (¶ 177; *see also* Kasner Decl., Ex. K at 1.)   On September 18, 2008, the SEC's Director of Enforcement testified before Congress that Merrill and other auction dealers "failed to disclose the increasing risks associated with ARS, including their reduced ability to support the auctions. By engaging in this conduct, those firms violated the Federal securities laws, including the broker-dealer antifraud provisions." (¶ 178.)

Defendants also hold Plaintiffs to a higher standard than the securities laws allow when they suggest that Plaintiffs are charged with knowledge of the disclosures.  The securities laws were "not designed to shield perpetrators of fraud by forcing investors to conduct exhaustive research every time they invest money, lest the seller be manipulative or deceptive." *Alexander v. Evans*, No. 88 Civ. 5309, 1993 U.S. Dist. LEXIS 14560, at *52 (S.D.N.Y. Oct. 15, 1993); *accord The Interpublic Group Of Cos., Inc. v. Fratarcangelo*, No. 00 Civ. 3323 (SHS), 2002 U.S. Dist. LEXIS 22989, at *40 (S.D.N.Y. Nov. 26, 2002).  Plaintiffs bought ML ARS from "distributing firms" rather than from Merrill itself.  (¶¶ 11-13, 36.)  While Merrill's transaction confirmation slips referenced Merrill's website disclosure statement, Merrill did not provide such confirmation slips to Plaintiffs, as they were not Merrill's customers.  (Def. Mem. at 11; ¶ 174.) Plaintiffs had no reason to delve deeply into Merrill's website to scrutinize its disclosures, as they purchased securities issued by BlackRock and Nuveen from E*Trade and Wells Fargo.  (¶¶ 11-13 & attached certifications.)   The securities laws, which were designed "to substitute a

22

philosophy of full disclosure for the philosophy of *caveat emptor*," *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 (1972), do not require Plaintiffs to have undertaken such a detailed investigation to determine whether Merrill (neither the issuer nor the direct seller) was manipulating the market for fungible securities sold to Plaintiffs as cash equivalents.

Moreover, Merrill did not provide any disclosures or prospectuses to Plaintiffs and other investors who purchased ML ARS through distributing firms, even though it knew those firms would not disclose the nature and extent of Merrill's interventions in ML ARS auctions.  (¶¶ 57-58.)  Plaintiffs are not required to have known about purportedly material information that Defendants deliberately withheld.  *Compare Steed Fin. LDC v. Nomura Sec. Int'l Inc.*, No. 00 Civ. 8058 (NRB), 2001 U.S. Dist. LEXIS 14761, at *29 (S.D.N.Y. Sep. 20, 2001) (denying motion to dismiss where plaintiffs alleged they did not have access to all material information), *with Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993) (investors could not justifiably rely on oral misrepresentation where "the Hutton brokers forwarded the offering materials to the [investors]"), *superseded on other grounds by the PLSRA, as described in Louros v. Kreicas*, 367 F. Supp. 2d 572, 592 n.145 (S.D.N.Y. 2005).

As described above, Defendants would fare no better even if they had actually provided the prospectuses and disclosures directly to Plaintiffs.  None of these documents told investors the true risks of investing in ML ARS:  that the market for ML ARS would collapse once Merrill stopped placing support bids; that Merrill rigged the clearing rates in the auctions in which it intervened, depriving investors of material information necessary to assess liquidity risk; that the risk of pervasive auction failure increased dramatically as Merrill's inventory of ML ARS exceeded internal risk-management limits; and that Merrill already had withdrawn support for certain ML ARS and anticipated the total market failure that would come to pass.  (¶ 175.)  *See Hunt v. Alliance North Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) (finding prospectuses misleading when they "did not warn of the risk plaintiffs claim was not disclosed").  These material facts were within Merrill's unique knowledge and could not have been discovered by Plaintiffs upon review of any relevant prospectuses or disclosures.  *See Doehla v.*

*Wathne Ltd., Inc.*, 98 Civ. 6087 (CSH), 1999 U.S. Dist. LEXIS 11787, at *39 (S.D.N.Y. Aug. 3, 1999) (investigation not required "where the facts allegedly misrepresented 'are peculiarly within the defendant's knowledge [and plaintiff] has no independent means of ascertaining the truth'") (quoting *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir. 1980); *accord JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 410 (S.D.N.Y. 2004); *Bank of Am. Corp. v. Braga Lemgruber*, 385 F. Supp. 2d 200, 231 (S.D.N.Y. 2005) (denying motion to dismiss fraudulent inducement claim where due diligence would not have revealed scheme involving series of fraudulent transactions that was uniquely within defendant's knowledge).

Moreover, the disclosures Merrill did make were offset by statements in Merrill's research reports that repeatedly minimized the risk of auction failure:

- August 22, 2007:  "In the history of the market, failed auctions are extremely rare."  (Kasner Decl. Ex. D at 2.)

- December 6, 2007:  "[W]orries of a failed auction are misplaced:  failed auctions are extremely rare, and investors may have an exaggerated view of their consequences. . . . In the unlikely event of a failed auction, investors who wished to sell their holdings away from the auction would face a price below par. . . . The main risk:  lower rates. . . . However, auction securities still make sense for investors who need ready access to their funds."  (Kasner Decl. Ex. H at 5.)

- January 28, 2008:  "Last week we saw the first failed auction of an Auction Rate Preferred issue since 1990. . . . We do not believe this failed auction is cause for alarm. . . . [A] failed auction has historically been quite rare. . . ."  (Kasner Decl. Ex E at 1.)

- February 1, 2008:  "**How often do closed-end fund auctions fail?**  Hardly ever. There was one failed auction on January 22, 2008.  But that was an isolated event that involved only a small number of shares, and the next auction from the same closed-end fund was successful."  (¶ 160.)

- February 8, 2008:  "We still view the auction market preferreds of closed-end funds to be the 'conservative's conservative investment' in the auction market, just as we noted back in August. . . . We think, fails in the closed-end fund auction market will be an aberration and do not expect to see multiple recurrences." (Kasner Decl. Ex. L at 3.)

These and other similar soothing statements stand in stark contrast to contemporaneous internal communications between Merrill executives who referred to investor sell-offs as a "contagion that has engulfed all [ML ARS]," recognized that the "[m]arket is collapsing," described auction failures as a "new crisis" that would "add[] further illiquidity to an already illiquid market," and proposed to "[f]ail future auctions" to ensure that "ML balance sheet will be capped at levels today." (¶¶ 133, 137-38, 143.) These allegations, ignored by Defendants, only highlight the inadequacy of their claimed disclosures. *See In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 476 (S.D.N.Y. 2004) (a defendant "cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder").

## IV.    PLAINTIFFS ADEQUATELY PLEAD SCIENTER

### A.    Standards For Pleading Scienter

Plaintiffs must plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," or scienter. 15 U.S.C. § 78u-4(b)(2). Scienter requires a showing of "intent to deceive, manipulate, or defraud." *Ernst & Ernst*, 425 U.S. at 193. Plaintiffs may show intent or allege facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Comm'ns*, 493 F.3d at 99. "Motive would entail concrete benefits that could be realized" by the alleged misconduct, while opportunity "would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (quotation omitted). Recklessness is "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (internal quotation omitted).

