**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
IN RE MERRILL LYNCH AUCTION RATE  :     Master File No.:
SECURITIES LITIGATION            :     No. 09-md-2030 (LAP)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - :
THIS DOCUMENT RELATES TO          :     **ECF Case**
NO. 1:08-CV-3037 (LAP)            :     **Electronically Filed**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS LEAD PLAINTIFFS' "FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT"

Jay B. Kasner
Scott D. Musoff
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
(212) 735-3000

Paul J. Lockwood
SKADDEN, ARPS, SLATE
  MEAGHER & FLOM LLP
One Rodney Square
Wilmington, Delaware  19801
(302) 651-3000

Attorneys for Defendants Merrill Lynch & Co., Inc.
  and Merrill Lynch, Pierce, Fenner &
  Smith Incorporated

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT .....................................................................................................................6

    I.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER SECTION
        10(b) OF THE EXCHANGE ACT OR RULE 10b-5 ............................................6

        A.    Plaintiffs Have Failed To Allege A Disclosure Claim Under Rule
              10b-5(b) ....................................................................................................6

        B.    Plaintiffs Have Failed To Allege A Market Manipulation Claim
              Under Rule 10b-5(a) or (c) ......................................................................7

              1.    Plaintiffs Have Failed To Allege That Defendants Engaged
                      In Manipulative Conduct ............................................................7

              2.    Plaintiffs' Allegations Based Solely On Misrepresentations
                      And Omissions Cannot Sustain A Market Manipulation
                      Claim .........................................................................................14

              3.    The Complaint Does Not Plead Reasonable Reliance .................17

              4.    Plaintiffs Have Failed To Allege Particularized Facts
                      Giving Rise To A Strong Inference Of Fraudulent Intent ............20

                    (a)    Any Inference Of Scienter Is Not Cogent And Is
                            Less Compelling Than Non-Fraudulent Inferences ..........20

                  (b)    Merrill's Receipt Of Fees For Its Services Does Not
                              Establish Scienter ...........................................................22

    II.    PLAINTIFFS HAVE FAILED TO PLEAD A CLAIM AGAINST
        MERRILL LYNCH & CO., INC. ......................................................................22

    III.    PLAINTIFFS' CLAIMS ARE BARRED BY THE STATUTE OF
        LIMITATIONS .................................................................................................23

CONCLUSION ................................................................................................................25

## TABLE OF AUTHORITIES

## CASES

Page(s)

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ........................................................................*passim*

*Aimis Art Corp. v. Northern Trust Securities Inc.*,
    08 Civ. 8057 (VM), 2009 U.S. Dist. LEXIS 68712
    (S.D.N.Y. Aug. 6, 2009).............................................................................3, 6

*In re Alstom SA Securities Litigation*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005) .............................................................4, 15

*Avon Pension Fund v. GlaxoSmithKline PLC*,
    No. 08-4363-CV, 2009 WL 2591173 (2d Cir. Aug. 24, 2009) ............................20

*In re Bristol-Myers Squibb Securities Litigation*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004) ............................................................21

*In re Citigroup Auction Rate Securities Litigation*,
    No. 08 Civ. 3095, 2009 U.S. Dist. LEXIS 83046 (S.D.N.Y. Sept. 11, 2009)................*passim*

*Collier v. Aksys Ltd.*,
    No. 3:04CV1232 (MRK), 2005 U.S. Dist. LEXIS 20300
    (D. Conn. Aug. 15, 2005), *aff'd*, 179 Fed. App'x 770 (2d Cir. 2006) .............................16, 17

*Cross v. 21st Century Holding Co.*,
    No. 00 Civ. 4333 (AGS), 2001 U.S. Dist. LEXIS 11189 (S.D.N.Y. Aug. 6, 2001)...............23

*Defer LP v. Raymond James Fin., Inc.*,
    No. 08-Civ. 3449 (LAK), 2009 U.S. Dist. LEXIS 84685
    (S.D.N.Y. Sept. 17, 2009)............................................................................3

*ECA v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) .......................................................................5, 21

*GVA Mkt. Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.*,
    580 F. Supp. 2d 321 (S.D.N.Y. 2008) ..............................................................24

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154, 167 (2d Cir. 2000).....................................................................12

*Kemp v. Universal Am. Fin. Corp.*,
    No. 05 Civ. 9883 (JFK), 2007 U.S. Dist. LEXIS 2162 (S.D.N.Y. Jan. 10, 2007)...........13, 19

*Korwek v. Hunt*,
  646 F. Supp. 953 (S.D.N.Y. 1986).......................................................................24

*Kurzweil v. Philip Morris Cos.*,
  No. 94 Civ. 2373 (MBM), 1995 U.S. Dist. LEXIS 13030 (S.D.N.Y. Sept. 8, 1995)..............9

*LC Capital Partners, LP v. Frontier Ins. Group, Inc.*,
  318 F.3d 148 (2d Cir. 2003) ......................................................................24, 25

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
  No. 07 Civ. 0976 (LAP), 2008 U.S. Dist. LEXIS 76670
  (S.D.N.Y. Sept. 30, 2008)...........................................................................13

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) ................................................................ 3, 6, 14, 15, 16

*In re Loral Space & Commc'ns Ltd. Securities Litigation*,
  No. 01 Civ. 4388 (JGK), 2004 U.S. Dist. LEXIS 3059 (S.D.N.Y. Feb. 23, 2004) .................5

*Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*,
  No. 07-5423, 2009 U.S. Dist. LEXIS 74382 (E.D. Pa. Aug. 20, 2009)................................21

*In re Merrill Lynch & Co. Research Reports Securities Litigation*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003) .............................................................5, 21

*Mishkin v. Ageloff*,
  No. 97 Civ. 2690 (LAP), 1998 U.S. Dist. LEXIS 14890
  (S.D.N.Y. Sept. 23, 1998)...........................................................................23

*Mo. Portland Cement Co. v. Cargill, Inc.*,
  498 F.2d 851 (2d Cir. 1974) ..........................................................................9

*In re N.Y. Cmty. Bancorp, Inc., Securities Litigation*,
  448 F. Supp. 2d 466 (E.D.N.Y. 2006).................................................................9

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) .........................................................................13

*Santa Fe Indus., Inc. v. Green*,
  430 U.S. 462, 477 (1977) ..............................................................................8

*Schlick v. Penn-Dixie Cement Corp.*,
  507 F.2d 374 (2d Cir. 1974) .........................................................................16

*Schnell v. Conseco, Inc.*,
  43 F. Supp. 2d 438, 488 (S.D.N.Y. 1999) .........................................................16

*SEC v. Badian*,
 No. 06 Civ. 2621 (LTS)(DFE), 2008 U.S. Dist. LEXIS 64661
 (S.D.N.Y. Aug. 22, 2008)................................................................................16

*SEC v. Martino*,
 255 F. Supp. 2d 268 (S.D.N.Y. 2003)...............................................................11

*SEC v. Resch-Cassin & Co.*,
 362 F. Supp. 964 (S.D.N.Y. 1973).....................................................................11

*Shah v. Meeker*,
 435 F.3d 244 (2d Cir. 2006) ........................................................................23, 24

*Staehr v. Hartford Fin. Servs. Group*,
 547 F.3d 406 (2d Cir. 2008) .............................................................................24

*Steed Fin. LDS v. Nomura Securities Int'l, Inc.*,
 No. 00 Civ. 8058 (NRB), 2001 U.S. Dist. LEXIS 14761
 (S.D.N.Y. Sept. 20, 2001).................................................................................13

