**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:  MERRILL LYNCH & CO., INC.,
AUCTION RATE SECURITIES (ARS)
MARKETING LITIGATION

| | |
|---|---|
| This Document Relates To: ) | |
| ) | |
| UNITED STATES DISTRICT COURT ) | 09-MDL-2030 (LAP) |
| EASTERN DISTRICT OF KENTUCKY ) | ECF Case |
| Docket No. 08-CV-00231-ART ) | |
| ) | |
| COMMUNITY TRUST BANK, INC., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| V. ) | **SECOND AMENDED COMPLAINT** |
| ) | |
| MERRILL LYNCH, PIERCE, FENNER ) | |
| & SMITH INCORPORATED, ) | |
| ) | |
| Defendants. ) | |

The Plaintiff, Community Trust Bank, Inc. ("Community Trust"), through counsel, for its

Second Amended Complaint against the Defendant, Merrill Lynch, Pierce, Fenner & Smith

Incorporated ("Merrill Lynch"), respectfully states as follows:

**THE PARTIES**

1.      Community Trust is a Kentucky corporation with its principal offices and place of

business in Pikeville, Kentucky, as well as offices and banking facilities located in other parts of

the Eastern District of Kentucky.

2.      Community Trust and Investment Company ("CTIC"), pursuant to a formal

written agreement with Community Trust making it the portfolio manager of all Community

Trust investments, purchased for and on behalf of Community Trust, as its agent, auction rate

securities underwritten and sold by Merrill Lynch.  CTIC bought these auction rate securities for the account and benefit of Community Trust, and all CTIC employees, officers, directors and managers involved in the subject matter were at all times acting as paid agents of Community Trust.  All representations and omissions made to CTIC related to this matter were thereby also made to Community Trust, and all actions, reliance and decisions by CTIC related to this matter are likewise the actions, reliance and decisions of Community Trust.  References hereinafter to Community Trust may also include its paid agent, CTIC.

3.      As a result of the collapse of the auction rate securities market in February 2008, Community Trust now holds auction rate securities underwritten by and purchased from and at the urging of Merrill Lynch and is unable to sell them.

4.      The Defendant, Merrill Lynch, is incorporated in Delaware with its principal executive offices located in New York, New York.  Merrill Lynch is a wholly owned subsidiary of Merrill Lynch & Co. and is registered with the SEC as a broker-dealer pursuant to § 15(b) of the Exchange Act.  Merrill Lynch is also a member of the New York Stock Exchange (the "NYSE") and the Financial Industry Regulatory Authority (the "FINRA").  Merrill Lynch is resident and maintains offices within the Eastern District of Kentucky and throughout the Commonwealth of Kentucky, including offices located at 109 Prater Place, Pikeville, Kentucky. Merrill Lynch's Registered Agent for service of process in Kentucky is CT Corporation Systems, 4169 Outlook Road, Louisville, Kentucky  40207.

## JURISDICTION AND VENUE

5.      The Plaintiff's chosen forum for this dispute is the United States District Court for the Eastern District of Kentucky, Pikeville Division.

6.      The Eastern District of Kentucky has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1337; and § 27 of the Exchange Act (15 U.S.C.

§ 78aa).  The claims asserted herein arise under § 10(b) of the Exchange Act (15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission (the "SEC") (17 C.F.R. 240.10b-5) as well as under Kentucky statutory and common law.  The Eastern District of Kentucky has supplemental  jurisdiction over the state law claims asserted herein by Community Trust pursuant to 28 U.S.C. § 1367 because the state law claims arise from the same operative facts and form part of the same case or controversy as the claim brought pursuant to the Exchange Act.

7.      Venue is proper in the Eastern District of Kentucky pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1391(b), 1332 and 1337.

8.      On June 10, 2009, this action was transferred to this Court for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.  Docket Entry No. 1.  The Plaintiff, Community Trust, maintains that its claims should be remanded to the Eastern District of Kentucky for the conduct of all proceedings, including pretrial discovery.

9.      The Defendant Merrill Lynch is resident and maintains offices within the Eastern District of Kentucky, at 109 Prater Place, Pikeville, Kentucky, and may therefore be sued within the Eastern District of Kentucky, Pikeville Division, pursuant to 28 U.S.C. § 1391(b).

10.      In addition, certain of the acts giving rise to the violations complained of in this Second Amended Complaint took place or were facilitated within the Eastern District of Kentucky by Merrill Lynch.

11.      In connection with the acts alleged by Community Trust in this Second Amended Complaint, Merrill Lynch, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets to fraudulently and/or negligently induce Community Trust to purchase the auction rate securities at issue in this litigation.

## GENERAL ALLEGATIONS

### BACKGROUND INFORMATION
### REGARDING AUCTION RATE SECURITIES

12.     The term "auction rate security" typically refers to either municipal or corporate debt securities or preferred stock which pay interest at rates set at periodic "auctions." Auction rate securities generally have long-term maturities, and in the case of preferred stocks, no maturity date.

13.     Auction rate securities were first introduced in the 1980s, after which the market for auction rate securities grew dramatically. According to the reports of several financial media sources and state and federal regulators, the estimated value of auction rate securities in existence prior to the collapse of the auction market was at least $330 billion.

14.     Investments in auction rate securities were initially limited to institutional investors with required minimums of $250,000. In recent years, however, issuers and sellers of auction rate securities lowered the minimum amount for investment to $25,000 in an effort to market auction rate securities as widely as possible to the general public.

15.     Auction rate securities were auctioned at par value, and as such the return on the investment to the investor and the cost of financing to the issuer were determined by the interest rate or dividend yield set through the auction. The method for auctioning the securities was described in the prospectus of the fund through which they were offered, with the formula generally being substantially similar for all securities offered as auction rate securities.

16.     The number of days between each auction was set by the prospectus utilized. Generally, the auctions were held every 7, 28 or 35 days, with interest paid at the end of the auction period.

17.     The auction itself was of the type commonly referred to as a "Dutch" auction, i.e., one where the price was initially set at a presumably economically unattractive level and then

made more attractive to purchasers throughout the course of the auction.  For auction rate securities, bids with successively higher rates were offered until all of the securities at the auction were sold.

