USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/31/10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X
                                    :
In re Merrill Lynch Auction Rate    :     09 MD 2030 (LAP)
Securities Litigation               :
                                    :     Opinion and Order
----------------------------------X
                                    :
This Document Relates To            :
                                    :
        No. 08 Civ. 3037 (LAP)      :
                                    :
- - - - - - - - - - - - - - - - - -X

LORETTA A. PRESKA, Chief U.S. District Judge

        Plaintiffs Colin Wilson, Ronald Levy, and Michael Bonde,

purchasers of auction rate securities ("ARS"), bring this

purported class action against Merrill Lynch & Co., Inc.

("Merrill Lynch & Co."), a financial firm that offers wide-

ranging financial services and products through its

subsidiaries, and Merrill Lynch, Pierce, Fenner & Smith, Inc.

("Merrill Lynch"), a securities broker-dealer and a wholly-owned

subsidiary of Merrill Lynch & Co.  Plaintiffs bring their claim

under Section 10(b) of the Securities Exchange Act of 1934

("Exchange Act"), 15 U.S.C. § 78j(b), and Rules 10b-5(a) and

10b-5(c) thereunder, 17 C.F.R. § 240.10b-5(a), (c).  Plaintiffs

also claim violations of Section 20(a) of the Exchange Act, 15

U.S.C. § 78t(a).  Defendants now move to dismiss the Plaintiffs'

complaint for failure to state a claim.  For the reasons

discussed below, the Defendants' motion is GRANTED.

## I. Background

This case is one of nine that comprise the Multidistrict Litigation ("MDL") known as In re Merrill Lynch Auction Rate Securities Litigation, 09 MD 2030.  In an order dated June 10, 2009, the Judicial Panel on Multidistrict Litigation ("MDL Panel") granted a motion by defendants to centralize four actions that had been brought against Merrill Lynch in various district courts throughout the country.  The MDL Panel transferred three actions to the Southern District of New York and assigned the Multidistrict Litigation to this Court for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.[1]  To date, five other actions have been added to this MDL.[2]

---

[1] The three actions were: Community Trust Bank, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., No. 08-cv-5403; Louisiana Stadium & Exposition District, et al. v. Financial Guaranty Insurance Co., et al., No. 09-cv-5404 and No. 09-cv-6770; and The Cooperative Bank, et al. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., et al., No. 09-cv-5405.  These three actions joined In re Merrill Lynch Auction Rate Securities Litigation, No. 09-cv-3037, which had already been located in the Southern District of New York.

[2] These five actions are: Louisiana Pacific Corp. v. Money Market 1 Institutional Investment Dealer, et al., No. 09-cv-9887; The Anschutz Corp. v. Merrill Lynch & Co., Inc., et al., No. 09-cv-9888; Teva Pharmaceutical Industries Ltd. et al. v. Merrill Lynch & Co. Inc., et al., No. 09-cv-6936; Dow Corning Corporation et al. v. Merrill Lynch & Co., Inc., et al., No. 09-cv-9697; and Iconix Brand Group Incorporated v. Merrill Lynch, Pierce, Fenner & Smith Incorporated, No. 10-cv-124.

By Order dated October 30, 2008, the Court instructed the Defendants to inform the Plaintiffs of any perceived deficiencies in the complaint by letter.  Plaintiffs were instructed to then inform the Court whether they wished to stand on their complaint or file an amended complaint.  Plaintiffs filed the Consolidated Class Action Complaint on December 10, 2008. [dkt. no. 34.][3]  Defendants filed a motion to dismiss on February 27, 2009. [dkt. no. 40.]

By letter dated April 17, 2009, Plaintiffs informed the Court that they would not respond to Defendants' motion to dismiss in light of Judge Lawrence M. McKenna's ruling in In re UBS Auction Rate Securities Litigation, No. 08 CV 2967 (LMM), 2009 WL 860812, at *6 (S.D.N.Y. Mar. 30, 2009).  Judge McKenna had ruled that the lead plaintiffs in a similar proposed class action against UBS did not have standing to pursue their claims because they had accepted a UBS repurchase offer for their ARS pursuant to a regulatory settlement and were precluded from bringing claims on behalf of those who had not settled. See id. at *5-6.  Since the original lead plaintiffs in the instant case had accepted a similar repurchase offer from Merrill Lynch, counsel for the lead plaintiffs proposed to amend the complaint

---

[3] Unless otherwise indicated, docket numbers refer to the docket for 08-cv-3037.

by substituting new lead plaintiffs who had not been eligible for the repurchase offer. [dkt. no. 44.]

Plaintiffs filed the First Amended Consolidated Class Action Complaint for Violations of the Securities Laws ("Complaint") on May 22, 2009. [dkt. no. 45.]  On June 19, 2009, this Court granted the withdrawal of former lead plaintiffs Gerald Wendel and Robert Berzin and approved the substitution of new lead plaintiffs Colin Wilson, Ronald Levy, and Michael Bonde ("Lead Plaintiffs" or "Plaintiffs"). [dkt. no. 48.]  Defendants filed the instant motion to dismiss the Complaint on July 24, 2009. [dkt. no. 51.]  On March 25, 2010, the parties convened before the Court for oral argument on the motion to dismiss.

The Lead Plaintiffs purport to represent all persons or entities who purchased ARS for which Merrill Lynch served as sole auction dealer, lead auction dealer, co-lead auction dealer, or joint lead auction dealer between March 25, 2003, and February 13, 2008 (the "Class Period"). (Compl. ¶¶ 2, 18.)  A summary of the factual allegations of the Complaint follows.

## A.  Auction Rate Securities

Auction rate securities were equity or debt instruments that were traded through periodic Dutch auctions held every seven, twenty-eight, thirty-five, or forty-nine days. (Compl. ¶¶ 30, 34.)  The securities were issued by closed-end

preferred funds, states, state agencies, municipalities, student loan originators and lenders, and other corporations and entities. (Id. ¶ 31.)  While the market for ARS was initially populated by sophisticated institutional investors in the 1980s, issuers and underwriters subsequently attracted unsophisticated investors by lowering the minimum investment to $25,000. (Id. ¶ 33.)  By February 2008, the market for ARS had grown to over $330 billion. (Id. ¶ 32.)

Investors participated in the periodic auctions by submitting orders to buy, sell, or hold ARS at particular interest rates. (Id. ¶¶ 34, 37.)  An auction succeeded if the number of purchase orders at a particular interest rate equaled or exceeded the number of sell orders at that same rate. (Id. ¶ 37.)  The clearing rate was then set as the lowest interest or dividend rate at which all sale orders could be fulfilled.  This clearing rate applied until the next auction. (Id.)

An auction failed if the number of sell orders exceeded the number of buy orders. (Id.)  In the event of a failed auction the interest rate on a security was reset to a predetermined rate, referred to as the maximum rate. (Id. ¶ 38.)  If the maximum rate was sufficiently high it would attract new buyers or prompt the issuer to refinance; if the maximum rate was sufficiently low, on the other hand, it would not attract new

buyers and the holder would be left with an illiquid security.
(Id. ¶ 39.)

Plaintiff Colin Wilson purchased ARS from E*Trade on July
17, 2007. (Id. ¶ 11; Certification of Proposed Lead Plaintiff
Colin Wilson ¶ 7.)  Plaintiff Ronald Levy, as Trustee of the
Levy Family Trust, purchased ARS from Wells Fargo Investments,
LLC ("Wells Fargo") on March 16, 2006. (Compl. ¶ 12;
Certification of Proposed Lead Plaintiff Ronald Levy ¶ 7.)
Plaintiff Michael Bonde purchased ARS from Wells Fargo on
December 24, 2007. (Compl. ¶ 13; Certification of Proposed Lead
Plaintiff Michael Bonde Ex. A.)

### B.  Defendants' Conduct

Plaintiffs allege that Merrill Lynch engaged in a scheme to
manipulate the ARS market "to create the appearance of a
functioning auction market in which auction rate securities
traded in accordance with actual supply and demand." (Compl.
¶ 42.)  Merrill Lynch participated in the ARS market as an
underwriter, an auction dealer, and a bidder for its own
account. (Id. ¶¶ 40, 44-45, 163.)  As an underwriter, Merrill
Lynch allegedly issued ARS with maximum rates that were
insufficient to attract liquidity in the event of a failed
auction. (Id. ¶ 41.)  As an auction dealer, Merrill Lynch
accepted orders from investors and managed the auctions.

Investors could also place orders through other brokerages,
which would then submit orders to Merrill Lynch. (Id. ¶ 36.)

The central component of the alleged scheme was Merrill
Lynch's intervention to prevent auction failures in every
auction for which it served as sole or lead auction dealer.
From January 3, 2006, to May 27, 2008, for example, Merrill
Lynch prevented more than 5,800 auctions from failing by placing
bids for its own account. (Id. ¶ 47.)  This intervention
occurred pursuant to tacit agreements with ARS issuers that
Merrill Lynch would suppress auction failures. (Id. ¶ 49.)

