UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

| | |
|---|---|
| IN RE MERRILL LYNCH | : Master Case File |
| AUCTION RATE SECURITIES LITIGATION | : No. 09 MD 2030 (LAP) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

This Document Relates to
No. 09 Civ. 9887 (LAP)

LOUISIANA PACIFIC CORPORATION,

                     Plaintiff,

           v.

MONEY MARKET 1 INSTITUTIONAL
INVESTMENT DEALER; MERRILL LYNCH &
CO., INC.; MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED; and DEUTSCHE BANK
SECURITIES INC.,

                     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF DEFENDANTS MERRILL LYNCH & CO., INC. AND MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED TO DISMISS THE FIRST AMENDED COMPLAINT

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York  10019
(212) 839-5300

*Attorneys for Defendants Merrill Lynch
& Co., Inc. and Merrill Lynch, Pierce,
Fenner & Smith Incorporated*

# **TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ...................................................................................................................... 4

      A.  Auction Rate Securities ..................................................................................... 4

      B.  Merrill Lynch's Role as Placement Agent for Numerous ARS ...................................... 4

      C.  Merrill Lynch's Role as Broker-Dealer in the Auctions of Merrill ARS ..................... 6

      D.  The 2006 SEC Order ....................................................................................... 7

      E.  Merrill Lynch's Published "Auction Rate Securities Practices and Procedures" .......... 8

      F.  Plaintiff's ARS Investments ................................................................................. 9

      G.  Auction Failures ................................................................................................. 9

      H.  Louisiana Pacific's Claims ............................................................................... 10

ARGUMENT ......................................................................................................................... 11

I.     PLAINTIFF FAILS TO STATE A
      SECTION 10(b) CLAIM AGAINST MERRILL LYNCH ............................................. 12

      A.  Merrill Lynch's Conduct Was Lawful and Disclosed .................................................. 12

      B.  Plaintiff Fails to Plead a Misrepresentation or Manipulation Claim ........................... 17

          1.  The Amended Complaint Fails Adequately
             to Allege an Actionable Misstatement or Omission .............................................. 18

          2.  The Amended Complaint Fails Adequately to Allege Manipulation .................... 24

          3.  The Amended Complaint Fails Adequately to Allege Scienter ........................... 26

          4.  The Amended Complaint Fails Adequately to Allege Reliance ........................... 29

          5.  The Amended Complaint Fails Adequately to Plead Loss Causation ................... 32

6.  Plaintiff Has Not Alleged an Economic Loss...........................................................34

II.   PLAINTIFF FAILS TO STATE A
      SECTION 20(a) CLAIM AGAINST ML & CO................................................................35

III.  PLAINTIFF FAILS TO STATE A CALIFORNIA CORPORATE
      SECURITIES LAW CLAIM AGAINST MERRILL LYNCH.........................................35

IV.   PLAINTIFF FAILS TO PLEAD A
      COMMON LAW FRAUD CLAIM AGAINST MERRILL LYNCH .............................38

CONCLUSION ..............................................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Alameda v. Nuveen Mun. High Income Opportunity Fund,
   No. C 08-4575 SI, 2009 WL 1424529 (N.D. Cal. May 20, 2009) ..........................................38

Ashland Inc. v. Morgan Stanley & Co., Inc.,
   No. 09 CV 5415 (RPP), 2010 WL 1253932 (S.D.N.Y. Mar. 30, 2010)...................................32

Ashland Inc. v. Oppenheimer & Co.,
   No. 09-135-JBC, 2010 WL 672106 (E.D. Ky. Feb. 22, 2010).................................................29

Atlantic Mut. Ins. Co. v. Balfour MacLaine Int'l, Ltd.,
   968 F.2d 196 (2d Cir. 1992) ...................................................................................................12

ATSI Commc'ns Inc. v. Shaar Fund, Ltd.,
   493 F.3d 87 (2d Cir. 2007) ...............................................................................12, 18, 25-26

Bell Atlantic Corp. v. Twombly,
   127 S. Ct. 1955 (2007)........................................................................................................11-12

Boguslavsky v. Kaplan,
   159 F.3d 715 (2d Cir. 1998) ...................................................................................................35

Bui v. Indus. Enters. of Am., Inc.,
   594 F. Supp. 2d 364 (S.D.N.Y. 2009) ....................................................................................38

California Amplifier, Inc. v. RLI Ins. Co.,
   113 Cal. Rptr. 2d 915 (Cal. Ct. App. 2d Dist. 2001)..............................................................37

Churchill Village, LLC v. General Elec. Co.,
   169 F. Supp. 2d 1119 (N.D. Cal. 2000)..................................................................................36

Davidoff v. Farina,
   No. 04-7617, 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005) ..................................................29

Defer LP v. Raymond James Fin., Inc.,
   654 F. Supp. 2d 204 (S.D.N.Y. 2009) ................................................................................27-28

Dent v. U.S.T.A.,
   No. CV-08-1533 (RJD)(VVP), 2008 WL 2483288 (E.D.N.Y. June 17, 2008) ......................24

Desiano v. Warner-Lambert & Co.,
   467 F.3d 85 (2d Cir. 2007), aff'd, 552 U.S. 440 (2008)........................................................11

Diamond Multimedia Sys., Inc. v. Sup. Court,
   19 Cal. 4th 1036 (1999) ..................................................................................... 36

Dura Pharms., Inc. v. Broudo,
   544 U.S. 336 (2005) ....................................................................................... 33-34

Gil v. Bank of Am., Nat. Ass'n,
   138 Cal. App. 4th 1371 (Cal. Ct. App. 2d Dist. 2006) ......................................... 38

Grieves v. Sup. Court,
   157 Cal. App. 3d 159 (Cal. Ct. App. 4th Dist. 1984) ........................................... 35

Halperin v. eBanker USA.com, Inc.,
   295 F.3d 352 (2d Cir. 2002) .......................................................................... 23-24

Healthcare Fin. Group, Inc. v. Bank Leumi USA,
   669 F. Supp. 2d 344 (S.D.N.Y. 2009) ................................................................. 33

In re Bristol-Myers Squibb Sec. Litig.,
   312 F. Supp. 2d 549 (S.D.N.Y. 2004) ................................................................. 28

In re Citigroup Auction Rate Sec. Litig.,
   No. 08 Civ. 3095 (LTS), 2009 WL 2914370 (S.D.N.Y. Sept. 11, 2009) ........................ *passim*

In re Hyperion Sec. Litig.,
   No. 93 Civ. 7179 (MBM), 1995 WL 422480 (S.D.N.Y. July 14, 1995) ................................ 31

In re Livent, Inc. Noteholders Sec. Litig.,
   151 F. Supp. 2d 371 (S.D.N.Y. 2001) ................................................................. 12

In re Loral Space & Comm'ns Ltd. Sec. Litig.,
   No. 01 Civ. 4388 (JGK), 2004 WL 376442 (S.D.N.Y. Feb. 27, 2004) ...................... 28

In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,
   218 F.R.D. 76 (S.D.N.Y. 2003) .......................................................................... 24

In re Merrill Lynch Auction Rate Sec. Litig.,
   No. 08 Civ. 3037 (LAP), 2010 WL 1257597 (S.D.N.Y. Mar. 31, 2010) (Preska, J.) ...... *passim*

In re Omnicom Group, Inc. Sec. Litig.,
   541 F. Supp. 2d 546 (S.D.N.Y. 2008) ................................................................. 33

In re PXRE Group, Ltd., Sec. Litig.,
   600 F. Supp. 2d 510 (S.D.N.Y. 2009) ............................................................. 27-28

Kainos Labs., Inc. v. Beacon Diagnostics, Inc.,
   No. C-97-4618 MHP, 1998 WL 2016634 (N.D. Cal. Sept. 14, 1998) ...................... 37

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001) ........................................................... 28

Kemp v. Universal Am. Fin. Corp.,
   No. 05 CIV. 9883 (JFK), 2007 WL 86942 (S.D.N.Y. Jan. 10, 2007) .....................................23

Ladmen Partners, Inc. v. Globalstar, Inc.,
   No. 07 Civ. 0976 (LAP), 2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008) (Preska, J.).............23

Lentell v. Merrill Lynch & Co.,
   396 F.3d 161 (2d Cir. 2005) .....................................................................................12, 33-34

LNC Investments, Inc. v. First Fidelity Bank,
   No. 92 Civ. 7584 (MBM), 1997 WL 528283 (S.D.N.Y. Aug. 27, 1997) ..............................35

Luce v. Edelstein,
   802 F.2d 49 (2d Cir. 1986) .................................................................................................19

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,
   547 U.S. 71 (2006) .............................................................................................................18

Mishkin v. Ageloff,
   No. 97 Civ. 2690, 1998 WL 651065 (S.D.N.Y. Sept. 23, 1998) (Preska, J.).........................35

N.Y.C. Employees' Ret. Sys. v. S.E.C.,
   45 F.3d 7 (2d Cir. 1995) .....................................................................................................22

Norwest Mortgage, Inc. v. Sup. Court,
   72 Cal. App. 4th 214 (Cal. Ct. App. 4th 1999).......................................................................36

Priest v. Global Furniture, Inc.,
   No. 1:05CV165, 2006 WL 752594 (E.D. Tenn. Mar. 23, 2006).............................................38

Rombach v. Chang,
   355 F. 3d 164 (2d Cir. 2004) .......................................................................................19, 35

Santa Fe Indus. v. Green,
   430 U.S. 462 (1977) ...........................................................................................................20

Shah v. Meeker,
   435 F.3d 244 (2d Cir. 2006) ...............................................................................................35

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,
   128 S.Ct. 761 (2008).........................................................................................................17

Teamsters Allied Benefits Funds v. McGraw,
   No 09 Civ. 140 (PGG), 2010 WL 882883, (S.D.N.Y. Mar. 11, 2010) ...................................29

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,
   531 F.3d 190 (2d Cir. 2008) ...............................................................................................28

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    127 S. Ct. 2499 (2007)..........................................................................................12, 26, 29

Teva Pharmaceutical Indus. v. Deutsche Bank AG, et al.,
    09-cv-6205 (AKH), Tr. (S.D.N.Y. Mar. 23, 2010) ......................................................21, 23, 31

Wentner v. Ridgewood Energy Corp.,
    62 F.3d 1427 (9th Cir. 1995) ........................................................................................36

**STATUTES AND RULES**

28 U.S.C. § 1658(b)....................................................................................................35

62 F.R. 520-01 (Jan. 3, 1997)..............................................................................13, 25

Cal. Corp. Code §§ 25400, 25401, 25500, 25501, 25504 .........................................36-38

Fed. R. Civ. Proc. 9(b)...............................................................................12, 18-19, 36

Fed. R. Civ. Proc. 12(f) ..............................................................................................24

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) ..............................*passim*

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ..........................*passim*

Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2) .........................................37

**SECONDARY AUTHORITY**

Harold Marsh, Jr. & Robert H. Volk,
    Practice Under the Calif. Sec. Laws, § 14.05[2][d] (2008) ......................................................37

Defendants Merrill Lynch & Co., Inc. ("ML & Co.") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") respectfully submit this memorandum of law in support of their motion to dismiss the First Amended Complaint (the "Amended Complaint" or "FAC") pursuant to Rules 9(b), 12(b)(6), and 12(f) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiff Louisiana Pacific Corporation ("Louisiana Pacific" or "Plaintiff") is a leading manufacturer of building materials with more than a billion dollars in annual sales, and is a sophisticated investor that, since at least 2004, purchased hundreds of millions of dollars worth of auction rate securities ("ARS") from its "broker-dealer and trusted financial advisor," defendant Money Market 1 Institutional Investment Dealer ("MM1"). (FAC ¶ 2.) Merrill Lynch served as the placement agent in 2003 and 2004 for the initial offering of six of the ARS that Louisiana Pacific purchased through MM1 years later, in 2007. This action arises from Louisiana Pacific's claim that it suffered damages as a result of its purchase of "high risk securities unsuitable to [its] conservative investment needs." (Id. ¶ 5.)

