USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/11/10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X
                   :
In re Merrill Lynch Auction Rate  :  09 MD 2030 (LAP)
Securities Litigation             :
                   :  Opinion and Order
----------------------------------X
                   :
This Document Relates To:         :
                   :
Louisiana Stadium and Exposition  :
District, et al.,                 :
                   :
        Plaintiffs,               :
                   :
        v.                        :
                   :
Financial Guaranty Insurance Co., :
et al.,                           :
                   :
        Defendants.               :
                   :
      No. 09 Civ. 5404 (LAP)    :
      No. 09 Civ. 6770 (LAP)    :
                   :
- - - - - - - - - - - - - - - - - -X

LORETTA A. PRESKA, Chief U.S. District Judge

This case is one of several that make up the multidistrict litigation known as In re Merrill Lynch Auction Rate Securities Litigation, 09 MD 2030.  Plaintiff the Louisiana Stadium and Exposition District ("LSED") alleges four causes of action against Defendant Financial Guaranty Insurance Company ("FGIC"): failure of cause, breach of contract, detrimental reliance, and unjust enrichment.  FGIC moves to dismiss the allegations for

1

failure to state a claim.  For the reasons set forth below,
FGIC's motion to dismiss is GRANTED.

## I. Background

### A. LSED Issues the Bonds

LSED is a corporate and political subdivision of the State
of Louisiana.  LSED owns and has jurisdictional authority over
the Louisiana Superdome ("Superdome") and leases it to the
State. (Compl. ¶ 15.)  Around the time of the events at issue,
LSED's main source of revenue was a Hotel Occupancy Tax that
charged a 4% fee for occupancy in any hotel located within
certain Parishes in New Orleans. (Id. ¶ 39.)  FGIC is a stock
insurance company with its principal place of business in New
York, New York. (Id. ¶ 20.)

In 2005, LSED sought to refinance its existing debt to take
advantage of lower interest rates.  Through the Louisiana State
Bond Commission, LSED began soliciting offers from various
underwriters to structure and manage new bonds. (Id. ¶ 30.)
LSED eventually accepted a proposal from Merrill Lynch, Pierce,
Fenner & Smith, Inc. ("Merrill Lynch") to serve as lead
underwriter and broker-dealer for the proposed bonds. (Id.
¶ 37.)  LSED and Merrill Lynch agreed that they would work
together to develop a bond structure that would fit LSED's
particular financing needs. (Id.)

2

On August 29, 2005, Hurricane Katrina struck the City of New Orleans.  The hurricane caused severe damage to the Superdome and New Orleans hotels and resulted in a slump in tourism. (Id. ¶ 39.)  Faced with the likelihood that revenue from the Hotel Occupancy Tax would be lower than anticipated, LSED made clear to Merrill Lynch that the parties urgently needed to develop a plan to refinance LSED's debt in a more cost-effective way, raise funding to make repairs to the Superdome, and reduce LSED's debt service payments. (Id. ¶ 40.) Merrill Lynch suggested that LSED issue auction rate securities using a synthetic fixed rate structure, which would convert LSED's floating rate payment obligations set by the auctions into fixed obligations. (Id. ¶ 43.)  Merrill Lynch allegedly failed to disclose to LSED that the success of the proposed bond structure was dependant on Merrill Lynch's submitting support bids in every auction for the thirty-year life of the bonds. (Id. ¶ 48.)  Absent Merrill Lynch's bidding for its own account, the auctions would not produce the desired interest rates. (Id.)

The proposed plan also included LSED's obtaining insurance for the bonds. (Id. ¶ 53.)  Merrill Lynch predicted that bond insurance would result in cash flow relief and interest rate savings of at least 100 basis points. (Id.)  LSED subsequently paid $13 million to FGIC for the Municipal Bond New Insurance Policy and Municipal Bond Debt Service Reserve Fund Policies

(collectively the "Policies"). (Id. ¶ 74.) LSED believed that
the large up-front payment was worthwhile because the Policies
would save LSED more than $13 million in interest payments over
the life of the Bonds. (Id. ¶¶ 77-78.) LSED anticipated that
insured bonds would offer lower interest rate payments than
uninsured bonds because FGIC would provide credit enhancement:
the Policies would "wrap" the Bonds with FGIC's triple-A credit
rating and therefore make the Bonds more attractive to
investors. (Id. ¶¶ 88-89.)

In March 2006, Merrill Lynch and LSED closed on the
issuance of three series of bonds: the Series 2006A bonds, the
Series 2006B bonds, and the Series 2006C bonds (the "Bonds").
(Id. ¶¶ 63-65.) The Bonds, insured by the Policies that LSED
had purchased from FGIC, began their periodic auction cycles in
April 2006.

## B. The Auctions Fail and FGIC is Downgraded

At the time that LSED paid FGIC the premium for the
Policies and issued the Bonds, FGIC was entering into a series
of credit default swaps and guarantees of securities of
collateralized debt obligations consisting of subprime
mortgages. (Id. ¶¶ 157-58.) These transactions proved
disastrous when the housing and mortgage markets deteriorated in
2007 and 2008. On January 30 and 31, 2008, as FGIC's insured
portfolio came under increasing pressure, Fitch and Standard &

4

Poor's downgraded FGIC's credit ratings to AA. (Compl. ¶ 159.)
On February 14, 2008, Moody's Investors Service downgraded
FGIC's rating six levels to A3. (Id. ¶ 160.)  By the end of the
first quarter of 2008, FGIC had ceased writing new business.
(Id. ¶ 161.)  By April 2009, Moody's and Standard & Poor's had
completely withdrawn their ratings of FGIC; Moody's anticipated
that the loss from FGIC's portfolio would exceed claims paying
resources. (Id. ¶¶ 162-63.)

     The auction rate securities market also underwent
significant changes in 2007 and 2008.  Since April 2006, Merrill
Lynch had placed support bids in one-hundred percent of the
auctions for the Bonds and set the clearing rates for the Bonds
in all but a handful of auctions. (Id. ¶¶ 91-95.)  Sixty-nine
percent of the auctions that occurred between April 2006 and
February 2008 would have failed without Merrill Lynch's support
bidding. (Id. ¶ 96.)  On February 13, 2008, Merrill Lynch did
not place a support bid in an auction for the Series 2006B
bonds. (Id. ¶ 109.)  As a result, the auction failed, and the
interest rate was set at the predetermined failure rate of
twelve percent. (Id.)  Merrill Lynch similarly declined to bid
in a February 15, 2008 auction for the Series 2006C bonds,
causing that auction to fail and the failure rate to kick in.
(Id. ¶ 110.)  In subsequent auctions for the three series of
Bonds, Merrill Lynch bid at or around the failure rate of twelve

percent, causing the auctions to clear at that rate. (Id. ¶¶ 109-11.) The interest rates continued to be set at or around twelve percent until April 2008, when the State of Louisiana purchased substantially all of the Bonds at a rate of 2.9% in an effort to mitigate LSED's damages. (Id. ¶¶ 109-12, 201.)