Allegations of scienter must give rise to an inference that is cogent and at least as compelling as any opposing inference of non-fraudulent intent. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). The "court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326. The proper inquiry is "[w]hen

25

viewing the allegations as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as the opposing inference?" *Id.* The weighing of inferences does not occur in a "vacuum," but is "inherently comparative" based on the "underlying facts." *Id.* at 323. The inference that a defendant acted with scienter "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324 (citations omitted). Under the inference-balancing standard, "ties go to the plaintiff." *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 543 n.199 (S.D.N.Y. 2008); *accord Lormand v. US Unwired, Inc*., 565 F.3d 228, 254 (5th Cir. 2009); *ACA Financial Guaranty Corp. v. Advest, Inc*., 512 F.3d 46, 59 (1st Cir. 2008); *Akerman v. Arotech Corp*., 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009); *Comm. Workers of Am. Plan v. Csk Auto Corp.,* 525 F. Supp. 2d 1116, 1120 (D. Ariz. 2007). Considering the allegations of the Complaint as a whole, Defendants' assertion of non-fraudulent intent is not plausible, let alone as cogent and compelling as the strong inference that Merrill acted with scienter.

### B.    Merrill Knowingly Manipulated The ML ARS Market

"Intentional misconduct is easily identified since it encompasses deliberate illegal behavior. . . ." *Novak*, 216 F.3d at 308. An allegation that a defendant "knowingly or recklessly participated in and furthered a market manipulation" by effecting manipulative transactions, "and that he intentionally engaged in manipulative conduct is plainly sufficient to satisfy the requirement." *SEC v. U.S. Environmental, Inc.*, 155 F.3d 107, 111 (2d Cir. 1998) (internal quotations omitted). After all, market manipulation does not happen by accident. *Id.* ("It is well-settled that knowledge of the proscribed activity is sufficient scienter under § 10(b).") Plaintiffs' detailed allegations that Merrill knowingly engaged in a wide-spread pattern of market manipulation satisfy this standard. (¶¶ 40-98.) Not only must these allegations be accepted as true, *see Tellabs*, 551 U.S. at 325, but the alleged conduct is "so obviously manipulative (and material . . . ) that it could not have been done inadvertently." *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 360 (S.D.N.Y. 2003), *discussed in* 544 F. Supp. 2d 277, 292 (S.D.N.Y. 2008) (later opinion in same case).

### C.    Merrill's Internal Communications Demonstrate Strong Circumstantial Evidence Of Conscious Misbehavior Or Recklessness

The Complaint is replete with detailed allegations of Merrill's awareness of the fragility of ML ARS market, and its manipulation of that market to stave off inevitable collapse.  (¶¶ 68-73, 135-44, 148-52.)  For example, on August 21, 2007, Merrill published an analyst report stating that ML ARS did not have a "hard put" feature.  (¶¶ 68-69.)    Frances Constable, Managing Director of the ARS Trading Desk, became apoplectic, declaring that the report "MAY SINGLE HANDLY UNDERMINE THE AUCTION MARKET." (¶ 70 (Upper-case lettering as original).)  To prevent a "run" on the market, Merrill immediately retracted the report and published a replacement eliminating any reference to the potential for illiquidity.  (¶¶ 71-72.)  Merrill then used the new report and other similar publications to aggressively stimulate sales of ML ARS.  (¶¶ 73-75.)   Merrill knowingly compounded its wrongdoing by compensating its research analysts for promoting the sale of ML ARS, including awarding one with a six-figure bonus in 2007 for his efforts.  (¶¶ 42, 97-98.)

Merrill continually monitored its own ML ARS holdings.  (¶¶ 79, 131-33.)   As that inventory increased far in excess of levels set by risk management, Constable's superiors directed her to "us[e] any means possible" to reduce Merrill's exposure.  (¶¶ 81-82, 132.)  That pressure was exacerbated as lenders who had previously provided financing for Merrill's excess inventory stopped accepting ML ARS as collateral, given the risk that Merrill would be unable to sell the securities at par.  (¶ 134.)  To reduce inventory, Merrill publicly emphasized the AAA ratings on ML ARS (¶ 126); increased clearing rates to promote sales (¶ 62); violated its own "Chinese Wall" between the ARS Trading Desk and Merrill's "independent" research analysts (¶¶ 66, 76-78); had the analysts pump up its financial advisors during national conference calls with the same misinformation they were supplying to the public in their reports (¶¶ 67, 76-78, 80, 83-85); and provided its financial advisors with extraordinary compensation to encourage them to sell ML ARS rather than other investments.  (¶¶ 91-96.)   Nonetheless, by the fall of 2007, Merrill had already allowed dozens of auctions to fail and expected the entire market to unravel. (¶¶ 101, 135-47.)

Internal communications revealed Merrill's dismal appraisal of the market. (¶¶ 135-44.) Constable cautioned against serving as auction dealer for subsequent issues, writing that "[n]onchalantly waiving in additional supply seems cavalier at best." (¶136.) Merrill also recognized that the only options to "reduce the risk" of being stuck with illiquid securities were to aggressively sell inventory or allow the auctions to fail. (¶¶ 138-43.) By January 2008, when Merrill knew that other auction dealers were allowing auctions to fail, Constable described the state of the market as being "like the Sorcerer's Apprentice…can[']t someone make these people stop bucketing us with water. . . ." (¶¶ 143-44.) Upon determining that the entire market's demise was a "fait accompli," Merrill withdrew its support, leaving Plaintiffs and other unsuspecting Class members holding billions of dollars of illiquid securities. (¶¶ 103-07.)

These allegations—which Defendants ignore—satisfy the scienter element of Section 10(b). *See South Cherry Street, LLC v. Hennessee Group LLC*, 07-3658-cv, 2009 U.S. App. LEXIS 15467, at *28 (2d Cir. July 14, 2009) ("[T]he scienter element can be satisfied by a strong showing of reckless disregard for the truth."). *See also Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807, 824 (S.D.N.Y. 2006) (allegations that defendant engaged in manipulative market transactions while in possession of confidential, non-public information about target issuer supported strong inference of scienter); *In re Alstom Sec. Litig.*, 406 F. Supp. 2d at 458 (finding recklessness in allegations of defendant's awareness that undisclosed financing arrangements "posed an expanding risk to the company" that was "'highly unreasonable' for the company to not disclose"); *In re Blech Sec. Litig.*, 961 F. Supp. 569, 583 (S.D.N.Y 1997) (finding scienter in allegations that investment bank knew about manipulative scheme through its contact with market manipulators, its familiarity with market, value and liquidity of manipulated securities, and its daily analysis of accounts through which manipulative trades were executed).

### D.    Merrill Had Motive And Opportunity To Commit Fraud

Defendants focus only on motive, conceding—as they must—that Plaintiffs allege that Merrill had ample opportunity to commit fraud. (Def. Mem. at 32-33.) The ML ARS market was so opaque that it gave Merrill, in its capacity as auction manager, ample opportunity to intervene in the auctions, obscure the risk of illiquidity, and exert almost complete control over

the interest rates paid. (¶¶ 115-20.)  Merrill took advantage of the opportunity, placing support bids throughout the Class Period that prevented thousands of auction failures and set clearing rates at levels chosen by Merrill.  (¶¶ 47, 121.)