*TCS Capital Mgmt., LLC v. Apax Partners, L.P.*,
 No. 06-CV-13447 (CM), 2008 U.S. Dist. LEXIS 19854 (S.D.N.Y. Mar. 7, 2008) ..........4, 15

*In re UBS Auction Rate Securities Litigation*,
 No. 08 CV 2967 (LMM), 2009 U.S. Dist. LEXIS 26385
 (S.D.N.Y. Mar. 30, 2009)...............................................................................3, 6

*In re Ultrafem Inc. Securities Litigation*,
 91 F. Supp. 2d 678 (S.D.N.Y. 2000)..................................................................24

*United States v. Royer*,
 549 F.3d 886 (2d Cir. 2008) .............................................................................16

*W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp.*,
 No. 08-3867-cv, 2009 WL 2779119 (2d Cir. Sept. 3, 2009).................................20

*In re Zyprexa Prods. Liability Litigation*,
 549 F. Supp. 2d 496 (E.D.N.Y. 2008)................................................................23

**STATUTES**

15 U.S.C § 78j(b) ..............................................................................*passim*

15 U.S.C § 78u-4(b) ...............................................................................1

17 C.F.R. § 240.10b-5 ................................................................................................. *passim*

Fed. R. Civ. P. 9(b) ........................................................................................................ 1

Fed. R. Civ. P. 12(b)(6) .................................................................................................. 1

Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill" and collectively, "Defendants")[1] respectfully submit this reply memorandum of law in support of their motion to dismiss Plaintiffs' Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and Section 21D(b) of the PSLRA, 15 U.S.C. § 78u-4(b).

## PRELIMINARY STATEMENT

In their opposition brief, Plaintiffs make a concession that greatly reduces the scope of this case.  Plaintiffs expressly disavow any intent to pursue claims under Rule 10b-5(b), *i.e.*, Plaintiffs do not plead a claim based on false or misleading statements or omissions.  (*See* Memorandum Of Law In Opposition To Defendants' Motion To Dismiss Lead Plaintiffs' First Amended Consolidated Class Action Complaint ("Plaintiffs' Brief" or "Pl. Br.") at 37)  This concession was compelled by the fact that Plaintiffs were not Merrill customers and did not receive their information regarding their investments in auction rate securities ("ARS") from Merrill.  (*See* Pl. Br. at 22)  As a result, the Court should simply disregard Plaintiffs' allegations that Merrill issued overly positive research reports on ARS or had its "analysts pump up its financial advisors during national conference calls with the same misinformation" allegedly found in Merrill's research reports.  (*See* Pl. Br. at 27)  As Plaintiffs were not Merrill customers, they neither received Merrill's research reports, nor interacted with Merrill's financial advisors, and they concede that they do not sue based on any such misrepresentations.

Having disavowed any effort to bring a claim based on false and misleading disclosures, Plaintiffs attempt to plead a claim for market manipulation.  Plaintiffs contend that

---

[1]   Undefined capitalized terms are defined in the Memorandum Of Law In Support Of Defendants' Motion To Dismiss Lead Plaintiffs' "First Amended Consolidated Class Action Complaint" filed July 24, 2009 ("Opening Brief" or "Op. Br.").

Merrill "manipulated the market for these securities by *systematically* placing 'support bids' to keep the auctions from failing." (Pl. Br. at 1 (emphasis in original)) The short and direct answer to this assertion is that Merrill *disclosed* that it may "*routinely* place one or more bids in an auction for its own account … *to prevent an auction failure*." (Declaration of Jay B. Kasner dated July 24, 2009 (D.E. 52) ("Kasner Decl. I"), Ex. A at 16 (emphasis added))[2]  Merrill also *disclosed* that (i) its bidding practices would likely have an effect on the rates (*see id.* ("Bids by Merrill Lynch or by those it may encourage to place bids *are likely to affect the clearing rate* ....) (emphasis added), and (ii) it was not required to bid and therefore auction failures could occur. (*See id.* at 18 ("[A]uction failures are possible, especially … if a market disruption were to occur or if, for any reason, Merrill Lynch were unable or unwilling to bid.")) In a similar auction rate securities related action against Citigroup, Inc., Judge Swain held that Citigroup's almost identical disclosures supported the dismissal of a claim that Citigroup had manipulated the market for the auction rate securities it managed. *In re Citigroup Auction Rate Sec. Litig.*, No. 08 Civ. 3095, 2009 U.S. Dist. LEXIS 83046, at *7-8, *10-11 (S.D.N.Y. Sept. 11, 2009). Judge Swain held that no market manipulation claim could be pleaded because Citigroup had "disclosed that the ARS market was not necessarily set by the 'natural interplay of supply and demand,' but that they could be set by broker-dealers." *Id.* at *24. Thus, such disclosures were "fully consistent with the fundamental purpose of the [Exchange] Act to substitute a philosophy

---

[2]  (*See also* Kasner Decl. I, Ex. A at 18 ("Merrill Lynch may submit a bid in an auction to keep it from failing, but it is not obligated to do so. There may not always be enough bidders to prevent an auction from failing in the absence of Merrill Lynch bidding in the auction for its own account or encouraging others to bid. Therefore, auction failures are possible, especially … if a market disruption were to occur or if, for any reason, Merrill Lynch were unable or unwilling to bid."))

of full disclosure for the philosophy of caveat emptor." *Id.* at *24-25 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).[3]

   Plaintiffs nevertheless argue that Merrill's disclosures were inadequate by placing great emphasis on the assertion that Merrill "systematically" placed support bids instead of "routinely" placing support bids.  (*See* Pl. Br. at 1)  Such subtle semantic differences are hardly the stuff of fraud.  Webster's defines "systematic" in pertinent part as: "3 a: methodical in procedure or plan, b: marked by thoroughness and regularity", and defines "routine" in pertinent part as "1 a: of a commonplace or repetitious character, 2: of, relating to, or being in accordance with established procedure." Merriam-Webster's Online Dictionary, http://www.merriam-webster.com.  Thus, either word alerts investors to the fact that Merrill had a procedure in place for repetitively supporting auctions.

   Furthermore, Plaintiffs' challenge to the adequacy of Merrill's disclosures only serves to confirm that their claim is not one of market manipulation, but a misrepresentation claim based on allegedly inadequate disclosures (for which Plaintiffs could never satisfy the exacting requirements of such a claim).  (*See* Op. Br. at 33-44)  Courts have consistently prohibited plaintiffs from seeking to evade the pleading requirements of a misrepresentation claim by merely re-labeling the alleged misstatements and omissions as manipulative and deceptive conduct.  *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177-78 (2d Cir. 2005); *see*

---

[3] Thus far, every case in this District alleging fraud pursuant to Section 10(b) concerning auction rate securities has been dismissed for failure to state a claim.  *See In re Citigroup*, 2009 U.S. Dist. LEXIS 83046; *Defer LP v. Raymond James Fin., Inc.*, No. 08-Civ. 3449 (LAK), 2009 U.S. Dist. LEXIS 84685 (S.D.N.Y. Sept. 17, 2009) (Kaplan, J.) (dismissing for failure to meet the heightened pleading standards); *Aimis Art Corp. v. Northern Trust Sec., Inc.*, No. 08 Civ. 8057 (VM), 2009 U.S. Dist. LEXIS 68712 (S.D.N.Y. Aug. 6, 2009) (Marrero, J.) (dismissing for failure to plead damages); *In re UBS Auction Rate Sec. Litig.*, No. 08 CV 2967 (LMM), 2009 U.S. Dist. LEXIS 26385 (S.D.N.Y. Mar. 30, 2009) (McKenna, J.) (dismissing for failure to plead damages).