18.    At the end of the auction, the rate at which all of the securities were sold was set uniformly and was called the "clearing rate."  If there were not enough orders to purchase all the shares being sold at the auction, a "failed" auction occurred.  In the event of a failed auction, none of the securities holders could sell their securities.  An auction failure would therefore create a liquidity crisis for Merrill Lynch auction rate securities customers such as Community Trust, who would be unable to cash or sell its securities.

19.    To prevent failed auctions, and unbeknownst to Community Trust, Merrill Lynch placed orders for its own account through the use of "support bids."  Support bids were proprietary bids placed by Merrill Lynch through which Merrill Lynch purchased auction rate securities where there would otherwise be insufficient demand to support an auction.  Because of the nature of the auction process and the undisclosed practices of Merrill Lynch regarding such auctions, including its use of support bids, Community Trust could not determine if auctions were succeeding because of normal marketplace demand or because Merrill Lynch and other broker-dealers were covertly propping up auctions through support bids.  Merrill Lynch thus hid the true infirmities of the auction rate securities market and the illiquidity of such securities through these fraudulent and manipulative practices, while at the same time representing that such securities were safe, sound and highly liquid investments.

20.    The Plaintiff is informed and believes, and therefore alleges, that without the support bids placed by Merrill Lynch, the auctions in which the support bids were placed would have failed.  Merrill Lynch's support bidding created the artificial appearance of a liquid and efficient market, enabling Merrill Lynch to market its securities to investors such as Community

Trust.  For example, the Massachusetts Securities Division found that "Merrill Lynch and other broker dealers … used their own capital to ensure auctions did not fail … touted the 20 year track record of very rare failures, and [thus created] the impression with investors that there was a deep liquid market for the securities."  See In re Merrill Lynch, Pierce, Fenner & Smith, Inc., Mass. Sec. Div., No. 2008-0058, April 9, 2009 Consent Order.

## INTRODUCTION

21.    This action is brought by Community Trust pursuant to Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), pursuant to Sections 292.320 and 292.480(1) of the Kentucky Securities Laws, pursuant to Kentucky common law principles of fraud and breach of fiduciary duty and for grossly negligent misrepresentations and omissions under Kentucky common law.

22.    The Defendant, Merrill Lynch, through its publications, brokers, agents and/or representatives affirmatively represented to Community Trust and, upon information and belief, to other institutional investors that auction rate securities were equivalent to cash or money market funds, and that such securities were highly liquid, safe investments for short-term investing.  Merrill Lynch, through its publications, brokers, agents and/or representatives, represented to Community Trust that such securities were suitable to the investment goals of an institutional investor such as Community Trust.  Community Trust reasonably relied on these representations each time it purchased these securities.

23.    In addition, Merrill Lynch failed to disclose, among other material facts, the fact that the auction rate securities sold to Community Trust were illiquid, that the market for these securities was such that it was likely to collapse, leaving Community Trust with the inability to dispose of the securities purchased by it, and that Merrill Lynch itself was in effect acting both as a market maker concerning such securities and engaging in undisclosed fraudulent and

manipulative practices designed to obscure the true nature of the auction rate securities market and the illiquidity of the securities.

24.     In January 2006, and in reasonable reliance on representations made to it and to its paid agents by Merrill Lynch, Community Trust, through CTIC, purchased $10,050,000 worth of auction rate securities from Merrill Lynch.  Between January 2006 and the present date (the "Relevant Period") Community Trust purchased such securities, but since February 2008 has been unable to sell the vast majority of these securities because of Merrill Lynch's conduct which substantially contributed to the collapse of the market for such securities in February 2008.  Community Trust still holds $9.9 million of the auction rate securities sold by Merrill Lynch.  Specifically, Community Trust purchased auction pass-through certificates, Series 2006-2, offered by Merrill Lynch through a $106 million private placement involving non-cumulative preferred stock in the Federal National Mortgage Association ("Fannie May") held by a Trust established pursuant to the private placement presented and offered to institutional investors and the public by Merrill Lynch.

25.     In offering the auction rate securities involving Fannie May preferred stock to Community Trust and other institutional investors, Merrill Lynch knew, but failed to disclose to Community Trust and others, material facts concerning the auction rate securities.  Specifically, Merrill Lynch knew but failed to disclose that the auction rate securities were not cash alternatives.

26.     Merrill Lynch also knew but failed to disclose that the auction rate securities were not suitable for an institutional investor such as Community Trust and were only liquid at the time of sale because Merrill Lynch and other broker-dealers were unofficially supporting and manipulating the auction market to maintain the appearance of liquidity and stability with respect to such securities, and that Merrill Lynch was acting as a market maker for such securities.

Merrill Lynch then knew but failed to disclose that auction rates securities would be illiquid as soon as Merrill Lynch and others stopped maintaining or supporting the auction market.

27.    On or about February 13, 2008, over 80% of all auctions of auction rate securities failed when Merrill Lynch and all other major broker-dealers refused to continue to support such auctions.  As a direct and proximate result of the withdrawal of such support by the major broker-dealers, including Merrill Lynch, the market for auction rate securities collapsed, leaving Community Trust and other holders of more than $300 billion in auction rate securities with no means of liquidating the investments which had been fraudulently, falsely and/or grossly negligently represented, offered and sold to Community Trust and others as a safe and suitable alternative to money market funds and other short-term cash management vehicles.

**A.    Merrill Lynch's Fiduciary Relationship With Community Trust.**

28.    Over a period of a number of years, starting well before January 2006, Community Trust relied on the skill, judgment and expertise of Merrill Lynch in purchasing numerous other investment vehicles or securities recommended by Merrill Lynch to Community Trust and its paid agent CTIC.  Community Trust continued to do so with respect to its purchase of auction rate securities.

29.    Merrill Lynch had superior knowledge, skill, judgment and expertise regarding auction rate securities and was the only party in this relationship in a position to know the truth or otherwise of the representations made regarding auction rate securities in its dealings with Community Trust.

30.    Because of their prior relationship, which was founded on the trust or confidence reposed by Community Trust in the soundness and integrity of the investment recommendations made by Merrill Lynch, and in Merrill Lynch's honesty and fidelity, Merrill Lynch owed

Community Trust a duty to recommend suitable investments, to disclose all facts and to refrain from misrepresenting or misleading Community Trust as to the auction rate securities sold to it.