By placing support bids with its own capital, Merrill Lynch
masked the lack of investor demand for ARS and led investors to
"believe their investments could be readily liquidated through
arm's-length sales at periodic auctions." (Id. ¶¶ 50, 51.)  In
reality, the market for ARS was not dictated by the natural
interplay of supply and demand but was upheld only because of
Merrill Lynch's constant interventions. (Id. ¶¶ 48-51.)

Merrill Lynch's support bidding also allowed it to set the
clearing rate at each auction.  Merrill Lynch was able to bid
for its own account after all other buy and sell bids were
submitted, allowing the Merrill Lynch ARS Trading Desk to bid at
specific rates and in specific amounts that guaranteed that
auctions would clear at those rates. (Id. ¶ 59.)  These interest
rates were set high enough to encourage continued investment by

customers but low enough to satisfy issuers. (Id. ¶ 60.)  After placing support bids and acquiring ARS for its own account, Merrill Lynch would reduce excess inventory by selling ARS between auction periods; by setting the clearing rate higher, Merrill Lynch could "clear more product" before the next auction period. (Id. ¶¶ 62, 63.)

Merrill Lynch allegedly furthered its manipulative scheme by misstating and omitting facts about its ARS practices and procedures and by pressuring Merrill Lynch sales representatives to sell ARS to investors.  Merrill Lynch described ARS to investors as "highly liquid, safe investments similar to money market funds" and classified ARS as "Other Cash" on clients' account statements. (Id. ¶ 53.)  Despite the purported existence of a protective wall designed to restrict the flow of material non-public information between various Merrill Lynch groups, the ARS Trading Desk shared information about Merrill Lynch's ARS inventory with the Research Department. (Id. ¶¶ 66-67.) Individuals at the ARS Trading Desk pushed the Research Department to issue favorable research reports, caused an unfavorable research report to be retracted and amended, and used research analysts to tout the benefits of ARS to Merrill Lynch's financial advisors. (Id. ¶¶ 65-80.)  Finally, Merrill Lynch pressured its financial advisors to sell ARS to customers through national sales conference calls, emails, and by paying

advisors greater commissions than they could have earned selling other financial products. (Id. ¶¶ 81-98.)

## C. **The 2006 SEC Order and Merrill Lynch's Website Disclosure**

The Securities and Exchange Commission ("SEC") began to investigate the auction practices of Merrill Lynch and other auction dealers in 2004. (Id. ¶ 171.)  The SEC's inquiry was reported in the Associated Press, The Wall Street Journal, Dow Jones Newswires, The Los Angeles Times, and The Bond Buyer. (See Declaration of Jay B. Kasner in Support of Defendants' Motion to Dismiss Lead Plaintiffs' "First Amended Consolidated Class Action Complaint" ("Kasner Decl.") Exs. M-V.)  The investigation culminated on May 31, 2006, when the SEC filed an Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934 ("2006 SEC Order"). (See id. Ex. B.)[4]

---

[4] The Court takes judicial notice of the 2006 SEC Order and the remedial disclosures subsequently placed on Merrill Lynch's website. (Kasner Decl. Exs. A, B.)  Judicial notice of these documents does not require conversion of this motion to dismiss into a motion for summary judgment because the Complaint incorporates the documents by reference. See Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) ("[F]or the purposes of deciding a motion to dismiss pursuant to Rule 12(b)(6): [T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." (internal quotation

The 2006 SEC Order noted that, among other conduct, certain auction dealers had "submitted bids to ensure that all of the securities would be purchased to avoid failed auctions and thereby, in certain instances, affected the clearing rate." (Id. at 6.) Such conduct was improper because it was not accompanied by adequate disclosure; the Order specified that it did "not prohibit broker-dealers from bidding for their proprietary accounts when properly disclosed." (Id. at 6 n.6.)

The Order included several remedial provisions. Merrill Lynch agreed to pay a civil monetary penalty of $1,500,000. (Id. at 9.) The Order also required Merrill Lynch to provide its customers who held ARS, issuers of ARS, and customers who were first-time purchasers of ARS with a written description of Merrill Lynch's material auction practices and procedures. (Id. at 10.) The SEC stated that Merrill Lynch could satisfy these requirements by sending customers the written material description itself or by including a written notification with the trade confirmation directing the purchaser to a specific page on Merrill Lynch's website containing the written description. (Id.) The Order required Merrill Lynch to "at all times make a description of its then-current material auction

_____

marks omitted)); In re Citigroup Auction Rate Sec. Litig., ---
F. Supp. 2d ---, No. 08 Civ. 3095 (LTS)(FM), 2009 WL 2914370, at
*3 n.2 (S.D.N.Y. Sept. 11, 2009) (taking judicial notice of the
2006 SEC Order and website disclosures of Citigroup's ARS
practices and procedures).

practices and procedures available to (1) all customers and broker-dealers who are participating through [Merrill Lynch] in an [ARS auction] on the portion of its website that is accessible to such customers and broker-dealers and is related to such action and (2) the general public on another portion of its website accessible to the general public." (Id. at 11.)

Merrill Lynch subsequently placed a document on its website titled "Description of Merrill Lynch's Auction Rate Securities Practices and Procedures." (Compl. ¶ 173.) The document noted that "because of the multiple roles that Merrill Lynch play[ed] in the [ARS] market, Merrill Lynch's interests in participating in that market [could] differ from [other investors]." (Kasner Decl. Ex. A at 4.) These roles included "providing services to issuers of [ARS], acting as an agent for investors . . . and purchasing and selling as principal for Merrill Lynch's own account." (Id.)

The document also contained a section titled "Risk Factors and Special Considerations." (Id. at 15.) Under a subheading titled "Bidding by Merrill Lynch," the document stated that "Merrill Lynch [was] permitted, but not obligated, to submit orders in auctions for its own account either as a bidder or a seller, or both, and routinely d[id] so in its sole discretion." (Id.) Merrill Lynch disclosed that if it

> submit[ted] an order for its own account, it would
> likely have an advantage over other bidders because
> Merrill Lynch would have knowledge of some or all of
> the other orders . . . and, thus, could determine the
> rate and size of its order so as to ensure that its
> order [was] likely to be accepted in the auction and
> that the auction [was] likely to clear at a particular
> rate.

(Id. at 15-16.)  Where Merrill Lynch was the sole auction

dealer, it "could discern the clearing rate before the orders

[were] submitted to the auction agent and set the clearing rate

with its order." (Id. at 16.)

The document disclosed certain facts surrounding the

possibility of a failed auction.  It noted that "Merrill Lynch

may routinely place one or more bids in an auction for its own

account to acquire auction rate securities . . . to prevent an

auction failure." (Id.)  The document also noted that "[b]ids by

Merrill Lynch or by those it may encourage to place bids [were]

likely to affect the clearing rate." (Id.)  "Because of these

practices," the document stated,

> the fact that an auction clear[ed] successfully d[id]
> not mean that an investment in the securities
> involve[d] no significant liquidity or credit risk.
> Merrill Lynch [was] not obligated to continue to place
> such bids or encourage other bidders to do so in any
> particular auction to prevent an auction from failing.

(Id.)  Investors were not to "assume that Merrill Lynch [would]

do so or that auction failures [would] not occur." (Id.)

Finally, under a section titled "Holder's Ability to Resell

Auction Rate Securities May Be Limited," the document noted that

12

> Merrill Lynch may submit a bid in an auction to keep
> it from failing, but it is not obligated to do so.
> There may not always be enough bidders to prevent an
> auction from failing in the absence of Merrill Lynch
> bidding in the auction for its own account or
> encouraging others to bid.  Therefore, auction
> failures are possible, especially if the issuer's
> credit were to deteriorate, if a market disruption
> were to occur or if, for any reason, Merrill Lynch
> were unable or unwilling to bid.

(Id. at 18.)

### D.  The Prospectuses

The prospectuses for the securities at issue also revealed

the broker-dealer's ability to intervene in auctions.[5]  The

prospectus for Blackrock MuniHoldings Fund Inc., Series C,

purchased by Lead Plaintiffs Colin Wilson and Ronald Levy,

provided that:

> A broker-dealer may bid in an auction in order to
> prevent what would otherwise be (i) a failed auction,
> (ii) an "all-hold" auction, or (iii) an applicable
> dividend rate that the broker-dealer believes, in its
> sole discretion, does not reflect the market for the
> [ARS] at the time of the auction.