Louisiana Pacific alleges that, in contradiction to Merrill Lynch's comprehensive disclosures that described in clear terms how the ARS auctions would work and the risks attendant thereto, MM1 told the senior-most financial officials at Louisiana Pacific that there were no liquidity risks in its ARS investments. Louisiana Pacific had no communications of any kind with Merrill Lynch. Nonetheless, apparently looking to add another "deep pocket" to its lawsuit, Louisiana Pacific also claims that Merrill Lynch made false and misleading statements that Merrill Lynch "may" support some, but not all, ARS auctions and then manipulated the ARS market by making support bids in all auctions, which supposedly gave the appearance that the ARS market was fully liquid. In other words, Plaintiff alleges that it was defrauded by Merrill

Lynch -- notwithstanding its lack of *any* direct dealings with Merrill Lynch -- because it was unable to discern from Merrill Lynch's disclosures the nature of Merrill Lynch's participation in the auctions and that its ARS investments had any liquidity risk. These types of allegations have recently been rejected by this Court and others in this District. They fail to state a claim, and the Amended Complaint should be dismissed with prejudice.

Indeed, as this Court recently recognized in In re Merrill Lynch Auction Rate Securities Litigation, No. 08 Civ. 3037 (LAP), 2010 WL 1257597 (S.D.N.Y. Mar. 31, 2010) (Preska, J.) (hereafter, "Merrill Lynch ARS Litig."), numerous "widely available" and "easily accessible" disclosures expressly and repeatedly explained that Merrill Lynch "routinely" (as opposed to periodically) provided support bids in the ARS auctions, but that it was under no obligation to continue doing so. These statements specifically warned investors that auctions could fail in the absence of bids by Merrill Lynch and, in the event of an auction failure, investors may not be able to sell their ARS until maturity. Id. at *12, 16.[1]  This conclusion is even more compelling with respect to ARS like those at issue in this action, which were available only to sophisticated investors (like Louisiana Pacific) who, by purchasing those securities, were deemed to have represented their understanding of the attributes and risks associated with ARS, including liquidity risk.

Unable to allege facts to support a claim of misrepresentation, omission or manipulation by Merrill Lynch, Louisiana Pacific instead claims that MM1 made statements that contradicted Merrill Lynch's disclosures and, using sound bites from Merrill Lynch's disclosures, Louisiana Pacific conclusorily contends that those disclosures were inadequate and that Merrill Lynch was

---

[1] Louisiana Pacific apparently was within the definition of the putative, but never certified, class at issue in Merrill Lynch ARS Litig.

motivated to perpetuate a fraud in order to increase its fees. As with the similar allegations found by this Court to be deficient in <u>Merrill Lynch ARS Litig.</u>, this falls far short of the particularized pleading requirements of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

- <u>First</u>, Merrill Lynch's conduct was lawful and fully disclosed to the market and, thus, it cannot form the basis of a securities fraud claim, whether couched in terms of misrepresentations and omissions or manipulation. Merrill Lynch's *complete* statements fully rebut any claim that Louisiana Pacific or the market in general could have been misled about the operation of the auctions, Merrill Lynch's role, and the specific risks of auction failure and illiquidity. <u>See</u> Points I.A to I.B.2.

- <u>Second</u>, Louisiana Pacific's allegations do not approach the "strong inference of scienter" required to support its claim. Louisiana Pacific simply alleges that Merrill Lynch was motivated to generate fees, which courts in this District routinely reject as insufficient to plead scienter. <u>See</u> Point I.B.3.

- <u>Third</u>, Plaintiff concedes that it had no contact with Merrill Lynch regarding its ARS investments and relied exclusively on its broker, MM1. Because Louisiana Pacific does not allege that it reasonably relied upon any of the claimed misrepresentations or omissions -- or ever read or even was aware of any of Merrill Lynch's disclosures -- the required element of justifiable reliance is lacking. <u>See</u> Point I.B.4.

- <u>Fourth</u>, Louisiana Pacific does not (and cannot) allege the requisite element of loss causation, as the Amended Complaint and the public statements upon which it relies make clear that Louisiana Pacific's losses, if any, are attributable directly to previously disclosed liquidity risks. In any event, Louisiana Pacific fails to plead a legally cognizable theory of damages. <u>See</u> Points I.B.5 & I.B.6.

- <u>Fifth</u>, because Louisiana Pacific fails to plead an underlying violation of Section 10(b), its claim for violation of Section 20(a) necessarily fails as well. <u>See</u> Point II.

- <u>Sixth</u>, Louisiana Pacific may not assert claims for violations of the California Corporate Securities Law because it does not allege that Merrill Lynch caused any harm to it in California and, in any event, those claims are otherwise deficiently pled. Likewise, Louisiana Pacific fails to plead a common law fraud claim against Merrill Lynch for the same reasons that its Section 10(b) claim fails. <u>See</u> Points III & IV.

For all of these reasons, the Amended Complaint should be dismissed with prejudice.

## BACKGROUND[2]

### A.   Auction Rate Securities

Auction rate securities generally are equity or debt instruments that have perpetual or long-term maturities and pay interest or dividends at rates set through periodic Dutch auctions. (FAC ¶ 21.)  As explained in the offering materials for each of the securities at issue in this matter, current and prospective ARS investors submit bids through a broker-dealer and, based on those bids, the auction agent then seeks to fill buy orders at the lowest interest rate at which all available securities would be purchased or held (the "clearing rate").  (Id. ¶¶ 23-25.)  In the event there are more sell orders than buy orders, the auction "fails," causing the interest rate to increase to the contractual "fail rate" until the next successful auction, and requiring a current holder of the securities to retain ownership until a subsequent, successful auction, maturity, or it locates a willing buyer in the secondary market.  (Id. ¶ 26.)  An auction failure is not a default.  (Id. ¶ 149.)

### B.   Merrill Lynch's Role as Placement Agent for Numerous ARS

Merrill Lynch served as placement agent[3] in private offerings of a variety of ARS, including the six at issue in this matter.  These ARS could be purchased only by "Qualified Purchasers," as defined by the Investment Company Act of 1940, meaning that such purchasers (including Louisiana Pacific) are presumptively financially sophisticated.  (Id. ¶¶ 56, 137.)[4]  As a

---

[2] The Background is drawn from the allegations of the Amended Complaint (assumed to be true for purposes of this motion), documents referenced therein, Louisiana Pacific's SEC filings, and other matters of which the Court may take judicial notice on this motion to dismiss.  See, e.g., Merrill Lynch ARS Litig. at *4 n.4, 5 n.5.  In addition, citations in the form of "Ex. _" refer to judicially noticeable exhibits attached to the accompanying Declaration of Andrew W. Stern.

[3] The Offering Materials refer to Merrill Lynch's underwriting role as that of placement agent or initial purchaser and, as those terms are similarly defined, we use placement agent herein.

[4] See also Exs. A at i, 9, 122-24 (Alesco I Offering Circular); B at i, 9, 120-22 (Alesco II

*(Footnote cont.)*

means of distributing those securities, Merrill Lynch sold the ARS to eligible investors, including non-Merrill Lynch brokers-dealers (such as MM1), who then sold those securities to their eligible customers.[5]  (FAC ¶ 50.)  Among the ARS for which Merrill Lynch served as placement agent were ARS that were structured as tranches of collateralized debt obligations ("CDOs").  (Id. ¶ 27.)[6]

At issue here are the ARS tranches from six CDOs for which Merrill Lynch served as placement agent in 2003 and in 2004 (collectively, the "Merrill ARS").  All six were purchased by Louisiana Pacific in 2007:

- Alesco Preferred Funding I, Ltd. ("Alesco I"): issued in September 2003 and designed to mature in 2033; purchased by Louisiana Pacific in July 2007;
- Alesco Preferred Funding II, Ltd. ("Alesco II"): issued in December 2003 and designed to mature in 2034; purchased by Louisiana Pacific in July 2007;
- Lakeside CDO I, Ltd. ("Lakeside I"): issued in December 2003 and designed to mature in 2039; purchased by Louisiana Pacific in May and June 2007;
- Lakeside CDO II, Ltd. ("Lakeside II"): issued in March 2004 and designed to mature in 2040; purchased by Louisiana Pacific in April 2007;
- South Coast Funding V, Ltd. ("South Coast"): issued in July 2004 and designed to mature in 2039; purchased by Louisiana Pacific in February 2007; and
- Cascade Funding CDO I, Ltd. ("Cascade"): issued in July 2004 and designed to mature in 2042; purchased by Louisiana Pacific in June 2007.

---

Offering Circular); C at i, 9, 118-20 (Lakeside I Offering Circular); D at i, 10-11, 134-36 (Lakeside II Offering Circular); E at cover page, 12, 159-61(South Coast Offering Circular); F at i, 16-17, 209-12 (Cascade Offering Circular); G at 7 (Alesco I Offering Supp.); H at 7 (Alesco II Offering Supp.); I at 22 (Lakeside I Offering Supp.); J at 9 (Lakeside II Offering Supp.); K at 7 (South Coast Offering Supp.); L at 10 (Cascade Offering Supp.).

[5] See id.

[6] CDOs are a form of structured asset backed securities ("ABS"), whereby the issuer of the CDO raises money by selling various classes of notes, with each class typically having a different credit rating and interest rate.  (FAC ¶ 46.)  "The issuer of the CDO typically uses the proceeds from the sale of the notes to acquire various types of" ABS and cash flows from those underlying securities then are paid out to the various tranches pursuant to a waterfall set out in the offering documents.  (Id.)

(Id. ¶¶ 58-64, 140.)[7]

C.     **Merrill Lynch's Role as Broker-Dealer in the Auctions of Merrill ARS**

Each of the Merrill ARS were issued only to sophisticated investors pursuant to Offering

Circulars and Supplements to the Offering Circular (the "Offering Supplements," and with the

Offering Circulars, the "Offering Materials"), the latter of which incorporated the corresponding

Offering Circular and singularly addressed attributes and risks associated with the ARS.  (FAC

¶¶ 56, 66, 68-69.)  For example, the Offering Supplements explained that Merrill Lynch would

act as a broker-dealer in the ARS auctions, making it responsible for receiving purchase bids, as

well as sell and hold orders, from current and prospective investors, and then transmitting such

bids and orders to the auction agent -- which was *not* affiliated with Merrill Lynch.  (Id. ¶ 66.)[8]

Prospective investors also were told that, in connection with ARS auctions, Merrill Lynch was

permitted (but not required) to take steps "to encourage bidding and to determine the level of

interest in the market," including "submit[ting] Orders and purchas[ing] [ARS] for [its] own

account, either in an Auction or otherwise."[9]  In this regard, "[a]s a condition to purchasing"

these ARS, purchasers were deemed to be making a number of acknowledgements, including

"that the Broker-Dealers that participate in an Auction may purchase [ARS] and submit orders in

Auctions for their own account and that, because all orders must be submitted through Broker-

---

[7] See also Exs. A at i; B at i; C at i; D at i; E at cover page; F at i; G at i; H at i; I at i; J at i; K at i; L at i.