**C. The New York Insurance Department's November 2009 Order**

On November 24, 2009, FGIC announced that the New York Insurance Department ("NYID") had issued an order requiring FGIC to suspend paying any and all claims (the "NYID Order"). (Id. ¶ 164.) The NYID Order also required FGIC to take steps to remove the impairment of its capital and to return to compliance with its minimum surplus to policyholders requirement. (Id. ¶ 165.) On March 25, 2010, the NYID issued a Supplemental Order (the "NYID Supplemental Order") stating that "based on confidential proprietary information constituting trade secrets provided by [FGIC] to [NYID], the Superintendent ha[d] determined that it [was] appropriate to provide additional time within which [FGIC] shall take such steps as may be necessary to remove the impairment to its capital and return to compliance with its minimum surplus to policyholders requirement." (Declaration of Shari A. Brandt in Support of Defendant Financial Guaranty Insurance Company's Reply Memorandum of Law in Support of Defendant's Motion to Dismiss the Third Amended and Supplemental Complaint ("Brandt Reply Decl.") Ex. B.)

6

FGIC's deadline for returning to compliance is now June 15,
2010; the other provisions of the NYID Order remain in effect.
(See id.)

### D. Procedural Background

On June 10, 2009, the United States Panel on Multidistrict
Litigation transferred this action from the Eastern District of
Louisiana for inclusion in coordinated or consolidated pretrial
proceedings pursuant to 28 U.S.C. § 1407.  Following the MDL
Panel's transfer order, the parties stipulated to a revised
scheduling order.  LSED filed a second amended complaint on
September 30, 2009.  After the Defendants sent LSED letters
detailing perceived deficiencies in the second amended
complaint, LSED filed a third amended complaint (the
"Complaint") on December 10, 2009.  That same day LSED also
filed a motion for a suggestion of severance and remand of its
claims against FGIC. [dkt. no. 36.][1]  On December 21, 2009, LSED
filed a motion to compel arbitration of its claims against
Merrill Lynch and to stay the instant proceedings pending
arbitration. [dkt. no. 42.]  On February 8, 2010, the Court
denied both motions. See In re Merrill Lynch Auction Rate
Securities Litigation, No. 09 MD 2030 (LAP), 2010 WL 532855

---

[1] Unless otherwise indicated, docket numbers refer to the docket
for 09-md-2030.

(S.D.N.Y. Feb. 8, 2010). That same day, FGIC filed a motion to dismiss the Complaint. [dkt. no. 74.]

Due to the concerns raised by LSED about FGIC's perilous financial condition in LSED's motion to remand and in a subsequent teleconference on February 10, 2010, the parties agreed to an expedited briefing schedule. On April 9, 2010, the parties convened before the Court for oral argument on FGIC's motion to dismiss. This decision follows.

## II. Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555). Moreover, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks and citations omitted). In assessing whether a plaintiff has met this standard, the Court must accept all non-conclusory factual allegations as true and draw all reasonable inferences in the

plaintiff's favor. Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008) (internal quotation omitted).

Consideration of material outside the complaint normally requires the court to convert a motion to dismiss into a motion for summary judgment. Fed. R. Civ. P. 12(b). However, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." Id. (quoting Int'l Audiotext, 62 F.3d at 72).

## III. Louisiana Law

### A. Choice of Law

FGIC and LSED initially briefed FGIC's motion to dismiss under Louisiana law.  FGIC changed course in its reply and stated that it was not conceding that Louisiana law—as opposed to New York law—applied. (See Reply Memorandum of Law in Support of Defendant Financial Guaranty Insurance Company's Motion to Dismiss the Third Amended and Supplemental Complaint

("Reply") 2 n.1.)  The Court requested that the parties prepare
to argue the choice of law issue at the April 9 hearing.  Prior
to the hearing, however, FGIC conceded that Louisiana law
applied. (See Letter from Brian S. Fraser (Apr. 8, 2010); Oral
Argument Transcript ("Tr.") 4:15-18, Apr. 9, 2010.)  The Court
will therefore apply Louisiana law to the Complaint.

### B. The Louisiana Civil Code

Louisiana is a civil law state.  Under the Louisiana Civil
Code, "[t]he sources of law are legislation and custom." La.
Civ. Code art. 1.  "However, as in all codified systems,
legislation is the superior source of law in Louisiana." Id.
Comment (a).  "Legislation is a solemn expression of legislative
will." Id. art. 2.  While *stare decisis* is not controlling in
Louisiana, Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331,
1334 (La. 1978), "secondary sources of law, such as
jurisprudence, doctrine, conventional usages, and equity . . .
may guide the court in reaching a decision in the absence of
legislation and custom," La. Civ. Code art. 1 Comment (b).
Courts may therefore look to "decisions rendered by the
Louisiana appellate courts, particularly when numerous decisions
are in accord on a given issue—the so-called *jurisprudence
constant*—but [courts] are not strictly bound by them."
Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co., 953 F.2d 985,
988 (5th Cir. 1992).

## IV. Discussion

LSED seeks a reimbursement of the premium it paid for the Policies under four causes of action: failure of cause, breach of contract, detrimental reliance, and unjust enrichment. (Compl. ¶¶ 3, 14, 285-307.)  Each cause of action is discussed below.

### A. Failure of Cause

LSED's primary argument for obtaining a return of a portion of the premium is that the principal cause of the parties' contract[2] has failed.  LSED argues that this principal cause was to obtain "credit enhancement for the life of the Bonds through FGIC's maintaining its 'triple-A' rating and through FGIC's ability to insure LSED's obligations over the 30-year life of the Bonds." (Id. ¶ 290.)  This cause allegedly failed when FGIC lost its triple-A ratings and became unable to provide credit enhancement for the Bonds. (Id. ¶ 289.)  LSED seeks rescission

---

[2] The Court notes at the outset that the contours of this contract are not entirely clear.  The parties refer both to the letters committing FGIC to provide insurance for the Bonds (the "Commitment Letters") as well as the Policies themselves. (See Tr. 5:23-6:7 (arguing that the contractual provision at issue is the promise to pay under the Policies); Opposition at 11-12 (citing the Commitment Letters); Reply at 6 (citing the Commitment Letters).)  The Court also notes that it may consider the Commitment Letters and the Policies without converting FGIC's motion to dismiss into a motion for summary judgment because the Plaintiffs rely on the terms of these documents and reference them in the Complaint. See (Compl. ¶¶ 74, 285-307); Chambers, 282 F.3d at 152.

of the contract on the theory that it was in error as to the

principal cause of the parties' agreement when it paid $13

million for the Policies.