Plaintiffs' allegations of motive are also enough to withstand a motion to dismiss. Merrill earned nearly $80 million in annual revenues from its underwriting and auction management business.  Merrill served as auction dealer for nearly $25 billion in auction rate preferred securities alone, and billions more in municipal, student loan-backed and CDO auction rate securities.  (¶ 21.)  Plaintiffs allege that Merrill was motivated to perpetuate an artificial market for ML ARS to maintain these substantial revenues.  (¶¶ 108-13.)  *See e.g.*, *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) ("the magnitude of the alleged fraud provides some additional circumstantial evidence of scienter").  As an auction manager, Merrill was able to keep clearing rates low enough to satisfy its issuer clients, while high enough to attract investors.  (¶¶ 59-64, 117-21.)  *See, e.g, Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*, No. 03 Civ. 3120 (LTS)(THK), 2005 U.S. Dist. LEXIS 16382, at *45 (S.D.N.Y. Aug. 9, 2005) (complaint alleged motive and opportunity to depress stock price where structure of financing agreement provided defendants with incentives to perpetuate manipulative conduct).  Plaintiffs also allege that Merrill was motivated to manipulate the ML ARS market so it could sell its own inventory and reduce its increasing exposure to ML ARS.  (¶¶ 129-34, 194.) *See, e.g., In re Blech Sec. Litig.*, 961 F. Supp. at 583 (crediting allegations that Bear Stearns was motivated to engage in manipulative conduct "to decrease its own risk of loss because the margin loans it extended Blech were collateralized by the Blech securities").

The simple desire to earn fees for providing a professional service is insufficient to raise a strong inference of scienter.  *See In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 465 n.1 (S.D.N.Y. 2008), *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 620-21 (S.D.N.Y. 2005), *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 428 (S.D.N.Y. 2003).  But Plaintiffs allege that Merrill earned fees in its dual role as ***both*** auction manager ***and*** underwriter for ML ARS.  (¶¶ 108, 109, 111, 112.)  "Courts have been especially ready to find motive pleading adequate to survive 12(b)(6) motions in cases where the . . .

company plays a dual role with respect to the client." *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 345 (S.D.N.Y. 2004) (discussing dual auditor-consultant role). *See also In re Dell Inc., Securities Litig.*, 591 F. Supp. 2d 877, 901 (W.D. Tex. 2008) (same). This is particularly true where, as here, there is a significant differential between the types of fees earned. The annual auction management fees that Merrill received were more than three times the amount of their annual underwriting fees. (¶¶ 110, 113.) *See In re Fleming Cos. Secs. & Derivative Litig.*, No. 5-03-MD-1530 (TJW), 2004 U.S. Dist. LEXIS 26488, at *123-124 (E.D. Tex. June 10, 2004) ("allegations that [defendant] had sufficient motive through its work as the company's consultant and receipt of consulting fees amounting to twice that of its auditing fees are sufficient to support an inference of scienter"). *See also generally In re Qwest Communs. Int'l, Inc. Secs. Litig.*, 396 F. Supp. 2d 1178, 1207-1208 (D. Colo. 2004) ("Avarice often is the motive for fraud. [Defendant] argues that its desire to be paid a fair fee for its work should not be presumed to be fraudulent. I conclude that an auditor's desire to maintain a strong revenue stream from a client conceivably could motivate a fraud by the auditor.").

### E. Defendants' Suggested Inferences of Non-Fraudulent Intent Are Implausible And Should Be Rejected

Defendants try but fail to convincingly argue that Plaintiffs' allegations could give rise to a plausible inference that Merrill lacked scienter. First, Defendants argue that their supposed full disclosure of Merrill's intervention in the ML ARS market negates an inference of fraudulent intent. (Def. Mem. at 30-31.) Plaintiffs have already refuted this defense of purported full disclosure. (*See* Section III, *supra*.) Even if Merrill's disclosures could be considered at this stage of the proceedings—which Plaintiffs dispute—they were nothing more than half-truths that failed to adequately apprise investors of the risk of purchasing ML ARS and concealed Merrill's persistent intervention in auctions, its manipulation of clearing rates, and internal pressures to reduce inventory, among other material facts. Merrill knew its disclosures were false or misleading but continued to use them despite the SEC's 2006 order mandating accurate disclosure of its auction rate securities practices. (¶¶ 173-79.) *See South Cherry Street*, 2009 U.S. App. LEXIS 15467, at *31 (scienter may be established where defendants "knew facts or

had access to information suggesting that their public statements were not accurate . . . [or] failed to check information they had a duty to monitor").

None of these cases Merrill cites involved market manipulation, nor do they address fraudulent misrepresentations going to the essential characteristics of the securities sold or undisclosed risks about the market itself. *Schick v. Ernst & Young*, 141 F.R.D. 23, 27 (S.D.N.Y. 1992), related to an account's involvement in an alleged fraud by limited partnership entities and their principals. *In re Loral Space & Commc'ns Ltd. Sec. Litig.*, No. 01 Civ. 4388 (JGK), 2004 U.S. Dist. LEXIS 3059, at *28-29 (S.D.N.Y Feb. 23, 2004), and *Rand v Starter Corp.*, No. 94 Civ. 5325 (DC), 1995 U.S. Dist. LEXIS 7267, at *10-11 (S.D.N.Y. May 25, 1995), addressed allegations of fraud in connection with "necessarily hypothetical" projections about products, services and earnings in light of warnings and cautionary statements in public filings and other communications.

Second, Defendants contend that Merrill's ML ARS purchases demonstrated its belief that the market was viable. (Def. Mem. at 31-32). To the contrary, internal communications confirm that Merrill knew the "market [was] collapsing." (¶ 137.) The more plausible inference is that Merrill bought ML ARS as part of a long-term strategy to perpetuate its scheme and dumped those securities on unsuspecting investors when it realized the scheme was no longer sustainable. (¶¶ 60, 108-14, 148-50.) Therefore, Merrill's ML ARS purchases do not negate the strong inference of scienter. *See, e.g.*, *In re Refco Sec. Litig.*, 503 F. Supp. 2d 611, 647 (S.D.N.Y. 2007) (scienter adequately pleaded despite insider buying where defendant believed scheme "could be hidden indefinitely or at some point permanently disposed of"); *In re Guilford Mills*, *Inc. Sec. Litig.*, No. 98 Civ. 7739 (CLB), 1999 U.S. Dist. LEXIS 21690, at *14 (S.D.N.Y. 1999) ("Buying back stock, however, does not, in and of itself, refute the strong inference of scienter raised by plaintiffs' other allegations of motive and opportunity.").

Third, Defendants' contention that it was "economically irrational" for Merrill to perpetuate the ML ARS market lacks merit. (Def. Mem. at 32-33.) This argument is based on Merrill's erroneous suggestion that it "committed more than $2.3 billion to holding *purportedly worthless* and illiquid ARS." (*Id.* at 32 (emphasis added).) Plaintiffs allege that ML ARS were

overvalued at the time of sale, but *not* that they were worthless. (¶¶ 166-67.) Moreover, as described above, Merrill reaped nearly $80 million in annual fees from its scheme throughout the Class Period, and allowed its affiliate BlackRock, Inc. to earn millions of dollars in fees as one of the largest issuers of auction rate securities.[6] These motivations are hardly economically irrational. Any losses Merrill ultimately sustained do not exonerate it from years of wrongdoing. *See, e.g., Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767 (LBS), 2002 U.S. Dist. LEXIS 24049, at *16 n.7 (S.D.N.Y. Oct. 10, 2002) ("Even if it turns out that Defendants ultimately lost money on their investment, that fact might not be dispositive to a finding of scienter."), citing *Markowski v. SEC*, 274 F.3d 525, 529 (D.C. Cir. 2001) ("Just because a manipulator loses money doesn't mean he wasn't trying.")).