*also TCS Capital Mgmt., LLC v. Apax Partners, L.P.*, No. 06-CV-13447 (CM), 2008 U.S. Dist. LEXIS 19854, at *63 (S.D.N.Y. Mar. 7, 2008) ("This sleight of hand does not magically transform its disclosure claim into a market manipulation claim.").  Indeed, this case is indistinguishable from other cases in this Circuit where courts have held that the sole basis for plaintiffs' claims was alleged misrepresentations and omissions, including *Lentell,* the controlling case on this issue.  (*See infra* pp. 15-17)

   Plaintiffs erroneously contend that their claim is not based entirely on misrepresentations and omissions, claiming that they also allege that Merrill committed manipulative acts by placing support bids to prevent auction failures and to set clearing rates. (*See* Pl. Br. at 15)  Those acts, however, unlike traditional market manipulation acts such as "washed sales", "matched orders", or "rigged prices", were not in and of themselves manipulative. Thus, any fraudulent conduct by Merrill would have to turn on misrepresentations regarding such activity.  *See TCS Capital Mgmt.*, 2008 U.S. Dist. LEXIS 19854, at *62-63 (holding that where the "so-called deception'" was "not a wash sale or a matched order," but grounded "in the alleged failure to disclose the 'real terms' of the deal," the allegations were "nothing more than a reiteration of the misrepresentations and omissions that underlie plaintiff's disclosure claim"); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 476-77 (S.D.N.Y. 2005) (holding that plaintiffs had failed to plead a market manipulation claim where the alleged conduct was not in and of itself deceptive, but that it was only the deliberate non-disclosure of that conduct that gave rise to the alleged fraud).  Here, of course, Merrill's purchases gave no false pricing signal to the market because both Merrill's participation in the auctions and the potential effect its bids could have on pricing were disclosed.  (*See* Op. Br. pp. 11-15; *infra* pp. 7-13)

In addition to their failure to plead manipulative conduct, Plaintiffs have also failed to plead reasonable reliance in light of Merrill's disclosures, as well as other public information available through the 2006 SEC Order and the publicly filed prospectuses for the ARS.  Plaintiffs merely assert that "they did not know about the comprehensive scheme alleged in the Complaint and presumed that those securities traded in an efficient market free of manipulation." (Pl. Br. at 33)  Plaintiffs' professed ignorance of Merrill's bidding practices is irrelevant.  Those public disclosures "negate *any* inference that reliance by the class on such a view of the ARS pricing mechanism was reasonable."  *In re Citigroup*, 2009 U.S. Dist. LEXIS 83046, at *23 (emphasis added).  (*See infra* pp. 17-19)

Plaintiffs have also failed to plead facts giving rise to a strong inference of fraudulent intent.  Despite the great length of their brief,[4] Plaintiffs were unable adequately to explain the stark internal inconsistency contained in their Complaint – that Merrill was manipulating the market by buying more and more ARS in order to facilitate its efforts to sell its thereby larger ARS inventory.  Such economically irrational allegations consistently have been viewed as insufficient to establish scienter.  *See ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 203 (2d Cir. 2009); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 263 (S.D.N.Y. 2003).  Moreover, that Merrill publicly disclosed its bidding practices undermines Plaintiffs' allegations of scienter.  *See In re Loral Space & Commc'ns Ltd. Sec. Litig.*, No. 01 Civ. 4388 (JGK), 2004 U.S. Dist. LEXIS 3059, at *28-29 (S.D.N.Y. Feb. 23, 2004).  (*See infra* pp. 20-22)

---

[4]    Plaintiffs' brief is one-and-a-half spaced, not double spaced.  Merrill's counsel converted Plaintiffs' brief to double spaced text, and it became nearly 55 pages, well beyond the 50-page limit set by this Court.  (*See* August 17, 2009 Order (D.E. 54))

Finally, Plaintiffs' claims are barred because information in the market over two years prior to their filing of this action put them on inquiry notice of their claims. (*See infra* pp. 23-25)[5]

## ARGUMENT

## THE COMPLAINT SHOULD BE DISMISSED

I.    **PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT OR RULE 10b-5**

Plaintiffs' Section 10(b) claim should be dismissed because the Complaint fails to plead facts that could establish a market manipulation claim under subsection (a) or (c) of Rule 10b-5 or a disclosure claim under subsection (b) of Rule 10b-5.

A.    **Plaintiffs Have Failed To Allege A Disclosure Claim Under Rule 10b-5(b)**

As an initial matter, Plaintiffs concede that they "have not plead a claim under Rule 10b-5(b)." (*See* Pl. Br. at 37) While Plaintiffs assert that their Section 10(b) claim is a market manipulation claim under Rule 10b-5(a) and (c) only (*see* Pl. Br. at 37), as explained more fully below, Plaintiffs have merely relabeled a claim based on alleged misrepresentations and omissions as a market manipulation claim, which is prohibited under clearly established Second Circuit law. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177-78 (2d Cir. 2007). (*See also* Op. Br. at pp. 19-25; *infra* pp. 14-17) Thus, as Plaintiffs have not pled a market manipulation claim under Rule 10b-5(a) or (c) and have conceded that they have not pled a

---

[5]    As Plaintiffs concede that "investors who have had their ML ARS redeemed or repurchased at par are not members of the proposed Class" (Pl. Br. at 46), the claims of those investors should be dismissed. *See Aimis Art Corp. v. Northern Trust Sec., Inc.*, 08 Civ. 8057 (VM), 2009 U.S. Dist. LEXIS 68712, at *13-14, *16-17, *19 (S.D.N.Y. Aug. 6, 2009); *In re UBS Auction Rate Sec. Litig.*, No. 08 CV 2967 (LMM), 2009 U.S. Dist. LEXIS 26385, at *14, *16-17, *19 (S.D.N.Y. Mar. 30, 2009).

disclosure claim under Rule 10b-5(b), Plaintiffs' Section 10(b) claim should be dismissed in its entirety with prejudice.

    **B.**    **Plaintiffs Have Failed To Allege A Market Manipulation Claim Under Rule 10b-5(a) or (c)**

        **1.**    **Plaintiffs Have Failed To Allege That Defendants Engaged In Manipulative Conduct**

Plaintiffs correctly observe that "[m]anipulative conduct misleads investors 'to believe "that the prices at which they purchase and sell securities are determined by the natural interplay of supply and demand not rigged by manipulators.""" (Pl. Br. at 13 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007))) "In identifying activity that is outside the 'natural interplay of supply and demand,' courts generally ask whether a transaction sends a false pricing signal to the market." (Pl. Br. at 13 (quoting *ATSI Commc'ns*, 493 F.3d at 101))

As explained in its Opening Brief, Merrill's participation in the auctions was not in and of itself fraudulent. (*See* Op. Br. at 22-23) Merrill's purchases were not "washed sales," "matched orders," or "rigged prices." The Complaint contains no facts suggesting that Merrill's purchases were anything other than legitimate, lawful transactions wherein Merrill accepted the risk of its investment. Furthermore, Merrill *disclosed* that it may "routinely place one or more bids in an auction for its own account … *to prevent an auction failure*." (Kasner Decl. I, Ex. A at 16 (emphasis added))[6] It *disclosed* the effect that Merrill's bidding practices would likely have