**B.      The Material Misrepresentations And Omissions Regarding The Liquidity Of And Risks Associated With Auction Rate Securities, The Auction Market For Such Securities And Merrill Lynch's Role In Such Market.**

31.      Auction rate securities were extremely profitable for Merrill Lynch and for the Merrill Lynch financial advisors who sold the securities. As a large underwriter of auction rate securities, Merrill Lynch received significant underwriting fees from the issuers of these securities. As one of the largest broker-dealers, Merrill Lynch also entered into broker-dealer agreements with the issuers and was paid an annualized broker-dealer fee for operating the auction process for auction rate securities and other investment vehicles. Merrill Lynch also acted as a principal for its own account, using its access to inside information about the auction process to buy and sell auction rate securities for its own account and as a market maker to support or prop up the market for such securities. Individual Merrill Lynch financial advisors likewise had a significant financial incentive to sell auction rate securities because they were compensated by Merrill Lynch for each auction rate security sold.

32.      In order to perpetuate the auction market and to sell as many auction rate securities as possible, Merrill Lynch falsely, fraudulently and/or negligently misrepresented to investors in its written materials and uniform sales presentations to institutional investors that auction rate securities were equivalent to cash and were highly liquid, safe investments for short-term investing when it should have known such statements were false or inaccurate. Merrill Lynch also made these misrepresentations directly to Community Trust's paid agents. By way of example, but not limitation, in January 2006, Merrill Lynch, through its authorized broker Jason Stanley, made these specific verbal and written representations to, among others, Tammy Rushing (now Provost), Vice President of CTIC and Catherine Lee, then the Head of

Investments of CTIC.  Later, Community Trust's agents and representatives dealt with Josh Burden of Merrill Lynch, who failed to disclose these material facts regarding the true nature of the auction rate securities and the auction rate securities market.

33.    Throughout 2006 and until early 2008, Merrill Lynch, in the information provided verbally and in writing to Community Trust by its authorized brokers Jason Stanley and/or Josh Burden, among other Merrill Lynch sources, fraudulently and/or negligently failed to adequately disclose to Community Trust and, upon information and belief, to other purchasers of auction rate securities, numerous material facts about these securities.  Among the material matters that were omitted were the following:

(a)    that Merrill Lynch had a clear conflict of interest because in the auction market Merrill Lynch was acting simultaneously on behalf of the issuer, who had an interest in paying the lowest possible interest rate, on behalf of the investor, who was seeking the highest possible return, and on their own behalf, to maximize the return to Merrill Lynch on their holdings of auction rate securities;

(b)    that Merrill Lynch was placing orders for its own account by using support bids to create a false sense of demand and were acting in ways that were fraudulent and manipulative in order to perpetuate a market for the auction rate securities it was selling to Community Trust and others;

(c)    that Merrill Lynch and other broker-dealers routinely intervened in auctions for their own economic benefit, to set rates and prevent all-hold auctions and failed auctions;

(d)    that Merrill Lynch was acting as a market vendor with respect to such securities and as such was acting in ways adverse to the interests of Community Trust;

(e)    that the auction rate securities they were selling were only liquid at the time of sale because Merrill Lynch and other broker-dealers in the auction market were artificially supporting and manipulating the market to maintain the appearance of liquidity and stability; and

(f)    that at the time auction rate securities were offered and sold to Community Trust, the ability of holders of auction rate securities to liquidate their positions depended on the maintenance of an artificial auction market maintained by Merrill Lynch and other broker-dealers.  When Merrill Lynch and the other broker-dealers stopped artificially supporting and manipulating the auction market, the market immediately collapsed and the auction rate securities sold by Merrill Lynch became illiquid.

34.    Despite failing to disclose these foregoing important and material facts, Merrill Lynch, through its authorized brokers Jason Stanley and/or Josh Burden (among others), and through the publications which these individual brokers and others at Merrill Lynch provided to Community Trust, continued to aggressively market and sell auction rate securities to Community Trust and, upon information and belief, to others.  For example, and as described in more detail in Paragraph 37 below, Merrill Lynch posted a document entitled "Description of Merrill Lynch's Auction Rate Securities Practices and Procedures" on its website (the "Website Description") which the SEC found did not fully or adequately disclose, among other things, that Merrill Lynch placed support bids whenever it need to prevent an auction failure and that it masked the impact of its auction activities on the liquidity of the securities it sold and auctioned.

In addition, by way of example but not limitation, Merrill Lynch issued internal research reports that mischaracterized the nature of the ARS auctions and of the ARS market – "In the history of the market, failed auctions are extremely rare" (August 22, 2007 Merrill Lynch Research Report); "However, auction securities still make sense for investors who need ready access to their funds" (December 6, 2007 Merrill Lynch Research Report); "We still view the auction market preferreds of closed-end funds to be the 'conservative's conservative investment' in the auction market, just as we noted back in August … fails in the closed-end fund auction market will be an aberration and do not expect to see multiple recurrences" (February 8, 2008 Merrill Lynch Research Report). Such statements were materially false and misleading, were relied upon by the investing public, and were never corrected by Merrill Lynch.

35.     Merrill Lynch continued to aggressively market auction rate securities and continued to misrepresent to investors that these securities were secure, short-term cash equivalent investments even after Merrill Lynch had determined that it and other broker-dealers would withdraw their support for the periodic auctions and that a "freeze" of the market for auction rate securities was imminent, which material facts were not disclosed by Merrill Lynch prior to the sale of such securities to Community Trust.

36.     At the time auction rate securities were offered and sold to Community Trust, Merrill Lynch also knew but fraudulently and/or grossly negligently failed to disclose to Community Trust that the auctions it was conducting were not governed by arms-length transactions but were instead auctions that suffered from systemic flaws and manipulative practices, including the following: (a) allowing certain customers to place open or market orders in auction; (b) intervening in auctions and bidding through Merrill's own proprietary account; (c) asking customers to make or change orders; (d) preventing failed auctions or all-hold auctions to set the market rate; (e) submitting or changing orders after auction deadlines; (f) not requiring

customers to purchase partially-filled irrevocable orders which provided certain customers with higher returns than the auction clearing rate; and (g) providing inside information about the auction process to certain customers in connection with the auction bidding.