(Kasner Decl. Ex. F at 6.)  The prospectus further stated that

as "a result of bidding by broker-dealers in an auction for

their own account, the dividend rate that would apply at the

auction may be higher or lower than the rate that would have

---

[5] As with the 2006 SEC Order and Merrill Lynch's ARS website, the
Court may take judicial notice of the prospectuses for the
securities at issue without converting the motion to dismiss
into a motion for summary judgment. See Kramer v. Time Warner
Inc., 937 F.2d 767, 774 (2d Cir. 1991) (stating that a court may
take judicial notice of public documents filed with the SEC).

13

prevailed had the broker-dealer not bid" and that "[n]either broker-dealers nor the Fund are [sic] obligated to purchase shares of [ARS] in an auction or otherwise." Id.

The prospectus for Nuveen Premium Income Municipal Fund, Series M, purchased by Lead Plaintiff Michael Bonde, stated that "A Broker-Dealer may also submit Orders to the Auction Agent for its own account as an Existing Holder or Potential Holder." (Id. Ex. G.)  The prospectus also noted that a broker-dealer that submitted bids for its own account "might have an advantage over other Bidders because it would have knowledge of all Orders submitted by it in that Auction." Prospectus, Nuveen Premium Income Municipal Fund, Inc., Series M, available at http://www.sec.gov/Archives/edgar/data/833251/0000950137-97-003273.txt.

### E.  The Collapse of the ARS Market

The credit market deteriorated in the summer of 2007. (Compl. ¶ 99.)  In August and September 2007, Merrill Lynch and several other major broker-dealers allowed a number of auctions for collateralized residential mortgage-backed ARS to fail. (Id. ¶¶ 99-100.)  Merrill Lynch continued to monitor the ARS landscape throughout the rest of 2007 to determine if other broker-dealers were continuing to support their auctions. (Id. ¶ 103.)  On February 12, 2008, after learning that two other major broker-dealers had allowed auctions to fail, Merrill Lynch

14

executives decided to stop supporting auctions. (Id. ¶ 104.)
Beginning on February 13, Merrill Lynch and all other major
auction dealers stopped supporting auctions. (Id. ¶ 105.)  Since
the collapse of the market, the Plaintiffs have been unable to
sell at par the ARS they purchased during the Class Period. (Id.
¶ 164.)

## II.  Standard for Motions to Dismiss

"To survive a motion to dismiss, a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim
to relief that is plausible on its face.'" Ashcroft v. Iqbal,
129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly,
550 U.S. 554, 570 (2007)).  "A pleading that offers 'labels and
conclusions' or 'a formulaic recitation of the elements of a
cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at
555).  Moreover, "[w]here a complaint pleads facts that are
merely consistent with a defendant's liability, it stops short
of the line between possibility and plausibility of entitlement
to relief." Id. (internal quotation marks and citations
omitted).  In assessing whether a plaintiff has met this
standard, the Court must accept all non-conclusory factual
allegations as true and draw all reasonable inferences in the
plaintiff's favor. Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir.
2008) (internal quotation omitted).

15

Securities fraud claims must meet heightened pleading requirements under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). A complaint alleging securities fraud must abide by Rule 9(b)'s requirement that "the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b). "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI, 493 F.3d at 99. "[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).

## III. Discussion

### A. The Plaintiffs Have Not Stated a Claim for Market Manipulation under Section 10(b)

The Plaintiffs allege that Merrill Lynch manipulated the ARS market in violation of the securities laws.[6] Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in

---

[6] The Plaintiffs have expressly disclaimed any reliance on Rule 10b-5(b), which prohibits material misrepresentations or omissions. (See Defs. Mem. of Law 37.)

connection with the purchase or sale of any security . . . , any
manipulative or deceptive device or contrivance in contravention
of such rules and regulations as the Commission may prescribe as
necessary or appropriate in the public interest or for the
protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 in
turn states that

> It shall be unlawful for any person, directly or
> indirectly, by the use of any means or instrumentality
> of interstate commerce, or of the mails or of any
> facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to
> defraud,
>
> . . .
>
> (c) To engage in any act, practice, or course of
> business which operates or would operate as a fraud or
> deceit upon any person, in connection with the
> purchase or sale of any security.

17 C.F.R. § 240.10b-5.

"Market manipulation requires a plaintiff to allege
(1) manipulative acts; (2) damage (3) caused by reliance on an
assumption of an efficient market free of manipulation;
(4) scienter; (5) in connection with the purchase or sale of
securities; (6) furthered by the defendant's use of the mails or
any facility of a national securities exchange."
ATSI, 493 F.3d at 101.

A claim for fraud in the form of market manipulation must
be pled with particularity under Rule 9(b). Id. Because a

17

market manipulation claim "can involve facts solely within the
defendant's knowledge," however, "at the early stages of
litigation, the plaintiff need not plead manipulation to the
same degree of specificity as a plain misrepresentation claim."
Id. at 102. "Accordingly, a manipulation complaint must plead
with particularity the nature, purpose, and effect of the
fraudulent conduct and the roles of the defendants." Id. The
complaint will satisfy this test when it "sets forth, to the
extent possible, what manipulative acts were performed, which
defendants performed them, when the manipulative acts were
performed, and what effect the scheme had on the market for the
securities at issue." Id. (internal quotations omitted). This
standard balances the requirements of Rule 9(b) with a
plaintiff's realistic ability to plead specific facts at the
beginning stage of the litigation. See id.

The Defendants urge this Court to dismiss the Complaint for
failure sufficiently to plead manipulative acts and reliance on
an assumption of an efficient market free of manipulation. Each
of these arguments will be taken up in turn.[7]

---

[7] Because the motion to dismiss is decided on the grounds
discussed below, the Court does not reach the Defendants'
remaining arguments in the motion.

18

### 1.   **The Plaintiffs Have Failed to Plead Certain Acts with Specificity**

As an initial matter, the Plaintiffs have failed to plead one aspect of the alleged scheme with sufficient particularity. The Plaintiffs assert in the Complaint that Merrill Lynch made false and misleading statements to investors in order to encourage investment in ARS. (See Compl. ¶¶ 52-58, 80, 81-90.) Specifically, the Plaintiffs allege that Merrill Lynch pressured its financial advisors to tout ARS "as highly liquid, safe investments similar to money market funds." (Compl. ¶ 53; Memorandum of Law in Opposition to Defendants' Motion to Dismiss Lead Plaintiffs' First Amended Consolidated Class Action Complaint ("Pls. Mem. of Law") 15.)  The Complaint nevertheless fails to identify with any specificity which financial advisors made such statements or when, where, and to whom the statements were made.

While market manipulation claims require less specificity at the pleading stage, this relaxed standard is based on the theory that courts should not require a plaintiff to plead in elaborate detail acts that are within the exclusive knowledge of the defendant. See ATSI, 493 F.3d at 99; S.E.C. v. U.S. Environmental, Inc., 82 F. Supp. 2d 237, 240 (S.D.N.Y. 2000) ("[Rule 9(b)'s strict pleading standard] is inappropriate, however, in the context of market manipulation, as such claims

do not necessarily involve affirmative misrepresentations."); In re Blech Sec. Litig., 961 F. Supp. 569, 585 (S.D.N.Y. 1997) ("[W]here . . . the principal allegations of wrongdoing involve market manipulation rather than false statements, the level of specificity required by 9(b) is somewhat relaxed.").

In the instant case, any false or misleading statements made by Merrill Lynch financial advisors to investors would not be solely within Merrill Lynch's knowledge. The Plaintiffs' failure to identify these allegedly false and misleading statements with particularity is therefore fatal to this aspect of the Plaintiffs' claim. ATSI, 493 F.3d at 99.

In Defer LP v. Raymond James Financial, Inc., for example, the plaintiff alleged that the defendant engaged in a similarly widespread scheme to direct "its financial advisors throughout the United States to represent to investors . . . that auction rate securities were equivalent to cash and were safe, highly liquid short-term investment vehicles." 654 F. Supp. 2d 204, 214 (S.D.N.Y. 2009). As in the instant case, however, the complaint failed "to allege exactly who made the misstatements and to whom, when (other than throughout the Class Period), where, how frequently and in what form." Id. While the complaint alleged "the content of the statement itself and why plaintiff believe[d] it to have been fraudulent, the circumstances in

20

which the statement allegedly was made [were] not identified sufficiently to meet the stringent standards of Rule 9(b)." Id.

While an allegation regarding a statement can be made on information and belief, a plaintiff must plead facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." Novak v. Kasaks, 216 F.3d 300, 314 n.1 (2d Cir. 2000). The Plaintiffs' allegations that Merrill Lynch held conference calls with financial advisors and provided them with incentives to sell ARS support the reasonable inference that the financial advisors did actually focus on selling ARS to investors. (See Compl. ¶ 86.) Absent other facts, however, these allegations do not support a reasonable inference that the financial advisors did so by making false or misleading statements. The Complaint therefore fails to satisfy the strict requirements of Rule 9(b) and the PSLRA in regard to the Plaintiffs' allegations that Merrill Lynch's financial advisors made false or misleading statements to investors.