[8] See also Exs. G at 5, 9-11, 21; H at 5, 9-11, 21; I at 4-7; J at 5, 11-13, 23; K at 5, 9-11; L at 7, 12-14.

[9] Exs. G at 5; H at 5; I at 4; J at 4; K at 5; L at 7; see also Exs. A at vii, 14, 129 (same); B at xiii, 15, 127 (same); C at viii, 14, 122 (same); D at viii, 16, 138 (same); E at 19, 76, 161 (same); F at x, 24, 215 (same).  Moreover, potential investors in the Alesco I and II ARS also were informed that Merrill Lynch's participation in the auctions presented a conflict of interest because it "may impact the Applicable Rate established pursuant to the Auction Procedures."  (Exs. G & H at 16.)

Dealers, such Broker-Dealers may have knowledge of orders placed through them in any such Auction."[10]

Prospective investors also were informed that these securities would have "limited liquidity" and that "a purchaser must be prepared to hold the Securities for an indefinite period of time or until the maturity or early redemption thereof."[11]  Likewise, investors were informed that, in the event of an auction failure, existing holders of ARS "will not be able to sell all, and may not be able to sell any, [ARS] in the Auction."[12]  Notably, the Offering Materials specifically state that "[n]o person is authorized in connection with any offering made hereby to give any information or make any representation other than as contained herein and, if given or made, such information or representation must not be relied upon as having been authorized by" Merrill Lynch.[13]

### D.   The 2006 SEC Order

In 2004, the SEC began to investigate the practice of broker-dealers placing bids in ARS auctions, and that investigation resulted in a May 31, 2006 agreement between numerous broker-dealers (including Merrill Lynch) and the SEC (the "2006 SEC Order").  (FAC ¶ 34; Exs. M (June 24, 2004 WSJ Article); N (2006 SEC Order).)  The 2006 SEC Order, which was reported widely and made available on the SEC's website,[14] addressed certain broker-dealers' historical practices and disclosures regarding broker-dealer participation in ARS auctions.  (FAC ¶ 34.) The SEC made clear that it "does not prohibit broker-dealers from bidding for their proprietary

---

[10] Exs. G at 5-6; H at 5-6; I at 20-21; J at 8; K at 5-6; L at 7, 9.

[11] Exs. A at 129; B at 127; C at 122; D at 138; E at 19; F at 215; see also FAC ¶ 69.

[12] Exs. G at 11, 15; H at 11, 15; I at 8, 11; J at 14, 18; K at 11, 15; L at 15, 18-19.

[13] Exs. A at iv; B at iv; C at iv; D at iv; E at iii; F at iv; G at i; H at i; I at i; J at i; K at i; L at i.

[14] See, e.g., Ex. O (June 1, 2006 WSJ Article); www.sec.gov/litigation/admin/2006/33-8684.pdf.

accounts when properly disclosed" (id. at 6 n.6) but, rather, would require broker-dealers to take specific steps to ensure adequate disclosure of "material auction practices and procedures" to their customers, including making available on their websites a description of their respective auction practices and procedures. (Id. at 10-11; FAC ¶ 35.)

**E.**     **Merrill Lynch's Published "Auction Rate Securities Practices and Procedures"**

Pursuant to the 2006 SEC Order, Merrill Lynch posted on its website the "Description of Merrill Lynch's Auction Rate Securities Practices and Procedures" (the "ARS Practices and Procedures").[15] (FAC ¶¶ 36, 70, 81; Ex. P (ARS Practices and Procedures).) Supplementing the discussions in the Offering Materials for the Merrill ARS, the ARS Practices and Procedures posting describes Merrill Lynch's roles in the auction process and includes express and specific warnings regarding the possibility of auction failure, making clear that, inter alia: (i) Merrill Lynch was permitted (but not required) to bid in ARS auctions; (ii) Merrill Lynch "routinely" made such bids for the *express purposes* of preventing auction failures, setting interest rates, and acquiring securities for its inventory; (iii) investors could not rely upon a successful auction as indicating that security's actual liquidity risk; (iv) absent Merrill Lynch bidding in the auctions, third-party demand for ARS might not be sufficient to prevent auction failure; (v) auctions could fail, "especially if the issuer's credit were to deteriorate, if a market disruption were to occur or, if for any reason, Merrill Lynch were unable or unwilling to bid"; and (vi) in the event of a failed auction, investors would receive the maximum rate of interest, as defined in the Offering Materials, but would not be able to sell all or a portion of their securities until either the next successful auction or maturity. Id.; see also Part I.A, infra (comparing Plaintiff's allegations to the specific disclosures).

---

[15] See www.ml.com/media/70501.pdf.

F.      **Plaintiff's ARS Investments**

Louisiana Pacific "is a supplier and distributor of building products," with a principal

place of business located in Nashville, Tennessee.  Its common stock is traded on the New York

Stock Exchange.  (FAC ¶¶ 1, 13; Ex. R at cover page (Plaintiff's 2009 Form 10-K).)  Louisiana

Pacific concedes that, beginning in 2004, it has made substantial investments in ARS through its

broker, defendant Money Market 1 Institutional Investment Dealer ("MM1").  (FAC ¶¶ 130,

139; Exs. Q at 52 (reporting ARS valued at $281.4 million) (Plaintiff's 2004 Form 10-K); T at

55 (reporting ARS valued at $492 million) (Plaintiff's 2005 Form 10-K).)  Louisiana Pacific

closely monitored its investments, including through communications with its broker "on a

nearly-daily basis, both by telephone and e-mail" and in face-to-face meetings "multiple times a

year" that included "senior financial officials at LP" and "LP's Treasurer."  (FAC ¶¶ 134, 136-

38.)  Louisiana Pacific alleges that, "[i]n reliance upon the specific recommendations of" MM1,

Louisiana Pacific "invested heavily in auction rate securities," including, in 2007, in the ARS at

issue in this case.  (Id. ¶¶ 134-40.)[16]  Further, while Louisiana Pacific initially classified its ARS

as "cash equivalents," in 2005 (two years before its purchase of the Merrill ARS), Louisiana

Pacific reported that it had reclassified those securities as "short-term investments."  (Exs. U &

V at 8 (Plaintiff's 2005 Form 10-Qs).)

G.      **Auction Failures**

Merrill Lynch (like other broker-dealers) routinely placed support bids for its own

account in certain auctions, as disclosed in the Offering Materials, the 2006 SEC Order, and

---

[16] See also, e.g., Exs. R at 40 (reporting wide range of ARS investments, including those
originated as "Bank Trust Preferred notes," CDOs, "Credit Linked Notes," and "Corporate"); S
at 56 (reporting ARS valued at $186.4 million) (Plaintiff's 2006 Form 10-K); T at 55 (reporting
ARS valued at $492 million).

Merrill Lynch's ARS Practices and Procedures. (Exs. A to L, N, P.) Prior to August 2007, out of the millions of auctions that had taken place across the industry over the prior 20+ years, only a handful had ever failed. (Ex. W at 2 (Feb. 20, 2008 Moody's Report).) In 2007, demand for some ARS began to decline as a result of "liquidity issues experienced in global credit and capital markets" and, in or about August 2007, Merrill Lynch stopped placing support bids in certain ARS auctions. (FAC ¶¶ 143-44; Exs. Y at 38, 58 (Plaintiff's 2007 Form 10-K); Z at 9, 35-36, 56 (Plaintiff's 2008 Form 10-K).) Over the ensuing weeks and months, all or virtually all auctions for ARS -- not just those involving Merrill Lynch -- failed. (See, e.g., Ex. X (Feb. 14, 2008 WSJ Article).)

## H.   Louisiana Pacific's Claims

On July 31, 2009, Louisiana Pacific filed the initial complaint in the Northern District of California, which asserted claims arising under federal and state securities laws and common law against MM1, Deutsche Bank Securities Inc. ("DBSI"), and Merrill Lynch.[17] The Amended Complaint closely resembles the initial complaint. Louisiana Pacific asserts a number of claims against its broker, MM1, including that MM1 and Louisiana Pacific had regular communications; that MM1 sold all of the securities at issue here to Louisiana Pacific; and that MM1 made various misrepresentations to Louisiana Pacific concerning the risks associated with ARS that contradicted the Offering Materials, the 2006 SEC Order, and Merrill Lynch's ARS

---

[17]   This matter was transferred to this Court for coordinated or consolidated pretrial proceedings by the Judicial Panel on Multidistrict Litigation ("JPML"). The JPML severed the claims relating to ARS underwritten by Deutsche Bank Securities Inc. (rather than Merrill Lynch) and remanded that portion of the case to the Northern District of California. Prior to transfer, the parties executed a stipulation that tracked this Court's August 18, 2009 Revised Scheduling Order, and Merrill Lynch provided Louisiana Pacific with a "deficiency letter" setting forth the infirmities of the initial complaint. (Ex. AA (Letter from Andrew W. Stern to Kevin J. Miller, dated Oct. 15, 2009).) In response, Louisiana Pacific opted to amend its complaint.

Practices and Procedures.  (See, e.g., FAC ¶¶ 127-51.)

Louisiana Pacific does not make any similar allegations with respect to Merrill Lynch.

Nonetheless, Louisiana Pacific contends that, despite the aforementioned disclosures, Merrill

Lynch committed fraud by virtue of its routine participation in the ARS auctions until August

2007 and its abstention from the auctions after that time.  Louisiana Pacific asserts five causes of

action against Merrill Lynch:

- Count II, for violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (Id. ¶¶ 166-72);
- Count III, for violation of Section 20(a) of the Exchange Act (Id. ¶¶ 173-77);
- Count VI, for violation of Sections 25500 and 25501 of the California Corporate Securities Law (Id. ¶¶ 192-97);
- Count VII, for violation of Section 25504 of the California Corporate Securities Law (Id. ¶¶ 198-202); and
- Count X, for common law fraud (Id. ¶¶ 215-19).

## ARGUMENT[18]

To avoid dismissal of any claim under Rule 12(b)(6), a plaintiff must plead "enough facts

to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 127 S. Ct.

1955, 1974 (2007).  Although "the Court must accept all non-conclusory factual allegations as

true," Merrill Lynch ARS Litig. at *6, a complaint must state a claim for relief that rises above

---

[18] The law of the Second Circuit applies to the motion to dismiss Louisiana Pacific's federal securities law claims.  See Desiano v. Warner-Lambert & Co., 467 F.3d 85, 90-91 (2d Cir. 2007) ("As to issues of federal law, we are permitted – indeed, required – to reach our own conclusions. . . . This obligation does not change in the context of transferred cases. . . . [E]ven in the transfer context, a court of appeals must develop its own circuit law on federal questions; it cannot mechanically adopt the reasoning and conclusions of its sister circuits: 'We have previously held that a transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit.'") (citations omitted), aff'd, 552 U.S. 440 (2008).  As to Louisiana Pacific's state law claims, "a transferee court applies the substantive state law, including choice-of-law rules, of the jurisdiction in which the action was filed."  Id. at 91.  As explained below, California law does not permit Louisiana Pacific to assert California statutory claims against Merrill Lynch.  (See Part III, infra.)

the "speculative level," and must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 127 S. Ct. at 1964-65. Moreover, courts are required to credit neither unsupported inferences, Atlantic Mut. Ins. Co. v. Balfour MacLaine Int'l, Ltd., 968 F.2d 196, 198 (2d Cir. 1992), nor factual allegations that are "contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001).