Under Louisiana law, "[a]n obligation cannot exist without

a lawful cause." La. Civ. Code art. 1966.

> "Cause is the reason why a party obligates himself."
> La. Civ. Code art. 1967.  Error can vitiate consent,
> so that a contract may be rescinded based upon error.
> La. Civ. Code art. 1948.  Article 1950 of the Civil
> Code describes an error which may concern cause as
> anything which the parties "should in good faith have
> regarded, as a cause of the obligation."  Further,
> "[e]rror vitiates consent only when it concerns a
> cause without which the obligation would not have been
> incurred, and that cause was known or should have been
> known to the other party." La. Civ. Code art. 1949.

Cyprien v. Bd. of Sup'rs ex rel. Univ. of La. Sys., 5 So.3d 862,

868 (La. 2009).

In Cyprien, for example, an assistant basketball coach

("Cyprien") applied for a position as head coach of the

University of Louisiana at Lafayette ("ULL") basketball team.

Id. at 864.  After interviewing for the position, Cyprien had a

student worker at his former university fax a copy of his resume

to ULL. Id.  The resume stated that Cyprien had graduated from

the University of Texas at San Antonio ("UTSA") with a Bachelor

of Science Degree; in fact, Cyprien had never graduated from

UTSA. Id.  After ULL hired Cyprien, a newspaper revealed the

apparent falsity on his resume.  ULL fired Cyprien that same

day.  Cyprien filed suit seeking damages for defamation and
breach of contract. Id.

The Louisiana Supreme Court granted summary judgment for
ULL on the ground that it properly rescinded the contract with
Cyprien due to a failure of cause. Id. at 867-68.  The Court
looked to affidavits from ULL officials and determined that ULL
would not have offered Cyprien the position if it had known that
he did not have a degree from an accredited university. Id. at
168.  "Cyprien clearly knew or should have known that his
academic qualifications were an important factor in ULL's
decision to hire him." Id.  Under these circumstances, ULL
validly rescinded the contract based on error in the cause. Id.

Another Louisiana court ordered the rescission of a
contract based on failure of cause in Nugent v. Stanley, 336
So.2d 1058 (La. App. 3d Cir. 1976).  The plaintiffs in that case
(the "Nugents") entered into negotiations with the defendant
("Stanley") to buy the defendant's carpet installation and
appliance repair business. 336 So.2d at 1060.  During the
negotiations, the Nugents made clear to Stanley that they
desired to purchase a business with an established line of
credit and a good reputation and goodwill in the community. Id.
Stanley assured the Nugents that they would acquire $12,000.00
to $15,000.00 in existing contracts for carpet installation. Id.
After the parties completed the sale, the Nugents discovered

13

that the business had an extremely poor credit rating and that

no profitable contracts existed. Id. at 1061.  The court held

that the principal cause of the Nugent's entering into the

contract was "their belief that they were acquiring a going

business with a good credit reputation and that upon

consummation of the sale they would immediately acquire firm

executory contracts for the installation of carpet." Id. at

1063.  Because Stanley was clearly aware of this belief, the

court ordered the contract rescinded for failure of cause. Id.

at 1063.

A party's unilateral error must be reasonable or excusable

in order for the error to vitiate consent. Quality Design and

Const., Inc. v. Capital Glass Co., Inc., No. 2008 CA 0838, 2008

WL 4764341, at *4 (La. App. 1st Cir. 2008).  "Louisiana

jurisprudence is sprinkled with cases which deny relief to

parties who claim an agreement should be invalidated because of

unilateral error which is caused, in large part, by the

complaining party's inexcusable ignorance, neglect, or want of

care." Scott v. Bank of Coushatta, 512 So.2d 356, 362 (La.

1987).  "Louisiana courts appear reluctant to vitiate agreements

when the complaining party is, either through education or

experience, in a position which renders his claim of error

particularly difficult to rationalize, accept, or condone." Id.

Moreover, "[s]olemn agreements between contracting parties

14

should not be upset when the error at issue is unilateral, easily detectable, and could have been rectified by a minimal amount of care." Id.

In Degravelles v. Hampton, 652 So.2d 647 (La. App. 1st Cir. 1995), for example, tenants sued their landlord after the tenants incurred costs maintaining and repairing the premises. The landlord argued that he had intended to enter into a contract whereby the tenants would be responsible for maintenance and repairs; despite this intention, the signed contract explicitly stated that the landlord was responsible for these costs. See 652 So.2d at 648-49. Testimony at trial revealed that a third individual had told the landlord prior to signing that the terms of the lease obligated him to pay maintenance and repairs. See id. at 649-50. "None of the parties to the contract were uneducated or disadvantaged in the process of negotiating th[e] lease. [The landlord] had previous real estate transaction experience and did not misunderstand any of his other obligations under the lease." Id. at 650. Given these circumstances, and given the defendant's failure to change the term of the lease after receiving the warning, the court held that his mistake constituted inexcusable neglect rather than unilateral error sufficient to vitiate his consent. Id. at 650.

15

Louisiana courts are likewise hesitant to vitiate a contract due to error when the error concerns an event that is expected to take place in the future. See St. Charles Ventures, L.L.C. v. Albertsons, Inc., 265 F. Supp. 2d 682, 693–94 (E.D. La. 2003).  "The Louisiana courts have consistently held that incorrect assumptions about future events that may affect profitability are not grounds for rescission of a contract." Id. at 699.  In St. Charles Ventures, for example, a development company purchased property in an area of New Orleans with the intention of developing a grocery store. Id. at 683.  A supermarket chain contracted with the development company to develop a supermarket building on the site, sell the building and site improvements to the development company, and then lease the site from the development company for a period of twenty-five years. Id. at 684.  The supermarket chain subsequently sought to terminate the contract when the New Orleans City Counsel approved the construction of a competing Wal-Mart Supercenter Store in the same area. Id.  at 685.