The cases Defendants cite are readily distinguishable, as the courts declined to find a strong inference of scienter based on internally inconsistent allegations in the complaints. *See ECA*, 553 F.3d at 203 (inconsistent allegations that investment bank had "both an intent to earn excessive fees . . . and also an intent to defraud Plaintiffs by losing vast sums of money"); *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 524-25 (S.D.N.Y.), *aff'd*, 157 Fed. App'x 398 (2d Cir. 2005) (plaintiffs' allegation that palladium purchases were motivated by top executives' desire for bonuses did not show scienter where other employees recommended the purchases); *In Merrill Lynch & Co. Research Reports Sec. Litig*, 272 F. Supp. 2d 243, 263 (S.D.N.Y. 2003) (allegation that defendant provided services to fund that it knew would cause the fund's assets to diminish in value showed lack of scienter where defendant's compensation was based on appreciation of fund's assets).

Fourth, Defendants' contention that the global credit crisis caused the auction failures (Def. Mem. at 1, 7, 32) is belied by the wealth of internal communications in the Complaint that expose Merrill's plan to dump ML ARS on retail investors to mitigate its own balance sheet risk. Merrill simply ignores these allegations. The scheme also predates the credit crisis by years, and Merrill's decision to stop supporting the auctions was made only to limit its own exposure.

---

[6] Merrill's parent company, Defendant Merrill Lynch, owned almost half of BlackRock's common stock. (¶ 60.)

Finally, there is no merit to Defendants' argument that the Complaint is "chronologically deficient" because Plaintiffs do not allege that Merrill underwrote or managed any new ML ARS after August 2007. (Def. Mem. at 33.) Again, Defendants ignore Plaintiffs' allegation that Merrill was motivated to continue its auction rate securities business over the long run. Even if Merrill stopped underwriting new issues, it continued to receive fees for managing auctions throughout the Class Period. (¶¶ 110-11.) Merrill maintained the market as long as it could for financial gain and to mitigate potential losses before finally giving up and letting the auctions fail. *Goplen v. 51job, Inc*., 453 F. Supp.2d 759, 772 (S.D.N.Y. 2006), and *California Public Employees' Retirement System v. Chubb Corp*., No. 00-4285 (GEB), 2002 U.S. Dist. LEXIS 27189, at *60 (D.N.J. June 25, 2002), *aff'd*, 394 F.3d 126 (3d Cir. 2004), cited by Defendants, are unavailing. Both cases involved allegations of defendants' motives to influence a discrete event—*i.e.*, an initial public offering and a merger vote, respectively. Neither case addresses a defendant's motive to perpetuate an ongoing, multi-year scheme, as is alleged here.

In sum, Defendants' assertions of non-fraudulent intent are not plausible, let alone as cogent or compelling as Plaintiffs' allegations and inferences of fraudulent intent. Therefore, the element of scienter is satisfied.

## V. PLAINTIFFS PLEAD THAT THEY RELIED ON A PRESUMPTION OF AN EFFICIENT MARKET FREE OF MANIPULATION

A claim of market manipulation requires no more than "reliance on an assumption of an efficient market free of manipulation." *ATSI Communs.*, 493 F.3d at 101. Plaintiffs satisfy this requirement by alleging that, when they purchased ML ARS, they did not know about the comprehensive scheme alleged in the Complaint and presumed that those securities traded in an efficient market free of manipulation. (¶¶ 153-62.) No further allegations are required.

Defendants do not question the efficiency of the auction rate securities market, nor could they. Plaintiffs allege that auction rate securities were held by all classes of investors and that the market reacted quickly and efficiently to new information, as evidenced by significant price and volume shifts following the publication of various research reports and the collapse of the market upon the disclosure of the inherent illiquidity of those securities. (¶¶ 154-62.) These

price movements are the hallmark of an efficient market.  *See generally In re Initial Pub. Offering Secs. Litig.,* 544 F. Supp. 2d 277, 296-97 (S.D.N.Y. 2008).

Plaintiffs' detailed allegations of Merrill's concerted effort to hide its manipulation defeat Defendants' argument that it was "not reasonable" for Plaintiffs to presume that the securities traded in an efficient market free of manipulation.  (Def. Mem. at 27-29.)  Plaintiffs allege that Merrill depressed clearing rates because allowing them to be set at arm's-length auctions "would be too scary" (¶ 62); falsely characterized its bids as an effort to increase its own inventory or ensure that the clearing rate "reflect[ed] a fair and reasonable rate for the security" and was "indicative of a broader market for similar securities" (Kasner Decl., Ex. A at 14); concealed that it needed to sell ML ARS to reduce its own balance-sheet exposure (¶¶ 43, 61, 90, 129-34); falsely told its sales force that Merrill was not conducting "a fire-sale" and that they should pitch ML ARS as being "good for the customer" (¶¶ 87-90); violated internal policies in issuing positive research reports late in the Class Period stating that ML ARS had "been around for years" and weathered each major economic crisis of the previous two decades, and that "worries of a failed auction are misplaced," despite its own knowledge to the contrary  (¶ 75); described ML ARS as "highly liquid, safe investments" throughout the Class Period (¶ 53); and even a week before the market collapsed, continued to tout ML ARS as the "conservative's conservative" investment (¶ 145.)

These actions were intended to and did create an artificial appearance that ML ARS traded in an efficient market free of manipulation. (¶¶ 163-69.)  Merrill would not have gone to such lengths, if it did not want investors to believe that ML ARS traded at legitimate arm's-length auctions.  No more is required at the pleading stage.  *See ATSI Communs.*, 493 F.3d at 102 ("[A]t the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim.").

Nonetheless, Defendants argue that Plaintiffs' reliance on the presumption of the non-manipulated nature of the auction rate securities market was unreasonable because Merrill's "participation" in the auctions was fully disclosed.  (Def. Mem. 27.)  As described in Section III

above, this "truth on the market" defense cannot be decided on a motion to dismiss, *see, e.g.,*
*Ganino*, 228 F.3d at 167; *Provenz*, 102 F.3d at 1493; *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d
278, 303 (S.D.N.Y. 2005), and lacks substantive merit at any rate. Defendants pin their hopes on
language that is at best equivocal, fails to disclose the extent of Merrill's involvement, served to
actively *conceal* the behavior underlying this litigation, and was later found inadequate by the
SEC. For the sake of brevity, Plaintiffs incorporate those arguments herein by reference.