---

[6]    (*See* Kasner Decl. I, Ex. A at 18 ("Merrill Lynch may submit a bid in an auction to keep it from failing, but it is not obligated to do so. There may not always be enough bidders to prevent an auction from failing in the absence of Merrill Lynch bidding in the auction for its own account or encouraging others to bid. Therefore, auction failures are possible, especially … if a market disruption were to occur or if, for any reason, Merrill Lynch were unable or unwilling to bid."))

on the rates. (*See* Op. Br. at 12)  It *disclosed* that its interests in conducting an auction may differ

from other auction participants.  (*Id.*)  Merrill's disclosure of its bidding practices refutes any

assertion that its conduct was manipulative as that term is used in the Exchange Act.  *See Santa*

*Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977) (holding allegedly unfair but fully disclosed

conduct cannot state a market manipulation claim under Section 10(b)).  (*See also* Kasner Decl. I,

Ex. B (2006 SEC Order) at 6 n.6 (expressly condoning broker-dealers to bid for their proprietary

accounts "when properly disclosed"))

It cannot be reasonably disputed that the material aspects of Merrill's ARS

practices and procedures were fully disclosed on its website.  (*See* Op. Br. at 11-15)  In

criticizing the adequacy of Merrill's disclosures, the Complaint falsely asserts: "Merrill

acknowledged in certain written disclosures that it might intervene in auctions, but suggested that

it did so only *sporadically*."  (Compl. ¶ 57 (emphasis added))  On the contrary, Merrill disclosed

that it "*routinely*" placed bids to prevent auction failure.  (*See supra* p. 7)  "Sporadically," which

means "occasionally, singly, or in scattered instances," is not a synonym for "routinely," which

means "of a commonplace or repetitious character," or "relating to, or being in accordance with

established procedure."  *See* Merriam-Webster's Online Dictionary, http://www.merriam-

webster.com.  It is telling that Plaintiffs must baldly misstate Merrill's disclosures in order to

characterize them as misleading.

Plaintiffs further argue that Merrill's disclosures were inadequate because an

internal email purportedly reveals that Merrill "feared that disclosure of the true liquidity risks

would 'SINGLE HANDEDLY UNDERMINE THE AUCTION MARKET.'" (Pl. Br. at 20

(quoting Compl. ¶ 70))  The hyperbolic internal email quoted in the Complaint, however,

concerned a research report that notes that certain fixed income securities, such as Variable Rate

Demand Obligations, accomplish short-term liquidity through a "hard put" obligating the issuer to redeem the security, while ARS have no similar hard put. (*See* Compl. ¶¶ 68-70) These facts regarding the relative terms of these securities were hardly "undisclosed" – all such terms are included in the publicly available prospectuses and the indentures for the notes.

Plaintiffs also contend that Merrill failed to disclose that its purpose in buying securities was "solely to distort the market", or that due to poor market conditions, "Merrill had no choice but to buy more ML ARS into its own inventory." (Pl. Br. at 19-20) Although Merrill did not apply Plaintiffs' negative spin to these facts, the *facts* themselves were disclosed – that Merrill would "routinely" bid "to prevent an auction failure." (Kasner Decl. I, Ex. A at 16) Merrill had no obligation to describe those facts in pejorative terms. *See In re N.Y. Cmty. Bancorp, Inc. Sec. Litig.*, 448 F. Supp. 2d 466, 480 (E.D.N.Y. 2006) (no obligation for bank to describe mortgage backed securities "in pejorative terms"); *Kurzweil v. Philip Morris Cos.*, No. 94 Civ. 2373 (MBM), 1995 U.S. Dist. LEXIS 13030, at *12-14 (S.D.N.Y. Sept. 8, 1995) (dismissing plaintiffs' Section 10(b) claims as immaterial and holding that courts "should tread lightly in imposing a duty of self-flagellation") (citing *Mo. Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 873 (2d Cir. 1974)).

Moreover, Merrill's website was not the only place that Plaintiffs could have obtained information regarding Merrill's bidding practices. They were also disclosed in the publicly available prospectuses of the ARS that Plaintiffs purchased. (*See* Op. Br. at 13-14) In addition, such practices were disclosed in the 2006 SEC Order. (Kasner Decl. I, Ex. B at 5-6)[7]

---

[7] The 2006 SEC Order disclosed:

> Intervention in Auctions. Certain Respondents intervened in auctions by bidding for their proprietary accounts … without adequate disclosures. In certain instances, the
>
> *(cont'd)*

The combination of these extensive disclosures eviscerates Plaintiffs' contention that Merrill was secretly manipulating the market with its purchases and thereby sending false pricing signals to investors.

Judge Swain's recent decision dismissing claims that Citigroup manipulated its ARS auctions is directly on point.  *See In re Citigroup Auction Rate Sec. Litig.*, No. 08 Civ. 3095, 2009 U.S. Dist. LEXIS 83046 (S.D.N.Y. Sept. 11, 2009).  After examining nearly identical disclosures contained in Citigroup's ARS practices and procedures, *see id.* at *10-11,[8] Judge Swain held that those disclosures, along with the 2006 SEC Order and the ARS prospectuses,

_____

*(cont'd from previous page)*

interventions affected the clearing rate.  Certain Respondents intervened in one or more of the following … ways:

(1)    <u>Bids To Prevent Failed Auctions</u>.  Without adequate disclosure, certain Respondents bid to prevent auctions from failing ….  These Respondents submitted bids to ensure that all of the securities would be purchased to avoid failed auctions and thereby, in certain instances, affected the clearing rate;

(2)    <u>Bids To Set a "Market" Rate</u>.  Without adequate disclosure, certain Respondents submitted bids or asked investors to change their bids so that auctions cleared at rates that these Respondents considered to be appropriate "market" rates.  In certain instances, this practice affected the clearing rate and/or the Respondents' or investors' bids displaced other investors' bids.

(Kasner Decl. I, Ex. B at 5-6)

[8]    Citigroup's ARS practices and procedures disclosed:

Citigroup is permitted to submit orders for its own account, that, in doing so, it would have an advantage over other bidders, and that, where Citigroup was the only broker-dealer, it could set the clearing rate with its order.  This section also states that Citigroup may routinely place one or more bids in an auction in order to prevent a failed auction or to prevent an auction from clearing at a rate that Citigroup does not believe reflects the market for the ARS being auctioned.  The website further states that "[b]ids by Citigroup or by those it may encourage to place bids are likely to affect (i) the auction rate – including preventing the auction rate from being set at the Maximum Rate or otherwise causing bidders to receive a higher or lower rate than they might have received had Citigroup not bid or not encouraged others to bid …."

*In re Citigroup*, 2009 U.S. Dist. LEXIS 83046, at *11 (internal citations omitted).