37.     Also by way of example, but not limitation, pursuant to a Consent Order issued by the SEC related to Merrill Lynch's previous ARS activities and the related censure and penalties issued by the SEC, Merrill Lynch posted the Website Description in or around August 2006 (http://www.ml.com/media/70501.pdf), well after the purchase by Community Trust of the Fannie May auction rate securities at issue in this litigation.  Merrill Lynch placed support bids in every auction where it served as lead or sole broker-dealer, including the auctions involving securities held by Community Trust, but the Website Description merely stated that Merrill Lynch "<u>may</u>" place support bids and take other actions to prevent auction failures.  These disclosures, made after Community Trust purchased its securities, were false and substantially misleading.  They were also contrary to the Securities Industry and Financial Markets Association ("SIFMA") Best Practices, which require broker dealers to disclose that they do routinely place auction support bids, not that they <u>may</u> do so.

38.     Since the collapse of the ARS market, the SEC and several state regulators have charged Merrill Lynch with wrongdoing and a preliminary settlement has been reached with the SEC regarding the SEC's allegations that Merrill Lynch misrepresented that ARS "were safe, highly liquid investments equivalent to money market instruments and cash" that "Merrill Lynch did not make adequate disclosures that the liquidity of these securities was based on Merrill Lynch supporting the auctions it managed when there was not enough demand" and that "Merrill Lynch continued to tout the purported liquidity of ARS to customers despite its awareness of the escalating liquidity risks in the weeks and months preceding the collapse of the ARS market."

Merrill Lynch has also entered into a Consent Order with the Massachusetts Securities Division and the New York Attorney General, among others, based on its ARS activities.

39.    In addition to its direct misrepresentations to Community Trust and its agents, as set forth in detail herein, internal Merrill Lynch e-mails demonstrate that Merrill Lynch was taking affirmative action to conceal from the investing public at large its activities and the true liquidity (or lack thereof) of the securities.  For example, in response to an August 21, 2007 internal research report, the liquidity of ARS was questioned.  In response, Merrill Lynch's Managing Director in charge of the auction desk, Frances Constable, demanded that the report be retracted.  In so doing, she stated "I had not seen this piece until just now and it may single handedly undermine the auction market … I have asked for an immediate clarification to be published and a retraction of this," after which the report was revised.

40.    On November 19, 2007, Ms. Constable's supervisor, John Price, sent e-mails to Ms. Constable that included statements such as "Market is collapsing.  No more $2k dinners at CRU!! The Financials are being invicerated! [sic]" and "AMS desk barraged by issuers asking why their rates are climbing as well as investors expressing concern about muni by monoclines.  Negative tone prevails.  Inventory up by 100MM.  We are offering discounts as well as 25 and 50 bp credit specials in an effort to move inventory." A few days later, on November 26, 2007, Ms. Constable e-mailed Mr. Price that, regarding ARS, "we are working it higher to at least be consistent," referring to Merrill Lynch's practice of setting the auction interest rates higher.  Merrill Lynch clearly recognized the imminent collapse of the ARS market, but continued to prop up the auctions and to conceal from its investors that the securities were not safe, liquid, cash-like investments and that the auction rate securities market was not the stable, safe market represented to Community Trust and other investors but was instead in jeopardy of collapse.

14

41.    On December 3, 2007, Merrill Lynch advised in the <u>Fixed Income Digest</u>, that it was "comfortable with the safety of auction market securities, and view the present backup in rates as a buying opportunity for investors looking for short-term instruments."  This statement was clearly false and misleading.

## C.    The Collapse Of The Auction Rate Securities Market And Merrill's Role In That Collapse.

42.    In the Summer of 2007, some auctions for auction rate securities backed by sub-prime debt began to fail, but these securities represented only 2-6% of the entire auction rate securities market.  In the Fall-Winter of 2007, more auctions began to fail.  Even though some of the auctions that failed initially were conducted by Merrill Lynch, it continued to encourage investors to purchase auction rate securities and continued to misrepresent to investors that these securities were the same as cash or money markets and were highly liquid, safe investments for short-term investing, without any disclosure of the increased risks associated with the securities.

43.    In particular, through the verbal and written representations of its authorized agents such as Jason Stanley, during the last half of 2007 Merrill Lynch actively encouraged Community Trust to continue purchasing auction rate securities and affirmatively represented to Ms. Rushing, among others, that the auction rate securities were highly liquid, were safe for short-term investing and were the same as cash or money markets.  In addition, no one at Merrill Lynch disclosed to anyone at Community Trust during the last half of 2007 these material facts demonstrating that the risks associated with the securities were steadily increasing.  As such, Merrill Lynch actively concealed from Community Trust the truth about the falsity of certain statements made by and on behalf of Merrill Lynch to Community Trust at the time it purchased auction rate securities and as it continued to hold them.  Upon information and belief, this same pattern occurred between Merrill Lynch and other investors during this same time period.

44.     On February 13, 2008, 87% of all auctions of auction rate securities failed when all of the major broker-dealers, including Merrill Lynch, refused to continue to support the auctions.  On February 14, 2008, it was disclosed that UBS, the second largest underwriter of auction rate securities, had decided to no longer support the auction market.  Virtually every other major broker-dealer, including Goldman Sachs, Lehman Brothers, Citigroup and Merrill Lynch, among others, also decided around the same time to withdraw their support of the auction market.  As a result of the withdrawal of support by all of the major broker-dealers, the market for auction securities collapsed, rendering more than $300 billion of outstanding securities illiquid.

45.     As a result of the earlier materially false and misleading statements and/or grossly negligent misrepresentations and fraudulent or negligent failures to disclose material facts, auction rate securities sold by Merrill Lynch traded at artificially inflated prices at the time the auction rate securities were offered and sold to Community Trust.  Community Trust and, upon information and belief, other investors purchased and continued to hold the auction rate securities sold by Merrill Lynch, Community Trust doing so in reliance upon the integrity of the auction market and the market price of those securities as falsely represented to it by Merrill Lynch authorized brokers.  Community Trust has thereby been damaged by Merrill Lynch's failure to disclose the material facts outlined above and by Merrill Lynch's false and fraudulent and/or grossly negligent misrepresentations concerning such securities and the risks of the auction rate securities market then known by Merrill Lynch outlined above, ultimately resulting in the collapse of the market and the inability to sell such securities.