## 2. The Plaintiffs Have Failed to Allege Manipulative Conduct

Defendants argue that the Plaintiffs have failed sufficiently to allege that Merrill Lynch engaged in manipulative conduct. "Manipulation is virtually a term of art when used in connection with securities markets. The term refers generally to practices, such as wash sales, matched

orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 476 (1977) (internal quotations and citations omitted). Section 10(b)'s "broad language, on its face, extends to manipulation of all kinds, whether by making false statements or otherwise." United States v. Royer, 549 F.3d 886, 900 (2d Cir. 2008); see Santa Fe, 430 U.S. at 477 ("No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices.").

A plaintiff alleging market manipulation typically must show "that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security." ATSI, 493 F.3d at 100. Such activity misleads investors into thinking "that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." Id. (quoting Gurary v. Winehouse, 190 F.3d 37, 45 (2d Cir. 1999)). In other words, "while misrepresentations affect investor beliefs by directly injecting false information into the marketplace, market manipulation affects beliefs indirectly by creating circumstantial evidence that positive information has entered the market." Catton v. Defense Tech. Sys., Inc., No. 05 Civ. 6954 (SAS), 2006 WL 27470, at *6 (S.D.N.Y. Jan. 3, 2006).

The Defendants argue that the Plaintiffs have failed to allege manipulative acts because (1) the Plaintiffs' allegations are based solely on misrepresentations and omissions and (2) even if the Plaintiffs' allegations are based on conduct, there was nothing deceptive or manipulative about Merrill Lynch's support bids.  Each of these arguments is taken up below.

### a.   Plaintiffs' Claims are not Based Solely on Misrepresentations or Omissions

Defendants first argue that the Plaintiffs' claim for market manipulation should be dismissed because it is simply a material misrepresentation claim in disguise.  "A market manipulation claim . . . cannot be based solely upon misrepresentations or omissions." ATSI, 493 F.3d at 101 (quoting Lentell v. Merrill Lynch & Co., 396 F.3d 161, 177 (2d Cir. 2005)).  Rather, "[t]here must be some market activity, such as 'wash sales, matched orders, or rigged prices.'" Id. (quoting Santa Fe, 430 U.S. at 476).

The Plaintiffs satisfy this requirement by alleging that Merrill Lynch underwrote billions of dollars worth of ARS and placed support bids in every auction for which it served as sole or lead auction dealer. (Compl. ¶¶ 41, 44-48, 50, 59-64, 118.)  These support bids, which were placed after the bidding deadline for other investors and with knowledge of their bids, prevented

auction failures and set clearing rates; without the support bids, the market would have collapsed. (Compl. ¶¶ 41, 44-47, 124.) These practices constitute market activity. That the Plaintiffs also allege that Merrill Lynch failed to disclose these practices is not surprising given that "nondisclosure is usually essential to the success of a manipulative scheme." Santa Fe, 430 U.S. at 477.

### b.   Plaintiffs Have Not Sufficiently Pleaded Manipulative Activity

Defendants next argue that the Complaint fails to allege manipulation or deceptive conduct. "In identifying activity that is outside the 'natural interplay of supply and demand,' courts generally ask whether a transaction sends a false pricing signal to the market." ATSI, 493 F.3d at 100. "[Section] 10(b) seeks a market where 'competing judgments of buyers and sellers as to the fair price of the security brings about a situation where the market price reflects as nearly as possible a just price.'" Id. at 100-01 (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1466 (2d Cir. 1996)).

The market is not misled when a transaction's terms are fully disclosed. "Section 10(b)'s general prohibition of practices deemed by the SEC to be 'manipulative'——in this technical sense of artificially affecting market activity in order to mislead investors——is fully consistent with the

24

fundamental purpose of the [Exchange] Act 'to substitute a
philosophy of full disclosure for the philosophy of caveat
emptor.'" Santa Fe, 430 U.S. at 476-77 (quoting Affiliated Ute
Citizens v. United States, 406 U.S. 128, 151 (1972)); see
Schreiber v. Burlington N., Inc., 472 U.S. 1, 7-8 (1985)
("Congress used the phrase 'manipulative or deceptive' in
§ 10(b) as well, and we have interpreted 'manipulative' in that
context to require misrepresentation."). Indeed, "nondisclosure
is usually essential to the success of a manipulative scheme."
Santa Fe, 430 U.S. at 477.

In ATSI, for example, the Court of Appeals considered a
market manipulation claim alleging that the plaintiffs had
combined short selling with the conversion of floorless
convertible securities to bring about a "death spiral" in the
price of a company's common stock. See 493 F.3d at 96. The
Court stated that "purchasing a floorless convertible security
is not, by itself or when coupled with short selling, inherently
manipulative." Id. at 101. Rather, "so long as their terms are
fully disclosed, [these securities] can provide a transparent
hedge against a short sale." Id. (emphasis added).

Crane Co. v. Westinghouse Air Brake Co., cited by the Court
of Appeals in ATSI in its discussion of what constitutes market
manipulation, is also instructive. In that case, Crane Company
("Crane") sought to merge with Westinghouse Air Brake Company

("Air Brake") through a tender offer at $50. See Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 791 (2d Cir. 1969). Air Brake sought to avoid the Crane takeover attempt by merging with another company, American Standard, Inc. ('Standard'). See id. In order to push the price of Air Brake's stock above the tender offer amount, Standard purchased a substantial number of Air Brake shares in the final week leading up to the expiration date of Crane's tender offer and then sold some of those same shares off the market without announcing the sales to the public. See id. at 791-93. The Court of Appeals held that the market was distorted due to these undisclosed large open market purchases and secret off-market sales. See id. at 796. The Court stated that while "[c]oncentrated open market bidding in a takeover battle may not in itself violate present laws and regulations," Standard's conduct "in concealing from the public——and in particular from the Air Brake stockholders——the true situation as to the market it was making in Air Brake stock resulted in violations of sections 9(a)(2) and 10(b) of the Act." Id. at 793.

The Plaintiffs in the instant case have not sufficiently alleged that Merrill Lynch sent a false pricing signal to the market. The fact that Merrill Lynch could prevent failed auctions through the placement of support bids was disclosed in numerous publicly available documents. The 2006 SEC Order, for

example, highlighted that auction dealers had placed support bids to prevent failed auctions and specifically noted that the Order did not prohibit such conduct as long as it was properly disclosed. (See Kasner Decl. Ex. B at 6 n.6.)  The Order, moreover, indicated that Merrill Lynch was required to place a written description of its material auction practices and procedures on a specific page of its website accessible to the general public. (Id. at 11.)

Merrill Lynch's website disclosed "that Defendants could engage in the very conduct of which Plaintiff[s] complain[], the advantages that Defendants would have if they did engage in such conduct, the ability of such conduct to affect clearing rates and the possibility that the auctions would fail if Defendants did not intervene in them." In re Citigroup Auction Rate Sec. Litig., --- F. Supp. 2d ---, No. 08 Civ. 3095 (LTS)(FM), 2009 WL 2914370, at *7 (S.D.N.Y. Sept. 11, 2009) (dismissing similar claims against Citigroup based on the disclosure of Citigroup's material ARS practices and procedures on its website).  These disclosures negate the Plaintiffs' claims that Merrill Lynch misled the market into believing that the price of the securities and the clearing rates set by the auctions were dictated by the natural interplay of supply and demand. See Borochoff v. GlaxoSmithKline PLC, No. 07 Civ. 5574 (LLS), 2008 WL 2073421, at *8 (S.D.N.Y. May 9, 2008), aff'd 2009 WL 2591173

(2d Cir. Aug. 24, 2009) ("Allegations of defendants' intent to defraud by suppressing negative data are inconsistent with defendants' disclosure of that data on GSK's website and to the FDA. GSK disclosed its meta-analyses results to the FDA, and posted them to its website, which rebuts any intent to defraud by concealing information.")

The Plaintiffs' argument that the disclosures were insufficient is unavailing. The Plaintiffs characterize Merrill Lynch's acknowledgment that it "routinely" submitted support bids as inaccurate because Merrill Lynch "systematically" submitted support bids. (Pls. Mem. of Law 19.) This semantic distinction is not persuasive, particularly in light of the Plaintiffs' own use in the Complaint of the word "routinely" to describe Merrill Lynch's conduct. (See Compl. ¶ 44 ("Merrill used its own capital to routinely place 'support bids.'"); id. at 13 ("Merrill Routinely Intervened In Auctions to Set The Rates Of Interest Paid On ML ARS.").)