Further, claims that sound in fraud must satisfy the heightened pleading standards mandated by Rule 9(b) and the PSLRA. See generally Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007); ATSI Commc'ns Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99-102 (2d Cir. 2007) (Rule 9(b) and PSLRA pleading requirements apply to securities fraud claims, whether brought as a claim for misrepresentation or manipulation); Lentell v. Merrill Lynch & Co., 396 F.3d 161, 168 (2d Cir. 2005) (Rule 9(b) "is applied assiduously to securities fraud. This Circuit's strict pleading requirements in securities-fraud cases . . . were (essentially) codified in the [PSLRA]."). For the reasons that follow, the Amended Complaint should be dismissed with prejudice because Louisiana Pacific has not stated a claim against Merrill Lynch or ML & Co.

## I.   PLAINTIFF FAILS TO STATE A SECTION 10(b) CLAIM AGAINST MERRILL LYNCH

### A.   Merrill Lynch's Conduct Was Lawful and Disclosed

Louisiana Pacific's claims against Merrill Lynch arise from the notion that Merrill Lynch failed to disclose that it placed bids in the ARS auctions in order to prevent auction failure and later, with the onset of the financial crisis, elected not to make such "support bids," causing the collapse of the auctions. Louisiana Pacific attempts to bolster such claims with clandestine-sounding rhetoric, contending that Merrill Lynch "secretly propped up" and "manipulated" the

ARS market by submitting bids to ensure that ARS offered would be sold (see, e.g., FAC ¶¶ 3, 72), but utterly fails to allege the particularized facts required to sustain such a claim. Moreover, as this Court recently held in <u>Merrill Lynch ARS Litig.</u>, Merrill Lynch's practice of bidding in auctions -- and the potential effects on the securities at issue -- were well-known and publicly disclosed by Merrill Lynch *prior to* Louisiana Pacific's purchases of the Merrill ARS. <u>Id.</u> at *16.

As an initial matter, Louisiana Pacific concedes that "[b]roker-dealers are not barred from participating in auctions altogether." (FAC ¶ 33.) Indeed, the SEC long has condoned stabilization practices by broker-dealers conducted "for the purpose of preventing or retarding a decline in the market price of a security to facilitate an offering. Although stabilization is price-influencing activity intended to induce others to purchase the offered security, when appropriately regulated it is an effective mechanism for fostering or orderly distribution of securities and promotes the interests of shareholders, underwriters, and issuers." Anti-Manipulation Rules Concerning Securities Offerings, 62 F.R. 520-01, 535 (Jan. 3, 1997). Further, in 2006, the SEC expressly authorized broker-dealer firms to continue ARS market intervention practices so long as they provided adequate disclosure to investors. <u>See</u> 2006 SEC Order at 6 n.6 ("This Order does not prohibit broker-dealers from bidding for their proprietary accounts when properly disclosed.").

Consistent with this authorization, Louisiana Pacific admits that the Offering Materials and the ARS Practices and Procedures explain the possibility of auction failure and describe Merrill Lynch's roles in the auction process. (FAC ¶¶ 36, 68-70.) Indeed, a contrary allegation would be absurd: as set forth in the table below, the conduct about which Plaintiff complains was clearly and publicly disclosed. Thus, because deception is the core of the cause of action, whether styled as a claim of manipulation or one of misrepresentation, Louisiana Pacific has

failed to state a claim.  Indeed, in addition to the offering materials for the Merrill ARS (see pages 6-7, supra), the express and specific warnings in Merrill Lynch's ARS Practices and Procedures plainly refute each of Louisiana Pacific's alleged claims, as summarized in the following table:

| Alleged Misrepresentations, Omissions or Acts of Manipulation | Merrill Lynch's ARS Practices and Procedures |
| --- | --- |
| "[T]he auction market operated without transparency to investors, thus enabling manipulation by Merrill Lynch in its capacity as the sole broker-dealer for the" ARS at issue. (FAC ¶ 83(a).) | "Before you invest in any [ARS], you should read and understand the relevant offering documents, including the information that they provide regarding practices and procedures with respect to auctions of the security, and all the risks factors and other special considerations that may apply."  (Ex. P at 2.)<br><br>"Merrill Lynch plays multiple roles in the [ARS] market, including providing services to issuers of [ARS], acting as an agent for investors . . . and purchasing and selling as principal for Merrill Lynch's own account. . . . Merrill Lynch's interest in participating in [the ARS] market may differ from yours."  (Id. at 4.)<br><br>"If Merrill Lynch submits an order for its own account, it would likely have *an advantage* over other bidders because Merrill Lynch would have knowledge of some or all of the other orders placed through Merrill Lynch in that auction and, thus, could determine the rate and size of its order so as to ensure that its order is likely to be accepted in the auction and that the auction is likely to clear at a particular rate."  (Id. at 15-16.) |
| "Merrill Lynch submitted 'support bids' and engaged in other manipulative practices for its own account in all of the auctions for" the ARS at issue, including "for the full amount of the securities at auction"; "intervened in auctions for its own benefit, to set rates and to prevent all-hold auctions and failed auctions"; and "maintained a substantial inventory | "Merrill Lynch is permitted, but not obligated, to submit orders in auctions for its own account either as a bidder or a seller, or both, and *routinely does so* in its sole discretion."  (Ex. P at 15.)[19]<br><br>"Merrill Lynch *may routinely* place one or more bids in an auction for its own account to acquire auction rate securities for its inventory, to prevent an auction failure . . . or an auction from clearing at a rate that |

---

[19] All emphasis in this table has been added.

14

| Alleged Misrepresentations, Omissions or Acts of Manipulation | Merrill Lynch's ARS Practices and Procedures |
|---|---|
| of Merrill Lynch-underwritten securities." (FAC ¶¶ 83(b)-(d), 83(k).)<br><br>With each Merrill Lynch bid for its own account, Merrill Lynch "represented to the marketplace and to actual and prospective investors, including LP, that there was sufficient, legitimate demand for" a successful auction.  (FAC ¶ 6.)<br><br>"Merrill Lynch . . . entered into re-marketing agreements with broker-dealers like [MM1] to create a distribution channel for [ARS], and paid commissions to these distribution partners in return for placing Merrill Lynch-underwritten . . . securities with their own customers."  (FAC ¶ 7.) | Merrill Lynch believes does not reflect the market for the securities." (Id. at 16.)<br><br>"Merrill Lynch also *may routinely* encourage bidding by others in auctions, including to prevent an auction failure or an auction from clearing at a rate that Merrill Lynch believes does not reflect the market for the auction rate securities. Merrill Lynch may routinely encourage such bids even after obtaining knowledge of some or all of the other orders submitted through it." (Id. at 16.) |
| "[T]here was insufficient legitimate third-party demand in a significant number of the auctions for the [ARS at issue] to avoid auction failures;" (FAC ¶ 83(e).)<br><br>"[T]here were more sell orders than buy orders in a large percentage of the auctions, such that Merrill Lynch's bidding activity directly or indirectly set the clearing rate in those auctions;" (FAC ¶ 83(f).)<br><br>"[W]ithout Merrill Lynch's bids in these auctions, the interest rate paid to holders of the [ARS at issue] would have been the fail rate;" (FAC ¶ 83(g).)<br><br>"Merrill Lynch had no legitimate investment interest in acquiring the [ARS at issue], and was actively seeking to sell the securities that it acquired at auction;" (FAC ¶ 83(j).) | "Bids by Merrill Lynch or by those it may encourage to place bids are *likely to affect the clearing rate*, including preventing the clearing rate from being set at the maximum rate or otherwise causing bidders to receive a higher or lower rate than they might have received had Merrill Lynch not bid or not encouraged others to bid." (Ex. P at 16.)<br><br>"There may not always be enough bidders to prevent an auction failing in the absence of Merrill Lynch bidding in the auction for its own account or encouraging others to bid.  Therefore, *auction failures are possible*, especially if the issuer's credit were to deteriorate, if a market disruption were to occur or, if for any reason, Merrill Lynch were unable or unwilling to bid." (Id. at 18.)<br><br>"Investors should be aware that bids by Merrill Lynch or by those it may encourage to place bids may cause lower clearing rates to occur." (Id. at 19.)<br><br>"*Demand for [ARS] may change without warning*, and declines in demand may be short-lived or continue for longer periods." (Id. at 19.) |
| "[T]he [ARS at issue] only appeared to be liquid because Merrill Lynch was | "Because of these practices, the fact that an auction clears successfully *does not mean that an investment* |

| Alleged Misrepresentations, Omissions or Acts of Manipulation | Merrill Lynch's ARS Practices and Procedures |
|---|---|
| artificially supporting and manipulating the auction market to maintain the appearance of liquidity and stability;" (FAC ¶ 83(h).)<br><br>"[T]he short-term liquid nature of the [ARS at issue] and the ability of investors to liquidate these securities at par depended on the perpetuation of the artificial auction rate market created by Merrill Lynch;" (FAC ¶ 83(i).)<br><br>"[I]n the event of auction failures, the [ARS at issue] would be saleable only at a substantial discount from their purchase price, if at all." (FAC ¶ 83(m).) | *in the securities involves no significant liquidity or credit risk.*  Merrill Lynch is not obligated to continue to place such bids or encourage other bidders to do so in any particular auction to prevent an auction from failing or clearing at a rate Merrill Lynch believes does not reflect the market for the securities. Investors *should not assume* that Merrill Lynch will do so or that auction failures will not occur." (Ex. P at 16.)<br><br>"Merrill Lynch may submit a bid in an auction to keep it from failing, but it is not obligated to do so." (Id. at 18.)<br><br>"Holders who have submitted sell orders should be aware that, in the event of an auction failure, they will not be able to sell all, and may not be able to sell any, securities in the auction." (Id. at 11.)<br><br>"Holders who resell between auctions may receive less than par value, depending on market conditions." (Id. at 18.) |
| "[D]ue to capital constraints, [Merrill Lynch] could not continue to place orders in auctions for the Merrill Lynch-underwritten securities to prevent auction failures;" (FAC ¶ 83(l).) | "[A]uction failures are possible, especially if the issuer's credit were to deteriorate, if a market disruption were to occur or if, for any reason, Merrill Lynch were unable or unwilling to bid." (Ex. P at 18.)<br><br>"Merrill Lynch is not obligated to make a market in the securities, and may discontinue trading the securities in the secondary market without notice for any reason at any time." (Id. at 18.)<br><br>"Holders who have submitted sell orders should be aware that, in the event of an auction failure, they will not be able to sell all, and may not be able to sell any, securities in the auction. . . . Specifically, if no buy orders are placed in an auction, holders will not be able to sell any of their securities in the auction." (Id. at 11.) |

Admittedly aware of this information (see, e.g., FAC ¶¶ 36, 68-70), including most

significantly that ARS auctions could fail (id. ¶ 2), and having purchased hundreds of millions of

dollars of ARS in the past, Louisiana Pacific elected to purchase the Merrill ARS in 2007 through its broker, MM1.  Seeking to avoid the import of Merrill Lynch's clear disclosures, Louisiana Pacific contends that Merrill Lynch's statement that it "may routinely" make support bids "and routinely does so in its sole discretion" (Ex. P at 15-16) meant that such bids would be no more than "periodic."  (FAC ¶ 68.)  This Court has determined, however, that such allegations fail as a matter of law.  Merrill Lynch ARS Litig. at *12, 16.  Given the plain language in the disclosure materials regarding Merrill Lynch's bidding practices to prevent auction failures; that Merrill Lynch disclosed that its participation in the auctions likely would affect the interest rate paid to investors like Louisiana Pacific; that all such information was available to Louisiana Pacific *prior to* its purchases of Merrill ARS; and the absence of any allegation that anyone from Merrill Lynch told Louisiana Pacific to disregard those disclosures – or made *any* representations of *any* kind directly to Louisiana Pacific – Louisiana Pacific can state no Section 10(b) claim against Merrill Lynch.  Id.; accord In re Citigroup Auction Rate Sec. Litig., No. 08 Civ. 3095 (LTS), 2009 WL 2914370, at *7 (S.D.N.Y. Sept. 11, 2009) (dismissing ARS lawsuit where underwriter's public documents "disclosed that Defendants could engage in the very conduct of which Plaintiff complains, the advantages that Defendants would have if they engage in such conduct, the ability of such conduct to affect clearing rates and the possibility that the auctions would fail if Defendants did not intervene in them").