The court held that the supermarket chain could not rescind the contract due to failure of cause.  The supermarket chain argued that the principal cause of the contract was to run a profitable supermarket without competition; with Wal-Mart moving into the same area, the chain could no longer do so. Id.  The court disagreed that the impossibility of a competitor's

entering the market area was the principal cause of the
contract.  First, the court noted that "[o]bviously the
construction of an outlet in the 'market area' was and is
possible." Id. at 694.  Second, even assuming that the
development company knew that the chain relied on the assumption
that a competitor's entry into the market was highly improbable,
the fact of this improbability was simply one of several motives
of the chain in entering into the contract. Id.  "The
possibility of another competitor may have been remote, but was
clearly possible.  The fact that a Wal-Mart store [could] become
a reality [was] simply not a failure of cause or error." Id. at
699.

        The instant case involves an alleged cause that was
explicitly contradicted by the terms of the Commitment Letters
and that involved events expected to occur in the future.  LSED
does not allege that the Commitment Letters contained a
provision guaranteeing triple-A ratings.  Rather, the Commitment
Letters referred to the attached "Official Statement Disclosure
Language," which LSED was required to include in the Bonds.
(Declaration of Shari A. Brandt in Support of Defendant
Financial Guaranty Insurance Company's Motion to Dismiss Third
Amended and Supplemental Complaint ("Brandt Decl.") Exs. I-J at
¶ 15; Id. Ex. B at 48.)  The disclosure language stated that
FGIC's triple-A ratings reflected the "ratings agencies' current

17

assessments of the insurance financial strength of Financial Guaranty." (Id. Exs. I, J.) "These ratings [were] not recommendations to buy, sell or hold the Bonds, and [were] subject to revision or withdrawal at any time by the rating agencies." (Id.) "Financial Guarantee d[id] not guarantee the market price or investment value of the Bonds nor d[id] it guarantee that the ratings on the Bonds w[ould] not be revised or withdrawn." (Id.) The disclosure language also stated that the Policies did "not insure any risk other than Nonpayment by the Issuer." (Id. Ex. I.)

Given the absence of a clause in the contract guaranteeing credit enhancement, the attachment of the disclosure language to the Commitment Letters, and LSED's inclusion of the disclosure language in the Bonds, any erroneous belief by LSED that the principal cause of the Commitment Letters was to secure thirty years of credit enhancement was not reasonable. By their terms, the Letters required FGIC to issue the Policies for the Bonds; the Policies guaranteed the principal or interest due for payment to the Bondholders in the event of LSED's failure to pay. Both LSED and FGIC were sophisticated entities experienced in the issuance and insurance of bonds. (See Compl. ¶¶ 15, 20, 29.) According to LSED's allegations, FGIC's triple-A credit rating was central to FGIC's ability to provide credit enhancement for the Bonds. (See id. ¶ 287 ("[The interest rate]

savings would only occur if FGIC's wrapper of the Bonds continued to supply the "triple-A" rating.").)  In light of the apparent importance that LSED placed on FGIC's ratings at the time of the parties' agreement, FGIC's demand that LSED include language in the Bonds warning that FGIC's ratings were not guaranteed should have raised "red flags" to LSED that the parties were not contracting for thirty years of guaranteed credit enhancement. Scott v. Bank of Coushatta, 512 So.2d 356, 362 (La. 1987) (quoting Marsh Investment Corp. v. Langford, 554 F. Supp. 800, 805 (E.D. La. 1982)).

A recent case from the District of Massachusetts came to a similar conclusion.  In NPS, LLC v. Ambac Assurance Corp., --- F. Supp. 2d ----, No. 08-11281-DPW, 2010 WL 723786, at *1 (D. Mass. Feb. 25, 2010), NPS LLC ("NPS") issued bonds to fund the construction of Gillette Stadium.  NPS purchased financial guaranty insurance for the bonds from Ambac Assurance Corporation ("Ambac").  The insurance policy called for annual premiums as well as a guaranteed premium which would be payable if NPS paid the bonds in full within the first ten years of the term. See id. at *1.  In 2008, NPS redeemed the bonds in full but informed Ambac that it would not pay the guaranteed premium. When Ambac sued for breach of contract, NPS responded that it was excused from performing under New York's frustration of

19

purpose doctrine.[3] See id. at *11. Specifically, NPS argued that
the sole purpose of obtaining the insurance policy was to wrap
the bonds with Ambac's triple-A credit rating in order to
increase the bonds' marketability and reduce NPS's interest
payments. See id.

The court disagreed. First, the court held that the
language of the contract suggested "that NPS's principal purpose
in entering the Agreement was to obtain financial guaranty
insurance for the 2006 bonds, thereby ensuring that the
bondholders would still be paid in the event that NPS itself
could not pay them." Id. at *11. Second, the court held that
NPS could not

> show that the non-occurrence of a reduction in Ambac's
> credit rating was a basic assumption on which the
> contract was based. A credit rating is determined by
> external institutions, not the rated agency. The
> rating itself is subject to periodic review. NPS was
> aware that these institutions could at some point
> alter their evaluation of the risks involved in

---

[3] In New York, frustration of purpose is a "narrow" doctrine
which does not apply "unless the frustration is substantial."
Crown It Services, Inc. v. Koval-Olsen, 782 N.Y.S.2d 708, 711
(N.Y. App. Div. 2004) (quoting Rockland Development Assocs. v.
Richlou Auto Body, Inc., 570 N.Y.S.2d 343, 344 (N.Y. App. Div.
1991)). "In order to invoke this defense, the frustrated purpose
must be so completely the basis of the contract that, as both
parties understood, without it, the transaction would have made
little sense." Id. (citing Restatement (Second) of Contracts
§ 265 (1981)). Moreover, "the non-occurrence of the frustrating
event must have been a basic assumption on which the contract
was made." NPS, 2010 WL 723786, at *11 (quoting Metro. Life Ins.
Co. v. RJR Nabisco, Inc., 716 F. Supp. 1504, 1523 (S.D.N.Y.
1989) and Restatement (Second) of Contracts § 265 cmt. a
(1981)).

Ambac's business model. Indeed, NPS itself notified
prospective bondholders that a reduction in Ambac's
credit rating was possible, stating: "There is no
assurance that such ratings will continue for any
given period of time or that they will not be revised
downward or withdrawn entirely by such rating agencies
if, in the judgment of such rating agencies,
circumstances so warrant." While NPS may have
selected Ambac as an insurer because of its strong
credit rating history, and while NPS may have had
reason to expect that the strong credit rating would
continue, there is no indication that NPS's decision
to enter the Agreement was or could reasonably have
been premised on the basic assumption that Ambac's
credit rating would not be reduced.