Defendants' authorities do not aid their cause. Defendants cite cases where plaintiffs
could not have justifiably relied on defendants' statements, because minimal diligence would
have uncovered the truth. Those cases are irrelevant because no amount of diligence, "minimal"
or otherwise, would have uncovered the material fact that Merrill was systematically propping up
the ML ARS market or Merrill's reasons for doing so. *See Starr*, 412 F.3d at 110 (finding that a
careful reading of letters and notices sent to shareholders would have provided sufficient notice);
*Sailor v. Northern States Power Co.*, 4 F.3d 610, 612-13 (8th Cir. 1993) (observing how most of
the information plaintiff claimed to be material was actually "available to the public"); *Last
Atlantis Capital LLC v. Chi. Bd. Options Exch., Inc.*, 455 F. Supp. 2d 788, 801 (N.D. Ill. 2006)
(noting that any "guarantee" of order execution was belied by statements a reasonable investor
would have noticed indicating that such execution may not occur).

Defendants also rely on *Hunt v. Alliance North Am. Gov't Income Trust*, 159 F.3d at 728,
which actually supports Plaintiffs' position that Merrill's disclosures were inadequate. The *Hunt*
court ruled that a statement in a defendant's prospectus suggesting that an event may or could
occur in a specified manner was misleading because the defendant knew that the event would not
or could not occur in that manner. *Id.* (finding that a reasonable investor could have understood
defendant's statements that it would attempt to use certain hedging techniques to mean that those
techniques were available to it, when they were not). Merrill's statements that it "may routinely
place one or more bids in an auction" were misleading because, as Plaintiffs allege, Merrill's
placement of bids was not a mere possibility or even routine, but was systematically taking place

pursuant to Merrill's agreements with ML ARS issuers and would inevitably continue—until Merrill chose to stop.

## VI.   THE COMPLAINT ALLEGES WRONGFUL CONDUCT WITH PARTICULARITY AS TO EACH DEFENDANT

Rule 9(b) requires Plaintiffs to allege each Defendant's wrongful conduct separately. *See Simon v. Castello*, 172 F.R.D. 103, 107 (S.D.N.Y. 1996).  Plaintiffs have done so.  Although Defendants argue the Complaint impermissibly lumps both together as "Merrill," they are simply incorrect.  (Def. Mem. at 1 n.1, 7, 18-19, 38.)  Paragraph 1 of the Complaint identifies and distinguishes between "Merrill Lynch, Pierce, Fenner & Smith Inc. ('Merrill') and Merrill Lynch & Co., Inc. ('Merrill Lynch').") (¶ 1.)  Merrill Lynch was the parent company of Merrill.  (¶ 15.) "During the Class Period, Merrill underwrote and served as an auction dealer for ML ARS."  (¶ 16.)  Plaintiffs allege that "Merrill engaged in a scheme, practice or course of conduct to manipulate the market for ML ARS. . . ."  (¶ 4.)  The allegations of manipulative conduct and scienter pertain to Merrill.  (¶¶ 40-152.)  Plaintiffs also makes specific allegations about Merrill Lynch's culpable participation in the scheme.  (¶¶ 15, 100-01, 114, 166-67, 219-26.)

Defendants cite to Paragraph 17 of the Complaint to support their "impermissible lumping" argument.  (Def. Mem. at 1 n.1.)  That paragraph states, "Unless specifically noted, 'Defendants' refers collectively to defendants Merrill Lynch and Merrill."  (¶ 17.)  While at times referencing "Defendants"—for example, in the sections pertaining to class allegations, loss causation and damages—the Complaint is specific that Merrill manipulated the market for ML ARS and is therefore liable under Section 10(b), while Merrill Lynch culpably participated in the scheme and, as Merrill's corporate parent, is therefore liable under Section 20(a).

## VII.   DEFENDANTS' ATTEMPT TO MISCAST THE COMPLAINT AS ALLEGING A "PURE" MISREPRESENTATION AND OMISSIONS CLAIMS IS BASELESS

Defendants devote 11 pages to an argument that Plaintiffs have alleged a misrepresentation claim in violation of Rule 10b-5(b).  (Def. Mem. at 33-44.)  No such claim appears in Plaintiffs' Complaint.  Of course, "it is possible for liability to arise under both

36

subsection (b) and subsections (a) and (c) of Rule 10b-5 out of the same set of facts, where the plaintiffs allege both that the defendants made misrepresentations in violations of Rule 10b-5(b), as well as that the defendants undertook a deceptive scheme or course of conduct that went beyond the misrepresentations." *In re Alstom*, 406 F. Supp. 2d at 475; *see also Pagel*, 803 F.2d at 946. But Plaintiffs have not plead a claim under Rule 10b-5(b). Plaintiffs assert a claim for market manipulation in violation of Rule 10b-5(a) and (c) only. (¶¶ 203-18.)

Defendants' attempt to mischaracterize Plaintiffs' claims is informed by cases such as *Lentell* and *TCS Capital Management* (Def. Mem. at 5), in which the courts concluded that the harm alleged resulted from the defendants' misrepresentations and omissions, not from any manipulative conduct. As described in Section II.C, *supra*, those cases are simply off-point. Here, Plaintiffs allege they were injured as a result of Merrill's manipulative trading activities. As a result, no basis exists to analyze Plaintiffs' claims under Rule 10b-5(b).

## VIII.  PLAINTIFFS STATE A CLAIM AGAINST MERRILL LYNCH FOR CONTROL PERSON LIABILITY

Plaintiffs have alleged both a primary violation by Merrill and control of Merrill by Merrill Lynch, which is all that is required to state a claim for violation of Section 20(a) against Merrill Lynch. *See Mishkin v. Ageloff,* No. 97 Civ. 2690 (LAP, 1998 U.S. Dist. LEXIS 14890, at *77 (S.D.N.Y. Sept. 23, 1998). The element of control requires "only some indirect means of discipline or influence short of actual direction by the purported controller." *In re Moody's Corp. Sec. Litig.,* 599 F. Supp. 2d 493, 517 (S.D.N.Y. 2009). Allegations of control need not be "extremely detailed." *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 616, 627 (S.D.N.Y. 2005). "[E]ven if the specific facts alleged by plaintiffs, taken alone, would not be enough to establish actual control over the primary violator . . . , 'dismissal is improper as long as it is at least plausible that plaintiffs can develop some set of facts that would pass muster.'" *In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d at 210 (quotation omitted). The control person inquiry is "fact-intensive . . . and generally should not be resolved on a motion to dismiss."*Compudyne Corp. v. Shane,* 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) (citation omitted). This Court also requires a

plaintiff to allege "particularized facts of the controlling person's conscious misbehavior as a culpable participant in the fraud." *Mishkin*, 1998 U.S. Dist. LEXIS 14890, at *77.[7]

As discussed above, Plaintiffs allege a primary violation of Section 10(b) violation by Merrill.  Plaintiffs also allege that Merrill was a wholly-owned subsidiary of Merrill Lynch and that Merrill Lynch had operational and management control over Merrill.  (¶¶ 15-16, 221-23.)  As Defendants concede, these allegations show that Merrill Lynch had the power to "control" Merrill by causing the direction of the management and policies at Merrill.  (Def. Mem. at 44-45.)  *See Mishkin*, 1998 U.S. Dist. LEXIS 14890, at *77.