"all disclosed that Defendants could engage in the very conduct of which Plaintiff complains, the advantages that Defendants would have if they did engage in such conduct, the ability of such conduct to affect clearing rates and the possibility that the auctions would fail if Defendants did not intervene in them." *Id.* at *23-24. Accordingly, the court dismissed the plaintiff's market manipulation claim, reasoning that Citigroup had "disclosed that the ARS market was not necessarily set by the 'natural interplay of supply and demand', but that they could be set by broker-dealers." *Id.* at *24. Furthermore, the court concluded that such disclosures were "fully consistent with the fundamental purpose of the [Exchange] Act to substitute a philosophy of full disclosure for the philosophy of caveat emptor." *Id.* at *24-25 (quoting *ATSI*, 493 F.3d at 100).[9]

Similar to *In re Citigroup*, Merrill also disclosed that it may "routinely place one or more bids in an auction for its own account … *to prevent auction failure*" (Kasner Decl. I, Ex. A at 16 (emphasis added); it disclosed the effect that Merrill's bidding practices would likely have on the rates (*see* Op. Br. at 12); and it disclosed that its interests in conducting an auction may differ from other auction participants. (*Id.*) Moreover, the ARS prospectuses and the 2006 SEC Order further disclosed Merrill's participation in the bidding process. (*See supra* p. 9 & n.7) Accordingly, as in *In re Citigroup*, this Court should dismiss Plaintiffs' market manipulation claim due to these disclosures.

Plaintiffs respond that they should not be charged with knowledge of Merrill's disclosures because Plaintiffs "purchased their Merrill-managed auction rate securities from third-party brokerages." (Pl. Br. at 1, 9) According to Plaintiffs, while "Merrill's clients received

---

[9]    In support of their argument that Merrill engaged in manipulative conduct, Plaintiffs cite *SEC v. Martino*, 255 F. Supp. 2d 268 (S.D.N.Y. 2003), and *SEC v. Resch-Cassin & Co.*, 362 F. Supp. 964 (S.D.N.Y. 1973), which each concerned undisclosed trading designed to manipulate the market. As Merrill's participation in the ARS auctions was not secret, those cases are inapplicable here.

trade confirmations directing them to a website containing what purported to be Merrill's practices," "Plaintiffs' trade confirmations carried no such reference." (Pl. Br. at 9) This argument is unavailing for at least two reasons.

First, Plaintiffs have failed to allege that Merrill had any legal duty specifically to provide downstream market participants with such information.[10] In this connection, Plaintiffs' attempt to characterize Merrill's disclosures as a "truth-on-the-market" affirmative defense (*see* Pl. Br. at 17-18) turns Plaintiffs' pleading burden on its head. The truth-on-the-market defense applies where the plaintiff has pleaded a *prima facie* case that the defendant made a false or misleading statement, and the defendant responds by pointing to other disclosures correcting the misinformation. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (considering truth-on-the-market defense where defendants had inflated company's earnings but argued that other disclosures revealed that inflation). Here, Plaintiffs do not plead a *prima facie* case of misrepresentation: they do not allege that they received *any* information from Merrill regarding their ARS investment, so they cannot contend that corrective disclosures were necessary to render misleading statements by Merrill immaterial.[11]

---

[10]    The 2006 SEC Order only required that Merrill provide such information to *its* customers, not to customers of other entities. (*See* Kasner Decl. I, Ex. B at 10 ("Not later than 6 months after the entry of this Order, each Respondent shall provide all of *its* customers who hold auction rate securities … with a written description of the Respondent's material auction practices and procedures." (emphasis added)); *id.* ("In addition … each Respondent shall, at or before the completion of the applicable transaction, provide all customers who are first-time purchasers … of auction rate securities *from the Respondent* with a written description of the Respondent's material auction practices and procedures." (emphasis added)) The Complaint concedes that each *Merrill* customer who purchased ARS since August 2006 received from Merrill a written confirmation slip referring the customer to Merrill's website for a written description of Merrill's auction rate practices and procedures. (Compl. ¶ 174; *see also* Op. Br. at 10-11)

[11]    Moreover, courts frequently examine a plaintiff's securities fraud allegations in light of a defendant's public disclosures without characterizing such disclosures as a "truth-on-the-

*(cont'd)*

Second, in any event, Merrill's ARS practices and procedures were publicly available on its website for all interested parties to examine and ARS investors were directed to that website via statements in their confirmation slips. (*See* Op. Br. at 11-13) Merrill's efforts resulted in the widespread dissemination of this information to market participants. It is well settled that investors are charged with knowledge that has been made "reasonably available to investors and affect the total mix of information." *Kemp v. Universal Am. Fin. Corp.*, No. 05 Civ. 9883 (JFK), 2007 U.S. Dist. LEXIS 2162, at *30-31 (S.D.N.Y. Jan. 10, 2007).[12] (*See also* Op. Br. at pp. 28-29, 40-41, 43-44)

---

*(cont'd from previous page)*

market" defense. *See, e.g.*, *ATSI Commc'ns*, 493 F.3d at 98 (holding that a court may consider statements or documents incorporated into the complaint by reference, "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit"); *Rombach v. Chang*, 355 F.3d 164, 172-76 (2d Cir. 2004) (examining defendants' press releases, slides, analysts' reports, and registration statements in their entirety to evaluate plaintiffs' securities fraud claims); *In re Citigroup*, 2009 U.S. Dist. LEXIS 83046, at *8-10, *23-25 (taking judicial notice of the 2006 SEC Order, the ARS disclosure statements on Citigroup's website, and the ARS prospectuses to examine plaintiff's market manipulation claim); *Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07 Civ. 0976 (LAP), 2008 U.S. Dist. LEXIS 76670, at *39-56 (S.D.N.Y. Sept. 30, 2008) (Preska, J.) (examining alleged misstatements in light of other language contained in the prospectuses).

Furthermore, "cautionary information need not be in the same document that contains the forward-looking statement, but must instead be reasonably available to investors and affect the total mix of information." *Kemp v. Universal Am. Fin. Corp.*, No. 05 CIV. 9883 (JFK), 2007 U.S. Dist. LEXIS 2162, at *30-31 (S.D.N.Y. Jan. 10, 2007).

[12]    Plaintiffs' reliance on *Steed Finance LDS v. Nomura Securities International, Inc.*, No. 00 Civ. 8058 (NRB), 2001 U.S. Dist. LEXIS 14761, at *29 (S.D.N.Y. Sept. 20, 2001), to demonstrate that they are not charged with knowledge of Merrill's disclosures, the 2006 SEC Order, and the ARS prospectuses is misplaced. In *Steed*, the plaintiff alleged that it did not have access to material information "*beyond that contained in the registration statement filed with the SEC.*" *Id.* at *29 (emphasis added). Here, conversely, all of the relevant disclosures were publicly available online for Plaintiffs to examine before they made their ARS purchases. (*See* Op. Br. at 10 & n.9, 11-15)

13

2.    **Plaintiffs' Allegations Based Solely On Misrepresentations And Omissions Cannot Sustain A Market Manipulation Claim**

Plaintiffs concede that "misrepresentations and omissions cannot be the 'sole basis' for a market manipulation claim." (Pl. Br. at 15)  *See also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007) ("A market manipulation claim, however, cannot be based solely on misrepresentations and omissions."); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177-78 (2d Cir. 2005) (explaining that where the "sole basis" for a market manipulation claim "is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c), and remain subject to the heightened pleading requirements of the PSLRA").  They also concede that many of their allegations concern alleged misrepresentations and omissions.  (*See* Pl. Br. at 15-16)  Plaintiffs erroneously contend, however, that misrepresentations and omissions are not the sole basis for their market manipulation claim, asserting that they also allege that Merrill "engaged in manipulative acts by underwriting and selling ML ARS in the absence of sufficient investor demand, placing support bids, systematically preventing auction failures, and setting clearing rates." (Pl. Br. at 15; *see also* Compl. ¶ 42 (alleging that Merrill's manipulative conduct included "maintaining a policy of intervening in every auction … [to] prevent auction failures" and "routinely intervening in auctions to set the rates of interest or dividends paid"))  But those claims cannot withstand Merrill's motion to dismiss pursuant to clearly established Second Circuit law.