46.     At the time auction rate securities were offered and sold to Community Trust, Merrill Lynch materially misled Community Trust and other members of the investing public, thereby allowing the auction market to continue and actively encouraging such securities to be

sold to Community Trust and others.  Merrill Lynch's fraudulent and/or grossly negligent conduct thereby inflated the price of the auction rate securities sold to Community Trust by Merrill Lynch issuing both publicly and to Community Trust specifically false and misleading and/or grossly negligent statements and omitting to disclose material facts necessary to make Merrill Lynch's statements to Community Trust outlined above not false and misleading or free from negligence.  Merrill Lynch's statements and omissions were materially false and misleading and/or grossly negligent in that they failed to disclose material adverse information and fraudulently and/or grossly negligently misrepresented the truth about the auction market and the auction rate securities sold by Merrill Lynch.

47.     At all relevant times, the material misrepresentations and omissions particularized in this Second Amended Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Community Trust which followed the collapse of the auction rate securities market.  At the time auction rate securities were offered and sold to Community Trust's paid agent, CTIC, Merrill Lynch, through its authorized brokers including Jason Stanley,  Josh Burden or others, made or caused to be made a series of materially false, misleading and/or grossly negligent statements about the auction market itself and the auction rate securities sold by Merrill Lynch.  These material misstatements and omissions had the cause and effect of perpetuating the auction market and creating in that market a false and unrealistically positive assessment of the auction rate securities sold by Merrill Lynch, thus causing those securities to be overvalued and artificially inflated at all relevant times.  Merrill Lynch's materially false and misleading and/or grossly negligent statements at the time the auction rate securities were offered and sold to Community Trust resulted in Community Trust and others purchasing and continuing to hold auction rate securities sold by Merrill Lynch at artificially inflated prices, thus causing the damages complained of herein.

## NO SAFE HARBOR

48.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and/or negligent statements pleaded in this Second Amended Complaint.  The statements pleaded herein, made verbally and in writing by Merrill Lynch authorized brokers Jason Stanley, Josh Burden or others, and in Merrill Lynch publications provided to Community Trust by Merrill Lynch, were never identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

49.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Merrill Lynch is liable for those false forward-looking statements because at the time each of those forward-looking statements was made, Merrill Lynch knew or should have known that the particular forward-looking statement was false, questionable or negligently or recklessly made, and/or the forward-looking statement was authorized and/or approved by an executive officer of Merrill Lynch who knew that those statements were false when made.

## LOSS CAUSATION/ECONOMIC LOSS

50.    As outlined in this Second Amended Complaint, Merrill Lynch engaged in a scheme and course of conduct to create a market for and to artificially inflate the price of auction rate securities sold by Merrill Lynch that operated as a fraud or deceit on purchasers of auction rate securities sold by Merrill Lynch by misrepresenting the liquidity of and risks associated with such securities.  Merrill Lynch achieved this goal by making false and misleading and/or negligent statements about the auction market and the nature of the auction rate securities sold by Merrill Lynch and by failing to disclose material facts concerning the auction rate securities sold

and the market for such securities.  When Merrill Lynch's prior misrepresentations and omissions were disclosed and became apparent to the investing public, Merrill Lynch and others withdrew from such markets, the market for auction rate securities collapsed and the auction rate securities sold by Merrill Lynch have become illiquid.  As a result of their purchases of auction rate securities from Merrill Lynch at the time auction rate securities were offered and sold to Community Trust, Community Trust and others suffered economic loss, i.e., damages under the federal securities laws in that the securities have substantially less value than that falsely and fraudulently represented by Merrill Lynch.

51.     The collapse of the auction rate securities market at the time auction rate securities were offered and sold to Community Trust was substantially contributed to by Merrill Lynch's unilateral decision to no longer artificially support the auction rate securities market and as a result of the nature and extent of Merrill Lynch's wrongful conduct finally being revealed to investors.

## COUNT I

### (Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5)

52.     Community Trust repeats and realleges each and every allegation set forth in Paragraphs 1 through 51 of this Second Amended Complaint as if set forth fully herein.

53.     During the Relevant Period set forth above, Merrill Lynch, utilizing its publications and its authorized agents, including but not limited to initially Jason Stanley and later Josh Burden, among others, carried out a plan, scheme, and course of conduct that was intended to and, throughout the Relevant Period, did deceive the investing public, and in particular Community Trust.

54.     In furtherance of this plan, Merrill Lynch, as specified in detail herein above, made untrue statements of material fact to Community Trust regarding the liquidity and security

of auction rate securities and/or omitted to state material facts necessary to make the statements not misleading, and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Community Trust in its purchase of auction rate securities in an effort to maintain artificially high sales and market prices for such securities.

55.    Merrill Lynch acted with knowledge that certain of its representations with respect to the auction rate securities were false or misleading, or at the least acted with reckless and deliberate disregard for the truth in that it failed to ascertain and to disclose the true facts concerning the liquidity and stability of auction rate securities.

56.    As a result of the dissemination of materially false and misleading information and the failure to disclose material facts, as set forth above, the market and market price of the auction rate securities sold by Merrill Lynch was inflated during the Relevant Period.  In ignorance of the fact that the market prices of auction rate securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made or omitted to be made by Merrill Lynch, or upon the integrity of the auction market in which the auction rate securities were traded, and/or on the absence of material adverse information that was known to or deliberately disregarded by Merrill Lynch but not disclosed in public statements by Merrill Lynch during the Relevant Period, Community Trust purchased and continued to hold auction rate securities sold by Merrill Lynch at artificially high prices and was injured thereby.

57.    As a result of its fraudulent course of action, Merrill Lynch was able to sell millions of dollars of auction rate securities to Community Trust at inflated prices.

58.    Merrill Lynch directly benefited from the sale of these securities in multiple respects, and in particular through the receipt of commissions earned on such sales.