Another court in this district recently came to the same conclusion in a similar case. In Teva Pharmaceutical Industries v. Deutsche Bank AG, et al., 09-cv-6205 (AKH), the plaintiff alleged that Deutsche Bank manipulated the ARS market by, inter alia, placing support bids in every auction for which it served as a broker-dealer. (Transcript of Oral Argument ("Teva Tr.") at 22-24, Teva Pharmaceutical Industries v. Deutsche Bank AG, et

28

al., 09-cv-6205 (AKH), Mar. 23, 2010.)  Deutsche Bank had

disclosed in the private placement memorandum for the ARS that

it might buy for its own account. (Teva Tr. at 28, 30.)  The

court held that the plaintiff's allegations did not amount to

market manipulation because the disclosure informed investors

that Deutsche Bank might or might not intervene, "which meant it

might or might not affect the demand and supply for the

instruments that were being auctioned." (Teva Tr. at 33.)

Accordingly, the court dismissed the claims with prejudice.

(Teva Tr. at 34.)

        Contrary to the Plaintiffs' assertions in the instant case,

Merrill Lynch also disclosed that the lack of auction failures

was not indicative of the health of the ARS market. (See Kasner

Decl. Ex. A at 16 ("Because of these practices, [including

bidding by Merrill Lynch,] the fact that an auction clears

successfully does not mean that an investment in the securities

involves no significant liquidity or credit risk.").)  Indeed,

disclosing that Merrill Lynch might routinely intervene to

prevent failed auctions necessarily implied that there might not

be sufficient demand to support the auctions and to create

liquidity.

        Corporations are not required to phrase disclosures in

pejorative terms. See In re Donald J. Trump Casino Sec. Litig.,

7 F.3d 357, 375 (3d Cir. 1993), cert. denied, 510 U.S. 1178

(1994) ("[P]laintiffs cannot successfully contend that the
prospectus is actionable because it failed to describe its debt-
equity ratio as either 'unwarranted' or 'excessive.'").  Merrill
Lynch's website disclosed the fact that Merrill Lynch might
routinely submit support bids to prevent auction failures, that
Merrill Lynch's bidding could determine clearing rates, that
auction failures were possible "especially if . . . Merrill
Lynch were unable or unwilling to bid," and that failed auctions
could result in investors' not being able to sell any of their
securities. (Kasner Decl. Ex. A at 16, 18.)  These disclosures,
issued in the wake of the 2006 SEC Order, preclude the
Plaintiffs from pleading manipulative acts as a matter of law.

### 3.  Plaintiffs Have Failed Sufficiently to Plead Reliance

A plaintiff alleging market manipulation must plead
"reliance on an assumption of an efficient market free of
manipulation." ATSI, 493 F.3d at 101.  This reliance, moreover,
must be reasonable. First Lincoln Holdings, Inc. v. Equitable
Life Assurance Society of U.S., 43 Fed. Appx. 462, 463 (2d Cir.
2002); Harsco Corp. v. Segui, 91 F.3d 337, 342 (2d Cir. 1996).
Courts evaluate the reasonableness of a plaintiff's reliance by
analyzing the "entire context of the transaction, including
factors such as its complexity and magnitude, the sophistication
of the parties, and the content of any agreements between them."

Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343
F.3d 189, 195 (2d Cir. 2003).

Even assuming that the Defendants' conduct in this case
could be termed manipulative or deceptive, the disclosure of
that conduct prevents the Plaintiffs from sufficiently pleading
reliance on an assumption of an efficient market free of
manipulation. The Plaintiffs initially argued in their briefing
that they directly relied on the efficiency of the ARS market.
In subsequent briefing and at oral argument, the Plaintiffs
argued that reliance should be presumed.[8] For the reasons set
forth below, the Plaintiffs cannot prevail on either argument.

### a. The Plaintiffs Cannot Benefit from a Presumption of Reliance

The Plaintiffs make three arguments in support of a
presumption of reliance. First, the Plaintiffs argue that
reliance should be presumed because they have sufficiently
alleged a fraud on the market. (See Surreply Memorandum of Law
in Opposition to Defendants' Motion to Dismiss Lead Plaintiffs'
First Amended Consolidated Class Action Complaint ("Surreply")

---

[8] The change is not surprising given that plaintiffs often must
establish a presumption of reliance in order to certify a class.
See Basic Inc. v. Levinson, 485 U.S. 224, 242 (1988) ("Requiring
proof of individualized reliance from each member of the
proposed plaintiff class effectively would have prevented
respondents from proceeding with a class action [under Fed. R.
Civ. P. 23(b)(3)], since individual issues then would have
overwhelmed the common ones.").

4.)  Second, the Plaintiffs argue that reliance should be
presumed because their case is based primarily on a material
omission.  Finally, the Plaintiffs argue that reliance need not
be shown because they have alleged a "comprehensive scheme to
manipulate" that included "collateral omissions and
misrepresentations in furtherance of the scheme."  (Id. 5-6.)
These theories fail to support the application of a presumption
of reliance in this case.

### i.  Fraud on the Market

The fraud on the market theory is based on the premise that
"the market price of shares traded on well-developed markets
reflects all publicly available information, and, hence, any
material misrepresentations."  Basic Inc. v. Levinson, 485 U.S.
224, 246 (1988).  When a plaintiff alleges that "materially
misleading statements have been disseminated into an impersonal,
well-developed market for securities, the reliance of individual
plaintiffs on the integrity of the market price may be
presumed."  Id. at 247.

While the fraud on the market theory has been used
primarily for claims alleging false or misleading statements
under Rule 10b-5(b), several courts have held that the
presumption can also apply to claims of market manipulation.  See
Simpson v. AOL Time Warner Inc., 452 F.3d 1040, 1052 (9th Cir.
2006), vacated by 128 S.Ct. 1119 ("[A] plaintiff may be presumed

to have relied on this scheme to defraud if a misrepresentation, which necessarily resulted from the scheme and the defendant's conduct therein, was disseminated into an efficient market and was reflected in the market price."); Peil v. Speiser, 806 F.2d 1154, 1163 (3d Cir. 1986) ("[T]he fraud on the market theory pertains to rule 10b-5(b) claims as well as claims brought under clauses (a) and (c).") Scone Invs., L.P. v. Am. Third Market Corp., No. 97 CIV. 3802 (SAS), 1998 WL 205338, at *5 (S.D.N.Y. Apr. 28, 1998) ("The fraud on the market theory is especially applicable in the market manipulation context."). Treating misrepresentation and manipulation claims alike in this regard makes sense because both types of misconduct result in the injection of a false premise into the marketplace. See In re Genesisintermedia, Inc. Sec. Litig., No. CV 01-9024-SVW VBKX, 2007 WL 1953475, at *10 (C.D. Cal. June 28, 2007). The false premise, regardless of whether it is conveyed by a written misstatement or by manipulative misconduct, is then reflected in the price of the security.

The presumption of reliance created by the fraud on the market theory can be rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." Basic, 485 U.S. at 248. When information "credibly enter[s] the market and dissipate[s] the effects of

the misstatements," for example, the plaintiff has "no direct or indirect connection with the fraud." Id. at 248, 249; see Ganino v. Citizens Utilities Co., 228 F.3d 154, 167 (2d Cir. 2000) ("A defendant may rebut the presumption that its misrepresentations have affected the market price of its stock by showing that the truth of the matter was already known.").

Under the "truth on the market" doctrine, as this rebuttal is often called, "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market." Ganino, 228 F.3d at 167. A presumption of reliance is successfully rebutted when "the corrective information [is] conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged" misrepresentation. Id. (quoting In re Apple Computer Sec. Litig., 886 F.2d 1109, 1116 (9th Cir. 1989)). Because the truth on the market defense "is intensely fact-specific," it "is rarely an appropriate basis for dismissing a § 10(b) complaint." Id.

The fraud on the market theory can only apply when a plaintiff alleges an efficient market. While there is no set checklist for analyzing market efficiency, courts typically look at "(1) the average weekly trading volume of the [securities], (2) the number of securities analysts following and reporting on

them, (3) the extent to which market makers traded in the
[securities], (4) the issuer's eligibility to file an SEC
registration Form S-3, and (5) the demonstration of a cause and
effect relationship between unexpected, material disclosures and
changes in the [securities'] prices." Teamsters Local 445
Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 200
(2d Cir. 2008).[9]

The Plaintiffs argue that they have sufficiently pleaded an
efficient market because the Complaint alleges that ARS were
held by a wide variety of investors, (Compl. ¶ 154), the auction
market had existed since 1984, (id. ¶ 156), material information
"had a prompt and immediate effect on the market price of" ARS,
(id. ¶ 162), Merrill Lynch published research reports on ARS,
(id. ¶ 157-60), and ARS were traded at periodic auctions, (id.
¶ 34). While the Court notes that the Plaintiffs also allege
facts that draw the efficiency of the ARS market into question,[10]

---

[9] These factors, however, are designed to test market efficiency
for equity instruments; while the Plaintiffs allege that some
ARS were equity instruments, they also allege that some were
debt instruments. (See Compl. ¶ 30.) "Not only has a uniform
standard for measuring market efficiency even for stocks not
been established, but no standard at all appears to have been
established for measuring market efficiency for debt
securities." In re Enron Corp. Sec., 529 F. Supp. 2d 644, 748
(S.D. Tex. 2006).