## B.  **Plaintiff Fails to Plead a Misrepresentation or Manipulation Claim**

To state a misrepresentation claim under Section 10(b), a plaintiff must plead (1) a material misrepresentation or omission by the defendant, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation.  Stoneridge Inv.

Partners, LLC v. Scientific-Atlanta, Inc., 128 S.Ct. 761, 768 (2008).  Similarly, to state a market manipulation claim, a plaintiff must "allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendants' use of the mails or any facility of a national securities exchange."  ATSI, 493 F.3d at 101.

Furthermore, Section 10(b) claims are subject to the stringent pleading requirements of Rule 9(b) and the PSLRA.  Rule 9(b) provides that "[a] securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Merrill Lynch ARS Litig. at *7 (quoting ATSI, 493 F.3d at 99). Likewise, the PSLRA mandates that "securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 81-82 (2006) (citation omitted).  Furthermore, as to manipulation claims, which also must satisfy these heightened pleading standards (ATSI, 493 F.3d at 99, 101-02), where "any false or misleading statements . . . would not be solely within [the defendant's] knowledge," a plaintiff's "failure to identify these allegedly false and misleading statements with particularity is therefore fatal" to its claim.  Merrill Lynch ARS Litig. at *8.  Louisiana Pacific's allegations fall well short of these stringent pleading requirements.

### 1. The Amended Complaint Fails Adequately to Allege an Actionable Misstatement or Omission

Louisiana Pacific alleges that Merrill Lynch made both material misstatements and omissions about ARS.  For the following reasons, these allegations are insufficient.

First, while Louisiana Pacific alleges that Merrill Lynch made false statements (see, e.g., FAC ¶¶ 6, 36, 49-50, 87, 167), the Amended Complaint does not contain a single well-pled allegation of a particular statement by any Merrill Lynch source that was, in fact, false or misleading. Instead, Louisiana Pacific makes only conclusory allegations based upon "information and belief developed through investigation by [Louisiana Pacific] and by counsel" (FAC at p. 1). Thus, as in Merrill Lynch ARS Litig., Louisiana Pacific has failed to "plead facts 'sufficient to support a reasonable belief as to the misleading nature of the statement or omission'" and the Amended Complaint, therefore, does not satisfy the PSLRA and Rule 9(b). Id. at *9 (citation omitted); see also 15 U.S.C. § 78u-4(b)(1); Luce v. Edelstein, 802 F.2d 49, 54, 54 n.1 (2d Cir. 1986) ("allegations, which fail to specify the time, place, speaker, and sometimes even the content of the alleged misrepresentations, lack the 'particulars' required by Rule 9(b)") (citations omitted); Citigroup, 2009 WL 2914370, at *5 (dismissing claims by ARS investors where "Complaint does not include specific allegations as to which Defendants performed what manipulative acts at what times and with what effect").

Second, Louisiana Pacific does not explain how or why any of the purported misrepresentations and omissions were false and misleading. The absence of such particularity is not surprising as none of the alleged misrepresentations "were false when made." Rombach v. Chang, 355 F.3d 164, 172 (2d Cir. 2004) (affirming dismissal under PSLRA and Rule 9(b)). Indeed, as Louisiana Pacific concedes, the possibility of an auction failure and Merrill Lynch's role in the auction process were fully disclosed.  (FAC ¶¶ 2, 36, 68-70.)  Moreover, Louisiana Pacific's bare allegations that Merrill Lynch failed to disclose its role in preventing auction failure, the risks of a failed auction and illiquidity, and Merrill Lynch's right to cease bidding in auctions cannot withstand comparison to the comprehensive Offering Materials and ARS

19

Practices and Procedures.  Compare FAC ¶ 83 with pages 6-7 & Part I.A, supra; see Merrill Lynch ARS Litig. at *11-12; see also Santa Fe Indus. v. Green, 430 U.S. 462, 477-78 (1977) ("the Court repeatedly has described the 'fundamental purpose' of the [Exchange] Act as implementing a 'philosophy of full disclosure'; once full and fair disclosure has occurred, the fairness of the terms of the transactions is at most a tangential concern of the statute") (citations omitted).

Third, Louisiana Pacific seeks to fabricate a false statement by glossing over or ignoring outright pertinent language in the disclosures and simply stating conclusorily that a material misstatement or omission exists.  For example, although Merrill Lynch's ARS Practices and Procedures states flatly that Merrill Lynch "may routinely" participate in ARS auctions and encourage others to do so, "and routinely does so in its sole discretion" (Ex. P at 15-16 (emphasis added)), Louisiana Pacific nonetheless alleges that Merrill Lynch falsely represented that "its participation would only be periodic," (FAC ¶ 36 (emphasis added)).  In other words, Louisiana Pacific would have the Court find that Merrill Lynch's truthful statement that it "routinely" places support bids at auctions and "may routinely" continue to place such bids somehow is at odds with Merrill Lynch's alleged history of placing support bids in all of its auctions -- until it determined, in its discretion, to cease doing so.

To make such a leap, Louisiana Pacific highlighted the word "may" in "may routinely," suggesting that the Court need not focus on "routinely." (Id. ¶ 36.)  However, Louisiana Pacific does not explain why the Court should ignore Merrill Lynch's deliberate use of the word "routinely" in the ARS Practices and Procedures, nor does the Amended Complaint even mention the separate statement in that disclosure that Merrill Lynch "routinely does so in its sole discretion."  Louisiana Pacific also fails to explain why "routinely" should be interpreted to

mean "periodic" or anything other than its plain definition.[20] Thus, Louisiana Pacific's pleading

tactic is nearly identical to that which the Court rejected in Merrill Lynch ARS Litig.:

> The Plaintiffs characterize Merrill Lynch's acknowledgement that it "routinely"
> submitted support bids as inaccurate because Merrill Lynch "systematically"
> submitted support bids. . . . This semantic distinction is not persuasive,
> particularly in light of the Plaintiffs' own use in the Complaint of the word
> "routinely" to describe Merrill Lynch's conduct. . . .[21]
>
> Another court in this district recently came to the same conclusion in a similar
> case. In Teva Pharmaceutical Indus. v. Deutsche Bank AG, et al., 09-cv-6205
> (AKH), the plaintiff alleged that Deutsche Bank manipulated the ARS market by,
> inter alia, placing support bids in every auction for which it served as a broker-
> dealer. . . . Deutsche Bank had disclosed in the private placement memorandum
> for the ARS that it might buy for its own account. . . . The court held that the
> plaintiffs allegations did not amount to market manipulation because the
> disclosure informed investors that Deutsche Bank might or might not intervene,
> "which meant it might or might not affect the demand and supply for the
> instruments that were being auctioned." . . . Accordingly, the court dismissed the
> claims with prejudice. . . .
>
> Contrary to the Plaintiffs' assertions in the instant case, Merrill Lynch also
> disclosed that the lack of auction failures was not indicative of the health of the
> ARS market. . . . Indeed, disclosing that Merrill Lynch might routinely intervene
> to prevent failed auctions necessarily implied that there might not be sufficient
> demand to support the auctions and to create liquidity.
>
> Corporations are not required to phrase disclosures in pejorative terms. . . . Merrill
> Lynch's website disclosed the fact that Merrill Lynch might routinely submit
> support bids to prevent auction failures, that Merrill Lynch's bidding could
> determine clearing rates, that auction failures possible "especially if . . . Merrill
> Lynch were unable or unwilling to bid," and that failed auctions could result in
> investors[] not being able to sell any of their securities. . . . These disclosures,
> issued in the wake of the 2006 SEC Order, preclude the Plaintiffs from pleading
> manipulative acts as a matter of law.

---

[20] Webster's defines "routinely" (in reference to "routine") as "1: of a commonplace or
repetitious character[,] 2: of, relating to, or being in accordance with established procedure."
Merriam-Webster's Online Dictionary, www.merriam-webster.com/dictionary/routinely (last
visited Apr. 9, 2010).

[21] Louisiana Pacific similarly uses the word "routinely" to describe Merrill Lynch's conduct.
See, e.g., FAC ¶ 144 ("prior to August 2007, Merrill Lynch . . . *routinely* placed support bids in
the market for the foregoing securities"), ¶ 169 (Merrill Lynch "*routinely* and secretly plac[ed]
support bids for its own account") (emphasis added).

Id. at *12 (citations omitted); see also Teva Pharm. Indus. v. Deutsche Bank AG, et al., 09-cv-6205 (AKH), Tr. 33:21-24 (S.D.N.Y. Mar. 23, 2010) (disclosure that broker-dealer "may participate" in ARS auction not "false and misleading because the adverb 'may' indicates they may not and indicates that sometimes it will and sometimes it won't") (A copy of this transcript is attached hereto as Exhibit 1).[22]

Fourth, no claim against Merrill Lynch may be based upon the allegation that Louisiana Pacific's broker (MM1) incorrectly told Louisiana Pacific that it need not be concerned about the risks that Merrill Lynch took pains to disclose. (See, e.g., FAC ¶¶ 130, 135-38.) The Amended Complaint makes no allegation that Merrill Lynch had control over MM1 or that anyone from Merrill Lynch told MM1 that it could tell its clients to ignore Merrill Lynch's disclosures. Nor does Louisiana Pacific allege that it had any communication with anyone at Merrill Lynch that could have confirmed MM1's alleged misinterpretations of Merrill Lynch's disclosures. Thus, Louisiana Pacific can fashion no misrepresentation claim against Merrill Lynch based upon another party's misrepresentations. See also Merrill Lynch ARS Litig. at *20-21 ("Unlike Merrill Lynch's customers, Plaintiffs purchased their securities from E*Trade and Wells Fargo

---

[22] Louisiana Pacific contends that the 2006 SEC Order states that simply disclosing that a broker-dealer "may submit orders in Auctions" is "inadequate as a matter of law." (FAC ¶ 34.) To the contrary, the Order merely observed that disclosures varied, noting that some broker-dealers had stated, prior to the 2006 SEC Order, only that they "may" bid in auctions. In any event, as explained above, Merrill Lynch's disclosures went well beyond that simple statement. Nor may Louisiana Pacific find aid through its misinterpretation of a March 14, 2008 SEC No-Action Letter (FAC ¶ 41), which merely is interpretive and simply suggests what broker-dealer disclosures "could consist of," and states candidly that it "does not represent a legal conclusion." Mun. Auction Rate Sec., 2008 WL 1887307, at *2-3 (SEC No-Action Ltr. Mar. 14, 2008); see also, e.g., N.Y.C. Employees' Ret. Sys. v. S.E.C., 45 F.3d 7, 13-14 (2d Cir. 1995) ("no-action letters are nonbinding statements of the SEC's intent not to prosecute a potential rule violation; they do not oblige or prevent action by the SEC, the parties, or the courts. . . . A necessary corollary of this proposition is that rules announced in no-action letters also have no binding authority.") (citations omitted).