Id. at *12.

As in NPS, the Commitment Letters do not specify that FGIC
was agreeing to provide credit enhancement for the life of the
bonds. Rather, credit enhancement was mentioned in LSED's
discussions with Merrill Lynch and in FGIC's marketing and other
material available to LSED before the signing of the contract.
(See Compl. ¶¶ 80-88.) While obtaining credit enhancement for
the Bonds at the time of their issuance may have been an
advantage to contracting with FGIC, "characterizing the receipt
of these benefits as a 'principal' purpose of the Agreement runs
counter to the contractual document itself as well as to the
nature of the contractual relationship between the parties."
NPS, 2010 WL 723786, at *11; see also Water Works Bd. of the
City of Birmingham v. Ambac Fin. Group, Inc., CV-09-AR-2296-S,
slip op. at 6 (N.D. Ala. Apr. 1, 2010) ("It would defy logic and
common sense for Ambac to obligate itself to maintain for

thirty-five (35) years the highest possible credit rating, when the determination and award of credit ratings are by separate entities.").

The cases cited in LSED's brief on failure of cause do not guide the Court to the conclusion LSED seeks.  In those cases, the error as to cause concerned facts ascertainable at the time of contracting. See Cyprien v. Bd. of Sup'rs ex rel. Univ. of La. Sys., 5 So.3d 862, 868 (La. 2009) (in contract between university and basketball coach, error as to whether coach possessed a college degree); Nugent v. Stanley, 336 So.2d 1058, 1063 (La. App. 3d Cir. 1976) (in contract for the purchase of a business, error as to whether the business had a good credit reputation and a certain amount of existing contracts).  In contrast, whether FGIC would maintain its triple-A ratings for the thirty-year life of the Bonds was not ascertainable at the time of the agreement.  LSED does not allege that FGIC could not provide credit enhancement at the time that the parties contracted for the Policies.  Indeed, LSED benefitted from FGIC's triple-A ratings at the time the Bonds were issued and in the initial auctions following issuance; it was not until January 2008 that the agencies downgraded FGIC's ratings. (See Compl. ¶¶ 159-63.)  While LSED may have viewed as remote the possibility that FGIC would lose its triple-A ratings later in the life of the bonds, it cannot reasonably have believed that

22

the possibility was nonexistent. See St. Charles Ventures, 265
F. Supp. 2d at 693-94, 699.

     LSED does cite one case that appears to suggest that a
party's future actions can render a failure of cause.  In Angelo
& Son, LLC v. Piazza, 1 So.3d 705, 708 (La. App. 3d Cir. 2008),
a husband and wife agreed to purchase property with a house and
used car business from the wife's parents.  The wife's father,
who had previously operated the business, intended to retire but
agreed to stay on to help the husband and wife get started in
the business. See id.  Within weeks, disputes erupted between
the wife and her father, and the father set about to sabotage
the business. See id. at 710.  In effect, "[t]he business was no
longer a 'family business' as [the parents] distanced themselves
from it." Id.

     The court held that the contract was vitiated by a failure
of cause.  The husband and wife's consent was vitiated because
all of the factors that had driven the agreement——"[g]oodwill,
family ties, helping a father ease into well-deserved
retirement"——"disappeared, and the [husband and wife] were left
with a business and house they may have never really wanted in
the first place, but for the family considerations." Id.  The
husband and wife were therefore permitted to rescind the
contract. See id. at 707-08.

Unlike Piazza, this case is not "about the combination of business and familial considerations." Id. at 710.  Rather, the parties in the instant case were sophisticated business entities that entered into a written agreement containing language that specifically contradicted the precise cause that LSED now claims was the principal cause of their entering into the agreement. This type of explicit red flag was not present in Piazza. Moreover, the father in Piazza asserted and promised that he would aid his daughter and her husband in the operation of the business. See id. at 709.  In the instant case, LSED does not allege that the Commitment Letters or the Policies contained a promise by FGIC to provide thirty years of credit enhancement, or that FGIC made such a direct promise to LSED at any other time leading up to the transaction.  In these circumstances, LSED's belief that the principal cause of the parties' agreement was thirty years of credit enhancement was unreasonable.

LSED also argues that FGIC knew that thirty years of credit enhancement was a principal cause of the agreement because FGIC intended that its insurance policies be qualified guarantees under the applicable Treasury Regulations. (Compl. ¶ 79; Tr. 36:22-37:3.)  Those Treasury Regulations state that "[a] guarantee is a qualified guarantee if it satisfies each of the requirements of paragraphs (f)(2) through (f)(4) of" of 26 C.F.R. § 1.148-4. 26 C.F.R. § 1.148-4(f)(1).  Paragraph (2)

requires that "[a]s of the date the guarantee is obtained, the issuer must reasonably expect that the present value of the fees for the guarantee will be less than the present value of the expected interest savings on the issue as a result of the guarantee." 26 C.F.R. § 1.148-4(f)(2).  LSED points out that the representations made in the Certification Letters from FGIC and Merrill Lynch "closely track" the language of this section. (See Opposition at 3 n.5; McCardle Decl. Exs. A, B.)

The language tracking this section is found in the Certification Letter signed by Merrill Lynch, not in FGIC's Certification Letter. (See McCardle Decl. Exs. A, B.)   Even if Merrill Lynch's Certification Letter can be characterized as demonstrating FGIC's belief that LSED was receiving a qualified guarantee, however, the language in the Treasury Regulations does not equate with a guarantee of thirty years of credit enhancement.  At most, the parties anticipated that the "present value of the fees for the guarantee w[ould] be less than the present value of the expected interest savings on the issue as a result of the guarantee." 26 C.F.R. § 1.148-4(f)(2) (emphasis added).  Expectations are distinct from guarantees.  In light of the Commitment Letters' explicit warning that FGIC's credit ratings were not guaranteed, LSED's supposed belief that the Treasury Regulations language equated with a guarantee of credit enhancement was not reasonable.

Finally, LSED argues that the principal cause of the agreement has failed because LSED mistakenly believed that FGIC was following a "remote loss" underwriting standard when FGIC was actually engaging in risky activity. (Compl. ¶¶ 85, 157-58.) LSED points to statements in FGIC's 2005 Annual Review that FGIC would "maintain [its] market position as the triple-A insurer with the safest book of insured business[,] . . . be highly selective about [] market opportunities[,] . . . [and] actively manage concentrations of risk." (Compl. ¶ 85.)