Plaintiff also alleges facts that show Merrill Lynch's culpable participation in the scheme.  First, Plaintiffs allege that Merrill Lynch was motivated by greed to perpetuate the manipulation of the ML ARS market.  As Merrill's corporate parent, Merrill Lynch profited from Merrill's underwriting and auction dealer fees so long as Merrill could sustain the ML ARS market.  Merrill Lynch also profited from participation in the auction rate securities market by the investment management giant BlackRock, half-owned by Merrill Lynch and one of the largest issuers of auction rate securities.  (¶¶ 60, 114.)  Merrill served as an auction dealer for and/or sold over 180 BlackRock issuances to ML ARS investors, making BlackRock one of Merrill's largest issuer clients.  (*Id.*)  If the ML ARS market were to collapse (as it ultimately did), BlackRock would be forced to divest itself of billions of dollars of auction rate securities investments, dramatically reducing its assets under management and the attendant fees from which Merrill Lynch benefited.

Second, Merrill Lynch controlled Merrill's participation in the ML ARS market to limit its own exposure to the risks that those securities posed.  By the summer of 2007, Merrill Lynch

---

[7] Plaintiffs do not concede they must plead culpable participation by a controlling person or that a claim for violation of Section 20(a) is subject to the pleading standard under Rule 9(b), rather than Rule 8(a).  *See In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d at 396 ("Section 20(a) must . . . be pleaded only in accordance with Rule 8(a).")  Nonetheless, Plaintiffs allege particularized facts of Merrill Lynch's conscious misbehavior as a culpable participant in Merrill's fraudulent scheme that are sufficient to withstand scrutiny under Rule 9(b).

began to recognize billions of dollars of losses related to its sub-prime exposure. (¶ 100.) Merrill Lynch pressured Merrill to limit its exposure to sub-prime mortgages, including exposure with respect to ML ARS. (¶ 101.) Merrill Lynch could not have issued this kind of direction to Merrill without knowing that Merrill was actively propping up the ML ARS market. As a direct result of Merrill Lynch's pressure, beginning in August 2007, Merrill withdrew its support for certain CDO auction rate securities that primarily consisted of collateralized residential mortgage-backed securities secured by income streams from sub-prime mortgages. (¶¶ 100-01.) Merrill allowed at least 34 ML ARS auctions for CDO auction rate securities to fail, causing more than $2.6 billion of those securities to become illiquid. (¶¶ 100-01.)

Third, Merrill Lynch accepted financial responsibility for the ML ARS scheme. During the fiscal year ended December 26, 2008, Merrill Lynch recorded a charge of $375 million in connection with Defendants' offer to repurchase ML ARS from certain investor clients pursuant to their agreement with securities regulators. (¶¶ 166-67.) Merrill Lynch also paid $125 million in fines stemming from its participation in the auction rate securities market. (*Id.*)

These allegations sufficiently underscore Merrill Lynch's culpable participation in Merrill's scheme to manipulate the ML ARS market. Accordingly, the Court should deny Defendants' motion to dismiss Plaintiffs' claim for violation of Section 20(a).

## IX.    PLAINTIFFS' CLAIMS ARE TIMELY

Defendants argue that Plaintiffs' claims are untimely based on media items that were published several years before the Plaintiffs even purchased their securities. According to the Second Circuit, however, an investor has inquiry notice only "when the circumstances would suggest to an investor of ordinary intelligence the *probability* that she has been defrauded." *Dodds v. Cigna Sec.*, 12 F.3d 346, 350 (2d Cir. 1994) (emphasis added). "The fraud must be *probable*, not merely *possible*." *Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir. 2003) (emphasis added). Furthermore, "defendants bear a 'heavy burden' in establishing that the plaintiff was on inquiry notice as a matter of law. Inquiry notice exists only when 'uncontroverted evidence *irrefutably* demonstrates when plaintiff discovered or should have

39

discovered the fraudulent conduct.'"  *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F.

Supp. 243, 249 (S.D.N.Y. 1993) (emphasis added; citation omitted).

Defendants have not met their heavy burden.  Plaintiffs bought ML ARS between March

2006 and December 2007, long after the articles Defendants cite were published.  (*See* Compl.,

attached certifications; Kasner Decl., Exs. M-V (articles published between June 2004 and

February 2005).)  Defendants fail to explain how media reports from 2005 and earlier could have

put Plaintiffs on inquiry notice with regard to securities they had not yet bought (or even

considered buying).  *Compare In re Sterling Foster & Co., Inc., Sec. Litig.*, 222 F. Supp. 2d 312,

322 (S.D.N.Y. 2002) ("[T]he Court could not find that plaintiffs who purchased their shares in

December were on inquiry notice two months earlier."), *vacated on other grounds, remanded,*

*Levitt v. Bear Stearns & Co.*, 340 F.3d 94 (2d Cir. 2003), *with Shah v. Meeker*, 435 F.3d 244,

251-52 (2d Cir. 2006) (concluding that plaintiff could be put on inquiry notice by media reports

predating his securities purchase, where he bought shares of the stock at issue both before *and*

after publication of the article that put him on inquiry notice).

That should be the end of Defendants' argument.  But even assuming the articles came

out *after* Plaintiffs first bought ML ARS, they still would not have been enough to create inquiry

notice, as the media items Defendants cite fail to disclose the true nature and extent of Merrill's

manipulation of the ML ARS market.  (Kasner Decl. Exs. M-V.)

Two of the articles, for instance, did not describe any particular practice being

investigated by the SEC.  (*See* Kasner Decl., Ex. M (June 2004 AP item), Ex. P (Sept. 2004 AFX

item).)  Another article stated only:  "Some critics say the auctions are supposed to happen

without underwriting firms unduly interfering with the process, *but it may not always happen*

*that way*."  (Ex. N (June 2004 *Wall Street Journal* item) (emphasis added).)  Assuming this

statement was meant to refer to support bidding by auction managers in the first place, it is

difficult to imagine a more vague description of the conduct.

Two other articles described the practice under SEC scrutiny as tipping off favored

clients about how to bid in the auctions.  (Ex. Q (Sept. 2004 Dow Jones item), Ex. R (Sept. 2004

*Los Angeles Times* item).)  These reports are irrelevant to the issue of inquiry notice, as the only practice specified has nothing to do with Plaintiffs' allegations and claims.  Similarly, another article, which focused not on the SEC investigation but a debt offering by an Illinois county, said that "according to people familiar with the matter, the SEC is asking whether dealers conducting such auctions are *working behind the scenes with investors* to prevent the bond sales from failing."  (Ex. O (June 28, 2004 Dow Jones item), at 2 (emphasis added).)  Plaintiffs do not allege that Merrill's systematic interventions were carried out in collaboration with its investor clients.

The professional- and industry-publication pieces submitted by Defendants, from *Bond Buyer* and *Investment Dealers Digest*, are arguably relevant, but they also did not reveal enough of Merrill's actual conduct to put Plaintiffs on inquiry notice.  As an initial matter, any informative impact these items might have otherwise had was considerably muted by the fact they did not appear in mainstream media.  As the Second Circuit explained in *Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406 (2d Cir. 2008), in finding claims were not time-barred:

> With the exception of the *New York Times* article, the two *Financial Times* articles, and the *Chicago Tribune* blurb, the articles judicially noticed by the District Court were from industry newsletters.  These articles were not sufficient to put investors on inquiry notice.  We have never affirmed the dismissal of a complaint as time-barred based on a story that appeared only in a specialty publication, as opposed to mainstream press reports that are more likely to come to the attention of an investor of ordinary intelligence.  We are reluctant to affirm such a dismissal where, as here, the specialty publication coverage is relatively minimal and we do not know the publications' circulation or the extent to which a reasonable investor would be aware of the limited coverage.