Plaintiffs' brief actually underscores the central role that disclosures play in Plaintiffs' claims.  For example, Plaintiffs argue: "Because Merrill did not fully or fairly disclose the facts relevant to Plaintiffs' investments, the Court should reject Defendants' challenges to Plaintiffs' allegations of market manipulation, reliance, and scienter, *as they all depend on the sufficiency of Merrill's disclosures*." (Pl. Br. at 2 (emphasis added); *see also id.* at 8 ("Merrill

14

never fully or fairly disclosed the extent of its manipulative activity or the impact of that activity

on the market.")) The Complaint is also rife with challenges to the adequacy of Merrill's

disclosures. (*See, e.g.*, Compl. ¶ 57 ("*Merrill acknowledged in certain written disclosures that it

might intervene in auctions*, but suggested that it did so only sporadically." (emphasis added); *id.*

¶ 175 ("Merrill's website disclosure was incomplete and misleading ....."))

It is well settled that allegations of inadequate disclosures or nondisclosures

cannot sustain a market manipulation claim; such allegations must satisfy the strict standard for

pleading a claim based on misrepresentation or omission. *See Lentell*, 396 F.3d at 165-66, 177-

78 (holding that alleged scheme to set high stock prices by issuing false and misleading research

reports, entering into undisclosed agreements with securities issuers, and secretly sharing fees

with analysts was solely based on misrepresentations and omissions); *TCS Capital Mgmt., LLC v.*

*Apax Partners, L.P.*, No. 06-CV-13447 (CM), 2008 U.S. Dist. LEXIS 19854, at *62-63

(S.D.N.Y. Mar. 7, 2008) (holding that where the "so-called deception'" was "not a wash sale or a

matched order," but was grounded "in the alleged failure to disclose the 'real terms' of the deal,"

the allegations were "nothing more than a reiteration of the misrepresentations and omissions

that underlie plaintiff's disclosure claim"); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 476-

77 (S.D.N.Y. 2005) (dismissing market manipulation claim where the alleged conduct was not in

and of itself deceptive, but that it was only the deliberate non-disclosure of that conduct that gave

rise to the alleged fraud).

Plaintiffs' assertion that they have adequately pled a market manipulation claim

because their allegations include some conduct by Merrill or because Merrill's alleged

misrepresentations and omissions were "intertwined" with actions is unavailing. In many cases

where courts have determined that plaintiffs' allegations were based solely on misrepresentations

and omissions, those plaintiffs also alleged that defendants engaged in some allegedly manipulative conduct. *Lentell* is directly on point. There, plaintiffs' Section 10(b) allegations also included some alleged conduct, including "the setting of 'profoundly unrealistic price targets for [those] stocks'"; "the existence of undisclosed agreements between Merrill Lynch and 24/7 Media and Interliant to '"trade" favorable, bullish Analyst Reports for investment banking business directed to Merrill Lynch'"; and "the undisclosed 'sharing of investment banking fees among Merrill Lynch and its internet analysts.'" 396 F.3d at 165-66. Nevertheless, the Second Circuit concluded that the sole basis for plaintiffs' market manipulation claims was alleged misrepresentation and omissions. *Id.* at 177-78. *See also Schnell v. Conseco, Inc.*, 43 F. Supp. 2d 438, 488 (S.D.N.Y. 1999) (refusing to characterize allegations as market manipulation claim where alleged schemes to defraud consisted largely of an aggregation of alleged material misrepresentations to inflate stock, but also included some alleged misconduct).[13]

The court in *Collier v. Aksys Ltd.*, No. 3:04CV1232 (MRK), 2005 U.S. Dist. LEXIS 20300 (D. Conn. Aug. 15, 2005), *aff'd*, 179 Fed. App'x 770 (2d Cir. 2006), rejected allegations similar to those Plaintiffs bring here. In *Collier*, the plaintiff purported to plead a

---

[13]  The cases cited by Plaintiffs in support of their argument that "schemes often include allegations of both market manipulation and misrepresentations or omissions" are inapposite, as all of those cases involved deliberate illegal manipulative acts conducted by defendants that have not been alleged here. *See United States v. Royer*, 549 F.3d 886, 890-91 (2d Cir. 2008) (scheme consisted of insider trading based on the misappropriation of confidential information by an FBI agent of companies being investigated by the government); *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 376, 378-79 (2d Cir. 1974) (scheme consisted of manipulating the exchange ratio of stock prior to a merger by using improper accounting changes to reduce the target company's earnings, improperly inflating the buyer's assets, and causing the target company's pension fund to purchase the buyer's stock to inflate its value); *SEC v. Badian*, No. 06 Civ. 2621 (LTS)(DFE), 2008 U.S. Dist. LEXIS 64661, at *3-8 (S.D.N.Y. Aug. 22, 2008) (scheme consisted of placing orders before the market opened, falsely describing stock sales as long to disguise short sales, and executing wash sales and matched orders).

"hybrid between a 'misrepresentation or omission' case and a 'market manipulation' case,"

alleging that the defendants artificially affected the stock price by (1) failing to file Schedule

13D or 13G forms with the SEC after purchasing more than 5% of the outstanding shares; (2)

failing to file necessary prompt amendments as their ownership increased to over 20%; and (3)

making material omissions regarding their intentions to control the company. *Id.* at *2, *18-23,

*49. The plaintiff portrayed his claim as a "hybrid" by asserting that the stock price increased as

the supply of stock became constrained by defendants' manipulative activity, but was lower than

it would have been had defendants disclosed their concentrated ownership. *Id.* at *49-50. The

court rejected the "hybrid" claim, holding that it was a misrepresentations and omissions claim,

not a market manipulation claim, because the complaint did not allege any misleading conduct,

such as wash sales, matched orders or rigged prices, and was instead based on misstatements and

omissions regarding defendants' accumulation of shares. *Id.* at *52. Here, as in *Collier*,

Plaintiffs' claims are not a "hybrid," but turn on Merrill's alleged failure to adequately disclose its

bidding practices (which, of course, were disclosed).

### 3.    The Complaint does not plead reasonable reliance

Plaintiffs' market manipulation claim must also be dismissed for failure to plead

reasonable reliance. As Merrill explained in its Opening Brief, Plaintiffs must plead facts that, if

true, would show that Merrill "sen[t] a false pricing signal to the market" while Plaintiffs

believed that that market "'reflect[ed] undistorted (though not necessarily accurate) estimates of

the underlying economic value of the securities traded.'" *ATSI Commc'ns, Inc. v. Shaar Fund,

Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007) (quoting *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d

857, 861 (7th Cir. 1995)). In addition, Plaintiffs must demonstrate that their reliance on an

assumption of an efficient market free of manipulation was reasonable. *See In re Citigroup

Auction Rate Sec. Litig.*, No. 08 Civ. 3095 (LTS) (FM), 2009 U.S. Dist. LEXIS 83046, at *21-22

17

(S.D.N.Y. Sept. 11, 2009) (requiring that plaintiffs plead facts that prove their reliance was reasonable to establish a market manipulation claim).