59.    Community Trust, despite its best efforts to engage in due diligence and protect its interests, did not have the ability to protect itself against Merrill Lynch's intentional and

material misrepresentations and omissions regarding the auction rate securities, and therefore reasonably relied on Merrill Lynch's representations that the auction rate securities were liquid, cash equivalents and were secure investments.

60.    Had Community Trust known the truth regarding the liquidity of and risks associated with the auction rate securities sold by Merrill Lynch and regarding the auction rate securities market, and other material facts which were not disclosed by Merrill Lynch, Community Trust would not have purchased the securities, or if it had acquired such securities during the Relevant Period, it would not have done so at the artificially inflated prices which they paid.

61.    By virtue of the foregoing, Merrill Lynch has violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

62.    As a direct and proximate result of Merrill Lynch's fraud in artificially inflating the market for auction rate securities and its misrepresentations regarding the liquidity and risks associated with auction rate securities, Community Trust has been damaged in connection with its purchase of auction rate securities sold by Merrill Lynch and is entitled to recover compensatory damages in an amount of at least $9.9 million plus pre-judgment and post-judgment interest on that amount.

## COUNT II

### (Violations Of Sections 292.320 And 292.480(1) Of The Kentucky Securities Laws)

63.    Community Trust repeats and realleges each and every allegation set forth in Paragraphs 1 through 62 of this Second Amended Complaint as if set forth fully herein.

64.    During the Relevant Period set forth above, Merrill Lynch carried out a plan, scheme, and course of conduct that was intended to and, throughout the Relevant Period, did deceive the investing public, including Community Trust.

65.    In furtherance of this plan, Merrill Lynch made untrue statements of material fact regarding the liquidity and security of auction rate securities and/or omitted to state material facts necessary to make the statements not misleading, and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Community Trust in its purchase of auction rate securities in an effort to maintain artificially high sales and market prices for such securities.

66.    Merrill Lynch acted with knowledge that certain of its representations with respect to the auction rate securities were false or misleading, or at the least acted with reckless and deliberate disregard for the truth in that it failed to ascertain and to disclose the true facts concerning the liquidity and stability of auction rate securities.

67.    As a result of the dissemination of materially false and misleading information and the failure to disclose material facts, as set forth above, the market and market price of the auction rate securities sold by Merrill Lynch was inflated during the Relevant Period.  In ignorance of the fact that the market prices of auction rate securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made or omitted to be made by Merrill Lynch, or upon the integrity of the auction market in which the auction rate securities were trade, and/or on the absence of material adverse information that was known to or deliberately disregarded by Merrill Lynch but not disclosed in public statements by Merrill Lynch during the Relevant Period, Community Trust purchased and continued to hold auction rate securities sold by Merrill Lynch at artificially high prices and was injured thereby.

68.    As a result of its fraudulent course of action, Merrill Lynch was able to sell millions of dollars of auction rate securities to Community Trust at inflated prices.

69.    Merrill Lynch directly benefited from the sale of these securities in multiple respects, and in particular through the receipt of commissions earned on such sales.

70.     Community Trust, despite its best efforts to engage in due diligence and protect its interests, did not have the ability to protect itself against Merrill Lynch's intentional and material misrepresentations and omissions regarding the auction rate securities, and therefore reasonably relied on Merrill Lynch's representations that the auction rate securities were liquid, cash equivalents and were secure investments.

71.     Had Community Trust known the truth regarding the liquidity of and risks associated with the auction rate securities sold by Merrill Lynch and regarding the auction rate securities market and other material facts which were not disclosed by Merrill Lynch, Community Trust would not have purchased the securities, or if it had acquired such securities during the Relevant Period, it would not have done so at the artificially inflated prices which they paid.

72.     By virtue of the foregoing, Merrill Lynch has violated Sections 292.320 and 292.480(1) of the Kentucky Securities Laws.

73.     As a direct and proximate result of Merrill Lynch's fraud in artificially inflating the market for auction rate securities and its misrepresentations regarding the liquidity and risks associated with auction rate securities, Community Trust has been damaged in connection with its purchase of auction rate securities sold by Merrill Lynch and is entitled to recover compensatory damages in an amount of at least $9.9 million plus pre-judgment and post-judgment interest on that amount, as well as costs, attorneys fees, and all other relief to which Community Trust may be entitled pursuant to the Kentucky Securities Laws.

## <u>COUNT III</u>

### <u>(Fraud And Deceit Under Kentucky Common Law)</u>

74.     Community Trust repeats and realleges each and every allegation set forth in Paragraphs 1 through 73 of this Second Amended Complaint as if fully set forth herein.

75.     The conduct of Merrill Lynch, described in detail above, exacted a fraud upon Community Trust, from which wide-ranging compensatory and other damages have arisen.

76.     Specifically, Merrill Lynch knew or should have known that its material statements concerning the liquidity and short-term nature of auction rate securities were false. For example, auction rate securities were in fact long-term investments and were not liquid because the market was being artificially supported by Merrill Lynch and other broker dealers. These and other material facts were misrepresented as outlined above in this Second Amended Complaint.

77.     Merrill Lynch knew or should have known, but failed to disclose, that the auction rate securities market was then likely to collapse, greatly diminishing the value of the securities, if Merrill Lynch or other broker-dealers ceased their artificial support of the market.  These and other material facts were omitted as outlined above in this Second Amended Complaint.

78.     Merrill Lynch's material misstatements and material omissions concerning the auction rate securities were made fraudulently with the intention of inducing Community Trust to purchase such securities.

79.     The nature of the auction rate securities market and the actions of Merrill Lynch rendered it impossible for Community Trust and other institutional investors to discover that the market was being artificially supported in the manner described above.

80.     Community Trust reasonably relied on Merrill Lynch's representations regarding the auction rates securities in making the decision to purchase and retain these securities.  Had Community Trust known that such material statements were false or if it had known of the material facts omitted by Merrill Lynch, it would not have purchased the auction rate securities.

81.     At all relevant times, the material misrepresentations and omissions particularized in this Second Amended Complaint were directly or proximately caused or were a substantial

24

contributing cause of the compensatory and other damages sustained by Community Trust which followed the collapse of the auction rate securities market, as set forth more fully above in this Second Amended Complaint.