[10] The Plaintiffs allege that Merrill Lynch "invariably placed
support bids in every auction for which it was the sole or lead
auction dealer during the Class Period to prevent auction
failures," (Compl. ¶ 49), and that these support bids allowed
Merrill Lynch to set the clearing rates for ARS, (id. ¶ 59). In

whether a market is efficient "is not a pure question of law" and normally should not be decided on a motion to dismiss. In re Initial Public Offering Sec. Litig., 241 F. Supp. 2d 281, 377 (S.D.N.Y. 2003). The Court cannot say, on the record before it, that the Plaintiffs cannot establish an efficient market.

Even if the Plaintiffs have sufficiently alleged the efficiency of the ARS market, however, they still cannot benefit from the fraud on the market presumption of reliance. An efficient market incorporates "all publicly available information." ATSI, 493 F.3d at 101 n.4 (quoting Basic, 485 U.S. at 246). Under this theory the ARS market would have incorporated the 2006 SEC Order, Merrill Lynch's website disclosure, and the prospectuses for the ARS at issue. See White v. H&R Block, Inc., No. 02 Civ. 8965 (MBM), 2004 WL 1698628, at *13 (S.D.N.Y. July 28, 2004) ("If the market absorbed all public information, then it must have absorbed all the information available from the articles published in newspapers from coast

---

other words, Plaintiffs allege that ARS clearing rates did not result from investors' acting on publicly available information, but rather from Merrill Lynch's allegedly manipulative conduct. (Id. ¶ 51.) The lack of an actual market for ARS would raise questions as to how public information was incorporated into ARS pricing. See In re Citigroup Auction Rate Sec. Litig., --- F. Supp. 2d ---, No. 08 Civ. 3095 (LTS)(FM), 2009 WL 2914370, at *7 (S.D.N.Y. Sept. 11, 2009) (noting that the plaintiffs in a similar case acknowledged that ARS did not trade in an efficient market).

to coast and the press releases and SEC filings of [the defendant].")

Combined, these materials preclude the Plaintiffs from establishing a presumption of reliance on the efficiency of the ARS market. While "[t]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint," Ganino, 228 F.3d at 167, "'rarely appropriate' is not the same as 'never appropriate.'" In re Pfizer, Inc. Sec. Litig., 538 F. Supp. 2d 621, 632 n.61 (S.D.N.Y. 2008). Here, Merrill Lynch's participation in the ARS market was revealed to the public with the degree of credibility and intensity necessary to counterbalance any misinterpretations resulting from the alleged manipulation.

First, the SEC's investigation and resulting 2006 Order, which drew the attention of several major news providers as well as smaller niche investing publications, highlighted the practice of auction dealer participation in ARS auctions and specifically stated that the Order did not prohibit support bidding when properly disclosed. (Kasner Decl. Ex. B.) "[I]n today's world it is unrealistic to argue that documents available on the SEC website are not readily accessible to the investing public." In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 373 (E.D.N.Y. 2003). The fact that broker dealers could prevent failed auctions and set clearing rates by submitting

their own bids therefore would have been incorporated into ARS
pricing either by the time the Plaintiffs purchased their ARS
or, for plaintiffs who purchased prior to the release of the SEC
Order, when clearing rates were set in subsequent auctions.

Second, the Order explicitly required Merrill Lynch to
create a specific page on its website—directed to the public—
to disclose its material ARS practices and procedures.  Merrill
Lynch's website was readily accessible to the general public.[11]
The practices and procedures document revealed the multiple
roles that Merrill Lynch played in the ARS market and warned
that "Merrill Lynch's interests in participating in th[e] market
[could] differ from [other investors]." (Kasner Decl. Ex. A
at 4.)  The document told investors that Merrill Lynch could
place bids for its own account and that if it did so "it would
likely have an advantage over other bidders because Merrill
Lynch would have knowledge of some or all of the other orders."
(Id. at 15.)  This advantage would allow Merrill Lynch to set an

---

[11] Courts have increasingly recognized the ability of the
Internet to make information easily accessible to the general
public. See, e.g., Ashcroft v. American Civil Liberties Union,
535 U.S. 564, 567 (2002) ("[A]ccess to the Internet is widely
available in homes, schools, and libraries across the
country."); Reno v. American Civil Liberties Union, 521 U.S.
844, 853 (1997) (The Internet "constitutes a vast platform from
which to address and hear from a worldwide audience of millions
of readers, viewers, researchers, and buyers."); Firth v. State,
98 N.Y.2d 365, 370 (N.Y. 2002) ("Communications accessible over
a public Web site resemble those contained in traditional mass
media, only on a far grander scale.").

auction's clearing rate.  The document also stated that Merrill
Lynch might "routinely place one or more bids . . . to prevent
an auction failure." (Id. at 16.)  Merrill Lynch warned that
"[b]ecause of these practices, the fact that an auction
clear[ed] successfully d[id] not mean that an investment in the
securities involve[d] no significant liquidity or credit risk."
(Id.)  "[A]uction failures [were] possible, especially if the
issuer's credit were to deteriorate, if a market disruption were
to occur or if, for any reason, Merrill Lynch were unable or
unwilling to bid." (Id. at 18.)

Finally, the prospectuses for the ARS held by the Lead
Plaintiffs disclosed the ability of the broker-dealer to
intervene in auctions.  The prospectus for BlackRock
MuniHoldings Fund, Inc., for example, stated that "[a] broker-
dealer may bid in an auction in order to prevent what would
otherwise be [] a failed auction" and that "[a]s a result of
bidding by broker-dealers in an auction for their own account,
the dividend rate that would apply at the auction may be higher
or lower than the rate that would have prevailed had the broker-
dealer not bid." (Kasner Decl. Ex. F at 6.)  If insufficient
demand existed in an auction, the applicable maximum rate might
result in investors' being unable to sell any of their ARS.
(Id.)  The prospectus for Nuveen Premium Income Municipal Fund,
Inc. similarly stated that "[a] Broker-Dealer may also submit

39

Orders to the Auction Agent for its own account as an Existing
Holder or Potential Holder, provided it is not an affiliate of
the Fund." (Id. Ex. G.)  The prospectus also noted that a
broker-dealer that submitted bids for its own account "might
have an advantage over other Bidders because it would have
knowledge of all Orders submitted by it in that Auction."
Prospectus, Nuveen Premium Income Municipal Fund, Inc., Series
M, available at
http://www.sec.gov/Archives/edgar/data/833251/0000950137-97-
003273.txt.

        The prospectuses, 2006 SEC Order, and Merrill Lynch's ARS
website demonstrate that "[t]he 'total mix' of available
information included the very information plaintiffs claim was
concealed." White, 2004 WL 1698628, at *13.  These sources were
widely available, easily accessible, and disclosed in detail
Merrill Lynch's ability to place support bids, the reasons it
might place support bids, the advantages it might have if it
placed support bids, and the consequences of an auction failure.
In addition to this information's wide availability, investors
would have had every reason to trust the sources: an
investigation and settlement by the SEC, Merrill Lynch itself,
and the SEC-filed prospectuses for the ARS.  Given the detail
and credibility with which the sources discussed auction-dealer
participation in ARS auctions, no reasonable investor could have

40

been misled by Merrill Lynch's alleged failure to disclose its

involvement in the ARS market. See In re Yukos Oil Co. Sec.

Litig., No. 04 Civ. 5243, 2006 WL 3026024 (WHP), at *22

(S.D.N.Y. Oct. 25, 2006) (truth conveyed to the market with

sufficient intensity and credibility where allegedly concealed

meeting was actually disclosed in two international newspaper

articles); White, 2004 WL 1698628, at *12 (truth conveyed to the

market with sufficient intensity and credibility where allegedly

concealed lawsuits were available as public filings and were the

subject of extensive press coverage); In re AIG Advisor Group

Securities Litigation, 309 Fed. Appx. 495, 498 (2d Cir. 2009)

(affirming dismissal of a complaint where the defendants'

websites "disclosed the existence of the very 'conflict of

interest' at the heart of plaintiffs' complaint, barring any

claim based thereon"). Accordingly, Plaintiffs have failed to

plead a fraud on the market and cannot benefit from that

doctrine's presumption of reliance.

## ii. **Affiliated Ute** **Presumption**

Reliance may also be presumed when a plaintiff alleges a

material omission. See Affiliated Ute Citizens v. United States,

406 U.S. 128 (1972). Under Affiliated Ute, "positive proof of

reliance is not a prerequisite to recovery" in cases "involving

primarily a failure to disclose." 406 U.S. at 153. "All that is

necessary is that the facts withheld be material in the sense

that a reasonable investor might have considered them important
in the making of this decision." Id. at 153-54.  As with the
fraud on the market theory, the presumption of reliance that
arises in this type of case is rebuttable. See Black v. Finantra
Capital, Inc., 418 F.3d 203, 209 (2d Cir. 2005).