and did not receive confirmation slips directing them to Merrill Lynch's ARS website. . . . However, the fact that broker-dealers had historically made the ARS market – and the fact that they could continue to do so for the ARS held by Plaintiffs – did not require exhaustive research to uncover"); Teva, 09-cv-6205, Tr. 19:16-21 (rejecting "complaint brought by someone who didn't buy from Deutsche Bank Securities but apparently is complaining of what they did in different kinds of auctions and then they try to hobnail it onto their own activities [of] buying from Bank of New York by saying that Deutsche Bank Securities and other broker dealers were in cahoots").[23]

Finally, any misstatements that could be attributable to Merrill Lynch are rendered immaterial by the meaningful cautionary language in the Offering Materials and ARS Practices and Procedures, which bespoke caution. See, e.g., Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002) ("Certain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering."); Ladmen Partners, Inc. v. Globalstar, Inc., No. 07 Civ. 0976 (LAP), 2008 WL 4449280, at *13 (S.D.N.Y. Sept. 30, 2008) (Preska, J.) (dismissing Section 11 and 12(a)(2) claims sounding in fraud, reasoning that, "under the well-established 'bespeaks caution' doctrine, an alleged misstatement is not actionable where investors were adequately warned of the relevant investment risks."). The "cautionary information need not be in the same document that contains the forward-looking statement, but must instead be reasonably available to investors and affect the total mix of information." Kemp v. Universal Am. Fin. Corp., No. 05 CIV. 9883 (JFK), 2007 WL 86942, at

---

[23] Similarly deficient is Louisiana Pacific's bare allegation that Merrill Lynch was, "upon information and belief, encouraging investment managers, such as [MM1], to market these [ARS] in this manner" (FAC ¶ 132). Teva, 09-cv-6205, Tr. 19:16-21.

23

*11 (S.D.N.Y. Jan. 10, 2007) (citing Halperin, 295 F.3d at 357).  Here, as explained in the

Background and table, above (pp. 6-7 & Part I.A, supra), Merrill Lynch repeatedly cautioned

prospective and current investors of the attributes and risks associated with the Merrill ARS.

Because Louisiana Pacific cannot credibly contend that this "cautionary language did not

expressly warn of or did not directly relate to the risk that brought about [its purported] loss,"

Louisiana Pacific's claims are barred.  Halperin, 295 F.3d at 359. [24]

### 2.  The Amended Complaint Fails Adequately to Allege Manipulation

Louisiana Pacific also fails to allege with particularity that Merrill Lynch engaged in acts

that were manipulative.  As an initial matter, while the Amended Complaint includes

manipulation-like "buzz words," as demonstrated above, Louisiana Pacific's claim rests upon

deficiently pled allegations of express and implied misrepresentations or omissions.  For this

reason alone, no manipulation claim has been stated.  Merrill Lynch ARS Litig. at *10 ("A

market manipulation claim . . . cannot be based solely upon misrepresentations or omissions")

(quotation and citation omitted).

Assuming arguendo that the Amended Complaint is not "simply a material

misrepresentation claim in disguise," totally absent are any allegations of "some market activity,

such as 'wash sales, matched orders, or rigged prices,'" designed "to mislead investors."  Id. at

---

[24] Louisiana Pacific's improper references to investigations, lawsuits and settlements with certain regulatory and administrative bodies (see, e.g., FAC ¶¶ 3 n.2, 31, 55, 71, 89-90, 132, 132 n.18) are immaterial and must be stricken from the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(f).  Moreover, "Second Circuit case law makes clear that references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial under Rule 12(f)."  In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003) (collecting cases); accord Dent v. U.S.T.A., No. CV-08-1533 (RJD)(VVP), 2008 WL 2483288, at *2 (E.D.N.Y. June 17, 2008) (collecting cases); see also Pivot Point, No. 08 CV 2788 (AKH), Tr. 10:5-25 (settlements "without admitting or denying the allegations" have no "force of law" and contrary allegations do not "make[] out a complaint").

23-24 (citations omitted).  As this Court held in Merrill Lynch ARS Litig., "[t]he market is not misled when a transaction's terms are fully disclosed."  Id. at *10.  In other words, "nondisclosure is usually essential to the success of a manipulative scheme."  Id. (quotation and citation omitted).  Here, as in Merrill Lynch ARS Litig., the bidding practices described in the Amended Complaint not only were fully disclosed by Merrill Lynch, but also were condoned by the SEC prior to Louisiana Pacific's purchases, and Louisiana Pacific does not allege that Merrill Lynch engaged in any conduct that deviated from those disclosures or the SEC's recognition of the practice.[25]  Id. at *11-12.  Accordingly, Louisiana Pacific has failed to allege that Merrill Lynch "sent a false pricing signal to the market" (id. at *11), or engaged in any other "market activity aimed at deceiving investors."  ATSI, 493 F.2d at 100.

Indeed, as discussed above, Merrill Lynch's practice of bidding in auctions to prevent auction failure is a form of stabilization condoned by the SEC.  See Anti-Manipulation Rules Concerning Securities Offerings, 62 F.R. at 535.  Moreover, this Court has observed that the 2006 SEC Order "highlighted that auction dealers had placed support bids to prevent failed auctions and specifically noted that the Order did not prohibit such conduct as long it was property disclosed. . . . The Order, moreover, indicated that Merrill Lynch was required to place a written description of its material auction practices and procedures on a specific page of its website accessible to the general public."  Merrill Lynch ARS Litig. at *11.  Plaintiff cannot dispute that Merrill Lynch complied with that instruction by timely posting to its website the ARS Practices and Procedures, which set forth in specific detail "'that Defendants could engage

---

[25] Moreover, Louisiana Pacific does not allege that Merrill Lynch was managing the auctions for these securities; to the contrary, the Offering Supplements state that the auction agent was Deutsche Bank Trust Company Americas, meaning that Merrill Lynch was not even in a position to somehow "manipulate" the auctions.  (Exs. G at 4; H at 4; I at 3; J at 4; K at 4; L at 6.)

in the very conduct of which Plaintiff[] complain[s], the advantages that Defendants would have if they did engage in such conduct, the ability of such conduct to affect clearing rates and the possibility that the auctions would fail if Defendants did not intervene in them.'" Id. (citation omitted). Accordingly, the bidding practices described in the Amended Complaint cannot be deemed "manipulative" under Section 10(b).

Moreover, Louisiana Pacific does not sufficiently allege facts addressing "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." ATSI, 493 F.3d at 101 (internal quotations and citations omitted). Specifically, Louisiana Pacific fails to allege with particularity *what* Merrill Lynch did that was manipulative with respect to *which* auctions for *which* securities, *when* it did it, *how* it did it, and *why* it did it. See Citigroup, 2009 WL 2914370, at *5. These deficiencies preclude a claim of manipulation as a matter of law.

### 3.  **The Amended Complaint Fails Adequately to Allege Scienter**

The PSLRA requires that the Amended Complaint also plead with particularity facts giving rise to a *strong inference* that Merrill Lynch *intended* to deceive Louisiana Pacific. See 15 U.S.C. § 78u-4(b)(2). Louisiana Pacific fails to satisfy this pleading requirement as it does not allege facts "(1) showing that [Merrill Lynch] had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99. Moreover, the absence of any well-pled allegations of scienter is even more stark when taking into account plausible opposing inferences – for example, that Merrill Lynch disclosed the known material risks and had no ability to foresee unprecedented market risks. See Tellabs, 551 U.S. at 323. Indeed, "[a]n inference of scienter

must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. at 314.  The Amended Complaint contains no such "cogent" and "compelling" allegations of scienter.

Louisiana Pacific's scienter allegations are limited to conclusory allegations that Merrill Lynch had a motive to increase its fees (FAC ¶¶ 3, 7, 27, 28, 52-54, 57, 72, 144, 146, 176, 201); but courts in the Second Circuit routinely dismiss such allegations as too generalized to provide a basis to infer scienter.  See, e.g., Defer LP v. Raymond James Fin., Inc., 654 F. Supp. 2d 204, 217-18 (S.D.N.Y. 2009) (dismissing ARS claims for failure to plead scienter); Citigroup, 2009 WL 2914370, at *6 (same).  Thus, Louisiana Pacific has not alleged that Merrill Lynch "benefited in some concrete and personal way from the purported fraud."  Defer, 654 F. Supp. 2d at 217-18 (citation omitted).[26]

Where a complaint fails adequately to allege motive, "the strength of the circumstantial allegations of conscious misbehavior or recklessness must be correspondingly greater."  In re PXRE Group, Ltd., Sec. Litig., 600 F. Supp. 2d 510, 535 (S.D.N.Y. 2009).  "The Court of Appeals has noted that, even in the context of a motion to dismiss, 'this is a highly fact-based inquiry.' . . . The inquiry thus requires that the Court consider all of the allegations in the

---

[26] The Amended Complaint also alleges that Merrill Lynch was motivated to increase its CDO underwriting fees in 2006 and 2007, and that Merrill Lynch concealed information regarding its CDO holdings.  (FAC ¶¶ 51-54.)  These bare allegations are irrelevant.  For one, it is no secret that Merrill Lynch is in the business of earning money.  Further, Louisiana Pacific does not allege that it invested in any CDOs underwritten by Merrill Lynch after 2004, or that CDOs issued in 2006 and 2007 somehow impacted Louisiana Pacific's investment in ARS from 2003 and 2004 CDO issuances.  Louisiana Pacific also fails to explain how or why Merrill Lynch's supposedly concealed CDO holdings had any impact on Louisiana Pacific's ARS investments.  Nor does alleging that, "[o]n information and belief, Merrill Lynch additionally sought to reduce its growing inventory of CDO notes (including CDO auction rate notes) by placing these securities in the accounts of its advisory clients" (Id. ¶ 55) constitute a well-pled motive by Merrill Lynch, inasmuch as Louisiana Pacific was not such a client.

27

Complaint in their totality." In re Loral Space & Comm'ns Ltd. Sec. Litig., No. 01 Civ. 4388 (JGK), 2004 WL 376442, at *7 (S.D.N.Y. Feb. 27, 2004) (citations omitted). Here, the required inquiry reveals that there are no particularized allegations that Merrill Lynch engaged in conduct that was "'highly unreasonable and which represents an extreme departure from the standards of ordinary care,'" Defer, 654 F. Supp. 2d at 219 (citations omitted), or that Merrill Lynch had "'knowledge of facts or access to information contradicting [its] public statements.'" PXRE Group, 600 F. Supp. 2d at 535-36 (citation omitted). Moreover, Louisiana Pacific does not allege that *anyone* at Merrill Lynch either made knowing misstatements about the Merrill ARS to Louisiana Pacific or knew that MM1 allegedly made statements to Louisiana Pacific that contradicted the statements made by Merrill Lynch. See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008) (for corporate entity defendants, "pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.").