Courts have frequently held this type of "general and vague" language to be inactionable corporate puffery. See NPS, 2010 WL 723786, at *5-6, *8-9 (holding that Ambac's statements regarding its "focus on comprehensive risk management," adherence to guaranteeing only those obligations that were "of investment grade quality with a remote risk of loss," status as "conservative compared to other bond insurers," and adherence to a "time-tested business model of stringent underwriting practices" were inactionable as fraudulent misstatements because they were not coupled with any specific policies or statements of fact); Water Works, CV-09-AR-2296-S, slip op. at 12-13 ("Statements that an insurer is 'very cautious' or has 'rigorous underwriting standards' do not lend themselves to" being proven true or false unless they are accompanied by facts.).  Neither the Commitment Letters nor the Policies contained promises to

maintain a particular approach to risk.  Rather, as detailed

above, the Commitment Letters explicitly stated that FGIC's

ratings could be downgraded by the credit ratings agencies.

Given this language in the parties' agreement, LSED's reliance

on general statements in FGIC's 2005 Annual Review was

unreasonable. See Miller v. Loyola Univ. of New Orleans, 829

So.2d 1057, 1062 (La. App. 4th Cir. 2002) (holding that reliance

on a class description in a law school brochure was

unreasonable).

In sum, thirty years of guaranteed credit enhancement

through FGIC's maintenance of its triple-A ratings was "a

calculated risk, a motive, but not a cause." St. Charles

Ventures, 265 F. Supp. 2d at 695.  LSED was a sophisticated

business entity experienced in the issuance of bonds.  If LSED

believed that it was purchasing the Policies only because FGIC

was going to maintain its triple-A ratings for thirty years, it

should have questioned FGIC's disclosure language explicitly

declining to guarantee its ratings.  LSED instead acquiesced in

including the disclosure language in the Bonds.  Given these

circumstances, LSED cannot rescind its agreement on a failure of

cause theory.

### B. Breach of Contract

LSED's twelfth cause of action alleges that FGIC breached

the parties' contract.  FGIC's part of the alleged bargain was

to "provide credit enhancement over the 30-year life of the Bonds," which required FGIC "to issue LSED an insurance policy . . . and maintain its 'triple-A' rating over the 30-year life of the Bonds." (Compl. ¶ 293.)  In exchange, LSED paid FGIC a $13 million upfront premium. (Id.)

The Commitment Letters set forth FGIC's promise to issue the Policies once certain conditions were met. (See Brandt Decl. Exs. I, J.)  Attached to the Commitment Letters were specimens of the Policies as well as a Statement of Insurance related to the Policies that LSED was to include in the Bonds.  The specimen for the Municipal Bond New Insurance Policy stated that FGIC "unconditionally and irrevocably agree[d] to pay to U.S. Bank Trust National Association or its successor, as its agent (the "Fiscal Agent"), for the benefit of Bondholders, that portion of the principal and interest on the above-described debt obligations (the "Bonds") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer." (Id. Ex. I.)  The specimen for the Municipal Bond Debt Service Reserve Fund Policy contained similar language whereby FGIC "unconditionally and irrevocably agree[d] to pay the paying agent" the principal and interest on the Bonds that became due for payment but was unpaid by LSED. (Id. Ex. J.)  The Statement of Insurance stated that "Financial Guaranty hereby unconditionally and irrevocably agree[d] to pay for disbursement

to the Bondholders that portion of the principal or accreted value (if applicable) of and interest on the Bonds which is then due for payment and which the issuer of the Bonds (the "Issuer") shall have failed to provide." (Id. Ex. I.)  The Policies that FGIC issued contained the same language that was found in the specimens. (See id. Exs. D, E.)

LSED argues that FGIC has breached its agreement to provide credit enhancement in two ways: first, FGIC lost its triple-A rating in January and February 2008, and second, the NYID's November 2009 Order now prevents FGIC from paying any and all claims made under the policy. (See Compl. ¶ 297.)

### 1.  FGIC's Downgrade

Neither the Commitment Letters nor the Policies contain a clause guaranteeing FGIC's triple-A credit ratings or credit enhancement for the thirty-year life of the bonds.  LSED nevertheless argues that an agreement to provide credit enhancement for the life of the bonds can be implied from a number of extra-contractual sources and from a reference to "credit enhanced" bonds in the Commitment for Interest Rate Swap Insurance. (See Opposition at 13-14.)

A similar argument was recently rejected in Water Works Bd. of the City of Birmingham v. Ambac Fin. Group, Inc., CV-09-AR-2296-S, slip op. (N.D. Ala. Apr. 1, 2010).  In that case, the Water Works Board of the City of Birmingham (the "Board")

purchased a surety bond from Ambac for the benefit of the
holders of water and sewer revenue bonds issued by the Board.
See id. at 2.  In June 2008, S&P and Moody's downgraded Ambac's
credit ratings to AA and Aa3; this downgrade required the Board
to deposit $15 million into a reserve fund under the terms of
the bonds' trust indenture. See id. at 3.  The Board then filed
suit against Ambac for breach of contract.

The court dismissed the Board's complaint for failure to
state a claim.  The court noted that the contract did not
contain an express clause requiring Ambac to maintain its
triple-A credit ratings for the life of the bonds. See id. at 5-
6.  Moreover, while Ambac could operate in ways that would
contribute to the maintenance of its high ratings, "[i]t would
defy logic and common sense for Ambac to obligate itself to
maintain for thirty-five (35) years the highest possible credit
rating, when the determination and award of credit ratings are
by separate entities." Id. at 6.  Given the parties'
sophisticated business status, their arms-length negotiations,
and presumed familiarity with the type of transaction, the court
found that it was "not plausible that they inadvertently failed
to include such an important element" in the contract. Id.

Similarly, the court in NPS held that the obligation to
maintain a stable triple-A rating was not an implied condition
of NPS's obligation to perform under the parties' agreement. See

NPS, 2010 WL 723786, at *12.  The agreement contained no express
condition requiring Ambac to maintain its ratings and also had
an integration clause. See id.  Given the agreement's clarity
and the presence of the integration clause, the court held that
"[w]hile Ambac's strong credit rating no doubt played a role in
NPS's ultimate decision to secure Ambac's particular financial
guaranty, such attractions and benefits d[id] not amount to
conditions of the Agreement." Id.