*Id.* at 432 (citation to record omitted).

The January 2005 *Bond Buyer* piece, for instance, said that the SEC's "staff has found that dealers *sometimes* try to manipulate the bidding process—by sharing information about the bids or by putting in their own bids that have been based upon their knowledge of other bids—to avoid a failed auction, which can force issuers to pay high interest rates, *or to avoid volatility among the bids received*."  (Ex. S (emphasis added).)  The impression given is that any

intervention was undertaken only occasionally, and that it was equally likely a dealer would intervene "to avoid volatility" as to avoid auction failure.  Furthermore, the article suggested the only motivation for avoiding auction failure was to prevent issuers from having to pay higher interest rates.[8]  Plaintiffs, however, allege that until August 2007, Merrill intervened without exception whenever an auction would otherwise have failed, and that the purpose of these extensive, regular interventions was to prop up the whole ML ARS market, not merely to suppress the rates paid by issuers.  In fact, Plaintiffs allege that at times Merrill manipulated clearing rates *higher*, to enable it to sell more securities.

The January 2005 *Investment Dealers Digest* item discussed a potpourri of approximately thirty unrelated matters, with the SEC's investigation third on the list.  (Ex. T.)  The article said the SEC investigated "whether brokers tipped favored customers to other investors' bids, or bid for their own accounts while managing the auctions."  (*Id.* at 1.)  As explained above, the "tipping" conduct is not at issue in this case, and the cursory reference to proprietary bidding would not have led ML ARS buyers to conclude they had likely been the victims of deceptive conduct by Merrill.  In addition, the article said the SEC had started discussing a settlement, which "could result in changes in how the firms operate."  (*Id.*)  In other words, any irregularities would be rectified, and things would move on.

Even if these 2005 articles were sufficient to put investors on inquiry notice, the SEC's settlement with Merrill in May 2006 would have relieved their concerns.  Investors would reasonably assume that the SEC investigated and resolved any issues with Merrill's auction rate practices and that Merrill was actually complying with the directive to properly disclose its conduct.  *See Siebert v. Nives*, 871 F. Supp. 110, 115 (D. Conn. 1994) (denying motion to dismiss and rejecting argument that earlier storm warnings rendered plaintiffs' claims untimely: "While [the annual report] . . . does state that the FDIC had begun to investigate the corporation, it also assures investors that Amity had already revised its loan policy to address the FDIC's

---

[8] The February 2005 and March 2005 *Bond Buyer* articles contained similar, and similarly innocuous, descriptions.  (Ex. U, at 4, Ex. V, at 5-6.)

concerns and had begun to revise its methodology for determining the allowance for loan losses. . . . Therefore, it was not 'beyond cavil' (or to be expected) that a reasonable investor would have suspected that something was severely 'amiss' at Amity based on the 1990 Annual Report.").

To the extent the articles Defendants rely upon even identified a particular practice under scrutiny, the articles either referred to conduct not at issue in this case or gave a description of auction dealer proprietary bidding that bears little resemblance to the pervasive intervention that Plaintiffs allege.  The SEC investigation culminated in a settlement that appeared to address the practices that had been reported in the media as being under scrutiny.  These circumstances would not have suggested to ML ARS buyers of ordinary intelligence that they had likely been defrauded, particularly those who bought ML ARS after the SEC settlement seemingly resolved any issues with Merrill's practices.  *See In re Dynex Capital, Inc. Securities Litigation*, No. 05 Civ. 1897 (HB), 2006 U.S. Dist. LEXIS 4988, at \*16-18 (S.D.N.Y. Feb. 10, 2006) (rejecting defendants' argument that plaintiffs had been put on inquiry notice by "1) drastic increases in loan delinquency rates; 2) increases in 'loss severities' on defaulting loans; 3) increases in loan loss reserves; . . . 4) steep increases in total losses on the bond collateral [and] numerous media reports describing problems in the manufactured housing industry," and holding "[t]he mounting losses on the bond collateral, while indicative of poor performance, did not suffice to place investors on notice of fraud. . . . These indicators would not have apprised a reasonable investor of massive fraud in the origination and servicing of the bond collateral."), *vacated in part, remanded on other grounds sub nom. Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190 (2d Cir. 2008).

In addition, the market's reaction to the articles cited by Defendants confirms that they were not "storm warnings." The items were published in 2004 and 2005.  At the end of 2005, approximately $263 billion of auction rate securities were outstanding.  Over the next 26 months, the auction rate securities market grew significantly, exceeding $330 billion by February 2008, (¶ 32)—hardly the expected reaction if the articles had suggested the probability of massive

fraud.  *See Newman*, 335 F.3d at 195 (reversing district court's judgment dismissing plaintiffs' claims as time-barred:  "The Court's holding [that plaintiffs were not put on inquiry notice] is further supported by the fact that Warnaco's stock price did not have any significant movement following the filing of the 1998 Form 10-K. . . . While some courts have pointed to a decline in stock price as a factor supporting a finding of inquiry notice, . . . there was no such decline following the issuance of the 1998 Form 10-K in this case.") (citations omitted).

Furthermore, this is not a garden variety securities case where plaintiffs sue an issuer and its management for misrepresentations and omissions affecting the price of the issuer's stock.  In such an action, whether or not defendants' public statements were undermined by media reports or regulatory proceedings—and thus whether or not plaintiffs were put on inquiry notice—is relatively easy to determine.  The present case, by contrast, has been brought against not the issuers or even the direct sellers of Plaintiffs' auction rate securities, but the firm that managed the auctions for those securities.  The nature of the suit further militates against a finding that Plaintiffs were put on inquiry notice of Section 10(b) claims against "behind-the-scenes" wrongdoers such as Defendants, especially given the heightened pleading standards of the PSLRA.  *Cf. Levitt*, 340 F.3d at 103 (vacating district court's decision that plaintiffs' claims were time-barred:  "[T]his is not a typical storm warnings case, as it was not brought against ML Direct or its officers or directors but instead against ML Direct's clearing agent.  This is, therefore, not a case where Plaintiffs could allege a prima facie case against Bear Stearns simply by examining ML Direct's financial statements and media coverage of the company.").