Plaintiffs erroneously contend that they have satisfied the pleading requirement by alleging that "they did not know about the comprehensive scheme alleged in the Complaint and presumed that those securities traded in an efficient market free of manipulation." (Pl. Br. at 33) Plaintiffs, however, cannot claim that they *reasonably* relied on an assumption that ARS prices were determined by the natural interplay of supply and demand in light of Merrill's ample disclosures, the 2006 SEC Order, and the ARS prospectuses, all warning of Merrill's role in supporting the auction. In *In re Citigroup*, Judge Swain held that essentially the same publicly available information about Citigroup's role in its ARS auctions "negate[d] *any* inference that reliance by the class on such a view of the ARS pricing mechanism was reasonable." 2009 U.S. Dist. LEXIS 83046, at *23 (emphasis added). Judge Swain reasoned that those disclosures were fatal to plaintiff's market manipulation claim because no one could reasonably rely on an assumption that ARS prices were set by the "natural interplay of supply and demand" where such documents plainly disclosed that prices "could be set by broker-dealers" *Id.*

Judge Swain's holding is applicable here. Like Citigroup, Merrill specifically warned that its "bids are likely to affect the clearing rate, including preventing the clearing rate from being set at the maximum rate or otherwise causing bidders to receive a higher or lower rate than they might have received had Merrill Lynch not bid or not encouraged others to bid." (Kasner Decl. I, Ex. A at 16) (*See also supra* pp. 7-8) The ARS prospectuses and 2006 SEC Order contained similar disclosures. (*See supra* p. 9 & n.7) As in *In re Citigroup*, such disclosures negate any inference that it was reasonable to assume that the ARS prices were set by

the natural interplay of supply and demand, requiring dismissal of Plaintiffs' market manipulation claim. *See In re Citigroup*, 2009 U.S. Dist. LEXIS 83046, at *21-25.

Moreover, Plaintiffs' contention that they should not be charged with awareness of Merrill's disclosures illustrates their improper "have-their-cake-and-eat-it-too" position. On the one hand, Plaintiffs contend that downstream purchasers were affected by Merrill's sales force's and research department's alleged dissemination of information about ARS that purportedly omitted Merrill's support of the ARS auctions because those statements altered rates in an efficient market for ARS. (*See* Pl. Br. at 15-16; Compl. ¶¶ 52-53, 68, 72, 75, 80, 87-89, 145, 158-160, 162) On the other hand, Plaintiffs contend that Merrill's disclosure of the allegedly omitted information on its website and directly to ARS purchasers was insufficient because Merrill's disclosures were not specifically aimed at reaching downstream purchasers. (Pl. Br. at 22-23) Plaintiffs cannot have it both ways – *all* of Merrill's public statements must be considered part of "the total mix of information" available to the investing public. *Kemp v. Universal Am. Fin. Corp.*, No. 05 Civ. 9883 (JFK), 2007 U.S. Dist. LEXIS 2162, at *30-31 (S.D.N.Y. Jan. 10, 2007). (*See also* Op. Br. at 28-29, 43-44)[14]

---

[14]  Plaintiffs' allegations in this case differ from the allegations in *In re Citigroup* in one respect. The *In re Citigroup* plaintiffs expressly disclaimed that the ARS auctions were efficient markets, *see* 2009 U.S. Dist. LEXIS 83046, at *21, while the Complaint here alleges that the ML ARS markets immediately responded to new information. (*See* Compl. ¶ 162) Here, the alleged market efficiency further undercuts Plaintiffs' claims of reasonable reliance because the efficient market would have incorporated Merrill's disclosures regardless of whether Plaintiffs actually saw that information.

4.    **Plaintiffs Have Failed To Allege Particularized Facts Giving Rise To A Strong Inference Of Fraudulent Intent**

(a)    **Any Inference Of Scienter Is Not Cogent And Is Less Compelling Than Non-Fraudulent Inferences**

Plaintiffs assert that Merrill's inferences of non-fraudulent intent are "implausible." (*See* Pl. Br. at 30-33)[15] But Plaintiffs have failed to refute Defendants' two main arguments: (i) Merrill's disclosures belie an intent to defraud; and (ii) Merrill's purchases of ARS for its own account are inconsistent with scienter.

As explained above, Merrill disclosed that it routinely intervened in ARS auctions to prevent auction failures and to set clearing rates. (*See supra* pp. 7-8) Those disclosures undercut any inference, much less a strong inference, of fraudulent intent. *See Avon Pension Fund v. GlaxoSmithKline PLC*, No. 08-4363-CV, 2009 WL 2591173, at *2 (2d Cir. Aug. 24, 2009) (where plaintiffs alleged that defendants omitted negative drug meta-analyses from public statements, the defendants' disclosure of the meta-analyses to FDA and FDA's "publication of this information on its website effectively refutes plaintiffs' claim that the pleaded circumstances support the requisite scienter"). (*See also* Op. Br. at 30-31)

Moreover, Plaintiffs cannot overcome the stark internal inconsistency in the alleged scheme – that Merrill was purportedly manipulating the market by buying ever more

---

[15]    In the Opening Brief, Defendants explained that for Plaintiffs to plead a strong inference of scienter, the inference of fraud must be "cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." (Op. Br. at 30 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007))) Since the Opening Brief was filed, the Second Circuit has further demonstrated the exacting nature of this standard by dismissing securities fraud claims where the facts alleged raised merely plausible inferences of fraud that were not as compelling as other inferences. *See W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp.*, No. 08-3867-cv, 2009 WL 2779119 (2d Cir. Sept. 3, 2009); *Avon Pension Fund v. GlaxoSmithKline PLC*, No. 08-4363-cv, 2009 WL 2591173 (2d Cir. Aug. 24, 2009).

20

ARS in order to facilitate its efforts to sell its thereby larger ARS inventory.  *See Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*, No. 07-5423, 2009 U.S. Dist. LEXIS 74382, at *37-38 (E.D. Pa. Aug. 20, 2009) (holding that plaintiffs have failed to demonstrate fraudulent intent in selling securities where the defendants retained an economic interest in those securities); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (Preska, J.) (holding that increased holdings in securities was a fact "wholly inconsistent with fraudulent intent").  Courts have consistently rejected economically irrational theories of fraud as a matter of law.  *See ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 203 (2d Cir. 2009); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 263 (S.D.N.Y. 2003).[16]

Indeed, the more compelling inference to be drawn from the internal emails and other allegations in the Complaint is that they show Merrill's vigorous efforts to remain part of a viable long term market during a perceived temporary crisis.  In fact, even Plaintiffs admit "that Merrill was motivated to continue its auction rate securities business over the long run."  (Pl. Br. at 33)  Merrill's responses to those difficult market conditions may not have worked, but they do

---

[16]  Plaintiffs argue that Merrill's voluntary purchase of billions of ARS does not demonstrate that Merrill believed that the ARS market was viable because "internal communications confirm that Merrill knew the 'market [was] collapsing.'"  (Pl. Br. at 31, citing Compl. ¶ 137)  In support of this assertion, the Complaint selectively quotes from a November 19, 2007 email from John Price, a senior fixed income executive to whom the auction rate desk reported.  The full email provides as follows:

> Thanks T-Nut … Will call later.  Market is collapsing.  No more $2k dinners at CRU!!  The Financials are being invicerated!  More firings over at Citi … Inventory flooding the street.  Going to be a great '08 Trading environment.  All we have to do is live!!  Great conversations baby, with more to come …. MULUNUWU [Miss you, love you, need you, want you]. - J

(Declaration of Jay B. Kasner dated September 25, 2009 ("Kasner Dec. II"), Ex. A)  Viewed in full, this email is plainly a personal message, not a business communication.  Furthermore, the email makes no reference to ARS at all, but only generally refers to the "market" and "The Financials."

not suggest a strong inference of fraudulent intent. *See In re Citigroup Auction Rate Sec. Litig.*, No. 08 Civ. 3095, 2009 U.S. Dist. LEXIS 83046, at *20-21 (S.D.N.Y. Sept. 11, 2009) ("Instead, the very market conditions – specifically the 'subprime crisis' – that Plaintiff cites in his Complaint in connection with Defendants' intent to continue receiving ARS-related fees, give rise to an opposing and compelling inference that Defendants only engaged in bad (in hindsight) business judgments in connection with ARS, and did not engage in the alleged conduct with an intent to deceive investors.").