82.    As a direct and proximate result of the fraudulent misrepresentations and omissions of Merrill Lynch, Community Trust is entitled to recover compensatory damages in an amount of at least $9.9 million plus both pre-judgment and post-judgment interest on that amount.

83.    The conduct of Merrill Lynch was fraudulent and deceitful and was carried out intentionally with the intent to harm Community Trust and with utter disregard for the rights of Community Trust.

84.    As a further direct and proximate result of the fraudulent misrepresentations and omissions of Merrill Lynch, Community Trust is entitled to recover punitive damages of at least $29.7 million, the exact amount of which will be established at trial.

## COUNT IV

### (Breach Of Fiduciary Duty Under Kentucky Common Law)

85.    Community Trust repeats and realleges each and every allegation set forth in Paragraphs 1 through 84 of this Second Amended Complaint as if fully set forth herein.

86.    The relationship existing between Community Trust and Merrill Lynch prior to the transactions described herein was fiduciary in nature, founded on the trust or confidence reposed by Community Trust in the integrity and fidelity of Merrill Lynch's investment recommendations.

87.    Because Merrill Lynch possessed superior knowledge, skill, judgment and expertise in the auction rate securities market and concerning the securities sold to Community

Trust, Community Trust rightfully and reasonably relied upon the recommendations and representations of Merrill Lynch with respect to these securities.

88.     The relationship between the parties created a duty on Merrill Lynch to act honestly, fairly and in Community Trust's best interest with respect to the provision of advice concerning these securities. Merrill Lynch also had a further duty not to supply false, misleading, inaccurate or incomplete information with respect to the securities purchased by Community Trust.

89.     Merrill Lynch had a pecuniary interest in offering to sell and in selling the auction rate securities and was obligated to exercise reasonable care or competence in obtaining information, communicating information and providing guidance with respect to the auction rate securities and the auction rate securities market to Community Trust for the benefit and guidance of Community Trust.

90.     Merrill Lynch breached this duty by misrepresenting to Community Trust and to other institutional investors numerous material facts, including the representations that auction rate securities were equivalent to cash or money market funds and that such securities were highly liquid, safe investments for short-term investing. Merrill Lynch also misrepresented to Community Trust the material fact that the auction rate securities being sold to Community Trust were suitable to the investment goals of an institutional investor such as Community Trust.

91.     Merrill Lynch also breached the fiduciary duty it owed to Community Trust by failing to fairly and honestly disclose, among other material facts, the fact that the auction rate securities sold to Community Trust were in reality illiquid, that the market for these securities was such that it was then likely to collapse, leaving Community Trust with the inability to dispose of the securities purchased by it.

92.     Merrill Lynch also breached the fiduciary duty it owed to Community Trust by failing to disclose that Merrill Lynch itself was in fact acting both as a market maker concerning such securities and engaging in undisclosed improper and manipulative practices designed to obscure the true nature of the auction rate securities market and the true illiquidity of such securities themselves.

93.     As a direct and proximate result of these breaches of fiduciary duty by Merrill Lynch, Community Trust has suffered pecuniary losses and damages for which Merrill Lynch is responsible.  As a direct and proximate result of such conduct, Community Trust is entitled to recover compensatory damages in an amount of at least $9.9 million plus both pre-judgment and post-judgment interest on that amount.

94.     In breaching the fiduciary duties owed to Community Trust, Merrill Lynch acted fraudulently, deceitfully and intentionally with the intent to harm Community Trust and with utter disregard for the rights of Community Trust.

95.     As a further direct and proximate result of the fraudulent, intentional and deceitful conduct of Merrill Lynch in breach of the fiduciary duties owed by it, Community Trust is entitled to recover punitive damages of at least $29.7 million, the exact amount of which will be established at trial.

## COUNT V

## (Grossly Negligent Misrepresentations And Omissions Under Kentucky Common Law)

96.     Community Trust repeats and realleges each and every allegation set forth in Paragraphs 1 through 95 of this Second Amended Complaint as if fully set forth herein.

97.     In offering to sell and in selling auction rate securities to Community Trust, Merrill Lynch had a duty not to supply false, misleading, inaccurate or incomplete information with respect to the securities purchased by Community Trust.

27

98.     Merrill Lynch had a pecuniary interest in offering to sell and selling the auction rate securities and was obligated to exercise reasonable care or competence in obtaining information, communicating information and providing guidance with respect to the auction rate securities and the auction rate securities market to Community Trust for the benefit and guidance of Community Trust.

99.     Merrill Lynch knew or should have known that Community Trust would rely upon statements made by it grossly negligently or recklessly with respect to the auction rate securities being sold and with respect to the nature and integrity of the auction rate securities market.  Merrill Lynch knew or should have known that the information provided to Community Trust or withheld from Community Trust would influence its decision to purchase or not purchase the auction rate securities offered to it.

100.     Merrill Lynch grossly negligently or recklessly misrepresented to Community Trust and to other institutional investors that auction rate securities were equivalent to cash or money market funds and that such securities were highly liquid, safe investments for short-term investing.  Merrill Lynch also misrepresented to Community Trust the material fact that the auction rate securities being sold to Community Trust were suitable to the investment goals of an institutional investor such as Community Trust.

101.     Merrill Lynch grossly negligently failed to disclose, among other material facts, the fact that the auction rate securities sold to Community Trust were in reality illiquid, that the market for these securities was such that it was then likely to collapse, leaving Community Trust with the inability to dispose of the securities purchased by it.  Merrill Lynch also failed to disclose that Merrill Lynch itself was in fact acting both as a market maker concerning such securities and engaging in undisclosed improper and manipulative practices designed to obscure

the true nature of the auction rate securities market and the true illiquidity of such securities themselves.