The Plaintiffs face several hurdles in obtaining a
presumption of reliance under Affiliated Ute.  Here, the
Plaintiffs have specifically stated that they are not proceeding
under Rule 10b-5(b), which prohibits material misstatements and
omissions, but are instead proceeding under a theory of market
manipulation.  The Courts of Appeal in two other Circuits have
held that the Affiliated Ute presumption does not apply when a
plaintiff alleges a market manipulation claim, even if the claim
involves alleged omissions. See Desai v. Deutsche Bank
Securities Ltd., 573 F.3d 931, 940-41 (9th Cir. 2009); Joseph v.
Wiles, 223 F.3d 1155, 1162-63 (10th Cir. 2000). But see In re
Initial Public Offering Sec. Litig., 671 F. Supp. 2d 467, 496
(S.D.N.Y. 2009) (noting that "the Second Circuit has given no
indication that the Affiliated Ute presumption should not apply
in [market manipulation cases]" and that "Affiliated Ute itself
was a case based on manipulative conduct").

The courts that have declined to apply the presumption in
manipulation cases have been hesitant to allow "the mere fact of
[] concealment to transform [] alleged malfeasance into an

42

omission rather than an affirmative act." Joseph, 223 F.3d at 1163; see Desai, 573 F.3d at 941 ("If [] nondisclosure of a defendant's fraud was an actionable omission, then every manipulative conduct case would become an omissions case."). Applying the Affiliated Ute presumption in such cases, these courts have concluded, would risk "read[ing] the Supreme Court's case law on manipulative conduct as little more than an entertaining, but completely superfluous, intellectual exercise," Desai, 573 F.3d at 941, and would "swallow the reliance requirement almost completely," Joseph, 223 F.3d at 1163.

The Complaint in this case is based on Merrill Lynch's alleged market activity; the alleged omissions have merely "exacerbated the misleading nature of the" alleged conduct. Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc., 412 F.3d 103, 109 n.5 (2d Cir. 2005). The claims are therefore "not 'primarily' omission claims." Id.

Even assuming that the Affiliated Ute presumption applies in manipulation cases and that that this case involves "primarily omissions," however, the Plaintiffs face the same problem as with their attempt to benefit from the fraud on the market presumption. As stated above, Merrill Lynch's ability to intervene in the ARS market to prevent auction failures and to set clearing rates was fully disclosed to the market. These

43

disclosures rebut any presumption of reliance on an assumption of the efficiency of the ARS market.

### iii. Comprehensive Scheme

Finally, the Plaintiffs argue that reliance need not be shown under Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath and Horwath, 516 F.2d 811 (2d Cir. 1975), and Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374 (2d Cir. 1974). While these cases suggest that pleading reliance is not required where the defendants are accused of engaging in a "comprehensive scheme to defraud which includes not only omissions and misrepresentation, but substantial collateral conduct as well," Competitive Associates, 516 F.2d at 814, the Court of Appeals has clearly stated in a more recent opinion that reliance is a required element of a market manipulation claim. See ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 101 (2d Cir. 2007); Desai, 573 F.3d at 944 (O'Scannlain, J., concurring) (commenting that the Court of Appeals has reversed Schlick by affirming in ATSI that a plaintiff must plead reliance to state a claim for market manipulation). The Plaintiffs have not convincingly argued that reliance need not be alleged in this case.

## b. **The Plaintiffs Have Failed to Allege Direct Reliance**

Without a presumption of reliance, the Plaintiffs must establish that they directly, and reasonably, relied on an assumption of the efficiency of the ARS market. "An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth." Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc., 412 F.3d 103, 109 (2d Cir. 2005) (quoting Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020, 1032 (2d Cir. 1993)). "Under this standard, § 10(b) liability will not be imposed when an investor's conduct rises to the level of recklessness." Brown, 991 F.2d at 1032. While "no single factor is dispositive" in this determination, courts have considered:

> (1) The sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

Id.

Another court in this district recently confronted similar allegations of reliance on the efficiency of the auction rate securities market. See In re Citigroup Auction Rate Sec. Litig., --- F. Supp. 2d ---, No. 08 Civ. 3095 (LTS)(FM), 2009 WL 2914370

(S.D.N.Y. Sept. 11, 2009).  The plaintiff in Citigroup alleged
that Citigroup served as an underwriter and broker-dealer for
ARS, knew that demand for ARS did not match supply, and
consistently submitted support bids to prevent auction failures.
Id. at *2.  The plaintiff allegedly purchased ARS "believing
that the auction process was occurring as intended" and unaware
that Citigroup was increasingly intervening in auctions. Id.

The court held that the plaintiff had failed to provide a
specific basis for his belief in the integrity of the ARS market
and, moreover, that any reliance was unreasonable in light of
the disclosure of Citigroup's conduct. Id.  "The 2006 SEC Order,
[p]laintiff's trade confirmations and language from the
Citigroup Smith Barney website incorporated by reference
therein, and the official statements issued in connection with
ARS specifically enumerated in the Complaint," the court noted,
"all disclosed that [d]efendants could engage in the very
conduct of which [p]laintiff complains, the advantages that
[d]efendants would have if they did engage in such conduct, the
ability of such conduct to affect clearing rates and the
possibility that the auctions would fail if [d]efendants did not
intervene in them." Id. at *7.  When combined with the
plaintiff's failure specifically to allege a basis for his
belief in the integrity of the ARS market, Citigroup's

disclosures were "fatal to his claim for market manipulation."
Id.

### i.  Sufficiency of the Pleadings

The Plaintiffs in the instant case similarly fail to plead
facts sufficient to demonstrate the basis for their belief in
the efficiency of the ARS market.  The Plaintiffs allege
that Merrill Lynch ARS were widely held among numerous classes
of investors, (Compl. ¶ 154), that the designation of ARS as
"auction rate" implied that the securities were traded on an
arm's-length basis, (id. ¶ 155), that the ARS market had existed
since 1984 and had developed rapidly since then, (id. ¶ 156-58),
that Merrill Lynch touted the longevity, durability, liquidity,
and safety of ARS in research reports, (id. ¶¶ 157-62), that
research reports caused a run on, and then the stabilization of,
the ARS market, (id. ¶ 162), and that Merrill Lynch financial
advisors misrepresented ARS as highly liquid, safe investments,
(id. ¶ 53).

Several of these allegations are clearly deficient.  The
Plaintiffs do not allege that they read the research reports
cited in the Complaint and therefore cannot use the reports to
establish direct reliance. See Adler v. Berg Harmon Assocs., 816
F. Supp. 919, 926 (S.D.N.Y. 1993).  Similarly, the Plaintiffs
cannot rely on statements made by Merrill Lynch financial
advisors because the Plaintiffs were not Merrill Lynch

customers. See Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005) ("Plaintiffs do not claim to have read Merrill's reports, or to have bought 24/7 Media or Interliant securities through the Firm; instead, they rely on the fraud-on-the-market presumption.").

   The remaining allegations of reliance do not pass muster. As the court noted in Citigroup, alleging that class members believed that the "auction process" was occurring as intended is simply conclusory. Citigroup, 2009 WL 2914370, at *7. The remaining allegations——that the ARS market had existed since 1984 and that Merrill Lynch ARS were held by a variety of investors——do not provide a sufficient basis for the Plaintiffs' belief that the ARS market was efficient and free of manipulation. The market's longevity and investor base do not indicate that Merrill Lynch was not submitting support bids; indeed, Plaintiffs allege that the market survived for as long as it did only because Merrill Lynch intervened. Moreover, the Plaintiffs do not allege that they were actually aware of either fact at the time they purchased ARS or when subsequent auctions were held. The lack of specificity in the Plaintiffs' allegations prevents the Court from finding that they have raised "a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

The Plaintiffs' allegations suffer from another defect.  As will be discussed below, the Plaintiffs cannot establish reasonable reliance if, through minimal diligence, they should have discovered Merrill Lynch's market activity.  At oral argument, Plaintiffs' counsel asserted that the Plaintiffs would not have known that Merrill Lynch was the broker-dealer for their ARS. (Oral Argument Transcript ("Tr.") at 31:18-24, In re Merrill Lynch Auction Rate Sec. Litig., 08-cv-3037, Mar. 25, 2010.)  If the Plaintiffs did not know that Merrill Lynch was their broker-dealer, then the allegation of reliance on the fact that Merrill Lynch-brokered ARS were held by a wide spectrum of investors is neither plausible nor relevant.[12]

### ii. Justifiable Reliance

Even assuming that the Plaintiffs' allegations are sufficient to form a basis for their alleged reliance on an

---

[12] Plaintiffs' alleged lack of knowledge about Merrill Lynch's role as broker-dealer raises another pleading issue. Because of the fractured nature of ARS—with various broker-dealers running unique auctions for different securities—it is not entirely clear whether Plaintiffs must allege reliance on an assumption of the efficiency of the narrow market for Merrill Lynch-brokered ARS or the wider market for all ARS traded through all broker-dealers.  If the market is the narrower one, then the Plaintiffs' position would seem to prevent them from pleading any basis for reliance.  In other words, the Plaintiffs cannot plead that they assumed that Merrill Lynch ran an efficient ARS market if they never knew that Merrill Lynch was the broker-dealer. As explained in the following section, if the market is the wider market, the Plaintiffs cannot allege justifiable reliance because the general fact of broker-dealer intervention was disclosed to the market.

assumption of the ARS market's integrity, however, the disclosures contained in the research reports, prospectuses, 2006 SEC Order, and Merrill Lynch ARS website render any reliance unjustifiable.