Rather, Louisiana Pacific makes only unsupported, conclusory, hindsight allegations that Merrill Lynch "knew" its statements were materially false. (See, e.g., FAC ¶¶ 67-70.) Inasmuch as Merrill Lynch indisputably disclosed the risks and attributes associated with the Merrill ARS (see Part I.A & pages 6-7, supra), and Louisiana Pacific does not "'specifically alleg[e] [Merrill Lynch's] knowledge of facts or access to information *contradicting* [its] public statements,'" Louisiana Pacific has not alleged conscious misbehavior or recklessness. In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 562 (S.D.N.Y. 2004) (citation omitted) (emphasis added); see also, e.g., Kalnit v. Eichler, 264 F.3d 131, 143 (2d Cir. 2001) (absent duty to

disclose, "recklessness cannot be inferred from the failure to disclose").[27]

Thus, Louisiana Pacific's theory of scienter plainly is neither "cogent" nor "compelling." Tellabs, 127 S. Ct. at 2504-5. Further, when considered in light of "opposing inference[s] of non-fraudulent intent" (id.) – i.e., all known risks regarding the ARS were fully disclosed, coupled with the unforeseeable calamitous global economic crisis – it is clear that the Amended Complaint contains nothing more than improper "fraud-by-hindsight" allegations. See, e.g., Citigroup, 2009 WL 2914370, at *6 ("the very market conditions -- specifically the 'subprime crisis' -- that Plaintiff cites in his Complaint in connection with Defendants' intent to continue receiving ARS-related fees, give rise to an opposing and compelling inference that Defendants only engaged in bad (in hindsight) business judgments in connection with ARS, and did not engage in the alleged conduct with an intent to deceive investors."). Given these plainly "plausible nonculpable explanations," the requisite "comparative evaluation" precludes a "cogent and compelling" inference of scienter. See Tellabs, 127 S. Ct. at 2504, 2509.

### 4.  The Amended Complaint Fails Adequately to Allege Reliance

Louisiana Pacific also makes no well-pled allegations that it "directly, and reasonably,

---

[27] Louisiana Pacific also does not plead motive by alleging that Merrill Lynch accumulated ARS with the purported knowledge that, unless Merrill Lynch made support bids, there would be no market for the ARS (FAC ¶ 6). See, e.g., Davidoff v. Farina, No. 04-7617, 2005 WL 2030501, at 11 n.19 (S.D.N.Y. Aug. 22, 2005) ("[I]t would have made no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail"). Nor is any allegation regarding regulatory investigations and administrative suits, all of which should be stricken as immaterial (see note 24, supra), and which relate to sales practice issues concerning Merrill Lynch customers (i.e., not Louisiana Pacific), "in and of itself, sufficient to establish scienter." Teamsters Allied Benefits Funds v. McGraw, No 09 Civ. 140 (PGG), 2010 WL 882883, at *11 (S.D.N.Y. Mar. 11, 2010) (dismissing shareholder derivative suit, including securities claims); see also, e.g., Ashland Inc. v. Oppenheimer & Co., No. 09-135-JBC, 2010 WL 672106, at *6-7 (E.D. Ky. Feb. 22, 2010) (dismissing ARS lawsuit, noting that "'decision by government agencies to investigate a company is not sufficient to meet the heightened Tellabs standard on its own,' or possibly even in combination with other factors") (emphasis added) (quoting Konkol v. Diebold, Inc., 590 F.3d 390, 402 (6th Cir. 2009)).

relied on an assumption of the efficiency of the ARS market." Merrill Lynch ARS Litig. at *18

("'An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the

investor should have discovered the truth'") (citations omitted).[28]  To evaluate the

reasonableness of a plaintiff's reliance, courts consider a variety of factors, such as:

> (1) The sophistication and expertise of the plaintiff in financial and securities
> matters; (2) the existence of longstanding business or personal relationships; (3)
> access to the relevant information; (4) the existence of a fiduciary relationship; (5)
> concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the
> plaintiff initiated the stock transaction or sought to expedite the transaction; and
> (8) the generality or specificity of the misrepresentation.

Id. (citing Brown v. E.F. Hutton Group, 991 F. 2d 1020, 1032 (2d Cir. 1993)).  As applied here,

these factors weigh decidedly against Louisiana Pacific.

As an initial matter, Louisiana Pacific affirmatively pleads that it relied upon MMI's

"advice and recommendations" that allegedly contradicted the Offering Materials and Merrill

Lynch's ARS Practices and Procedures (FAC ¶¶ 2, 4-5, 127, 129, 134-43, 147-48, 151, 162, 164,

230-31, 235), but makes no similar allegations that it relied upon any such contradictory advice,

---

[28] Louisiana Pacific is not entitled to a presumption of reliance because the allegations in the
Amended Complaint do not involve "primarily omissions."  Merrill Lynch ARS Litig. at *17.
Indeed, all of the information for which Louisiana Pacific complains concern positive statements
in the Offering Materials and Merrill Lynch ARS Practices and Procedures that allegedly were
"false and misleading."  (E.g., FAC ¶ 36.)  Moreover, inasmuch as the Amended Complaint "is
based on Merrill Lynch's alleged market activity[,] the alleged omissions have merely
'exacerbated the misleading nature of the' alleged conduct."  Merrill Lynch ARS Litig. at *17
(citation omitted).  Likewise, Louisiana Pacific cannot fill the void of its failure to plead
reasonable reliance through the "fraud on the market theory," as the Amended Complaint
affirmatively pleads that there was no efficient market for the securities at issue (see, e.g., FAC ¶
3), meaning Louisiana Pacific is not entitled to a presumption of reliance.  See, e.g., Citigroup,
2009 WL 2914370, at *7 ("where a plaintiff does not plead that the market in which he
purchased his shares was efficient, he cannot rely on the 'fraud-on-the-market presumption' of
reliance, and must instead specifically allege reliance."); see also, e.g., Merrill Lynch ARS Litig.
at *15 ("presumption of reliance on the efficiency of the ARS market" rebutted where "Merrill
Lynch's participation in the ARS market was revealed to the public with the degree of credibility
and intensity necessary to counterbalance any misinterpretations resulting from the alleged
manipulation").

recommendations or other statements *by Merrill Lynch*. Indeed, Louisiana Pacific does not allege that it ever communicated with, or received any information directly from, Merrill Lynch. Furthermore, Louisiana Pacific does not claim that its employees ever *read* or even were aware of the Offering Materials or ARS Practices and Procedures before or after purchasing the Merrill ARS. Thus, as a matter of law and logic, Louisiana Pacific could not have relied upon any information in those disclosures, justifiably or otherwise. See Teva, 09-cv-6205, at 30:3-13 (asking "[w]hat's the point of having a private placement memorandum if you don't read it," and finding "where the private placement memorandum describes what would be done in the auction rate market and how it's set and the like, you can't ignore that"); see also, e.g., In re Hyperion Sec. Litig., No. 93 Civ. 7179 (MBM), 1995 WL 422480, at *8 (S.D.N.Y. July 14, 1995) (stating parenthetically that "investor's failure to read risks disclosed in prospectus upon reliance on broker's oral statements unreasonable") (citation omitted); cf. Merrill Lynch ARS Litig. at *21 ("The Plaintiffs could have, with minimal diligence, read the prospectuses for the ARS they purchased") (citation omitted).

Given that Merrill Lynch's "widely available" and "easily accessible" disclosures specifically (i) state that Merrill Lynch "may routinely" provide auction support bids and, in fact, "routinely" made such bids (but was not required to do so), (ii) forecast the possibility of an auction failure, (iii) warn against the lack of liquidity in the market, and (iv) state that investors may rely only on the disclosures and that no one is authorized to make any contradictory representations (see Part I.A. & pages 6-7, supra), no reasonable investor could have been misled. Merrill Lynch ARS Litig. at *16 (noting "availability and "detail and credibility" of "prospectuses, 2006 SEC Order, and Merrill Lynch's ARS website," and, in analyzing fraud on the market allegations, holding that "no reasonable investor could have been misled by Merrill

Lynch's alleged failure to disclose its involvement in the ARS market"). That is particularly so for Louisiana Pacific, a $1.29 billion company and sophisticated investor that invested in ARS for years before its purchase of the Merrill ARS. See Ashland Inc. v. Morgan Stanley & Co., Inc., No. 09 CV 5415 (RPP), 2010 WL 1253932, at *14 (S.D.N.Y. Mar. 30, 2010) ("As a sophisticated institution contemplating the investment of tens of millions of dollars [in ARS], it was unreasonable for [plaintiff] to rely upon the highly general statements alleged as misstatements in this case").

Unable to plausibly claim reliance on anything concrete, Louisiana Pacific also argues that it relied "on the integrity of the marketplace and the auction processes" in "making its decision to purchase" the Merrill ARS. (FAC ¶ 171.) However, Louisiana Pacific's bald allegation plainly cannot be squared with Merrill Lynch's specific disclosures that fully and accurately apprised the market of exactly what it was doing and further provided clear warnings regarding the liquidity risks of these ARS. (See Part I.A & pages 6-7, supra.) Thus, in view of the "2006 SEC Order, . . . language from the [ARS Practices and Procedures on the Merrill Lynch] website," and the Offering Materials, all of which "disclosed that [Merrill Lynch] could engage in the very conduct of which [Louisiana Pacific] complains, the advantages that [Merrill Lynch] would have if [it] did engage in such conduct, the ability of such conduct to affect clearing rates and the possibility that the auctions would fail if [Merrill Lynch] did not intervene in them," any claim of reliance on contrary representations or "assumptions" by Louisiana Pacific would not be reasonable. Citigroup, 2009 WL 2914370, at *7.

### 5. The Amended Complaint Fails Adequately to Plead Loss Causation

Louisiana Pacific also fails to plead the essential element of loss causation. To state a claim under Section 10(b), the plaintiff must allege an injury that was proximately caused by the

defendant's alleged misconduct. See 15 U.S.C. § 78u-4(b)(4); Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 346-47 (2005). In other words, the complaint must include particularized allegations that the materialization of a *concealed* risk caused an investment loss. See Lentell, 396 F.3d at 172-73 (plaintiff's economic loss must be "foreseeable" and "caused by the materialization of the concealed risk"). Because Louisiana Pacific "does not plausibly allege that the 'materialization of the risk[s] [allegedly] concealed by the [purported] fraudulent statement[s]' caused the failure of the auctions," the Amended Complaint should be dismissed. Healthcare Fin. Group, Inc. v. Bank Leumi USA, 669 F. Supp. 2d 344, 349-50 (S.D.N.Y. 2009); see also Merrill Lynch ARS Litig. at *15-16, 20 (finding that, under the efficient market theory, "the ARS market would have incorporated the 2006 SEC Order, Merrill Lynch's website disclosure, and the prospectuses for the ARS at issue," and further finding that those disclosures "demonstrate that '[t]he 'total mix' of available information included the very information plaintiffs claim was concealed'") (citations omitted); In re Omnicom Group, Inc. Sec. Litig., 541 F. Supp. 2d 546, 551-52 (S.D.N.Y. 2008) ("disclosed fact must be new to the market[, and a] . . . recharacterization of previously disclosed facts cannot qualify as a corrective disclosure").

Indeed, Louisiana Pacific does not allege a link between the value of its ARS and revelation of any purported "misrepresentations" by Merrill Lynch. Moreover, Louisiana Pacific previously has stated publicly that its ARS losses were *not* the result of anything that Merrill Lynch did or said but, rather, were due to "liquidity issues experienced *in global credit and capital markets*." (See, e.g., Exs. Y at 38, 58; Z at 9, 35-36, 56 (emphasis added).) Where, as here, "the plaintiff's loss coincides with a market wide phenomenon causing comparable losses to other investors, the prospect that plaintiff's loss was caused by the fraud decreases, and a plaintiff's claims fail when it has not adequately plead facts which, if proven, would show that its

loss was caused by the alleged misstatements as opposed to intervening events." Lentell, 396
F.3d at 174 (quotations and citations omitted); see also Dura, 544 U.S. at 342-43 (change in price
of security from date of purchase "may reflect, not the earlier misrepresentation, but changed
economic circumstances, changed investor expectations, new industry-specific or firm-specific
facts, conditions, or other events"). Because the Amended Complaint includes no well-pled
allegations that Plaintiff's purported loss actually was caused by any alleged misrepresentations,
omissions, or manipulation by Merrill Lynch – rather than the unprecedented market-wide
failure of auctions for ARS, the collapse in the credit markets generally, or the unexpected
decline in value of Louisiana Pacific's particular ARS – loss causation has not been pled.