As in Water Works and NPS, neither the Commitment Letters
nor the Policies contained an express provision guaranteeing
thirty years of triple-A ratings.  "When the words of a contract
are clear and explicit and lead to no absurd consequences, no
further interpretation may be made in search of the parties'
intent." La. Civ. Code art. 2046; see Bergeron v. Pan Am.
Assurance Co., 731 So.2d 1037, 1043-44 (La. App. 4th Cir. 1999)
("When a contract can be construed from the four corners of the
instrument without looking to extrinsic evidence, the question
of contractual interpretation is answered as a matter of law.").
The "Official Statement Disclosure Language" clearly and
unambiguously stated that FGIC "did not guarantee the market
price or investment value of the Bonds nor [did] it guarantee
that the ratings on the Bonds w[ould] not be revised or
withdrawn." (Id. Ex. I.)  Given the clarity of this language,
the Court declines LSED's invitation to look outside of the

31

contract for evidence of the parties' intent.  The Commitment
Letters make clear that the parties were contracting for the
issuance of the Policies—not for FGIC to maintain its triple-A
ratings over the life of the bonds.

    The reference to "credit enhanced" bonds in the "Swap Legal
Provisions" attachment to the Surety Bond Commitment Letter does
not change this result.  LSED and Merrill Lynch structured the
Bonds to include a Swap Agreement, which was intended to convert
LSED's floating interest rate payments into fixed-rate
obligations (See Compl. ¶¶ 47, 49, 54, 57, 68.)  As part of the
Swap transaction, LSED purchased a surety bond from FGIC which
insured the payments LSED was to make to Merrill Lynch. (See
Brandt Decl. Exs. G, H.)  In the letter setting out FGIC's
commitment to provide this insurance (the "Swap Commitment
Letter"), FGIC required the incorporation of certain terms into
the Insured Rate Swap Transaction (the "Swap Agreement") entered
into between Merrill Lynch and LSED. (See id. Ex. G at 1 and
¶ 4.)  These terms were laid out in an attachment to the Swap
Commitment Letter entitled "Swap Legal Provisions"; under a
subsection entitled "Assumptions," one of the terms stated that
the transaction would involve a "Municipal Issuer whose
obligations [were] being credit enhanced." (Id. at 1.)

    The reference to "credit enhanced" bonds as an assumption
of the Swap Agreement does not render the terms of the

32

Commitment Letters ambiguous. The reference was intended for inclusion in an agreement between LSED and Merrill Lynch, not in the agreement to issue the Policies or in the Bonds themselves. (See id. Ex. G at 1 and ¶ 4.) Moreover, as with the expectation that the Bonds would be qualified guarantees under the applicable Treasury Regulations, FGIC's assumption that the Bonds were being credit enhanced at the time the Swap Agreement was entered into does not imply that FGIC was guaranteeing that it would maintain its triple-A ratings for the following thirty years. "The rules of construction do not authorize a perversion of the words or the exercise of inventive powers to create an ambiguity where none exists or the making of new contract when the terms express with sufficient clearness the parties' intent." Campbell v. Melton, 817 So.2d 69, 76 (La. 2002). The language in the Commitment Letters is clear: FGIC did not guarantee the maintenance of its triple-A ratings. (See id. Ex. I.)

In sum, the Commitment Letters do not contain an express clause guaranteeing FGIC's maintenance of its triple-A ratings for the life of the Bonds. Both LSED and FGIC were sophisticated business entities. Had the parties intended such a term, they could have included it in their agreement. They did not, and the Court may not now imply such a term in the parties' agreement.

## 2. **Anticipatory Breach of the Promise to Pay Claims**

LSED also argues that FGIC's inability to pay claims under the NYID's November 2009 Order constitutes a breach of the parties' agreement. LSED acknowledges that FGIC has not failed to pay under the terms of the Policies, that LSED remains able to make all interest payments, and that no claims have yet been submitted to FGIC. (See Opposition at 12; Tr. 6:3-7.) LSED nevertheless argues that FGIC has committed an anticipatory breach of its promise "unconditionally and irrevocably" to pay the principal and interest "which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer." (Municipal Bond New Insurance Policy, Brandt Decl. Ex. I.)

"[A]n anticipatory breach of contract is actionable in Louisiana." Marek v. McHardy, 101 So.2d 689, 695 (La. 1958). "The doctrine of anticipatory breach applies when an obligor announces he will not perform an obligation which is due sometime in the future." Ken Lawler Builders, Inc. v. Delaney, 837 So.2d 1, 7 (La. App. 2d Cir. 2002). "Accordingly, in order for the doctrine of anticipatory breach to apply, evidence must be presented to show an express repudiation of the [obligation]." Id. "[A] definitive refusal to perform obviates the necessity of a formal putting in default as a prerequisite to recovery by the obligee." Andrew Dev. Corp. v. West Esplanade Corp., 347 So.2d 210, 213 (La. 1977).

34

FGIC has not expressly repudiated its obligations under the parties' agreement.  While the NYID Order has temporarily suspended the payment of claims while FGIC attempts to restore its capital surplus, the Policies remain outstanding, and FGIC has not expressly renounced its obligation to pay out on any claims submitted by the Bondholders. Compare Fertel v. Brooks, 832 So.2d 297, 302 (La. App. 4th Cir. 2002) (Anticipatory breach occurred where an individual stated on two occasions that he would not pay someone under the terms of a monthly payment agreement because he wanted the payee to "sue [him]" to get the money).

Moreover, there are no definite due dates for payment during the pendency of the NYID Order.  While FGIC might be presented with a claim for payment before June 15, 2010, it might not.  In the absence of an express repudiation and a certain due date for performance, the allegations in the Complaint do not amount to an anticipatory breach of the parties' agreement.[4] See Pittman v. Standard Ins. Co., Civil

---

[4] The Court also rejects LSED's argument, made in passing, that FGIC's defense should fail because it is in bad faith. (See Opposition at 12.) "Good faith shall govern the conduct of the obligor and the obligee in whatever pertains to the obligation." La. Civ. Code art. 1759. Moreover, "[c]ontracts must be performed in good faith." La. Civ. Code art. 1983. However, "[t]he term bad faith means more than mere bad judgment or negligence, it implies the conscious doing of a wrong for dishonest or morally questionable motives." Weysham v. Harney, 518 So.2d 1059, 1061 (La. App. 4 Cir. 1987). FGIC is currently

35

Action No. 07-3790, 2009 WL 113292, at *9-10 (E.D. La. Jan. 15, 2009) (rejecting claim for anticipatory breach of an insurance contract where it was possible that claim-triggering medical condition could improve in the future).