Defendants' authorities do not compel a different outcome.  In those cases, the very matters that plaintiffs alleged were misrepresented or omitted—and that formed the crux of plaintiffs' claims—had been plainly disclosed in the media with a fair amount of precision.  *See, e.g., Shah*, 435 F.3d at 251 ("Because of the degree of specificity with which it described the alleged conflicts of interest at the heart of Shah's complaint, the *Fortune* article stands in stark contrast to the 'generic articles on the subject of structural conflicts' that we previously have held to be insufficient to trigger inquiry notice."); *GVA Market Neutral Master Ltd. v. Veras*

*Capital Partners Offshore Fund, Ltd.*, 580 F. Supp. 2d 321, 329 (S.D.N.Y. 2008) (individual action brought by sophisticated offshore hedge fund: "[B]eginning on October 16, 2003, and continuing for months thereafter, numerous news articles, press releases and lawsuits appeared containing the exact allegations of wrongdoing by Veras that Gottex now includes in its Amended Complaint . . . ."); *Puttick v. Am. Online, Inc.*, No. 05 Civ. 5748 (SWK), 2007 U.S. Dist. LEXIS 38483, at *5 (S.D.N.Y. May 23, 2007) (finding inquiry notice where articles were published reporting issuer had inflated its revenue; issuer announced it may have overstated revenue; and dozens of securities actions were filed alleging revenue inflation). In *In re Ultrafem Inc. Securities Litigation*, 91 F. Supp. 2d 678 (S.D.N.Y. 2000) (Preska, J.), the Bloomberg News article that this Court held put plaintiffs on inquiry notice was itself cited in the complaint. *See id.* at 692. In *Wyser-Pratte Management Co. v. Telxon Corp.*, 413 F.3d 533 (6th Cir. 2005), contrary to Defendants' suggestion that the only storm warning was disclosure of an SEC investigation, plaintiffs were put on notice by a wealth of information, including the investigation; the issuer's February 1999 restatement of financial results; "the collapse of the Symbol deal following a due diligence review of Telxon's books; the December 11, 1998 restatement of earnings; the shareholder class actions filed that day alleging misrepresentations in the financial statements; [and] delays in the release of financial results because the review of certain judgmental accounting matters had not been completed." *Id.* at 563-64.

## X.  PLAINTIFFS DO NOT ASSERT CLAIMS ON BEHALF OF INVESTORS WHO HAVE BEEN MADE WHOLE

### A.  The Proposed Class Excludes Investors Whose Securities Have Been Repurchased At Par

Defendants mistakenly assume that this class action purports to cover investors fortunate enough to have had their ML ARS redeemed or repurchased at par.  To be clear, Plaintiffs do not assert claims on behalf of investors who have been made whole.  Plaintiffs seek to represent a proposed Class of all "persons and entities that, between March 25, 2003 and February 13, 2008, inclusive, purchased auction rate securities for which Merrill served as sole auction dealer, lead

45

auction dealer, co-lead auction dealer, or joint lead auction dealer, *and were damaged thereby*."
(¶ 18 (emphasis added).)  Courts have held that investors who were repaid the entire principal
amount of their auction rate securities investments have not suffered damages.  *See Aimis Art
Corp. v. Northern Trust Secs., Inc.*, 08 Civ. 8057 (VM), 2009 U.S. Dist. LEXIS 68712, at *13-14
(S.D.N.Y. Aug. 6, 2009); *In re UBS Auction Rate Secs. Litig.,* 2009 U.S. Dist. LEXIS 26385 at
*16-17, 19.   Under such authorities, investors who have had their ML ARS redeemed or
repurchased at par are not members of the proposed Class.  The Class definition is not
ambiguous and does not need to be revised at the pleading stage.

**B.**    **Plaintiffs Have Standing To Represent All Class Members**

In a footnote on the final page of their brief, Defendants contend that Plaintiffs lack
standing to bring claims on behalf of all putative Class members because the Class includes
people who bought securities that Plaintiffs did not buy.  (Def. Mem. at 49 n.21).  Defendants'
argument conflates constitutional standing with typicality under Rule 23.   "[S]tanding to sue . . .
is separate and distinct from the issue of whether the class representatives have claims that are
typical of the proposed class members."  *Open Hous. Ctr. v. Samson Mgmt. Corp*., 152 F.R.D.
472, 476 (S.D.N.Y. 1993); *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244
F. Supp. 2d 289, 334 (S.D.N.Y. 2003) (whether plaintiffs adequately represent other victims of
defendants' conduct "should be raised when plaintiffs move for class certification").   "Courts
have repeatedly held that . . . class representatives need not have invested in each security so
long as the plaintiffs have alleged a single course of wrongful conduct with regard to each
security.  Courts have not addressed this concern vis-à-vis the doctrine of standing, but rather
have examined such concerns pursuant to Rule 23(a)(3)'s typicality requirement."  *In re Dreyfus
Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318 (HB), 2000 U.S. Dist. LEXIS 13469, at
*8-16 (S.D.N.Y. Sep. 20, 2000).  *See also Maywalt v. Parker & Parsley Petroleum Co.*, 147
F.R.D. 51, 56-57 (S.D.N.Y. 1993); *Tedesco v. Mishkin*, 689 F. Supp. 1327, 1335 (S.D.N.Y.
1988).  As Plaintiffs allege a single course of misconduct, the Court should reject Defendants'
"standing" argument on this motion to dismiss.

Defendants' authorities are distinguishable as well.  Those cases involved putative class members and representatives with dissimilar claims, against different defendants pertaining to different securities.  *See In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.,* 434 F. Supp. 2d 233, 236 n.8 (S.D.N.Y. 2006) (claims involved securities plaintiffs never owned that were "issued, advised, and managed by non-parties . . . under different offering prospectuses"); *In re Salomon Smith Barney Mut. Fund Fees Litig.,* 441 F. Supp. 2d 579, 585 (S.D.N.Y. 2006) (different defendants and different types of mutual funds); *Hoffman v. UBS-AG,* 591 F. Supp. 2d 522, 527-30 (S.D.N.Y. 2008) (three sub-classes alleging multiple claims against multiple defendants based upon different purported misrepresentations claims for different types of mutual funds).  Here, Plaintiffs allege a single type of injury sustained by all putative Class members from their purchases of auction rate securities managed by one company, Merrill, and traceable to a single course of wrongful conduct perpetuated by Merrill and its parent, Merrill Lynch.  Whether Plaintiffs are adequate to represent the entire Class should be decided at class certification, not on a motion to dismiss.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss in its entirety.


Dated: August 28, 2009                        Respectfully submitted,

                                              **GIRARD GIBBS LLP**

                                              By:  _____*/s/ Aaron M. Sheanin*_____

                                                  Daniel C. Girard (admitted *pro hac vice*)
                                                  Aaron M. Sheanin (admitted *pro hac vice*)
                                                  Christina H. C. Sharp (admitted *pro hac vice*)
                                                  601 California Street, 14th Floor
                                                  San Francisco, CA 94108
                                                  Telephone:  (415) 981-4800
                                                  Facsimile:  (415) 981-4846

Jonathan K. Levine (JL-8390)
**GIRARD GIBBS LLP**
711 Third Avenue, 20th Floor
New York, NY  10017
Telephone:  (212) 867-1721
Facsimile:  (212) 867-1767

**Plaintiffs' Lead Counsel**

**Additional Counsel:**

Norman E. Siegel
Matthew L. Dameron
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO, 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101

Christopher A. Seeger (CS-4880)
Stephen A. Weiss (SW-3520)
David R. Buchanan (DB-6368)
**SEEGER WEISS LLP**
One William Street
New York, NY 10004
Telephone:  (212) 584-0700
Facsimile:  (212) 584-0799

<u>**CERTIFICATE OF SERVICE**</u>

I, Aaron M. Sheanin, hereby certify that on August 28, 2009, I caused the following

document(s) to be filed electronically with the United States District Court for the Southern

District of New York through the Court's mandated ECF service:

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS LEAD PLAINTIFFS' FIRST AMENDED CONSOLIDATED**
**CLASS ACTION COMPLAINT**

Counsel of record are required by the Court to be registered e-filers, and as such are

automatically e-served with a copy of the document(s) upon confirmation of e-filing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of August, 2009 at San Francisco, California.


                                    */S/ Aaron M. Sheanin*