### (b)    Merrill's Receipt Of Fees For Its Services Does Not Establish Scienter

Plaintiffs contend that Merrill engaged in the alleged manipulative scheme in order to earn "nearly $80 million in annual revenues from its underwriting and auction management business." (Pl. Br. at 29)  But Plaintiffs cannot explain why Merrill would have committed more than $2.3 billion (*see* Compl. ¶ 132) to holding purportedly "overvalued" and illiquid ARS to earn fees equal to roughly 3% of that amount.  Plaintiffs further concede that those fees would be even less in the future because Merrill was "against serving as auction dealer for subsequent issues" due to poor market conditions.  (Pl. Br. at 28)  These economically irrational allegations do not raise an inference of scienter at all.  (*See* Op. Br. at 31-32)  Furthermore, a desire to earn fees is insufficient as a matter of law to establish scienter.  *See In re Citigroup*, 2009 U.S. Dist. LEXIS 83046, at *19 (holding motive to obtain ARS broker-dealer fees insufficient to plead scienter).  (*See also* Op. Br. at 32-33)

## II.    PLAINTIFFS HAVE FAILED TO PLEAD A CLAIM AGAINST MERRILL LYNCH & CO., INC.

Plaintiffs' "control person" liability claim against Merrill Lynch & Co., Inc. should also be dismissed because Plaintiffs fail to plead a primary violation under Section 10(b).

(*See* Op. Br. at 44-45)  The Complaint also fails to plead with particularity any facts demonstrating conscious misbehavior by Merrill Lynch & Co., Inc. as a culpable participant in the alleged fraud.  *See Mishkin v. Ageloff*, No. 97 Civ. 2690 (LAP), 1998 U.S. Dist. LEXIS 14890, at *75-77 (S.D.N.Y. Sept. 23, 1998).  Indeed, Plaintiffs' brief makes clear that their only grounds for alleging participation by Merrill Lynch & Co., Inc. is its general motive to earn corporate profits.  (*See* Pl. Br. at 38-39)  Such generalized allegations have consistently been rejected as insufficient as a matter of law.  (*See supra* p. 22; Op. Br. at 32-33)

## III.    PLAINTIFFS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

The Opening Brief establishes that Plaintiffs' claims are time-barred because publicly available information put Plaintiffs on inquiry notice more than two years before they filed suit.  (Op. Br. at 47-49)  In response, Plaintiffs argue that those warning signs are irrelevant because they preceded Plaintiffs' investments in ML ARS.  But *Shah v. Meeker*, the very case cited by Plaintiffs, refutes this argument:  "Because Shah was on inquiry notice of Morgan Stanley's allegedly fraudulent practices as of May 14, 2001, he *cannot succeed* with a separate fraud claim for stock purchase made *after that date*; it was unreasonable after May 2001 to rely on the market price of Morgan Stanley stock."  435 F.3d 244, 252 (2d Cir. 2006) (emphasis added).  Indeed, courts routinely dismiss securities claims of persons who bought after the market was on inquiry notice.  *See, e.g.*, *In re Zyprexa Prods. Liab. Litig.*, 549 F. Supp. 2d 496, 537 (E.D.N.Y. 2008) (barring claims of persons who purchased stock between 2002 through 2006 because lawsuits filed in 2001 and 2002 "put plaintiffs on notice of a need to inquire further"); *Cross v. 21st Century Holding Co.*, No. 00 Civ. 4333 (AGS), 2001 U.S. Dist. LEXIS 11189, at *14 (S.D.N.Y. Aug. 6, 2001) (dismissing claims of persons who bought after pertinent disclosures).

Plaintiffs spill much ink describing how the materials cited in the Opening Brief do not detail the whole of the alleged fraud. This contention is irrelevant. "'Storm warnings' need not detail every aspect of the alleged fraudulent scheme: An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice." *Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 432 (2d Cir. 2008) (internal citations and quotation marks omitted). The statements in the numerous articles provided are more than sufficient to "suggest to an investor of ordinary intelligence" to inquire further. *Id.* at 427. Plaintiffs also suggest that reliance on articles from *Bond Buyer* and *Investment Dealers Digest* are insufficiently mainstream evidence, but similar publications have been found to establish inquiry notice. *See LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 155 (2d Cir. 2003) (article from *National Underwriter* was sufficient press coverage to contribute to finding of inquiry notice). Moreover, here, the SEC's investigation itself is the main factor in establishing inquiry notice. *See GVA Mkt. Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.*, 580 F. Supp. 2d 321, 329 (S.D.N.Y. 2008) (government investigation cited as storm warnings for inquiry notice); *Korwek v. Hunt*, 646 F. Supp. 953, 958-59 (S.D.N.Y. 1986) (government investigation triggered inquiry notice).

Plaintiffs also contend that the lack of a market reaction to the articles suggests that no inquiry notice exists. But courts in this Circuit have repeatedly found that a lack of market response does not necessarily bear on the question of inquiry notice. *See, e.g.*, *Shah*, 435 F.3d at 247 (plaintiffs were on notice by May 2001, even though stock price did not drop significantly until April 2002); *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 678, 688, 692-93 (S.D.N.Y. 2000) (inquiry notice triggered by news article, even where stock price remained high months after publication); *LC Capital Partners*, 318 F.3d at 152-53 (finding inquiry notice by

December 1998, even though rating downgrades were not made until 2000). Here, the market likely did not react because Merrill's participation in the auctions was unsurprising.

Finally, Plaintiffs contend that the 2006 SEC settlement would have allayed investor concerns. But the 2006 SEC settlement permits the very conduct that Plaintiffs point to in the Complaint to continue. (*See supra* p. 8; Op. Br. at 10) If Plaintiffs believed such remedies were inadequate, they should have brought suit years ago. Having failed to have done so, their claims are time barred. *LC Capital Partners*, 318 F.3d at 155 ("Whether reassuring statements justify reasonable reliance that apparent storm warnings have dissipated will depend in large part on how significant the company's disclosed problems are, how likely they are of a recurring nature, and how substantial are the 'reassuring' steps announced to avoid their recurrence.").

## CONCLUSION

For all of the reasons set forth above, Defendants' motion to dismiss the Complaint in its entirety should be granted with prejudice.

Dated:        New York, New York
              September 25, 2009

                                  Respectfully submitted,

                                  /s/  Jay B. Kasner
              _____
              Jay B. Kasner (jay.kasner@skadden.com)
              Scott D. Musoff (scott.musoff@skadden.com)
              SKADDEN, ARPS, SLATE,
                  MEAGHER & FLOM LLP
              Four Times Square
              New York, New York  10036
              (212) 735-3000

              Paul J. Lockwood (paul.lockwood@skadden.com)
              SKADDEN, ARPS, SLATE,
                  MEAGHER & FLOM LLP
              One Rodney Square
              Wilmington, Delaware  19801
              (302) 651-3000

              Attorneys for Defendants