102.    At the time auction rate securities were offered and sold to Community Trust, Merrill Lynch grossly negligently made or caused to be grossly negligently made a series of false or misleading statements concerning the auction rate securities market itself and the auction rate securities offered and sold by Merrill Lynch.  Such grossly negligently made material misstatements and omissions had the cause and effect of perpetuating the auction market and creating in that market a false and unrealistically positive assessment of the auction rate securities sold by Merrill Lynch.  Such grossly negligent misrepresentations and omissions caused such securities to be overvalued and artificially inflated at all relevant times.  As a result of such grossly negligent misrepresentations and omissions concerning the auction rate securities and the auction rate securities market, Community Trust purchased such securities and continued to hold them at artificially inflated prices, resulting in pecuniary damages being sustained by Community Trust.

103.    As a result of the numerous grossly negligent misrepresentations and omissions by Merrill Lynch, Community Trust has suffered pecuniary losses and damages for which Merrill Lynch is responsible because of its failure to exercise reasonable care or competence in grossly negligently misrepresenting or communicating material facts to Community Trust and in grossly negligently failing to disclose other material facts which would have had a material bearing upon Community Trust's decision to purchase or not purchase auction rate securities.

104.    Merrill Lynch breached its duty to exercise ordinary and reasonable care with respect to such grossly negligent misrepresentations or omissions and as a direct and proximate result of such conduct, Community Trust is entitled to recover compensatory damages in an

amount of at least $9.9 million plus both pre-judgment and post-judgment interest on that amount.

105.    The conduct of Merrill Lynch was grossly negligent and was carried out in gross and utter disregard for the rights of Community Trust.

106.    As a further direct and proximate result of the grossly negligent misrepresentations and omissions of Merrill Lynch, Community Trust is entitled to recover punitive damages of at least $29.7 million, the exact amount of which will be established at trial.

### COUNT VI

**(Breach Of The Implied Covenant Of Honesty, Good Faith
And Fair Dealing Under Kentucky Common Law)**

107.    Community Trust repeats and realleges each and every allegation set forth in Paragraphs 1 through 106 of this Second Amended Complaint as if fully set forth herein.

108.    In recommending the purchase of auction rate securities to Community Trust, Merrill Lynch knew that Community Trust reposed trust and confidence in it and in the integrity and fidelity of Merrill Lynch's investment recommendations.  Community Trust relied on the superior knowledge, skill, judgment and expertise of Merrill Lynch and on the recommendations and representations of Merrill Lynch with the respect to such securities.

109.    The longstanding relationship between Community Trust and Merrill Lynch and the contractual arrangements between them regarding the auction rate securities sold by Merrill Lynch created a duty and obligation on the part of Merrill Lynch to act honestly, fairly and in good faith and to at all times act in the best interest of Community Trust with respect to the investment advice regarding the auction rate securities and their sale to Community Trust. Merrill Lynch also had a further duty or obligation not to supply false, misleading, inaccurate or incomplete information with respect to the securities recommended and sold by it to Community Trust.

110.    By virtue of its conduct outlined above in this Second Amended Complaint, Merrill Lynch breached its implied covenant of honesty, good faith and fair dealing with respect to Community Trust in connection with the recommendation and sale of the auction rate securities at issue in this litigation.

111.    As a direct and proximate result of the breach of Merrill Lynch's implied covenant of honesty, good faith and fair dealing, Community Trust has suffered pecuniary losses and damages for which Merrill Lynch is responsible.  As a direct and proximate result of such conduct, Community Trust is entitled to recover compensatory damages in an amount of at least $9.9 million plus both pre-judgment and post-judgment interest on that amount.

WHEREFORE, the Plaintiff, Community Trust Bank, Inc., respectfully demands Judgment on its Second Amended Complaint herein against the Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated as follows:

A.    A Judgment on Count I of the Second Amended Complaint for compensatory damages in excess of the minimum jurisdictional requirements of this Court;

B.    A Judgment on Count II of the Second Amended Complaint for both compensatory and punitive damages in separate amounts, each in excess of the minimum jurisdictional requirements of this Court;

C.    A Judgment on Count III of the Second Amended Complaint for compensatory and punitive damages in separate amounts, each in excess of the minimum jurisdictional requirements of this Court;

D.    A Judgment on Count IV of the Second Amended Complaint for compensatory and punitive damages in separate amounts, each in excess of the minimum jurisdictional requirements of this Court;

E.     A Judgment on Count V of the Second Amended Complaint for compensatory and punitive damages in separate amounts, each in excess of the minimum jurisdictional requirements of this Court;

F.     A Judgment on Count VI of the Second Amended Complaint for compensatory damages in excess of the minimum jurisdictional requirements of this Court.

G.     An Order requiring Merrill Lynch to buy back auction rate securities from Community Trust at par;

H.     An Order directing Merrill Lynch to disgorge all gains and pay all restitution and damages caused, directly or indirectly, by the fraudulent and deceptive acts complained of herein;

I.     The payment of Community Trust's costs, including attorneys' fees as provided by law;

J.     Such further equitable or other relief as may be necessary to redress Merrill Lynch's violations of federal and state law and which are just and proper; and

K.     A trial by jury on all claims set forth in the Second Amended Complaint in Counts I through VI so triable.

Respectfully submitted,

 /s/ Richard A. Getty
RICHARD A. GETTY
DANIELLE H. BROWN
    and
JESSICA K. CASE

GETTY & CHILDERS, PLLC
1900 Lexington Financial Center
250 West Main Street
Lexington, Kentucky  40507
Telephone:  (859) 259-1900
Facsimile:  (859) 259-1909
E-Mail:  rgetty@gettychilders.com
E-Mail:  dbrown@gettychilders.com
E-Mail:  jcase@gettychilders.com

COUNSEL FOR PLAINTIFF
COMMUNITY TRUST BANK, INC.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Second Amended Complaint was served on the 19th day of October, 2009 electronically in accordance with the method established under this Court's CM/ECF Administrative Procedures and Standing Order upon all parties in the electronic filing system in this case.  Pursuant to Rule 2.B. of the Individual Practices of Chief Judge Loretta A. Preska, a courtesy copy of the foregoing Second Amended Complaint was submitted to chambers by regular U.S. mail, postage prepaid, to the following on this the 19th day of October, 2009:

Chief Judge Loretta A. Preska
United States Courthouse
500 Pearl Street, Room 1320
New York, New York 10007

 /s/ Richard A. Getty
COUNSEL FOR PLAINTIFF

dhbpld0042