The Merrill Lynch research reports, for example, would not help the Plaintiffs even if they had read them.  The Plaintiffs argue that these reports "touted the longevity and durability of auction rate securities" and reassured investors that "failed auctions [were] extremely rare." (Compl. ¶¶ 157-61.)  The Plaintiffs fail to acknowledge, however, that these reports also stated that part of the reason for this strength was auction dealer participation.  An August 22, 2007, report, for example, stated that

> Each auction program has at least one broker dealer associated with it.  The liquidity is enhanced by the broker dealer's market making activities.  Typically, the broker acts in a principal capacity as it conducts its market support activities, although it is only contractually obligated to act as an agent.

(Kasner Decl. Ex. D at 2.)  This exact same statement was repeated in a December 6 research report. (Id. Ex. H.)  A January 28, 2008, Closed-End Funds ("CEF") research report stated that "a failed auction has historically been quite rare as it pertains to CEFs" because "[t]ypically a broker/dealer assists in creating an orderly market by committing its own capital." (Id. Ex. E.)  A February 8, 2008, research report

likewise stated that "No broker dealer is going to guarantee
that it will always be making markets in auction securities no
matter what the environment looks like." (Id. Ex. L at 4.)

The prospectuses for the ARS at issue, the 2006 SEC Order,
and the Merrill Lynch ARS website also render reliance
unjustifiable.  Plaintiffs correctly note that the securities
laws were "not designed to shield perpetrators of fraud by
forcing investors to conduct exhaustive research every time they
invest money, lest the seller be manipulative or deceptive."
Alexander v. Evans, No. 88 Civ. 5309, 1993 WL 427409, at *17
(S.D.N.Y. Oct. 15, 1993).  Unlike Merrill Lynch's customers,
Plaintiffs purchased their securities from E*Trade and Wells
Fargo and did not receive confirmation slips directing them to
Merrill Lynch's ARS website. (Compl. ¶¶ 11-13, 36, 174.)
Moreover, the Plaintiffs asserted at oral argument that they
could not have known that Merrill Lynch was the broker-dealer
for their ARS at the time of purchase and that discovery of that
fact would have required extensive investigation. (Tr. at
32:2-4.)

However, the fact that broker-dealers had historically made
the ARS market—and the fact that they could continue to do so
for the ARS held by Plaintiffs—did not require exhaustive
research to uncover.  Courts frequently place reasonable
investors on notice of SEC filings. See Menowitz v. Brown, 991

F.2d 36, 42 (2d Cir. 1993); Ubuy Holdings, Inc. v. Gladstone,
340 F. Supp. 2d 1343, 1348 (S.D. Fla. 2004) (finding that an SEC
Order triggered a duty to investigate the possibility of fraud);
Bibeault v. Advanced Health Corp., No. 97 Civ. 6026 (RJW), 1999
WL 301691, at *5 (S.D.N.Y. May 12, 1999) ("[I]gnorance of [a]
document's availability on the SEC internet website do[es] not
exempt [a plaintiff] from the expectation that the average
investor of ordinary intelligence can acquire materials that are
a matter of public record."). Indeed, the prospectus is "the
single most important document and perhaps the primary resource
an investor should consult in seeking [] information." Brown v.
E.F. Hutton Group, Inc., 991 F.2d 1020, 1032 (2d Cir. 1993).
The Plaintiffs could have, with minimal diligence, read the
prospectuses for the ARS they purchased. As noted above, the
prospectuses revealed that the broker-dealer could bid for its
own account and that it would enjoy certain advantages if it did
so. (See Kasner Decl. Ex. F at 6, Ex. G at 33.) The
MuniHoldings Fund prospectus, moreover, stated that the broker-
dealer could bid to prevent failed auctions and to determine
clearing rates. (Id. Ex. F at 6, 10.)

The Plaintiffs also could have accessed the 2006 SEC Order
with minimal diligence. The Plaintiffs in fact rely on the 2006
SEC Order elsewhere in their briefing to argue that they were
not on inquiry notice of Merrill Lynch's alleged fraud. (Pls.

Mem. of Law 42-43.)  The SEC's investigation leading up to the
Order was publicized in numerous periodicals. (See Kasner Decl.
Exs. M-V.)  The investigation was also revealed directly in the
prospectus to holders of MuniHoldings Fund ARS. (Id. Ex. F at 6,
10.)  The resulting 2006 SEC Order disclosed that broker-dealers
had bid for their own accounts to prevent failed auctions and to
set clearing rates. (Id. Ex. B at 6.)  The Order also stated
that such activity was not prohibited as long as it was properly
disclosed. (Id. at 6 n.6.)  Taken together, the prospectuses and
the 2006 SEC Order would have revealed to a minimally diligent
investor the fact that broker-dealers had prevented failed
auctions in the past and could intervene in future auctions for
the ARS they owned.  Given this information, the Plaintiffs'
assertion that they assumed that the ARS market was efficient
and free of manipulation is unjustifiable.

Finally, Merrill Lynch's role as broker-dealer did not
require exhaustive research to uncover for at least some of the
Plaintiffs.  The prospectus for the MuniHoldings Fund noted that
Merrill Lynch had "advised the Fund that it and various other
broker-dealers and other firms that participate[d] in the
auction rate securities market" were voluntarily participating
in the SEC's investigation regarding Merrill Lynch's "practices
and procedures in that market." (Id. Ex. F. at 6.)  Failure to
take the minimal steps necessary to access the Merrill Lynch

website created in the wake of that investigation, and
referenced in the 2006 SEC Order, renders reliance for those
Plaintiffs unjustifiable.

In sum, Merrill Lynch's participation in the ARS market was
disclosed in several sources that were widely available and
easily accessible to the Plaintiffs.  The Plaintiffs do not
allege the existence of a longstanding business relationship or
a fiduciary relationship with Merrill Lynch.  The Plaintiffs
also do not allege that Merrill Lynch or any other entity
initiated their purchases of ARS.  Rather, the Plaintiffs took
the opportunity to purchase ARS on their own initiative without
availing themselves of the opportunity to detect the alleged
fraud.  The disclosures discussed above highlighted that broker-
dealers such as Merrill Lynch could submit bids for their own
accounts to prevent failed auctions and to determine clearing
rates.  "[A]bsent specific allegations of the basis for
Plaintiff[s'] incorrect assumptions about the ARS market and the
reasonableness of the alleged reliance in the face of such
disclosure, Plaintiff[s'] market manipulation claim must be
dismissed."  Citigroup, 2009 WL 2914370, at *8.

## B.  The Plaintiffs Have Failed to State a Claim for Control Person Liability under Section 20(a)

The Plaintiffs allege a claim against Merrill Lynch & Co.
as a controlling person of Merrill Lynch in Count II of the

Complaint. (Compl. ¶¶ 219-26.)  A claim for control person liability under Section 20(a) of the Exchange Act "is necessarily predicated on a primary violation of securities law." Rombach v. Chang, 355 F.3d 164, 177 (2d Cir. 2004). Accordingly, dismissal of Count I of the Complaint requires dismissal of Count II as well. Id.

## IV. Conclusion

For the reasons set forth above, the Defendants' motion to dismiss the Complaint [dkt. no. 51.] is GRANTED.  Prior to the filing of the motion to dismiss, Plaintiffs were given the opportunity to correct deficiencies pointed out by Defendants. Plaintiffs availed themselves of this opportunity prior to serving the First Amended Consolidated Class Action Complaint with the understanding that no further amendments would be permitted.  In addition, the grounds for dismissal set forth above demonstrate that further amendment would be futile. Accordingly, the dismissal is with prejudice.

The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED:

DATED:     New York, New York
           March 31, 2010

_Loretta A. Presca_
LORETTA A. PRESKA, Chief U.S.D.J.