### 6.  Plaintiff Has Not Alleged an Economic Loss

Louisiana Pacific also fails to plead a legally cognizable theory of damages. Dura, 544
U.S. at 346-47. An auction failure is to be distinguished from a decline in value of the
underlying security. Upon such a failure, the holders of ARS are to be compensated for that lack
of liquidity by receiving an agreed upon interest rate, as expressly provided in the Offering
Materials. Any decline in value of the security due to deterioration of its underlying assets is
unrelated to the liquidity risk that is the focus of Plaintiff's claims. At best, Plaintiff's damages
are speculative because any such alleged loss is based on current illiquidity rather than any
alleged default. (FAC ¶ 9.) Moreover, as explained above, Louisiana Pacific has not indentified
the proportion of its alleged loss that is attributable to any alleged fraud by Merrill Lynch. (See
Part II.B.5, supra.)[29]

---

[29]  Nor does Section 28(a) of the Exchange Act permit Louisiana Pacific to obtain consequential
damages based upon its self-serving contention that it somehow was "foreseeable" that, in the
event its $55.575 million investment in the Merrill ARS became illiquid, Louisiana Pacific
would need to issue $375 million in debt and enter into a new $100 million credit facility during
(*Footnote cont.*)

## II.  PLAINTIFF FAILS TO STATE A SECTION 20(a) CLAIM AGAINST ML & CO.

Because the Amended Complaint does not plead a primary violation under Section 10(b)

(Rombach, 355 F.3d at 177-78), and otherwise fails to plead particularized facts of conscious

misbehavior by ML & Co. as a culpable participant in the alleged fraud (see, e.g., Mishkin v.

Ageloff, No. 97 Civ. 2690, 1998 WL 651065, at *22-26 (S.D.N.Y. Sept. 23, 1998) (Preska, J.)),

it does not state a Section 20(a) claim against ML & Co.[30]

## III.  PLAINTIFF FAILS TO STATE A CALIFORNIA CORPORATE SECURITIES LAW CLAIM AGAINST MERRILL LYNCH

Louisiana Pacific fails to state a claim against Merrill Lynch for violation of the

California Corporate Securities Law ("CSL").  As an initial matter, Louisiana Pacific does not

allege that it was injured in California from any conduct by Merrill Lynch.  That is not surprising

given that Louisiana Pacific is based in Tennessee and its only relevant contacts with California

were its dealings with its broker, MM1.  Moreover, Louisiana Pacific does not allege that it had

communications or any interaction with anyone at Merrill Lynch in California (or anywhere else)

---

an unprecedented market-wide credit crunch (FAC ¶¶ 152-54).  See, e.g., LNC Investments, Inc.
v. First Fidelity Bank, No. 92 Civ. 7584 (MBM), 1997 WL 528283, at *34 (S.D.N.Y. Aug. 27,
1997) (collecting cases). Likewise, "punitive damages are unavailable under the 1934 Act"
(Boguslavsky v. Kaplan, 159 F.3d 715, 721 (2d Cir. 1998) (collecting authorities)), nor in
connection with the state law claims.  See, e.g., Grieves v. Sup. Court, 157 Cal. App. 3d 159, 166
(Cal. Ct. App. 4th Dist. 1984).

[30] Furthermore, all of Louisiana Pacific's purported federal securities law claims against Merrill
Lynch, which concern securities that were purchased on or before July 30, 2007, but which were
not asserted until more than two years later (on July 31, 2009), are time barred.  Indeed, when
Louisiana Pacific purchased the Merrill ARS, it was charged with knowledge of the Offering
Materials, May 31, 2006 SEC Order, and Merrill Lynch ARS Practices and Procedures. Further,
pursuant to the Offering Materials, Louisiana Pacific represented that, as a sophisticated investor,
it understood the attributes and risks associated with its investment. Thus, because Louisiana
Pacific was on inquiry notice of any purported federal securities law claims against Merrill
Lynch no later than July 30, 2007, but failed to assert any such claims until more than two years
later, those claims are time barred. See 28 U.S.C. § 1658(b); Shah v. Meeker, 435 F.3d 244,
251-52 (2d Cir. 2006).

regarding the Merrill ARS or any other topic.  Nor does Louisiana Pacific plead that Merrill

Lynch provided to MM1 a contradictory or incorrect interpretation of the Offering Materials or

Merrill Lynch's ARS Practices and Procedures, which MM1 then repeated to Louisiana Pacific

in California.  Further, Louisiana Pacific does not allege that Merrill Lynch approved of, or knew

about, any alleged misrepresentations that MM1 made to Louisiana Pacific in California.  Absent

any such well-pled allegations of California-based conduct by Merrill Lynch, or allegations of an

injury incurred by Louisiana Pacific in California as a result of conduct by Merrill Lynch in

California, as a matter of law, Louisiana Pacific cannot assert any CSL claim against Merrill

Lynch.  See Norwest Mortgage, Inc. v. Sup. Court, 72 Cal. App. 4th 214, 224-25 (Cal. Ct. App.

4th 1999) (non-California residents cannot assert California statutory claims for injuries

allegedly "caused by conduct occurring outside California's borders, by defendants whose

headquarters and principal places of operations are outside California") (interpreting Diamond

Multimedia Sys., Inc. v. Sup. Court, 19 Cal. 4th 1036, 1063 (1999) ("[S]ection 25400 regulates

only manipulative conduct in California") (emphasis added)); see also, e.g., Churchill Village,

LLC v. General Elec. Co., 169 F. Supp. 2d 1119, 1126-27 (N.D. Cal. 2000) ("[B]eyond

California's presumption against the extraterritorial application of its laws, a California court's

adjudication of non-residents' claims that lack a nexus with California 'raises significant due

process problems'") (citing Norwest Mortgage, 72 Cal. App. 4th at 225).

Moreover, even if it were permitted to assert the claim, Louisiana Pacific's allegations do

not state a CSL claim against Merrill Lynch.  As an initial matter, Louisiana Pacific asserts that

Merrill Lynch violated CSL Sections 25500, 25501, and 25504 (FAC ¶¶ 192-202), and each

claim must meet the stringent pleading requirements of Rule 9(b).  See, e.g., Wentner v.

Ridgewood Energy Corp., 62 F.3d 1427 (9th Cir. 1995) (dismissing CSL claims pursuant to Rule

9(b)); Kainos Labs., Inc. v. Beacon Diagnostics, Inc., No. C-97-4618 MHP, 1998 WL 2016634, at *12-13 (N.D. Cal. Sept. 14, 1998) (same). The claims do not come close to meeting this high pleading standard.

First, Section 25500 provides a claim against "[a]ny person who willfully participates in any act or transaction in violation of Section 25400." Here, Louisiana Pacific alleges that the underlying Section 25400 violation is limited to subsections (b) and (d). (FAC ¶ 196.) Section 25400(b) prohibits effecting transactions to induce the purchase or sale of securities, and 25400(d) prohibits participating in any materially false or misleading statement to induce such purchases or sales. Harold Marsh, Jr. & Robert H. Volk, Practice Under the Calif. Sec. Laws, § 14.05[2][d] (2008)). Moreover, the "purpose and intent of the willful participation requirement is to clarify and underscore the *high level of scienter* required for a violation of section 25500." California Amplifier, Inc. v. RLI Ins. Co., 113 Cal. Rptr. 2d 915, 923 (Cal. Ct. App. 2d Dist. 2001) (emphasis added). As explained above, the Amended Complaint contains no particularized allegations that Merrill Lynch engaged in any conduct to induce Louisiana Pacific to purchase ARS, much less with a "high level of scienter." As discussed in detail, Merrill Lynch had no dealings with Louisiana Pacific whatsoever and disclosed both at the time the Merrill ARS were issued and, later, in the ARS Practices and Procedures, the risks about which Louisiana Pacific complains. Louisiana Pacific has not alleged, and cannot allege, that Merrill Lynch induced its investment.

Second, the Section 25501 claim, which provides for liability for violations of Section 25401, also is deficiently pled. Section 25401 is akin to Section 12(a)(2) of the Securities Act of 1933, in that it makes it "unlawful for any person to offer or sell a security in [California] . . . by means of any written or oral communication which includes an untrue statement of a material

fact or omits to state a material fact necessary in order to make the statements made . . . not misleading." CSL § 25401. As discussed above, the Amended Complaint does not allege that Merrill Lynch made any misleading statements to Plaintiff. Further, any claim under Sections 25401 and 25501 requires "strict privity" between the parties. See, e.g., Alameda v. Nuveen Mun. High Income Opportunity Fund, No. C 08-4575 SI, 2009 WL 1424529, at *11 (N.D. Cal. May 20, 2009). Because Louisiana Pacific does not allege that it purchased any securities directly from Merrill Lynch or that it otherwise lies in direct privity with Merrill Lynch, the claim must fail.

Finally, Section 25504 provides for liability for persons or entities controlling those who violate Sections 25401 and 25501. (FAC ¶ 202.) Because the underlying claims have not been stated, the control-person claim fails as well.[31]

## IV.  PLAINTIFF FAILS TO PLEAD A COMMON LAW FRAUD CLAIM AGAINST MERRILL LYNCH

A claim of common law fraud requires specified allegations of "misrepresentation, knowledge of its falsity, intent to defraud, justifiable reliance and resulting damage." Gil v. Bank of Am., Nat. Ass'n, 138 Cal. App. 4th 1371, 1381-82 (Cal. Ct. App. 2d Dist. 2006); accord Bui v. Indus. Enters. of Am., Inc., 594 F. Supp. 2d 364 (S.D.N.Y. 2009); Priest v. Global Furniture, Inc., No. 1:05CV165, 2006 WL 752594, at *2-3 (E.D. Tenn. Mar. 23, 2006). For the reasons discussed in Part I, supra, Louisiana Pacific has not stated such a claim against Merrill Lynch as the Amended Complaint contains no particularized allegations of falsity, materiality, scienter, reasonable reliance, or damages.

---

[31] Also, for the reasons stated in note 30, supra, Louisiana Pacific's CSL claims are time barred. See also Cal. Corp. Code § 25506(b) (two year statute of limitations for CSL claims).

## CONCLUSION

For all of the foregoing reasons, Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce,

Fenner & Smith Incorporated respectfully request that the Court dismiss the First Amended

Complaint with prejudice and grant such other and further relief as it deems just and proper.

Dated: New York, New York
       April 9, 2010

                                   SIDLEY AUSTIN LLP

                                   By: _____
                                       Andrew W. Stern (astern@sidley.com)
                                       Nicholas P. Crowell (ncrowell@sidley.com)
                                       Alex J. Kaplan (ajkaplan@sidley.com)
                                       787 Seventh Avenue
                                       New York, New York 10019
                                       Telephone: (212) 839-5300
                                       Facsimile:  (212) 839-5599

                                   *Attorneys for Defendants Merrill Lynch & Co.,
                                   Inc. and Merrill Lynch, Pierce, Fenner & Smith
                                   Incorporated*