### C. Detrimental Reliance

LSED's thirteenth cause of action alleges damages as a result of LSED's reliance on FGIC's promises to provide credit enhancement for the life of the bonds, to maintain its creditworthiness, and to maintain its triple-A rating by practicing conservative underwriting standards. (See Compl. ¶¶ 299-303.)  These promises were allegedly conveyed to LSED by FGIC's statements, promotional literature, and agents' representations. (Id. ¶ 302.)

> A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

La. Civ. Code art. 1967.  A plaintiff alleging detrimental reliance must establish (1) a representation by conduct or word, (2) justifiable reliance on the representation, and (3) a detrimental change in position because of the reliance. Babkow

prevented from paying any claims pursuant to the NYID's Order. During the pendency of this Order, FGIC is working to restore its capital surplus. (See Brandt Reply Decl. Exs. B-D.) These facts do not suggest dishonesty or conscious wrongdoing.

36

v. Morris Bart, P.L.C., 726 So.2d 423, 427 (La. App. 4th Cir.
1998).

The clarity with which the Commitment Letters disclosed
that FGIC's credit rating was subject to change compels the
conclusion that LSED cannot benefit from the theory of
detrimental reliance. "An unambiguous contract may be
interpreted as a matter of law." Drs. Bethea, Moustoukas and
Weaver LLC v. St. Paul Guardian Ins. Co., 376 F.3d 399, 404 (5th
Cir. 2004) (citing Rutgers v. Martin Woodlands Gas Co., 974 F.2d
659, 661 (5th Cir 1992)). Under Louisiana law, courts have
found "reliance on promises made outside of an unambiguous,
fully-integrated agreement [to be] unreasonable as a matter of
law." Id.

In Drs. Bethea, for example, the plaintiffs were former
policyholders of a medical malpractice policy. See id. at 401.
The policy provided, inter alia, for free tail coverage if the
holder retired during the policy's term. See id. at 401-02. The
insurance provider subsequently notified policy holders that it
was exiting the market; the plaintiffs alleged that a letter
sent in connection with this notice promised to provide free
tail coverage to any holder who retired without mentioning the
limitation in the policy that the retirement had to occur during
the policy's term. See id. at 402. The Court of Appeals
affirmed the district court's dismissal of the complaint on the

grounds that the plaintiffs failed to state a claim for
detrimental reliance. "Given that the insurance policy
unambiguously define[d] the parties' rights and limit[ed] the
way to alter the policy, it was unreasonable to rely on informal
documents as modifying material aspects of the policy." Id. at
405.

LSED correctly notes that unlike the contract in Drs.
Bethea, the Commitment Letters did not contain an integration
clause. However, LSED does not point to any Louisiana authority
stating that reliance cannot be held unjustified as a matter of
law in the absence of an integration clause.[5] Moreover, the
integration clause in Drs. Bethea did not appear to be a
necessary part of the Court's holding that reliance was
unreasonable as a matter of law. See 376 F.3d at 405-06
(discussing why reliance was unreasonable in light of "[t]he
clarity of the policy and the informality of the [alleged
promise]" and then discussing why the presence of the
integration clause "also ma[d]e reliance unreasonable"); id. at
407 ("In light of the unambiguous contract, the integration
clause, and caselaw providing that reliance on extra-contractual
representations are unreasonable as a matter of law when the
parties' rights and obligations are clearly defined by contract,

---

[5] LSED does point to several cases where there was no evidence of
an integration clause, but these cases do not discuss
detrimental reliance. (See Opposition 19 n.25.)

the district court did not err in finding that Bethea could not allege reasonable reliance and dismissing the case.").

The Commitment Letters in the instant case were unambiguous: FGIC did not guarantee that it would remain a triple-A rated entity for the life of the Bonds. (See Brandt Decl. Ex. I.)  The Commitment Letters were negotiated by two sophisticated business entities at arm's length and concerned the specific Policies at issue in this litigation.  The statements contained in FGIC's Annual Reviews, press releases, and website, by contrast, were advertising and promotional statements directed to the market as a whole. See Compl. ¶¶ 79-88.)  As discussed above in Section IV.A., these marketing materials were too general reasonably to rely on in light of the clarity of the parties' written agreement and the nature of the credit rating system.  See Miller v. Loyola Univ. of New Orleans, 829 So.2d 1057, 1062 (La. App. 4th Cir. 2002) (holding unreasonable a student's reliance on a general course description advertising a class); Water Works Bd. of the City of Birmingham v. Ambac Fin. Group, Inc., CV-09-AR-2296-S, slip op. at 6 (N.D. Ala. Apr. 1, 2010) ("It would defy logic and common sense for Ambac to obligate itself to maintain for thirty-five (35) years the highest possible credit rating, when the determination and award of credit ratings are by separate entities."); NPS, LLC v. Ambac Assurance Corp., --- F. Supp.

2d ----, No. 08 Civ. 11218 (DPW), 2010 WL 723786, at *12 (D. Mass. Feb. 25, 2010) (There was "no indication that NPS's decision to enter the Agreement was or could reasonably have been premised on the basic assumption that Ambac's credit rating would not be reduced" because the rating was determined by outside agencies at periodic reviews, a fact that NPS disclosed to the bondholders.).

### D. Unjust Enrichment

LSED's final cause of action against FGIC alleges that FGIC was unjustly enriched by the acceptance of LSED's premium payment. A claim for unjust enrichment is not available where there is an enforceable contract. Edwards v. Conforto, 636 So.2d 901, 907 (La. 1993); La. Civ. Code art. 2298 ("The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment."). Because LSED cannot establish a failure of cause, the Commitment Letters remain enforceable and LSED cannot succeed on its unjust enrichment claim.

### Conclusion

For the reasons stated above, FGIC's motion to dismiss the eleventh, twelfth, thirteenth, and fourteenth causes of action in the Complaint [dkt. no. 74] is GRANTED. Prior to the filing of the motion to dismiss, Plaintiff was given the opportunity to

40

correct deficiencies pointed out by Defendants. Plaintiff availed itself of this opportunity prior to serving the Third Amended and Supplemental Complaint with the understanding that no further amendments would be permitted.  In addition, the grounds for dismissal set forth above demonstrate that further amendment would be futile.  Accordingly, the dismissal is with prejudice.


SO ORDERED:

DATED:    New York, New York
          May  11 , 2010

                              _Loretta A Preska_
                              LORETTA A. PRESKA, Chief U.S.D.J.